# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | **CORRECTED VERSION** |
| | ) | |
| Defendant, | ) | |

---

## APPENDIX TO
## OPENING BRIEF IN SUPPORT OF
## DEFENDANT DELAWARE PARK LLC'S
## MOTION FOR SUMMARY JUDGMENT

---

POTTER ANDERSON & CORROON LLP
Wendy K. Voss (#3142)
Jennifer Wasson (#4933)
Hercules Plaza - 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000

*Attorneys for Defendant Delaware Park LLC*

Dated:  November 27, 2007
832838v1 / 14672-132

## TABLE OF CONTENTS

Affidavit of Shannon DeLucia
Executed November 27, 2007................................................................................A1

Affidavit Of Karlyn Dixon
Executed November 26, 2007..............................................................................A13

Affidavit of Beverly Pope
Executed November 26, 2007..............................................................................A22

Excerpts from the Deposition of Sami Almakhadhi
Taken November 8, 2007....................................................................................A27

Excerpts from Plaintiff's Responses to Defendant's First Request for Production
Dated August 14, 2007 ....................................................................................A136

Excerpts from Plaintiff's Responses to Defendant's First Set of Interrogatories
Dated August 14, 2007 ....................................................................................A144

Excerpts from Plaintiff's Responses to Defendant's First Request for Admissions
Dated August 14, 2007 ....................................................................................A149

Excerpts from Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories
Dated October 4, 2007 .....................................................................................A156

Excerpts from Defendant's Responses and Objections to Plaintiff's First Requests For Admission,
Dated October 4, 2007 and Supplemental Letter Responses Dated November 5, 2007 ....A162

Charge of Discrimination filed by Sami Almakhadhi
Dated April 26, 2006.........................................................................................A169

Delaware Department Of Labor Final Determination and Right to Sue Notice
Issued September 29, 2006 ................................................................................A171

U.S. Equal Employment Opportunity Commission Dismissal and
Notice of Rights Issued January 16, 2007 ........................................................A173

Excerpts from the Collective Bargaining Agreement
Effective January 18, 2002 through January 18, 2006.......................................A174

Delaware Park's Attendance Policy
DP0122-DP0126...............................................................................................A177

Delaware Park Risk Management Workers' Compensation Policy & Procedure
DP0078-DP0094 ....................................................................................................A182

Job Description, Booth Cashier
Bates No. DP0023....................................................................................................A199

Job Description , Impress Supervisor
Bates No. DP0147....................................................................................................A200

Plaintiff's Employment Application Dated December 19, 2001
Bates No. DP0383-DP0387 .....................................................................................A201

State of Delaware First Report of Occupational Injury or Disease
Dated May 20, 2004
Bates No. DP0039 ................................................................................................. A206

Christiana Care Family Medical Center Report of Examination of Plaintiff
Dated March 12, 2004
DP0040-DP0041 .....................................................................................................A207

Plaintiff's 2005 Attendance Record
Bates Nos. DP0539a-DP0539aa ............................................................................ A209

Plaintiff's Request for Transfer to Main Bank Position
Dated January 16, 2005 and Interview Notes
Bates Nos. DP00245-DP00246................................................................................A211

Plaintiff's Request for Transfer to Impress Supervisor Position
Dated January 30, 2005 and Interview Notes
Bates No. DP0284....................................................................................................A213

Mid Atlantic Spine Report Regarding Plaintiff's Restrictions
Dated May 17, 2005
Plaintiff's Deposition Exhibit No. 4 .......................................................................A214

Plaintiff's Request for Transfer to Impress Supervisor Position
Dated August 11, 2005
Bates No. DP0376-DP0382 .....................................................................................A215

Plaintiff's Acknowledgment Form of Interview for the Position of Impress Supervisor
Dated August 18, 2005
Bates No. DP0500 ................................................................................................. A222

Notes of Meeting with Plaintiff
Held February 18, 2005
Bates No. DP0027....................................................................................................A223

Human Resources Incident Report
Dated February 22, 2005
Bates Nos. DP0030-DP0032..............................................................A224

Human Resources Incident Report
Dated March 15, 2005
Bates No. DP0033-DP0035 ...............................................................A227

Emails Regarding Plaintiff's Status
Dated April 2005
Bates Nos. DP0661-DP0662..............................................................A230

Letter to Plaintiff
Re:  FMLA approved for the period April 13, 2005 until June 13, 2005
Dated May 5, 2005
Bates No. DP0042............................................................................A232

Dr. Bohutiak's Note Releasing Plaintiff to Full-Time Full Duty Work
Dated June 12, 2005
Bates No. DP0660............................................................................A233

Plaintiff's Staff Performance Review
Evaluation Period Ending July 18, 2005
Bates Nos. DP0036-DP0038..............................................................A234

Emails Between S. DeLucia and K. Dixon Regarding  Plaintiff's Status
Dated August 2005
Bates Nos. DP0106-DP0107..............................................................A237

Emails between Judith Passmore and Shannon DeLucia
Regarding  Plaintiff's FMLA Status and June Release to Work
Dated August 31, 2005
Bates No. DP0043............................................................................A239

Human Resources Incident Report
Dated August 3, 2005
Bates Nos. DP0028-DP0029..............................................................A240

Report of Dr. Townsend of Examination of Plaintiff
Dated August 25, 2005
Bates Nos. DP0777-DP0780..............................................................A242

Letter from George Heckler to Leo West
Regarding defense medical expert report relating to Plaintiff
Dated August 29, 2005

3

Bates Nos. DP0108-DP0111 .................................................................................................. A246

Dr. Leddy's Note Detailing Plaintiff's Restrictions
Dated September 2, 2005
Bates No. DP0105 ................................................................................................................. A250

Emails Regarding Plaintiff's Restrictions
Dated September 2005
Bates Nos. DP0044-DP0047 .................................................................................................. A251

Notes of Surgical Discussion
Dated November 11, 2005
Bates No. DP0049 ................................................................................................................. A255

Dr. Khella Letter Regarding Plaintiff
Dated January 12, 2006
Bates Nos. DP0745-DP0746 .................................................................................................. A256

January 12, 2006 Excerpt from Dr. Khella's Appointment Book
Bates No. DP0781 ................................................................................................................. A258

Emails from B. Pope regarding Plaintiff's return to work status
Dated February 2006
Bates No. DP0100-DP0101 .................................................................................................. A259

Email from A. Sheats to K. Dixon
Re:  Plaintiff's call regarding employment status
Dated February 14, 2006
Bates No. DP0655 ................................................................................................................. A261

Personnel Action Notice Regarding Plaintiff's Termination of Employment
Dated March 10, 2006
Bates No. DP0658 ................................................................................................................. A262

Letter to Plaintiff from Shannon DeLucia
Regarding Plaintiff's Termination from Employment
Dated March 30, 2006
Bates No. DP0052 ................................................................................................................. A263

List of Applicants for the Positions of Main Bank Cashier and Impress Supervisor,
1/2005 – 5/2006
Bates No. DP0204 ................................................................................................................. A264

List of Denials of Light Duty Requests
Bates No.DP0099 ........................................................................................ A265

List of Employees Terminated from Employment after
Exhaustion of Leave
Bates No. DP0061 ....................................................................................... A266

Letters of Termination of Employment, Employees Terminated for
Exhaustion of Leave
Bates Nos. DP0149-DP0160; DP0669-DP670 ...................................................... A267

Documentation of Plaintiff's Family Medical Leave
Including Correspondence, Applications and Certifications
2004-2005
Bates Nos. DP0890-DP0918.............................................................................A281
Undated letter from Plaintiff to Whom It May Concern,
Re: FMLA Exhaustion and Question on Eligibility
Plaintiff's Deposition Exhibit No. 19 ...............................................................A310

Plaintiff's 2005 FMLA Certification
Pl. Dep. Ex. 2 ...........................................................................................A311

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

SAMI ALMAKHADHI,           )
                               )
          Plaintiff,      )     Civ. A. No. 07-78-JJF
                               )
          v.              )
                               )
DELAWARE PARK,         )
                               )
          Defendant,   )

**AFFIDAVIT OF SHANNON DELUCIA**

STATE OF DELAWARE      )
                          ) ss.
COUNTY OF NEW CASTLE  )

      I, Shannon DeLucia, being duly sworn this 27th day of November, 2007, do depose and say:

1. My name is Shannon DeLucia. I am employed by Delaware Park Management Company LLC (successor to Delaware Park LLC, collectively "Delaware Park" or the "Company") as the Vice President of Human Resources.

2. During the time period relevant to Mr. Almakhadhi's allegations, I served in the position of Director of Risk Management. In February 2006, I also was appointed to serve as Executive Director of Human Resources. Subsequently, the position of Director of Risk Management ceased to exist, but was incorporated into the role of Executive Director of Human Resources. On December 17, 2006, I was promoted to the position of Vice President of Human Resources. As the Director of Risk Management, among other duties, I was responsible for monitoring worker's compensation claims filed by the

1

Company's employees and overseeing the Company's return-to-work and light duty procedures.

3. Generally, when an employee of Delaware Park is injured at work, we attempt to get the employee back to work as soon as possible while working with the employee to ensure that he or she does not engage in activities that might exacerbate the injury. If employees are released to work by their treating physicians under restriction, the Company will provide light duty work consistent with those restrictions, **if** such work is available. Even then, employees are advised that such assignments are by definition temporary, and that the Company cannot ensure that it will have light duty work available. When such work is available, employees are explicitly informed (and are required to sign a document acknowledging) that they are responsible for complying with all such restrictions. If an employee fails to comply with his/her doctor's restrictions, which obviously could put the employee at risk for further injury, the employee is not permitted to perform further light duty work and may only return to work upon presentation of a full release from the treating physician.

4. In 2005, Mr. Almakhadhi claimed to have suffered a workplace injury to his back that resulted in his being out of work from April 13 until June 13, 2005, with the possible exception of a few days. However, at the time it was not apparent to me or his supervisors that he in fact had suffered this injury at work. When he reported his injury, Mr. Almakhadhi indicated that he had a herniated disc from a previous back injury. Therefore, it appeared that he suffered from a pre-existing condition, not a bona fide work-place injury. Further, Mr. Almakhadhi had filed a prior claim for workers' compensation for a back injury in May 2004, which was denied because an MRI taken a

**A2**

few weeks prior to his claim similarly revealed that he had ongoing back problems and had received treatment for his back previously. In light of this information, and because I did not have any new information indicating that Mr. Almakhadhi's injury was the result of his work at Delaware Park, I agreed with our insurer's initial decision to deny Mr. Almakhadhi's workers' compensation claim, subject to further investigation.

5.  On April 29, 2005, Mr. Almakhadhi came to the Risk Management Department complaining that his workers' compensation claim had been denied. Although Mr. Almakhadhi claimed that he had injured his back at Delaware Park, as discussed above, we did not have any documentation or other evidence showing that he hurt his back at work. We referred Mr. Almakhadi to the Benefits Department to discuss his options regarding a non-work related injury, since Mr. Almakhadhi was not eligible for light duty work. (Pursuant to Delaware Park's Modified Duty Program, light duty work is available only to those employees who are injured on the job.) Mr. Almakhadhi applied for and was granted FMLA leave for this time period. He fully exhausted his FMLA leave immediately before returning to work on June 14, 2005. At that time, he returned to his regular position, and to the best of my knowledge performed all of his regular duties. I learned later that when he returned to work, he presented a note from his doctor (but not the same doctor who had provided his FMLA certification) stating that he was fully released to work.

6.  On or about August 29, 2005, I received a report regarding the results of a defense medical examination of Mr. Almakhadhi that had been conducted at the request of Delaware Park's attorney responsible for defending the worker's compensation suit brought by Mr. Almakhadhi. That report, from Dr. Townsend, agreed that Mr.

Almakhadhi had injured his back at work in December 2003 and that this injury and his current complaints were related to his employment at Delaware Park. Given Dr. Townsend's report and my understanding of the worker's compensation system, I then believed (i.e., as of the date I reviewed the report) that Mr. Almakhadhi's back injury was a compensable worker's compensation claim, and acted in accordance with that understanding. In September 2005, I approved the workers' compensation insurance coverage provider's recommendation to increase the reserves on this case, which effectively communicated my approval of Mr. Almakhadhi's claim. I was later advised by the insurance provider that the claim was formally processed and accepted on or about October 31, 2005. Mr. Almakhadhi's claim was resolved without resort to a court hearing, and to the best of my knowledge Mr. Almakhadhi has received and is receiving all workers' compensation benefits to which he is entitled, including payment for all time missed from work since April 2005.

7. In discussing Mr. Almakhadhi's workplace injury, Dr. Townsend's defense medical examination report also advised that Mr. Almakhadhi had been placed under certain restrictions by his treating physician. Dr. Townsend agreed that such restrictions were both necessary and appropriate. The restrictions included limited lifting, standing, walking, bending, and twisting, and apparently had been imposed up to several months prior to Dr. Townsend's report by Mr. Almakhadhi's own physician.

8. This information regarding Mr. Almakhadhi's work restrictions was in conflict with the information that had been provided by Mr. Almakhadhi upon his return to work the prior June (i.e., that he was fully released for work). Therefore, I immediately got in touch with his department director, Karlyn Dixon, to see if she was aware of any restrictions

that had been imposed on Mr. Almakhadhi. She was not, and reported that Mr. Almakhadhi had been performing his job and had not mentioned being under any restrictions.

9. I told Shari Cartwright, the Claims Coordinator, to instruct the Cage Department to send Mr. Almakhadhi home. Mr. Almakhadi was to remain out of work until he provided a doctor's note to the Risk Management Department dated August 25, 2005 or later specifying what, if any, restrictions he might have. Thereafter, Mr. Almakhadhi came to the Risk Management Department, where he was told what was required of him before he could return to work. Mr. Almakhadhi disputed the notion that he needed work restrictions and stated that he was working his regular job.

10. On or about September 2, 2005, Mr. Almakhadhi provided his doctor's note, confirming the various restrictions listed above. These restrictions were completely inconsistent with the requirements of his position, and it was clear that he would not be able to perform his regular job duties while subject to such restrictions.

11. Shortly thereafter, I again discussed the situation with Ms. Dixon. She was in agreement that Mr. Almakhadhi's restrictions prohibited him from performing nearly all of his job duties and that it would be difficult to identify any appropriate, light duty work, and also was concerned that he might continue working outside his restrictions. In light of her comments, and my concern that he purposefully had violated his doctor's restrictions for a period of several months, I felt it was in the Company's best interests not to assign him to light duty (and which in any event would be difficult to identify and perhaps unavailable). As a matter of course, Delaware Park does not assign light duty work to those employees whose conduct has violated safety rules or who are not forthright about

the nature and/or extent of their injuries. I did not want Mr. Almakhadhi to continue to work in excess of his restrictions and exacerbate his injury, and I believed that there was a real risk that he would do so judging from the information available to me at the time. The fact that Dr. Townsend recommended surgery as a reasonable and necessary treatment for Mr. Almakhadhi's back condition confirmed in my mind the serious nature of his injury and the potential problems that could result from his continuing to work. Furthermore, in light of the physical requirements of the jobs of all employees in the Cage Department, there is very little, if any, light duty work that is available. Even if Mr. Almakhadhi's restrictions had not been so severe it still would have been difficult to find a light duty placement for him unless we created such a position. Since Mr. Almakhadhi already had been working for nearly two and a half months when it appeared he should have been subject to restrictions (and light duty assignments generally are limited to a period of 90 days), that did not seem appropriate. Since it was my understanding that Mr. Almakhadhi would now receive compensation through our worker's compensation insurance provider, I did not think he would be disadvantaged by this decision.

12. Thus, based on my conversation with Karlyn Dixon and the other information available to me, I felt I could not offer light duty work to Mr. Almakhadhi, and I instructed his department management that Mr. Almakhadhi should be informed that he could not return to work until his medical situation was reevaluated or he was released by his physician to full duty. That same day, September 2, 2005, Ms. Cartwright told Mr. Almakhadhi that he would not be permitted to continue working and that he should call in every day during his absence period and so long as he continued to be subject to restrictions, which was consistent with Delaware Park's attendance policy. In response

to Mr. Almakhadhi's questions regarding the availability of light duty work, and because he seemed unwilling to accept the decision that he would not be offered a light duty assignment, Ms. Cartwright also told him that he could discuss these issues with his department when he called in to work or consult his workers' compensation attorney. During this absence period, Mr. Almakhadi received all the health and welfare benefits to which he was entitled.

13. Mr. Almakhadhi never was released to full duty.  However, Delaware Park was later informed that he was scheduled to have surgery in November 2005 to remedy his back problem.  At that point, I decided to wait to reevaluate his situation until after the surgery. Assuming that he received medical clearance at that time, I anticipated and intended that he would return to work.  In early December 2005,  however, I learned that Mr. Almakhadhi had declined to have the surgery performed, and had also declined certain other treatments recommended by his physician, and that his medical condition had not changed.

14. In early February 2006, when we had received no further information regarding Mr. Almakhadhi's situation, I instructed his department managers to give Mr. Almakhadhi a deadline of February 12, 2006 to return to work, and told them to tell him that a full release from his physician would be required.  His management reported back to me that Mr. Almakhadhi first said that he would be returning to work and would provide a release, but later stated that he would not be returning to work because his physician would not release him and that he was unable to perform his job duties.

15. Based on this report by Mr. Almakhadhi, I made the decision to terminate his employment.  His department managers needed to fill the position, and there was no

7

**A7**

expectation at that point that Mr. Almakhadhi would be returning to active work. My decision to terminate Mr. Almakhadhi was consistent with Delaware Park's policy of discharging those employees who remain unable to return to work after they have exhausted all available leave time.

16. On or about March 10, 2006, I spoke to Mr. Almakhadhi by telephone. In that conversation, I advised him that his employment had been terminated effective February 12, 2006. He told me that he had not received written or other notice of his termination. The usual practice of Delaware Park's Human Resources Department is to complete its administrative process, including sending a letter to the employee providing written notice of termination, shortly after the effective date of termination. Such a letter should have been sent to Mr. Almakhadhi when Delaware Park went through its administrative process of documenting the termination. However, there had been some turnover and transition in the Human Resources Department around this time period. I had assumed that the outgoing Director of Human Resources, Micki Nardo, had completed the administrative process with regard to Mr. Almakhadhi's termination before her departure from Delaware Park. Apparently she had not done so, and the new Vice President of Human Resources, Diane Joseph, apparently had failed to do so as well.

17. Because Mr. Almakhadhi had not received notice in accordance with normal company procedure, I decided to modify his termination date to the time when he reasonably was on notice of the termination as a courtesy. Since that date had not yet been determined and I needed to investigate this matter further, I advised Mr. Almakhadhi only that his termination date would be modified. After I confirmed that no one in Human Resources

**A8**

had sent him a termination letter, I concluded that Mr. Almakhadhi had not been on notice of the termination until I talked with him on March 10, 2006.

18. Thereafter, I tried several times to contact Mr. Almakhadhi to advise him that his termination date would be modified to March 10, 2006, but I was not successful in reaching him. On March 30, 2006, I was advised by a member of Delaware Park's Benefits Department that Mr. Almakhadhi had incurred medical expenses in the month of March 2006 which had been denied by the insurance carrier. In order to finally conclude the matter and to ensure that Mr. Almakhadhi's benefits would be extended through the end of March, I sent him a letter that day which provided him with written notice that his employment was terminated effective March 10, 2006. However, given that my initial decision to terminate Mr. Almakhadhi was made on February 12, 2006, certain of Delaware Park's internal records, including its employee database, were not updated and continue to show that Mr. Almakhadhi was terminated effective February 12, 2006.

19. When I made the decision regarding light duty and to terminate Mr. Almakhadhi's employment, I was completely unaware that he had made complaints of discrimination in the past. As Director of Risk Management, I did not usually become involved with employee complaints of discrimination, and I was not involved with investigating Mr. Almakhadhi's discrimination complaints or otherwise aware of them. I only became aware of these complaints as a result of the investigation of the allegations made by Mr. Almakhadhi in his Charge of Discrimination, which he filed after his termination, on April 26, 2005.

20. I deny absolutely that I made any decisions concerning Mr. Almakhadhi on the basis of his race or national origin, any alleged disability, workers' compensation or FMLA

9

**A9**

status, or any other prohibited basis. Based on what I knew at that time, I believed light duty was inappropriate for Mr. Almakhadhi due to the very significant limitations on his physical activities, his apparent violation of these restrictions over a period of time, and his failure to even advise the Company that he was subject to such restrictions. As stated above, if the Company becomes aware that an employee is violating his or her work restrictions, that employee will be sent home – which was exactly the result with Mr. Almakhadhi. The fact that Mr. Almakhadhi had these significant work restrictions, however, did not mean he was disabled in any way, and I did not regard him as such. Mr. Almakhadhi performed his regular job duties from the time he returned to work from his medical leave in June 2005 until his last day of active employment in late August 2005.

21. The decision to terminate Mr. Almakhadhi's employment was based on the need to fill the position, coupled with the fact that Mr. Almakhadhi had exhausted all available leave, and the lack of any information indicating that Mr. Almakhadhi might return to work in the near future.

22. To the extent Mr. Almakhadhi alleges that he was treated differently than other similarly situated employees, I deny that that is the case. To the best of my knowledge, no employee who works in violation of their restrictions or otherwise provides questionable information to the Company in regard to their worker's compensation claims is assigned to light duty or, as the case may be, permitted to continue in light duty status. Ultimately, in my role as Director of Risk Management, I was responsible for all such decisions. While I consulted with the responsible supervisors in a given case, the authority and responsibility for managing employee's worker's compensation claims, including decisions regarding the grant or denial of light duty assignments was mine, and if a

situation was questionable it was my practice to limit the risk to the Company by declining to provide light duty assignments.

23. I assisted Delaware Park's attorney in preparing the initial and supplemental responses to Mr. Almakhadhi's Charge of Discrimination. The documents Delaware Park submitted to the Delaware Department of Labor in connection with that Charge were true and accurate to the best of my knowledge, based on the information available to me at the time.

24. Since the Company does not keep records specific to the denial of light duty, I must rely on my memory to identify such employees. Based on my best recollection at the time, I assisted our attorney in preparing a chart of individuals who, like Mr. Almakhadhi, had been denied light duty assignments (or the continuation of such assignments) for submission to the Delaware Department of Labor in conjunction with the investigation of Mr. Almakhadhi's Charge of Discrimination. While I now realize there were some errors in the chart (e.g., Kristy Dow was listed as "Kristy Dowell" and then mistakenly referred to as "Ms. Minus"), that chart nonetheless identifies individuals as to whom I did not authorize light duty. Such denials were based on the availability of this work, questions about the employees' safe work practices, withholding of information from Delaware Park, or because they had received light duty for (or beyond) the normal 90-day period and pursuant to our procedures it was no longer appropriate to provide them with such work. In short, I did not single Mr. Almakhadhi out, and he was not treated differently than other employees in similar situations.

SHANNON MAGUIRE DELUCIA

11

A11

Dated: November 28, 2007

SWORN TO AND SUBSCRIBED before me the day and year above written.

_____
Notary Public

CINDY A. IRWIN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission expires Aug. 27, 2008

**A12**

12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | |
| | ) | |
| Defendant, | ) | |

### AFFIDAVIT OF KARLYN DIXON

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) ss. |
| COUNTY OF NEW CASTLE | ) |

I, Karlyn Dixon, being duly sworn this _26_ day of November, 2007, do depose and say:

1. I am employed by Delaware Park Management Company LLC (successor to Delaware Park LLC, "Delaware Park" or the "Company") as the Director of Accounting Operations.

2. During the time period relevant to Mr. Almakhadhi's allegations, I served in the positions of Assistant Director of Accounting Operations and, effective March 13, 2005, Director of Accounting Operations. In both these positions, Mr. Almakhadhi, who was a Booth Cashier, ultimately reported to me (through several levels of management). Shift managers to whom he reported included, among others, Darla Cherry, Noel Lafferty, and Mark Joswick. In turn these individuals reported to Stacy Suhr (Assistant Cage Manager). Effective with her hire in May 2005, Mr. Almakhadhi also reported through

1                                                          **A13**

these Shift Managers and Ms. Suhr to Beverly Pope, Cage Manager, and then to myself. Finally, we all reported to Kevin DeLucia, Vice President of Finance.

3.  In 2004, Mr. Almakhadhi applied for and was selected for the position of Satellite Cashier, which was considered a promotional opportunity. He completed the two week training period for the new position, but then exercised his right under the applicable Collective Bargaining Agreement to return to the Booth Cashier position. Like other Booth Cashiers, Mr. Almakhadhi occasionally worked after that on a temporary basis as a Satellite Cashier, but he never formally assumed the position of Satellite Cashier.

4.  In February 2005, Mr. Almakhadhi applied to be a Main Bank Cashier, which again was considered a promotional opportunity. The department managers who reported to me (including Stacy Suhr, Assistant Cage Manager, and the other Shift Managers) came to a consensus that he was not the most qualified candidate. They questioned Mr. Almakhadhi's ability to move into an even more demanding position, when he had turned down the Satellite Cashier position, which he had said was too much for him and did not work with his personal schedule. There were also some lingering concerns regarding his interactions with co-workers, as well as with his management. Mr. Almakhadhi was always convinced that he was right, and everyone else wrong, and although generally good at his job, he could be difficult to deal with at times.

5.  The managers therefore recommended other candidates for the position, and I approved those selections; the selections also were approved by Kevin DeLucia before the decisions were finalized. The successful and the unsuccessful candidates (including Mr. Almakhadhi) for the positions were advised of the decision no later than February 6, 2005 due to the need to post schedules for the upcoming work periods. Schedules are

2                                                                              **A14**

posted one to two full weeks in advance, and always on a Sunday. The successful candidates, began working in the positions on February 13, 2005.

6.  When he was not selected in February 2005 to be Main Bank Cashier, I understand that Mr. Almakhadhi complained to Micki Nardo, Delaware Park's Director of Human Resources, that he had not been selected because of "discrimination" or because I did not like him. That is not true. The selections were made based on the consensus opinion of all the department managers and, while I approved and agreed with those decisions, I did not change the outcome of the selections made by the group. I am confident based on discussions with his managers that the decisions were made without regard to the race, national origin, or other protected characteristics of the individuals involved. Rather, the decisions were made based on a number of factors, including the candidates' work history and relevant experience. While Mr. Almakhadhi was not the first choice for the particular positions he sought, he was encouraged to apply again for the position of Satellite Cashier, which we all felt would be a developmental step in his career and would put him in a better position to compete for even higher level positions. Unfortunately, he did not take that advice.

7.  In any event, I understand that Ms. Nardo found no evidence to support his claim of discrimination and after she had met with him privately she arranged a group meeting that she, Mr. Almakhadhi, Kevin DeLucia and I all attended. The purpose of that meeting was to clear the air and to try to explain once again to Mr. Almakhadhi why he had not been selected for the Main Bank Cashier position and what he might do to enhance his career prospects.

**A15**

8. Despite these efforts, Mr. Almakhadhi did not appear to accept and certainly did not follow our advice. Other employees reported that he intended to apply for various positions, get the initial training, and then withdraw his application – all with the (misguided) intent of gaining sufficient experience in a variety of positions to ultimately be promoted to a supervisory position.

9. Mr. Almakhadhi's final application for a promotional opportunity occurred in August 2005, when he (and several other candidates) applied for an open position at an even higher level (and outside the bargaining unit) as an Impress Supervisor. At that time, in light of his previous complaints and the recent hiring of Ms. Pope as Cage Manager, I assigned Ms. Pope the responsibility of selecting the successful applicant. She interviewed all the candidates and later advised me and Stacy Suhr (who was in my office at the time) that she had discussed her selection with the other Shift Managers reporting to her and that they supported her selection. On Ms. Pope's recommendation, as supported by the Shift Managers, the job went to Penny Payne. Unlike Mr. Almakhadhi, who did not have any of the following qualifications, Ms. Payne had over seven years' supervisory experience, previous experience working in Las Vegas as a Cage Cashier, experience with Delaware Park working on a regular basis as a Satellite Cashier and, while working as a Satellite Cashier, experience working closely with Delaware Park Impress Clerks with whom she had established a positive working relationship.

10. Under all of the circumstances, I agreed Ms. Payne was the candidate with the best qualifications for the job and she was offered the position. Again, while I approved and agreed with the decision, I did not do anything to change the outcome of the selection

**A16**

made by Ms. Pope with the input of the Shift Managers. Again, Mr. DeLucia also
approved the decision made by Ms. Pope.

11. I have no reason to believe that these promotions decisions were denied to Mr.
Almakhadhi because of his race, national origin, alleged disability, or any other improper
factor. Neither Ms. Pope nor any of the other supervisors in the department ever
discussed such matters with me, and I am satisfied that they used sound business
judgment based on the candidates' qualifications in making their recommendations.

12. In regard to his alleged disability, I know only that in 2005 Mr. Almakhadhi suffered a
injury to his back and was out of work for approximately two months beginning in April
2005. At that time, however, I had no information that would substantiate Mr.
Almakhadhi's claim that his injury happened while at work, and it appeared to me that
that was not the case. Therefore, because light duty assignments are only provided to
individuals who suffer a work place injury, Mr. Almakhadhi was advised that we did not
have light duty work for him and was referred to the Human Resources Department (I
believe by Ms. Suhr) so that he could apply for FMLA leave. Later, I believe he was
able to establish that his injury was related to a work place incident, but I am not familiar
with the details of that claim.

13. Mr. Almakhadhi was on leave from mid-April until mid-June. When he returned to work
in June 2005, he provided a full release from his doctor, and returned to performing his
regular job duties. I was not aware of any condition that might be a disability, and since
he was performing his job (which can be quite physically demanding) on a daily basis, do
not believe that he suffers from a disability.

**A17**

14. In late August, however, I was contacted by Shannon DeLucia, who was then Delaware Park's Director of Risk Management, who wanted to know if I was aware of any restrictions imposed on Mr. Almakhadhi by his doctor. I told her I was not and that Mr. Almakhadhi was performing his regular job. Apparently, Ms. DeLucia had been advised that he had some restrictions, and shortly after our conversation she directed that he be sent home until he could provide further clarification from his doctor. Ms. DeLucia and I were both concerned that Mr. Almakhadhi had been working in violation of ongoing medical restrictions, and it did not appear the full release he had provided in June could be reconciled with the information Ms. DeLucia now had about his medical restrictions.

15. From that point forward, Ms. DeLucia was responsible for decisions regarding Mr. Almakhadhi's work status (in regard to his work restrictions, light duty, and worker's compensation claim), and I and the other department managers were no longer involved, other than to consult with Ms. DeLucia and convey information to Mr. Almakhadhi as directed by Ms. DeLucia. That was normal operating procedure, since the management of worker's compensation claims and decisions regarding the status of those individuals who are out of work because of on-the-job injuries is the responsibility of the Risk Management Department.

16. Not too long after our first conversation, Ms. DeLucia and I spoke again to review restrictions confirmed by Mr. Almakhadhi's doctor, and whether as a department we would be able to provide work within those restrictions. I told Ms. DeLucia that the restrictions were quite stringent in light of the job requirements, and that it was unlikely that we would be able to find much for him to do, if we could find anything at all. Ms. DeLucia ultimately made the decision that light duty work would not be offered, and that

6

**A18**

Mr. Almakhadhi would not be permitted to return to work until his medical situation was reevaluated or he was released by his physician to full duty. He did not return to work, and I understand that he never got such a release.

17. In early February 2006, we still had not received any information from Mr. Almakhadhi about his situation, and we therefore asked Ms. DeLucia whether we needed to continue to hold his job. Mr. Almakhadhi had been out of work for a long time, and business demands required that we fill the position. Ms. DeLucia told us to give Mr. Almakhadhi a deadline of February 12, 2006 to return to work, and to tell him that a full release from his physician would be required before he could do so. Ms. Pope provided that information to Mr. Almakhadhi, who ultimately told her that he would not be able to return to work, that he had not been and would not be released by his doctor and was unable to perform his job duties. Ms. DeLucia then made the decision to terminate his employment and let us know that we could fill the position. I was not involved in any of the administrative steps regarding his termination, other than signing the Personnel Action Notice ("PAN").

18. The Personnel Action Notice ("PAN") is a standard form that Delaware Park uses to document any changes in an employee's status, including wage adjustments, changes in position, leaves of absence, and terminations. In completing the PAN form, a series of supervisors must sign off, or "approve", the employment action at issue to indicate their awareness of that action, regardless of their participation in the decision. Individuals required to sign the PAN include the director of the employee's department, departmental vice president, an individual with overall budget responsibility, and a strategic planning representative. Human Resources is also required to sign off, so that all relevant

7

**A19**

departments have been notified of the decision. Pursuant to this standard protocol, I signed the PAN which acknowledged Mr. Almakhadhi's termination as the director of his department. The fact that my name is listed on the PAN form, along with Vice President Kevin DeLucia and several others, does not indicate that any one of us made the decision to terminate Mr. Almakhadhi. Instead, it merely shows that we received notice of the decision and executed the standard paperwork connected with that decision.

19. I never told Ms. DeLucia about Mr. Almakhadhi's complaints of discrimination, both because they were not true and because they had no bearing on the issues surrounding Mr. Almakhadhi's request for light duty or his worker's compensation leave. In fact, I only provided the information requested by Ms. DeLucia, since that was all that seemed relevant.

20. I understand that Mr. Almakhadhi has alleged that I made comments about Americans disliking Arabs at some unknown point in time. These allegations are completely untrue, and I am well aware that, pursuant to Delaware Park's policies and procedures, making such comments would be grounds for the immediate termination of my employment. I deny absolutely that I ever made such comments or that I discriminated in any way against Mr. Almakhadhi on the basis of his national origin or any other impermissible factor.

KARLYN DIXON

Dated: November 26, 2007

8

A20

SWORN TO AND SUBSCRIBED before me the day and year above written.

```
CINDY A. IRWIN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission expires Aug. 27, 2008
```

Notary Public

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | |
| | ) | |
| Defendant, | ) | |

**AFFIDAVIT OF BEVERLY POPE**

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) ss. |
| COUNTY OF NEW CASTLE | ) |

I, Beverly Pope, being duly sworn this ___ day of November, 2007, do depose and say:

1. I am employed by Delaware Park Management Company LLC (successor to Delaware Park LLC, collectively "Delaware Park" or the "Company"). I have been employed by Delaware Park in the position of Cage Manager since May 2005. In that position I have continuously reported to Karlyn Dixon, Director of Accounting, and am responsible for overseeing operations in the Cage Operations Department. The Cage Operations Department is responsible for Delaware Park's money handling functions.

2. Between May 2005 and his termination of employment, Sami Almakhadhi (a Booth Cashier) indirectly reported to me, through various Shift Supervisors who were my direct reports, including Stacy Suhr, Noel Lafferty, Mark Joswick, and Darla Cherry. I met Mr. Almakhadhi in June 2005 when he was returning from leave. Although I was aware he

1

**A22**

had been on leave, I did not know the nature of that leave. When he returned to work, however, he had a full release from his doctor and, to the best of my knowledge, was performing all of his day-to-day duties without complaint. I had absolutely no information, by way of personal observation or otherwise, that Mr. Almakhadhi might suffer from any disability – or even an impairment – as he now claims. In fact, he fully performed his job duties until Ms. DeLucia placed him on leave in September 2005.

3. Based on my observations of Mr. Almakhadhi during day to day operations, that he was fully capable of the money-handling duties associated with his position, but that he lacked certain interpersonal skills. Specifically, Mr. Almakhadhi exhibited a negative attitude at times. He would not look at me when I talked to him and tended to be inflexible in his interactions with others. He held strong opinions and did not appear to consider the input of others (whether his co-workers or supervisors) or the possibility of compromise. He would frequently express disagreement about or question changes to the schedule or to the location of his workstation. While these issues did not create serious concern regarding Mr. Almakhadhi's performance in his role of Booth Cashier, they were areas for development if he wished to advance into a supervisory position with the Company.

4. In August 2005, Mr. Almakhadhi applied for transfer to the position of Impress Supervisor, which was a promotional opportunity. Several other candidates also applied, and I was responsible (in consultation with those managers who reported to me) for deciding who would be awarded the position. That decision was subject to approval (or veto) by Karlyn Dixon and Kevin DeLucia, Vice President for Finance. In making that determination, I first interviewed all the candidates for the position, including Mr.

**A23**

Almakhadhi. In addition to personal interviews, I briefly reviewed their transfer forms, initial employment applications and discipline records to identify any area of concern and to determine if there were areas where further development was needed. I also relied on my day-to-day observations of their performance, and sought feedback from their supervisors.

5.  At the conclusion of that process, it was my opinion that the best candidate for the job was Penny Payne. Ms. Payne was then successfully working as a Satellite Cashier, which is a position at a higher level of responsibility than that of Booth Cashier. As a Satellite, Ms. Payne worked closely with Impress Clerks and had established a positive working relationship with them. In addition, she had a Las Vegas casino background, and had several years of supervisory experience prior to joining Delaware Park. Finally, I was impressed with her responses in our interview and felt she demonstrated the ability to clearly and diplomatically articulate her position, which I felt would serve her well in a supervisory position. In my view, she was far and away the most qualified candidate, and all of the remaining applicants had a significant need for further development before assuming a supervisory role.

6.  My assessment of Mr. Almakhadhi after his interview essentially did not change. He did not convince me that he possessed the skills that would make him successful as a supervisor. In fact, during his interview, Mr. Almakhadhi gave the impression that he felt he was entitled to the job. In light of the significant difference in the level of responsibility between his position as Booth Cashier and that of Impress Supervisor, his lack of experience in the impress area or in any intermediate level position, and his general attitude toward his current job, I did not share that view.

**A24**

7. Prior to making my recommendation to Ms. Dixon, however, I consulted individually with Shift Managers Noel Lafferty, Mark Joswick, and Darla Cherry. I felt it was important to do so since they (in addition to Ms. Suhr) would be working most directly with the individual selected, and because they all had been employed by the Company longer than I and had more experience working with the various candidates.

8. Each of the Shift Managers indicated their agreement with my selection. I then sought out Ms. Suhr, who coincidentally was meeting with Ms. Dixon in her office. Therefore, I advised Ms. Suhr and Ms. Dixon at the same time of that I recommended, and the other Shift Managers agreed, that we should give the position to Ms. Payne. Again, they both indicated their agreement with this selection. Subsequently, the formal approval of Mr. DeLucia was also obtained.

9. In early February 2006, Shannon DeLucia, the Director of Risk Management, told me to contact Mr. Almakhadhi and tell him that he needed to return to work on February 12, 2006 with a full duty release from his doctor. He responded that he needed to contact his doctor and get back to me. When I talked to him a few days later, he said that his physician would not release him to full duty and that he would be unable to return to work.

10. At the time I made this decision to promote Ms. Payne, I had no knowledge that Mr. Almakhadhi had previously complained that he was the victim of discrimination. In fact, I did not even know his national origin, and it did not make a difference to me anyway. I also had no knowledge of Mr. Almakhadhi's workers' compensation claim. While I knew that Mr. Almakhadhi had taken some leave a few months before applying for Impress Supervisor, I did not know the reason why he took the leave, and I did not

4                                                                                    **A25**

consider this leave as a factor in making my decision.  I deny absolutely that I considered

Mr. Almakhadhi's race, national origin, alleged disability, or any other improper factor

when I recommended Ms. Payne for the position.  Neither do I have any reason to believe

that

the Shift Managers considered such factors.  To the contrary, we were seeking the best

qualified candidate for the position and in my view and the collective view of the Shift

Managers that clearly was Ms. Payne.


Beverly Pope


Dated: November 26, 2007
832644

SWORN TO AND SUBSCRIBED before me the day and year above written.


Notary Public

CINDY A. IRWIN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission expires Aug. 27, 2008


A26

5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,                    )
                                    )
            Plaintiff,              )
                                    )    Civil Action
v.                                  )    No. 07-78 (JJF)
                                    )
DELAWARE PARK, LLC,                 )
                                    )
            Defendant.              )

            Deposition of SAMI ALMAKHADHI taken
pursuant to notice at the law offices of Potter,
Anderson & Corroon, LLP, Hercules Plaza, Sixth Floor,
1313 North Market Street, Wilmington, Delaware,
beginning at 9:30 a.m. on Thursday, November 8, 2007,
before Christina M. Vitale, Certified Shorthand
Reporter and Notary Public.

APPEARANCES:

        FRANK J. CONLEY, ESQUIRE
        THE CONLEY FIRM
            7715 Crittendon Street, Suite 133
            Philadelphia, Pennsylvania    19118
            For the Plaintiff


        WENDY K. VOSS, ESQUIRE
        JENNIFER C. WASSON, ESQUIRE
        POTTER ANDERSON & CORROON, LLP
            Hercules Plaza, 6th Floor
            1313 N. Market Street
            Wilmington, Delaware    19899
            For the Defendant


                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A27

**ORIGINAL**

Sami Almakhadhi

6

1    weeks ago.  Then, I stopped.

2        Q.    Why did you stop?

3        A.    The pizza shop is in Marcus Hook and it wasn't

4    a lot of hours, you know, and I didn't know the area

5    so I stopped.

6        Q.    What was your position with the pizza shop?

7        A.    I was doing everything including delivery, you

8    know.

9        Q.    Was there a title for your job?

10       A.    There is no title.  You know, I went there and

11   I worked for week and that's all.

12       Q.    So, you worked for one week?

13       A.    One week.

14       Q.    And that ended approximately two weeks ago?

15       A.    I think, yes.  Ten days, something like that.

16       Q.    You quit voluntarily?

17       A.    Yes.

18       Q.    What was the pay?

19       A.    He paid me for the time.  It was like $200.00

20   for the whole.

21       Q.    For the week?

22       A.    For the whole week, yes.

23       Q.    How many hours did you put in that week?

24       A.    Not many.  I mean, it was flexible hours, you

W&F

**WILCOX & FETZER LTD.**
Registered Professional Reporters

A28

Sami Almakhadhi

7

1   know, sometimes from five to nine, you know, until he

2   closed nine o'clock; but, I didn't know the area and,

3   you know, I wasn't comfortable with the job so I left

4   it, but I have an interview tomorrow.

5       Q.    Just a few more questions on the pizza shop.

6   So, you said some days you worked five to nine

7   approximately.  Was that fairly typical to work four

8   hours?

9       A.    No, he told me he wants me that time.

10      Q.    Okay, I'm just trying to figure out how many

11  hours you worked total during the one week you were

12  there.

13      A.    It was five to nine times maybe six, maybe 30

14  hours.

15      Q.    Thirty?

16      A.    Thirty.

17      Q.    Did you receive tips as well?

18      A.    No.  He took the tips.

19      Q.    And you said you have an interview coming up?

20  He took the tips?

21      A.    Yeah.

22      Q.    Sorry.  You have an interview coming up?

23      A.    Yes.

24      Q.    What is that?



Sami Almakhadhi

8

1    A.    For many jobs, at least, you know, three jobs

2    at least after I had -- I hired my attorney.  I tried

3    to start for a job.  Before that I was -- my

4    employment was practice law, fight for my case.  You

5    know, that's it.

6    Q.    But my question was who do you have an

7    interview with?

8    A.    Tomorrow morning I have school bus with

9    Advance.

10    Q.    Other than the pizza shop was your last

11    employment active employment with Delaware Park?

12    A.    Yes.

13    Q.    Your final position there was booth cashier?

14    A.    Was booth cashier, yes.

15    Q.    Do you recall what your final rate of pay was?

16    A.    When I terminated, it was, I believe, 10.63.

17    Q.    Other than the pizza shop since leaving

18    Delaware Park you haven't performed any other work for

19    pay?

20    A.    No.

21    Q.    In your discovery responses you told me about

22    certain job applications that you made.  I would like

23    to speak about those briefly.

24    A.    Sure.

Sami Almakhadhi

9

1    Q.    In October of 2005 you applied to 7-Eleven, is

2    that correct?

3    A.    Yes.

4    Q.    And the position you applied for was field

5    consultant?

6    A.    For 7-Eleven it was a manager.

7    Q.    That's a manager's job?

8    A.    Manager's job.

9    Q.    At that time you were still employed by

10   Delaware Park, isn't that correct?

11   A.    I'm not sure what time.

12   Q.    I can represent to you or I can show you the

13   letter from 7-Eleven that it was in October of 2005.

14   You were still employed?

15   A.    2005, October of 2005?  They suspend me,

16   Delaware Park, in September '05.  So, in October I'm

17   sure I think I went looking for a job or something.  I

18   tried looking for a job.

19   Q.    When you say they suspended you, did you

20   understand that to be disciplinary in nature?

21   A.    Well, they sent me home without pay, that's

22   suspended.

23   Q.    So, the manager's position would that require

24   you to lift things or perform some of those physical

Sami Almakhadhi

10

1    activities that you needed to perform at Delaware

2    Park?

3      A.    Which position?

4      Q.    The manager's job at 7-Eleven.

5      A.    At 7-Eleven it could be, but it would not be --

6    you know, it could be.  Manager, I was working before

7    as an employee in 7-Eleven.  I have experience, I

8    work, you know, long time for 7-Eleven.

9      Q.    You were familiar with what a manager might be

10   required to do?

11     A.    Yes.

12     Q.    Do managers assist with stocking and kind of do

13   what needs to be done at the moment?

14     A.    I had my own store.  I had, you know, a

15   convenience store like 7-Eleven.  It was in Philly and

16   I was owner and the manager.  So, 7-Eleven, same

17   thing.

18     Q.    But so that would involve at times moving stock

19   around, helping with deliveries, whatever.  So,

20   physical activity was involved in that job?

21     A.    Physical, of course, of course.

22     Q.    At that point in time when you applied were you

23   capable of performing those duties?

24     A.    Yes.

Sami Almakhadhi

11

1    Q.    Then, the next job that you listed that you

2  applied for was with American Infrastructure?

3    A.    Yes.

4    Q.    Do you recall that?

5    A.    Yes.

6    Q.    That was in August of 2006?

7    A.    August 2006.  You have the documents so I

8  cannot recall that.

9    Q.    I'm happy to show it to you.

10   A.    If you have the documents that say '06, that's

11  it.

12   Q.    I don't think we probably need to mark this as

13  an exhibit, but these were all the documents that you

14  produced that related to your applications for

15  employment.  So, here is the one that you gave us for

16  American Infrastructure.

17   A.    Okay.

18   Q.    Apparently that job would involve driving a

19  vehicle where a CDL license was required?

20   A.    Yes.

21   Q.    Do you have a CDL license?

22   A.    I do.

23   Q.    When did you obtain that license?

24   A.    I obtained it in I believe in '05, the end of

Sami Almakhadhi

12

1    '05.

2    Q.    When did you first get your CDL permit?

3    A.    Well, I had permit from Delaware like five

4    years ago.  Then, you know, I did not continue.  Then,

5    I went to Cecil Community College and I got that

6    permit.  I went to school for Cecil Community College.

7    Q.    And that was five years ago that you got the

8    permit?

9    A.    No.  I got the permit from Delaware five years

10   ago before even I think I started Delaware Park.

11   Then, CDL I took it, I went to courses I think it was

12   in '05.

13   Q.    Was that after you were suspended by Delaware

14   Park?

15   A.    I don't recall, but we can, you know, review

16   some -- I can't tell you the exact date.  I cannot

17   recall now.

18   Q.    My understanding of how you get a CDL license

19   that first you get a permit and then you are required

20   to basically drive along with someone else who has

21   their license in order to get your own license.

22   Q.    Did you complete that requirement of driving --

23   A.    I went to Cecil Community College, they have

24   their own trucks.

16

Q.    They sent you a letter in November of 2006
asking you to submit your CDL license with a passenger
endorsement, is that correct?

A.    Yes.

Q.    Did you do that?

A.    I went to Maryland to get the license, I paid
$90.00, bad situation, but they paid $90.00 to get
that passenger.  I passed the test and everything, I
submit to them.

Q.    And they didn't offer you a position?

A.    Yeah, they sent me a letter and they said --
they told me that they are going to keep my record for
one year.  Then, a week later they sent me another
letter and they said that I have to apply again in the
future and they already send me a letter before that I
passed the test and I passed everything.  I don't know
what happened.

Q.    The next application that you reported was to
Loews in October of 2006?

A.    Yes.

Q.    And what was that position?

A.    That position for cash office.

Q.    And, again, you weren't offered a position?

A.    During the interview he told me do you want --

17

1   can you lift -- he told me can you lift 40 pounds?  I

2   said -- I am sure 40 or 50 pounds.  I said, no, I have

3   back injury, I cannot lift, but I can lift 20, 25, you

4   know, I can manage.  I said is it okay?  He said okay.

5   I think they sent me a note or something that I can

6   apply again in the future or something.  You have it.

7      Q.    I understand that to mean that they didn't

8   offer you a position at that time, but they said you

9   could re-apply, is that what happened?

10     A.    They sent me that note.

11     Q.    The letter that is in your production?

12     A.    That's the only letter.

13     Q.    That's the only letter you received?

14     A.    Yes.

15     Q.    Looks like in May of 2007 you applied to C & S

16  Wholesale Grocers as a fork lift operator?

17     A.    Yes, yes.

18     Q.    I got the fork lift operator from the bottom of

19  the letter.

20     A.    Yes.

21     Q.    Those positions that we have just talked about

22  and the pizza job are those the only applications that

23  you have made?

24     A.    Can you specify the time?  You mean --

Sami Almakhadhi

18

1    Q.    Between the time you were suspended by Delaware

2  Park -- and I'm using your word, I understand

3  suspended to be disciplinary, but I'm using your word

4  because you used that word --

5    A.    Okay.

6    Q.    -- between the time you were suspended from

7  Delaware Park and today have you made any other

8  applications other than the ones we just talked about

9  and the pizza shop and the one where you have the

10  interview tomorrow?

11   A.    I told you in the beginning that I applied at

12  least for a few jobs, I applied for correction

13  officer.  I applied for --

14   Q.    When did you apply for the job as a correction

15  officer?

16   A.    I think the beginning of this month I sent it,

17  an application.  I think I applied correction officer

18  before for Delaware.  Do you have that?

19   Q.    I don't.

20   A.    I did apply for correction officer.

21   Q.    And you told me about the school bus job where

22  you have the interview tomorrow, correct?

23   A.    And I applied for a school bus with Red Clay.

24  Do you have that as well?

Sami Almakhadhi

27

1    first apply for employment with Delaware Park?

2    A.    I think it was in January, January '02.

3    Q.    As best I know you started work in January of

4    '02.

5    A.    1/18.

6    Q.    So, you applied before?

7    A.    Before.

8    Q.    A few days before and got the job?

9    A.    I'm not exactly, but it's before, put it that

10   way.

11   Q.    Who interviewed you at Delaware Park?

12   A.    The one that interviewed was a guy.  He left

13   after -- I don't know what is his name, but --

14   Q.    If I suggested a name, might you remember it?

15   A.    Well, could be.

16   Q.    Were you interviewed by Bill Borecki?

17   A.    I don't recall exactly.  Could be, but you are

18   talking about, what, five years ago, seven years ago.

19   It's really hard.

20   Q.    Sure.

21   A.    I remember, you know, he left the job after I

22   was hired, after a few months or something.

23   Q.    Was the person you are talking about in the HR

24   department or employed in some other area?

32

1  Keisha not because someone told you, just because you

2  figured that out?

3    A.   It's not I figure.  If you read the evaluation,

4  you know, it's about Keisha.

5    Q.   Well, we can look at the evaluation in a little

6  bit.

7    A.   Yeah, you can look at it.

8    Q.   But I don't believe it mentioned her

9  personally, so I want to know if someone told you

10 specifically that's what their concern was.

11          MR. CONLEY:  It's a yes or no answer.

12   A.   I'm not sure.  I don't remember.

13   Q.   In 2004 you were promoted to satellite cashier?

14   A.   That's right.

15   Q.   Before I talk about the satellite cashier I do

16 have a question.  On your tax return your occupation

17 is listed as gate operator, what is a gate operator?

18   A.   Cage operator or booth cashier, same thing.

19 Call us cage operator, booth cashier, cage cashier.

20   Q.   What department did you work in?

21   A.   The cage department.

22   Q.   Is that G-A-G-E, gage department?

23   A.   Cage, yes, C-A-G-E.

24   Q.   Oh, cage department.  Again, I just want to

Sami Almakhadhi

33

1    make sure we all understand and the court reporter can

2    get the right word down.  So, gate operator is the

3    same as a cage operator, it's the booth cashier

4    position?

5        A.    Booth cashier position.

6        Q.    Now, satellite cashier, you were promoted to

7    satellite cashier in 2004?

8        A.    2004, that's right.

9        Q.    When in 2004 was that?

10       A.    I am not sure.

11       Q.    Summer?  Spring?  Fall?

12       A.    It was -- I believe it was -- I think -- I

13   believe it was after May.

14       Q.    Do you know if other candidates had applied for

15   that position as well?

16       A.    I don't know who applied for it.

17       Q.    Do you believe other people applied for it?

18       A.    Maybe.  I'm not sure.

19       Q.    Were you interviewed for that job?

20       A.    For that job, yes, I believe.

21       Q.    Who interviewed you?

22       A.    I don't remember.

23       Q.    Do you recall when you actually started working

24   in that position?

Sami Almakhadhi

34

1    A.    If you can give me some time to review

2    documents, I can tell you.

3              MR. CONLEY:   Answer the question, Sami.

4    A.    I don't know.

5    Q.    I can tell you that the only thing I was able

6    to find on the satellite cashier position was a

7    document -- and, again, we'll see if we can find it, I

8    don't have it handy -- a document that basically asked

9    to have your pay adjusted for some weeks in June and

10   July 2004.  Would that be the time period when you

11   worked as a satellite cashier?

12   A.    It could be.  I don't remember exactly, but.

13   Q.    How long did you work as a satellite cashier?

14   A.    I worked for three weeks, I believe.

15   Q.    And my understanding is you asked to go back to

16   your booth position?

17   A.    Yes.

18   Q.    Why did you do that?

19   A.    Because it was too much for my back injury, the

20   job required more lifting than my regular job as a

21   booth cashier.

22   Q.    Any other reason?

23   A.    I was making close to the satellite --

24   Q.    Just to make sure I understand what you just

Sami Almakhadhi

35

1    told me, as a booth cashier you were making a similar

2    --

3     A.    Almost the same, yes.   I don't know what is the

4    difference.

5              MR. CONLEY:   Wait until she finishes her

6    position.

7    BY MS. VOSS:

8     Q.    The money wasn't enough to make you stay in the

9    satellite job, is that a correct understanding of what

10   you told me?

11    A.    Yes.

12    Q.    Any other reasons?

13    A.    The time did not work for me.

14    Q.    You mean the schedule didn't work?

15    A.    The time it took.   I told my supervisor that

16   time I have my father is dying, you know, he has a

17   cancer and I need to take care of him at that time.

18    Q.    At the time you were working as a satellite had

19   your doctor told you you should be working subject to

20   restrictions?

21    A.    Well, since my injury my doctor -- your answer

22   is, yes, from the beginning since I started -- since I

23   had the injury, yes.

24    Q.    Let me understand clearly.   Your injury, when

Sami Almakhadhi

36

1  did that occur?

2    A.    It happened in December '03.

3    Q.    So, as of December of '03 your doctor had

4  advised you you should be working subject to

5  restrictions?

6    A.    No.

7    Q.    When did your doctor first tell you you should

8  be working subject to restrictions?

9    A.    There is a point here.  Like I did not tell my

10  doctor I'm working as a booth cashier.  He doesn't

11  know I have to lift or anything.  So, in May -- from

12  my injury until I did the MRI nobody knows I had back

13  injury.  Even the one doctor I went there they didn't

14  know that I have back injury.

15    Q.    And which doctor is that?

16    A.    The one that found I had back injury is named

17  Dr. Davis.  That was I think in May or June '04.

18    Q.    You have seen several doctors, right?

19    A.    I have seen several doctors.

20    Q.    I will never remember all their names so when I

21  say your doctor I mean any of your doctors unless I

22  name a specific doctor, is that okay?

23    A.    Sure.

24    Q.    When did your doctor first tell you that you

Sami Almakhadhi

37

1   should be working subject to restrictions?

2       A.   My doctor only advised me because I have back

3   injury not to weigh a lot, don't lift anything heavy.

4       Q.   When did your doctor first tell you that?

5       A.   I think it was in -- when I took the FMLA and

6   before that I think maybe Dr. Katz when I went to him,

7   you know.  Before that I don't think -- there was no

8   need to tell my doctor give me restriction or give me,

9   you know --

10              MR. CONLEY:  Her question is for a date, do

11   you recall the date?

12      A.   Do I recall the date?  I don't recall the date.

13      Q.   You took your FMLA in 2005?

14      A.   Yes, in 2005.

15      Q.   When you decided to leave the satellite job and

16   you said it was too much lifting, that was your own

17   decision, right?

18      A.   Yes, it was my own decision.

19      Q.   At that point in time had you given Delaware

20   Park any information that you should not be lifting?

21      A.   Yeah, I told them I had back injury.

22      Q.   Did you give any medical documentation?

23      A.   Yes, I give him in May 18, '04, I give them a

24   release of all my medical records.  I give them the

38

1    MRI.  They know I have back injury.

2    Q.   Was that in conjunction with the worker's

3    compensation claim?

4    A.   Yes, based in December '03.

5    Q.   Did you bring any slip from your doctor that

6    said you should be working subject to restrictions?

7    A.   I think I -- I don't remember I give him --

8    only I give him I think during my FMLA and before I

9    think Dr. Davis he told me -- in May 18 I think I went

10   to the hospital, I went to the hospital, and they gave

11   me one day off.  That was in May 18th.  After that --

12   Q.   After that you came back to work and worked

13   your full job?

14   A.   Yeah, I think I took a day off or two days off,

15   but I'm not sure did I give him or not, but I can --

16   if you give me more time to search -- but I do

17   remember I don't recall now.

18   Q.   After you took one or two days off did you come

19   back to work and work your full job?

20   A.   Yes.  I was working full job.

21   Q.   And you continued to do that until I think the

22   next year when you took some FMLA leave, is that

23   correct?

24   A.   I believe I asked him for light duty, you know,

Sami Almakhadhi

44

1    A.    That's ongoing, yes.

2    Q.    And what is that payment?

3    A.    It's 464 every two weeks.

4    Q.    How long do you expect to continue receiving

5    that?

6    A.    Until I -- I'm not sure when.  How long I'm

7    expecting?  I don't know how long.

8    Q.    You told me you had your injury in late 2003,

9    is that correct?

10    A.    December '03, yes.

11    Q.    Did you report that to Delaware Park at the

12    time?

13    A.    No.

14    Q.    Why not?

15    A.    I didn't know I had back injury, but, but, the

16    satellite there at that time he went to the office and

17    told them, "Sami lift something," he reported it.  He

18    told him, "Don't worry, if he doesn't report it,

19    that's fine."  He told them I lift something.

20    Q.    How could your co-worker know you had hurt

21    yourself if you didn't know?

22    A.    I lift something and I feel something, but I

23    didn't -- you know, you feel something, pain, here,

24    and I just like this.  I thought it was going to go by

Sami Almakhadhi

45

1    itself.  The next day was -- but he told him, the

2    satellite, he told him, he went to the office and he

3    told him, "Sami was lifting," and he told him, "That's

4    fine, if he didn't report it."

5        Q.    At some later point did you report that injury?

6        A.    Yes.

7        Q.    Was that in May when you gave the medical

8    release?

9        A.    May 18, '04.

10       Q.    How was that claim resolved?

11       A.    They sent me to a doctor and he said I had an

12   injury there.

13       Q.    So, they acknowledged the claim?

14       A.    Yes, we did not go to court and he acknowledged

15   I had an injury there.

16       Q.    So, you did not go to court?

17       A.    No.

18       Q.    Did you receive all the compensation from that

19   claim?

20       A.    What do you mean "compensation"?

21       Q.    Well, did you receive any pay for missed time

22   at work?

23       A.    For missed time, yes.

24       Q.    Did the doctor get paid through the worker's

Sami Almakhadhi

47

1  because you did not injure it here.

2    Q.    But you just told me they acknowledged the

3  claim?

4    A.    That was in '05 after they suspend me.

5              MR. CONLEY:  I think the time frame might

6  need to be clarified here.

7              MS. VOSS:  I think the time frame

8  definitely needs to be clarified.

9  BY MS. VOSS:

10    Q.    Right now let's focus on 2004.  You said on May

11  18, 2004 you made a claim under worker's compensation,

12  correct?

13    A.    Yes.

14    Q.    You also said that that claim was acknowledged

15  by Delaware Park?

16    A.    No.

17    Q.    That was not acknowledged by Delaware Park?

18    A.    '04, no.

19    Q.    Okay, all right, then let's start over on 2004.

20  What happened, the claim was denied and that was the

21  end of it?

22              MR. CONLEY:  Go back to May and start from

23  May 2004.

24    A.    May 2004 until I believe November '05 --

51

1    Q.    In 2005 did you make another report of injury?

2    A.    In 2005?

3    Q.    Yes.

4    A.    I think it's based on the first one I told them

5    I have -- long time I have numbness in my leg and they

6    went to the other one and they told them to speak to

7    that first one, to the first injury, you know, and I

8    think I went to the hospital.

9    Q.    Well, back to your income.  Other than the

10   pizza job and the worker's compensation payments that

11   we have talked about, selling your business, any other

12   sources of income?

13   A.    No.

14   Q.    Has your back injury affected your day-to-day

15   activities?

16   A.    Yes.

17   Q.    When did it first affect your day-to-day

18   activities?

19   A.    When you say "activities," about what?

20   Q.    Well, I guess that's what I need to know.  How

21   has it affected your day-to-day activities?

22   A.    It's back injury, you know, cannot lift a lot

23   of heavy weight.  You can lift, you know, 20, 25, you

24   know, but not lift a lot of heavy -- any back injury

Sami Almakhadhi

52

1    anyone when you go to a doctor, we have back injury,

2    you don't even need to go to the doctor, you yourself

3    know you can't lift anything.  That's what is most

4    important.

5    Q.    You are not able to lift heavy, heavy objects?

6    A.    Heavy, no.  I can lift them, but not many

7    times, you know.

8    Q.    Occasionally you can lift heavy objects?

9    A.    Occasionally, but not --

10   Q.    Are you able to perform household chores?

11   A.    What is it?

12   Q.    Are you able to perform household chores?

13   A.    I don't understand the question.

14   Q.    Are you able to do things around the house?  I

15   don't know what kind of things you might do in the

16   house, but take care of your property?

17   A.    Yeah, I can do that.

18   Q.    Well, you rent so you probably don't have to

19   mow the grass, but can you do that?

20   A.    Yes.

21   Q.    Do you help in caring for your children?

22   A.    Helping care for my children?  For what?

23   Q.    Do you participate in caring for your children?

24   A.    I don't know exactly -- could you explain?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A50

Sami Almakhadhi

53

1   Some specific words I didn't understand.

2      Q.    That's okay.  Let's see if I can come up with a

3   better way of saying that.  Do you ever bathe your

4   children?

5      A.    Bathe for my children, yes, I bathe them.

6      Q.    Help feed them, give them dinner, play with

7   them?

8      A.    Yes, I'm the only source for the income in my

9   family.  Does that answer your question?

10     Q.    Are you able to care for your own physical

11  needs, bathing, dressing yourself, doing things like

12  that?

13     A.    Yeah, absolutely.

14     Q.    So, really your problem is lifting heavy

15  objects?

16     A.    Lifting objects.

17     Q.    When was the last day that you performed your

18  booth cashier duties at Delaware Park?

19     A.    I think beginning of September, I think

20  September 1st, you know.

21     Q.    Was that 2005?

22     A.    Yeah, September 1st, 2005.

23     Q.    Were you able to fully perform your duties on

24  that day?

Sami Almakhadhi

54

1    A.    When you say perform the duties, I was doing my

2    job, I didn't have any complaint.

3    Q.    At that time you were not working under medical

4    restrictions, is that correct?

5    A.    I had restrictions, I worked with restrictions

6    since my injury, you know.

7    Q.    Had you given any documentation to Delaware

8    Park as of September 1st to say that you should be

9    working under restrictions?

10    A.    I give them documents before I -- when I took

11    my FMLA, when I went to the hospital the last time I

12    did give them, you know, restrictions or something.

13    Q.    I'll get to that.  That last day you worked did

14    you work a full shift?

15    A.    The last day I worked only one hour.

16    Q.    Let's go to the day before that then.

17    A.    I'm not sure, it's either August 31st I think

18    was my day off, August 31st, was my day off.  I think

19    you can say so August 29th because 30th and 31st was

20    my day off.

21    Q.    So, August 29th did you work a full shift?

22    A.    Yes, I was working full shift.

23    Q.    How many hours in a full shift?

24    A.    Eight hours.

Sami Almakhadhi

55

1    Q.   Of those eight hours how many of those hours do

2  you estimate you were standing?

3    A.   I was standing -- we have a break for 20 and 15

4  and the rest was standing.

5    Q.   Other than lunch and some rest breaks you were

6  standing the whole time?

7    A.   Yeah, I can stand seven, eight hours.

8    Q.   How many hours do you estimate you were walking

9  that day?

10   A.   I'm not walking.  I only walk to the -- when I

11 go to the bathroom or go to the lunch, my 20 minutes

12 -- I mean, my breaks, the 20 minutes and the 15, I

13 come back.  It wasn't a lot of walking.

14   Q.   When they talk about a booth cashier, is there

15 actually a booth that you are in?

16   A.   Booth cashier is like a room, big room, and we

17 have windows.  Sometimes if you have this big booth,

18 you have like seven windows and you just stand next to

19 your bank.

20   Q.   Similar to a bank where the cashier just stays

21 at their window?

22   A.   Yes.

23   Q.   You would do the same, you would stay at your

24 window?

**W&F**

56

1    A.    Yes.

2    Q.    But standing.  Do you sit on the job?

3    A.    No, you don't really sit at the job.

4    Q.    So, on August 29th you wouldn't have spent any

5    time sitting?

6    A.    No.  They do not give me a chair to sit.

7    Q.    And the lifting that you were doing on August

8    29th, what kind of lifting were you doing?

9    A.    It was doing one bag at a time.

10   Q.    And that's a coin bag?

11   A.    Yes.  I was doing one bag at a time since my

12   injury, since May '04.

13   Q.    And do you know how much a bag weighs?

14   A.    Not more than 20 pounds.

15   Q.    I think we'll look at your doctors' records

16   now, but if it's okay with you I would like to take a

17   short break.

18              (Brief recess.)

19              MS. VOSS:  If you would mark this as

20   Exhibit 2.

21              (Almakhadhi Deposition Exhibit No. 2 was

22   marked for identification.)

23   BY MS. VOSS:

24   Q.    Mr. Almakhadhi, a few moments ago you told me

57

1    that you had given Delaware Park medical documentation

2    for your FMLA in 2005.  Is Exhibit 2 the documentation

3    that you were talking about?

4    A.    That's right.

5    Q.    And, so, this documentation basically relates

6    to your back injury, is that correct?

7    A.    That's right.

8    Q.    If you look at the signature page it's dated

9    May 5, 2005?

10    A.    Yes.

11    Q.    How long were you on FMLA leave?

12    A.    FMLA was in -- says here for two months because

13    actually when it was FMLA -- your question is about

14    exact FMLA leave.  I was in --

15    Q.    Maybe I should make my question more specific.

16    This FMLA that Exhibit 2 refers to was for your back.

17    How long were you on FMLA for that occasion?

18    A.    See, there is something I would like to address

19    before I answer your question.

20            MR. CONLEY:  Well, just answer her

21    question.  How long was this FMLA?

22    A.    This one I think was for one month.  Says here

23    two months, but --

24            MS. VOSS:  Would you please mark this as

Sami Almakhadhi

58

1    Exhibit 3.

2                (Almakhadhi Deposition Exhibit No. 3 was

3    marked for identification.)

4    BY MS. VOSS:

5    Q.    Exhibit 3 is a letter to you, dated May 5th,

6    2005?

7    A.    Yes.

8    Q.    And that letter says that you were approved for

9    FMLA effective 4/13/05 until 6/13/05, is that correct?

10   A.    Yes.

11   Q.    So, for two months?

12   A.    No, this one is two months, but this one I

13   answered your exact question how long I stayed as FMLA

14   at home.   There is a difference, there is another

15   story.

16   Q.    Were you out of work as of 4/13/05?

17   A.    It wasn't FMLA.   I took -- 4/13?   I think I

18   give him light duty, either light duty or from work,

19   from hospital.

20   Q.    Excuse me?

21   A.    I give them a note from the hospital that I

22   need one week off for light duty, I'm not sure what

23   was it.   You know, for one week.   Then, they told me

24   follow-up with my own doctor.   I went to my own

Sami Almakhadhi

59

1    doctor, he give me one more week.  I came back to

2    work.  When I came back to work, they give me I think

3    some points.  So, that's how I get the points, a

4    violation was in April.

5       Q.   When you say "points," you mean points under

6    the attendance system?

7       A.   Yes, violation.  I used my FMLA to cover that

8    points.

9       Q.   First they gave you points, but then they took

10   them back away?

11      A.   Yes.

12      Q.   And were you, in fact, out of work from 4/13/05

13   until 6/13/05?

14      A.   No, not all the time.

15      Q.   Did you work somewhere in there?

16      A.   Yes, yes, I have a paycheck too.

17      Q.   No, I'm not asking about that.  I'm asking

18   whether you physically came to work and performed your

19   job.

20      A.   Your question is did I work during the 4/13 to

21   6/13?

22      Q.   Correct.

23      A.   I did work maybe three, four days during that

24   time.

Sami Almakhadhi

60

1    Q.    And in terms of getting any time you were

2    absent between these two dates approved for FMLA and

3    getting the points taken off Exhibit 2 is what you

4    gave to Delaware Park?

5    A.    Yeah, to dismiss the points I have.

6    Q.    Then, while you were on FMLA you saw your

7    doctor again or maybe several times while you were on

8    that leave?

9    A.    I believe I went to see a doctor, yes.

10              MS. VOSS:  Will you mark this as 4, please.

11              (Almakhadhi Deposition Exhibit No. 4 was

12    marked for identification.)

13    BY MS. VOSS:

14    Q.    Exhibit 4 is a one-page document from Mid

15    Atlantic Spine and up at the top it's dated 5/17/05?

16    A.    Yes.

17    Q.    Now, this document lists restrictions in the

18    middle.  Do you see that part?

19    A.    I'm sorry, what part again?

20    Q.    The part of the middle that lists restrictions.

21    A.    Yes.

22    Q.    Did you ever provide this document to Delaware

23    Park?

24    A.    This one?

Sami Almakhadhi

61

1    Q.    Yes.

2    A.    No.

3    Q.    Why not?

4    A.    I was under FMLA.

5    Q.    So, you didn't think it was necessary?

6    A.    I was home, I was under FMLA.  It's only for

7    four weeks.

8    Q.    So, from 5/17/05 were you out of work

9    continually until the end of your FMLA period?

10   A.    5/17, yes, I was out.

11          MS. VOSS:  Please mark this.

12          (Almakhadhi Deposition Exhibit No. 5 was

13   marked for identification.)

14   BY MS. VOSS:

15   Q.    Exhibit 5 is, again, a one-page document, this

16   time from Dr. George -- I'm not sure how to pronounce

17   his last name.  Is it Bohatiuk, is that correct?

18   A.    Okay.

19   Q.    Did you see him on June 1, 2005?

20   A.    June 1, 2005, okay.

21   Q.    Again, he is discussing your back injury in

22   this document, is that correct?

23   A.    Yes.

24   Q.    And at the end of of the letter do you see

Sami Almakhadhi

62

1  where it says "Discussion"?  It says, "He remains

2  disabled from work."

3    A.    Okay.

4    Q.    Correct?

5            MS. VOSS:  Would you mark this.

6            (Almakhadhi Deposition Exhibit No. 6 was

7  marked for identification.)

8  BY MS. VOSS:

9    Q.    Exhibit 6 is also a one-page document from Dr.

10  Bohatiuk, this one is dated June 13, 2005?

11    A.    Um-hum.

12    Q.    Why did you see Dr. Bohatiuk on June 13, 2005?

13    A.    Because I finished my FMLA and I needed to go

14  back to work.

15    Q.    And what did you need from Dr. Bohatiuk?

16    A.    I went to Delaware Park because I took FMLA and

17  by law you have to give a full release, you know.  It

18  wasn't worker's comp.  It was only they want a release

19  from my doctor to get back to work.  They will not

20  allow me to go back to work unless if I bring the

21  documents for full release.

22            MS. VOSS:  I probably should have marked

23  these together, I apologize.

24            (Almakhadhi Deposition Exhibit No. 7 was

63

1   marked for identification.)

2   BY MS. VOSS:

3      Q.    Did Dr. Bohatiuk give you a full release?

4      A.    Yes.

5      Q.    On Exhibit 6 under "Discussion" it says, "He

6   will return to work full-time full duty tomorrow and

7   see how he can handle it.  He will keep me informed of

8   his progress."

9      A.    Yes.

10     Q.    What had changed between June 1 when you saw

11  Dr. Bohatiuk and you were disabled and June 13 when

12  you were able to return to full duty?

13     A.    This one, when I went to this doctor, 5/17,

14  this one, June 1st --

15     Q.    For the court reporter I want to be clear.

16  When you said I went to this doctor 5/17 you are

17  referring to what is the exhibit number on that one?

18     A.    For four weeks.  Exhibit 6.

19           MS. WASSON:  I think that's 4.

20  BY MS. VOSS:

21     Q.    When you went to the doctor on 5/17 and that's

22  reflected in Exhibit 4, correct, we are agreed?

23     A.    That's Exhibit 4.

24     Q.    Now, go ahead.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A61

Sami Almakhadhi

65

1   when he says you were returning to full-time full duty

2   what changed?

3    A.    This one he didn't disable from work.  I told

4   him I'm disabled, I'm still home.

5    Q.    That's because you told him?

6    A.    Yeah, I told him.

7   BY MS. VOSS:

8    Q.    Exhibit 7 is a note from Dr. Bohatiuk, dated --

9   it's a little hard to read, but -- I can read the

10  text.  The text says, "Released to full-time full duty

11  work on 6/14/05."

12   A.    That's right.

13   Q.    That was the day after your FMLA leave expired?

14   A.    That's right.

15   Q.    Why did Dr. Bohatiuk agree to release you

16  full-time full duty?

17   A.    You have back injury and sometimes you feel

18  good and you can carry and sometimes -- this doctor, I

19  was, you know, as I said, in two months I told him

20  full duty.

21   Q.    Did you tell Dr. Bohatiuk that you felt you

22  could do your job?

23   A.    Yes, I told him and he released me.

24   Q.    Had anything else changed in your medical

Sami Almakhadhi

76

1   the tape because I didn't know we were going to be

2   here.  She told me while she was working there more

3   than once, "Hey, terrorist, what are you doing?"  You

4   know.  I tried to --

5      Q.    Were you offended by that comment?

6      A.    Well, I kidded.  As I told you, I'm trying to

7   make living in Delaware Park so I'm not trying to

8   start fight or make argument, talk about terrorism.  I

9   mean, you feel it, of course, somebody is telling you,

10  but what are you going to do?

11     Q.    How many times do you think she made comments

12  like that?

13     A.    She told me more than once.  Maybe two, three

14  times when she seen me.

15     Q.    Did anybody else make any comments to you about

16  your race or your national orgin?

17     A.    Karlyn Dixon.

18     Q.    What did she do?

19     A.    Karlyn she told me I should not be applying for

20  supervisor because Americans don't like to be

21  supervised by Arabs one time and one time she told me

22  all Americans hate Arabs after 9/11.

23     Q.    Do you recall when that was?

24     A.    No.  I remember it was in the break room.

Sami Almakhadhi

77

1    Q.   You know it has to be after 9/11, right?

2    A.   Yes, it has to be while I'm working there.

3    Q.   Other than that did she say anything to you?

4    A.   After that when I went -- but that's not about

5 race or something.  She told when I asked for FMLA,

6 when I asked for light duty in April 29th, she called

7 me to the office and she told me, "I checked the tape

8 with Shannon DeLucia with the security and you did not

9 injure it here.  Go find where you did injury.  You

10 did not injure it here."

11    Q.   Did she make any other comments that you

12 understood to be about your race or your national

13 origin?

14    A.   No, I think that's it.

15    Q.   Did anybody else make comments to you that you

16 thought were about your race or national origin?

17    A.   No.

18    Q.   When Karlyn made these comments to you, did you

19 complain to anyone?

20    A.   No.

21    Q.   Why not?

22    A.   For the same reason I just told you, you know,

23 same reason.  This talking about terrorists, about all

24 Americans didn't like Arabs, that's not -- it's like

78

1  you start making fight.  I don't want to talk about

2  that stuff.

3    Q.    So, you didn't want to make a big deal out of

4  it?

5    A.    It is like hurting me, but, you know.  She told

6  me, "You can't apply for satellite or main bank," but

7  I told her, "I look like Spanish, don't worry."  She

8  said, "No, your accent, everybody knows you are Arab."

9    Q.    Based on your accent?

10    A.    She told me I look like Spanish, nobody is

11  going to know me -- she said, "Don't go high, stay

12  like satellite, main bank job, but don't go for

13  supervisor."  And that's the reason why she keep my

14  transfer form for 2002, I believe 2003, even 2004.  I

15  applied for at least, at least -- you told us in

16  discovery that I did not do any transferring.  That's

17  a lie.  I'm sorry, but --

18    Q.    That is not exactly what I said.  What I said

19  was we have not found any documents or transfer forms

20  for that time period so in the documents Delaware Park

21  did not locate a record that you had applied for jobs

22  before 2000 -- I have to think about this -- 2004.

23  Did you apply for other jobs before 2004?

24    A.    That means somebody took them.

Sami Almakhadhi

82

1    Q.    Okay, let's go back to the complaint.

2    Paragraph 15 says, "In April 2004 Mr. Almakhadhi

3    suffered a work-related injury." Is that the work-

4    related injury that you reported on May 18th, 2004?

5    A.    This I went to the hospital, the one that is

6    related to December of '03. It was related to

7    December '03.

8    Q.    In April, did you go to the hospital in April?

9    A.    Yes, I felt bad --

10    Q.    From work?

11    A.    When I was working, it could be when I was

12    working, it could be when I was sleeping, but it only

13    happens because December.

14    Q.    I need to start over. In April 2004 did you go

15    to the hospital directly from work?

16    A.    Yes.

17    Q.    What date was that that you went to the

18    hospital? Do you recall?

19    A.    It was in April, I don't recall.

20            MS. VOSS:  Please mark this.

21            (Almakhadhi Deposition Exhibit No. 9 was

22    marked for identification.)

23    BY MS. VOSS:

24    Q.    Exhibit 9 is a State of Delaware First Report

Sami Almakhadhi

83

1   of Occupational Injury.  Have you seen this before?

2    A.    Yes.

3    Q.    When did you first see it?

4    A.    I think sometimes in the Department of Labor

5   stuff.

6    Q.    As you can see, the boxes are numbered.  If you

7   look at the number box number 19 it says the date of

8   report is 5/20/2004 and next box numbered 20 says the

9   date of the injury is 5/18/2004?

10   A.    Um-hum.

11   Q.    Is that the date you went to the hospital?

12   A.    I went to the hospital -- date of report is

13  5/20/04.  I don't recall.

14   Q.    So, you are not sure when you went to the

15  hospital?

16   A.    I don't remember.  It was in -- I don't know.

17  I give you a release of all my medical records so you

18  should have that date.

19   Q.    On the first date in April 2004 when you say

20  you hurt your back at work did you immediately report

21  it to Delaware Park?

22   A.    In '04?

23   Q.    In April '04.

24   A.    I reported I think when I went to the --

Sami Almakhadhi

84

1    something happened I have to go see the EMT in

2    Delaware Park so they have a report from there.

3        Q.    So, it would be reflected in the EMT report?

4        A.    Yes, it would be reflected in the EMT reports.

5        Q.    If you look at paragraph 20.

6        A.    (Witness complies.)

7        Q.    In paragraph 20 of the complaint, the second

8    sentence says, "In January 2005, Mr. Almakhadhi

9    applied for the job of impress supervisor.  This job

10   was a promotion for which Mr. Almakhadhi was

11   qualified, and which did not involve the heavy lifting

12   restricted by his doctor."  Why do you believe that

13   job didn't involve heavy lifting?

14       A.    Because booth cashier they have machine.  You

15   know, you have to bend all the time.  Since 2004,

16   since I found out that I am injured until the last

17   time I believe it was in September, I was lifting only

18   bag.  There is no -- the point is I never violate my

19   work --

20       Q.    That's not my question.  The question is why

21   you believe the impress supervisor job did not involve

22   heavy lifting?

23       A.    As I told you, it's less physical than the

24   cashier job.

Sami Almakhadhi

85

1    Q.    Are you aware that that job, the impress

2    supervisor job, has the same 40-pound lifting

3    requirement?

4    A.    It has 40 pounds, but it has in the papers, but

5    most of the people there didn't lift 40 pounds.  You

6    have to get two bags.  There is no objects weigh 40

7    pounds at Delaware Park.  Only weigh 20 or less.

8    That's why I lift during the time only one bag, plus,

9    plus, to answer your question, it's less bending.

10   Booth cashier, when the bags fill underneath of the

11   machine you have to go bend and, you know, take the

12   bag and go away.  Impress supervisor is, you know,

13   bend and -- it's less physical activity than booth

14   cashier.

15   Q.    And you applied for impress supervisor in

16   January 2005?

17   A.    I believe it was January 30.

18   Q.    Around that time?

19   A.    January 30, 31, '05, yes.

20   Q.    You hadn't given Delaware Park any

21   documentation at that time that you were subject to

22   lifting restrictions, right?

23   A.    Well, Delaware Park --

24   Q.    That's a yes or no question.

Sami Almakhadhi

86

1    A.    No.

2    Q.    Does being a booth cashier involve supervisory

3    responsibility?

4    A.    Booth cashier?

5    Q.    Yes.

6    A.    Supervisory responsibility?

7    Q.    Yes.

8    A.    No.

9    Q.    Did you have any prior experience in the

10   impress department?  Again, it's yes or no.  Had you

11   worked in the impress department?

12   A.    Well, I need to know what is impress

13   department.

14   Q.    I'll be specific.  Had you ever worked as an

15   impress clerk?

16   A.    No.

17   Q.    Had you ever held any other position in the

18   impress department?

19   A.    There is no impress department.  We have same

20   department.  Impress and cage together.  So, we work

21   in the same.

22   Q.    How many times did you apply for a position as

23   an impress supervisor, how many times did you apply

24   for that position?

87

```
 1    A.    I applied twice, twice.

 2    Q.    And the first time was in or around January

 3   2005?

 4    A.    January 2005.

 5    Q.    When was the second time?

 6    A.    In August.  The first one I need to be

 7   specific, it was January 30 or 31, '05.

 8    Q.    In August when you applied were you

 9   interviewed?

10    A.    In August, yes, I was interviewed.

11    Q.    Who interviewed you at that time?

12    A.    Cage manager, her name is Beverly Pope.  She is

13   a new one so I didn't know her.

14    Q.    Do you have any reason to believe that she

15   would discriminate against you on the basis of your

16   race or national origin?

17    A.    I don't think so.  I mean, she was new, she

18   doesn't even know us.

19    Q.    Do you have any reason to believe she would

20   discriminate against you on any other basis?

21    A.    I don't know.

22    Q.    Do you know if she recommended you for the job?

23    A.    I don't know.

24    Q.    Do you know if she was aware of your worker's
```

Sami Almakhadhi

88

1    compensation claim?

2      A.    I don't know.

3      Q.    Do you know if she was aware of your FMLA

4    leave?

5      A.    Again, I don't know if she was aware of that.

6      Q.    If you look at paragraph 21 when did you

7    complain to Delaware Park's human resources

8    department?

9      A.    I think it was in beginning of '05, maybe right

10   after what happened with the position, and I did not

11   have interview with the bank job right after that in

12   January or February maybe.  You know, February, March.

13   It has to be one of those two, either February or

14   March.

15     Q.    When you first complained, do you recall what

16   your complaint was?

17     A.    I was complaining about discrimination.

18     Q.    In regard to any particular action?  Reading

19   your complaint looking at paragraph 20 and then

20   paragraph 21 it's easy to assume that you were

21   complaining about not being selected for impress

22   supervisor.  Is that what you were complaining about?

23            MR. CONLEY:  Are you asking him the first

24   time he complained to Delaware Park about

Sami Almakhadhi

89

1    discrimination?

2              MS. VOSS:   I'm asking in regard to -- first

3    I asked him in regard to the statement in paragraph 21

4    when he is talking about --

5    BY MS. VOSS:

6    Q.    Later in that paragraph I'll point out, Mr.

7    Almakhadhi, it does says that on February 14, 2005

8    Micki Nardo informed you that the department had found

9    no discrimination and so I'm assuming you must have

10   talked to her earlier in February, perhaps January?

11   A.    I cannot complain in January about what is

12   going to happen in February.

13   Q.    So, when you talked with Micki Nardo -- is that

14   who you talked with?

15   A.    I talked with Micki Nardo after I did not get

16   promoted for the main bank job.

17   Q.    When you went to speak with Micki Nardo the

18   first time, you were complaining about the main bank

19   job?

20   A.    I told her about discrimination in the main

21   bank position.  I did not get the position because of

22   discrimination.

23   Q.    Did you meet with Ms. Nardo in person?

24   A.    Yes.

Sami Almakhadhi

90

1    Q.    How much time did you spend with her?

2    A.    I don't recall the time.

3    Q.    Did she give you an opportunity to tell you

4    what your concerns were?

5    A.    The first time, the first time.  The second

6    time she told me why did I not make an appointment

7    with her?  First time she is happy.  She said, "I

8    don't remember seeing you in here before, are you

9    employed with us?"  She was kind of like I didn't make

10   any argument or any -- that's why she was glad, we

11   didn't know you before.  That second time she wants me

12   to make an appointment with her to complain and --

13   Q.    Did you follow-up and make an appointment?

14   A.    No.  I felt she was going to be nice like the

15   first time, like the first time, but she is like you

16   have to make a complaint when you come here -- I mean,

17   you have to make an appointment when you come here.

18   Q.    Did you then make an appointment?

19   A.    I told her I'm just here for this and I'm

20   still, you know, suffering from discrimination, you

21   have to do something.

22   Q.    In paragraph 21 it says that you were not

23   interviewed about the discrimination you suffered, but

24   you just told me you talked to Micki Nardo about it.

Sami Almakhadhi

91

1  So, I don't understand what you mean.  What do you

2  mean by that?

3      A.    I told her about the discrimination.  If you

4  read her report to the Department of Labor at the top

5  it says discrimination.

6      Q.    So, this is not a correct statement?

7      A.    It's not about it's not correct.  I complained

8  about discrimination.  I did not get the position

9  because of discrimination.  I did not get interviewed

10  because of, you know.

11     Q.    In that paragraph it also says human resources

12  personnel spoke to Mesdames Dixon and Suhr and relied

13  on incorrect and inaccurate information provided by

14  them.  What incorrect and inaccurate information did

15  they rely on?

16     A.    I'm sorry, where are you at?

17     Q.    In paragraph 21 down here.

18             MS. VOSS:  Well, I'm upside down.  Can you

19  help me, Frank?

20             THE WITNESS:  "On February 14th"?

21             MR. CONLEY:  No, sentence above that, she

22  wants to know about what was incorrect and inaccurate

23  if you can recall not having looked at the report.

24             MS. VOSS:  Hold on, you can object to the

Sami Almakhadhi

95

1   Department of Labor.

2       Q.    Now, in paragraph 22 you talk about applying

3   for a main bank cashier job and I want to --

4       A.    Which one?

5       Q.    In paragraph 22 you talk about applying for a

6   main bank cashier job in February 2005.

7       A.    Okay.

8       Q.    Then, in paragraph 23 on the next page it says

9   again you complained to Delaware Park's human

10  resources department.  Was that the second time you

11  went to see Ms. Nardo that you talked about?

12      A.    Yes.

13      A.    This one, 22, should be -- because I applied in

14  the end of January.  So, it's considered like

15  beginning of February, you know?

16      Q.    Okay, in that general time frame you applied?

17      A.    Yeah, yeah, and the stamp was January 31

18  because I was working shift and it could be February

19  1st.

20      Q.    Do you recall when that second conversation

21  with Micki Nardo took place, the one referred to in

22  paragraph 23?

23              MR. CONLEY:  23 doesn't say Micki Nardo.

24              MS. VOSS:  He just told me the person he

Sami Almakhadhi

96

1   spoke with was Micki Nardo.

2            MR. CONLEY:   You asked him about a second

3   conversation with Micki Nardo.

4            MS. VOSS:   I asked him if his complaint to

5   Delaware Park's human resources department was the

6   second conversation with Micki Nardo he had discussed.

7   I recall him saying yes.

8   BY MS. VOSS:

9    Q.    Is that correct, Mr. Almakhadhi?

10   A.    I talked to Mr. Nardo, yes.

11   Q.    Do you recall when that was, approximately?

12   A.    I told you in February or March.

13   Q.    That's good enough, that's good.  Then, in

14   paragraph 24 it says that you filed additional

15   complaints with Delaware Park's human resources

16   department.  When did you do that?

17   A.    This was with Micki.  I think she came to me,

18   Micki, from her office to my room to while I'm working

19   as a cashier and I think I talked to her.

20   Q.    And that was after --

21   A.    Could be between.

22   Q.    -- the events in paragraph 23?

23   A.    Because I went to her, between the two days I

24   went to her twice, and I think she came and stopped in

Sami Almakhadhi

100

1    A.    As I told you before, I know what -- you know

2    from the words she told me and I told you she --

3    Q.    I understand your opinion, but right now --

4    A.    I feel like we are --

5    Q.    Right now I need to know if you recall any

6    other specific comments she made to you?

7    A.    Except the one April 29th in the office when I

8    asked her about light duty.

9    Q.    Which year was this?

10   A.    '05.

11   Q.    I thought you were out of work on April 29th,

12   '05?

13   A.    When I took FMLA, it was April 29th.

14   Q.    April 13th, I believe.

15   A.    As I told you, I worked three full days.

16   Q.    So, you may have been in the office.  How do

17   you remember so specifically it was April 29th?

18   A.    I have a calendar, I can show it to you.

19   Q.    How about if we put in a request to produce

20   that to us.  We have requested all diaries, calendars

21   and other documents.

22   A.    It's only one page.

23   Q.    Did you have a meeting with her on that date?

24   A.    No, I don't have a meeting with her.

Sami Almakhadhi

101

1    Q.    So, this was just a normal workday encounter?

2    A.    No.  After I ask for light duty, which is

3    cashier training supervisor, she told me I have to

4    talk to Karlyn Dixon, I cannot make any decision about

5    light duty.  One hour ago they called the satellite

6    cashier, they told him count Sami out, count me out

7    and close.  He closed me out, the satellite --

8    Q.    Was that in August?

9    A.    That was in April 29th when I asked them for

10   light duty.

11   Q.    So, something happened on that date.  You said

12   there was an argument.

13   A.    Ms. Voss, I need to check the date.  When I

14   applied for FMLA it was 5/5, right?

15   Q.    Right.

16   A.    Right, when I went to doctor.  Before that I

17   was outside, I was suspended.  I went to use my own

18   FMLA because I was kicked out from the company.  So, I

19   am using this FMLA.  That's the point.

20   Q.    Didn't Stacey Suhr suggest you apply for FMLA?

21   A.    I called her, I said, "What are you going to

22   do?  Are you going to fire me?"  She told me, "If you

23   want to use your FMLA --"

24   Q.    So, Stacey Suhr did suggest that?

1    A.    Yes, use my FMLA because my point was

2   protecting my job at the time.

3    Q.    On April 29th did you tell me you had an

4   argument with Ms. Dixon on that day?

5    A.    This is the story.  Let me start the story

6   again.  April 29th, I came to work and I said I need

7   light duty.  She said, "I cannot give you light duty,

8   we have to talk to Ms. Dixon because she is the

9   decision-maker."

10    Q.    And the person you were speaking with first was

11   Roberta Evans?

12    A.    Yes, and she admit that.  In less than an hour

13   the supervisor satellite cashier he told me, Close

14   Sami out, because Stacey and Karlyn they were in the

15   office.  Karlyn, you know, closed my bank.  I came to

16   the office.  I said, "What happened?"  She said, "You

17   did not injure it here and you need to get out from

18   the company."  I said, "I injured it here."  Even

19   Stacey -- Stacey, she doesn't know what happened.

20    Q.    Just to be clear, the one who said you weren't

21   injured here was Karlyn?

22    A.    Was Karlyn.  As I told you, Stacey, she was

23   there with her in the office, but she said, "What

24   happened?"  I think she just came from vacation or

Sami Almakhadhi

103

1   something.  Karlyn, she said, "We already checked the

2   tape and I check it with Shannon DeLucia in security

3   and we determined that he did not hurt it here."  They

4   told me to go find out where I was injured.

5       Q.    I'm sorry, I didn't understand that part.

6       A.    Where did you injure?  You did not injure it

7   here.  They asked me if I want to quit.

8       Q.    Who asked you that?

9       A.    Stacey.

10      Q.    You said it was an argument, how so was it an

11  arguement?

12      A.    They closed my bank and I went there and I only

13  asked for light duty.  I went there and she was, you

14  know, yelling at me, you know, I need to -- you know,

15  out, now.  It's like personal, you know, again with

16  raising her voice at me with no respect and she kicked

17  me out.  For her it's normal, you know.  I was

18  suspeneded, no pay.  If you don't work, you are not

19  going to get paid.

20      Q.    Back to paragraph 25 what specifically did

21  Stacey Suhr do?

22      A.    She told me, "You are not going to get the job

23  and we will not put you in any other position until

24  you become a satellite."

**W&F**

104

1    Q.    Anything else?

2    A.    You know, and she told me that was the company

3    policy.  She was making excuses.  It should not be

4    right.

5    Q.    Making excuses for what?

6    A.    That I will not get any job.  That's why I did

7    not get the job, not that they're better than me.

8    When I ask her why the other candidates get the

9    position and they never been a satellite and she told

10   me, "We are not here to talk about them, we are here

11   to talk about you."  Even when I was with her

12   discussing she told me -- she was in the office with

13   Darla, I was talking to Stacey and Darla.  I was

14   talking to Darla and she was, "Look at me in the

15   eyes."  You know, it's like, "I'm talking to you, look

16   at me."

17   Q.    Stacey said that?

18   A.    Yes, in this segment.  I'm talking to you with

19   raising her voice.  She not reported it was raising

20   her voice.

21   Q.    Anything else?

22   A.    I don't recall anything.

23   Q.    If you look at paragraph 27 it says you

24   returned to work on June 14th, that's correct, right?

Sami Almakhadhi

105

1    A.    Yes.

2    Q.    And your new FMLA period began on October 12th,

3    2005, what is the basis for that statement?

4    A.    Well, the day I took -- the day I applied for

5    FMLA for my father was -- August, I believe it was

6    August 14th, '04.

7    Q.    Okay.

8    A.    Until -- when I applied for FMLA, I applied for

9    it, but I did not use it.  I only used it --

10   Q.    For your father, you mean?

11   A.    Yeah, it was intermittent FMLA.

12   Q.    When did you first use it?

13   A.    I used it in October, October 12th or 11th.  I

14   had my check.  I took vacation with it.  Either one,

15   if you want to count it from August 14th to August

16   14th that I have my FMLA or from the day, from

17   October, from the first time I used it until the end

18   I'm eligible for FMLA.  Can I add one more thing?

19   There is an E-mail from Judy in the benefits to Sheryl

20   Cartwright in risk management advising that I will not

21   gain anything until February 12 '05.  You have this

22   document among the Department of Labor documents.

23   Q.    After you returned to work on June 14, 2005 did

24   you discuss your FMLA status with anyone at Delaware

Sami Almakhadhi

109

1    Q.    Had you asked for light duty at that time?

2    A.    I did not ask for light duty at that time.  I

3  was suspended.  You mean September 1st?  I bring from

4  my doctor, of course, note for light duty.

5              MS. VOSS:  Mark this, please.

6              (Almakhadhi Deposition Exhibit No. 10 was

7  marked for identification.)

8  BY MS. VOSS:

9    Q.    Exhibit 10 is a one-page document that comes

10  from Christiana Care Family Medicine Center and it's

11  signed by Dr. Mary Leddy, right?

12    A.    Um-hum.

13    Q.    Is this what you brought back to Delaware Park

14  after they had requested the note from a doctor?

15    A.    Yes.

16    Q.    And you agree that the restrictions listed on

17  this document are substantially similar to the

18  restrictions that were listed in Exhibit 2 for your

19  FMLA certification?

20    A.    That's not the same.

21    Q.    No, it's not exactly the same, I agree, is it

22  similar?

23    A.    It's close, but it's 20 pounds, that's ten

24  pounds.  I'm sorry, this doctor -- okay, go ahead,

Sami Almakhadhi

110

1   finish.

2     Q.   Is it also similar to the limitations listed in

3   Exhibit 4, which was the one that came from Mid

4   Atlantic Spine?  Take your time to look at them if you

5   need to.

6            MR. CONLEY:  Hold on, Sami.  I object, I

7   don't know what the point of asking this is.  The

8   documents speak for themselves, they are what they

9   are.

10  BY MS. VOSS:

11    Q.   Did you understand at that time on September

12  2nd that the limitations that your doctor, Dr. Leddy,

13  had given you were similar to the ones that Mid

14  Atlantic Spine had given you?

15    A.   This doctor I went to see her for the first

16  time.  I called my own doctor, the one I was trying to

17  do surgery with him, Dr. Katz --

18    Q.   The question is not why you saw Dr. Leddy.  The

19  question is why you understood them to be similar

20  restrictions?

21    A.   When you say "similar," all of them said

22  lifting, but here it says 20 pounds and, I don't know,

23  was it ten pounds?

24    Q.   Twenty pounds?

Sami Almakhadhi

111

1    A.    No prolonged standing.  Third one no repetitive

2  bending or twisting.

3    Q.    Exhibit 4 says no repetitive bending or

4  twisting.

5    A.    Normal for any back injury.  That said only

6  three.  How many there?

7    Q.    One, two, three, four, five, six?

8    A.    So, that's half of it, that's less.

9    Q.    It's less on September 2nd than it was --

10    A.    I was much better.

11    Q.    Okay.  Now, after the date that you brought the

12  note that is Exhibit 10 did you have any days when you

13  came back to Delaware Park and worked?

14    A.    I got suspended.

15    Q.    Yes or no question.  After September 2nd did

16  you have any days when you came back to Delaware Park

17  and worked?

18    A.    By 1st they send me home.

19    Q.    Just yes or no.

20    A.    No.

21    Q.    Back to the amended complaint.  Just to kind of

22  re-orient ourselves, paragraph 27 talks about your

23  return to work on June 14th, okay?  Paragraph 28 says

24  that Ms. Dixon and Ms. Suhr tried to harass you until

Sami Almakhadhi

118

1    A.    Before termination, no.  I don't recall

2   actually.

3    Q.    Paragraph 29 refers to you being granted a

4   hearing on your worker's compensation claim.  When

5   were you granted a hearing on your worker's

6   compensation claim?

7    A.    My worker's compensation claim we had the

8   court, we had the court to find out if I injured there

9   or no and the date was November 8th.

10    Q.    The date of the hearing?

11    A.    Date of the hearing, November 8th, '05.

12    Q.    Let me try to understand.  In paragraph 29 are

13   you referring to discrimination that intensified after

14   the hearing or after the hearing was scheduled?

15    A.    I'm sorry, could you repeat the question again?

16    Q.    I'm just trying to understand what is meant by

17   the allegations in paragraph 29.

18         MR. CONLEY:  I think the problem is the

19   facts are not correct.  There was no hearing.

20         THE WITNESS:  There was no hearing.  We did

21   not go for hearing.

22   BY MS. VOSS:

23    Q.    So, paragraph 29 says the discrimination

24   intensified.  When did that happen?

Sami Almakhadhi

119

1     A.    Remember when I told you today when Karlyn and

2    and Stacey said you did not injure there --

3     Q.    That happened back in April?

4     A.    In April '05.  FMLA was in '05.

5     Q.    So, paragraph 29 is referring to April of '05?

6     A.    I told her, "I'm going to see you in the

7    court," because I believe I give my case to my

8    attorney and I don't know when she filed it exact, but

9    I told her -- I felt we are going to go to the court.

10   I never been in court before.  I thought she was going

11   to come to the court to testify with Shannon with the

12   security and with the tape and I told her in court,

13   okay, and I left because they told me -- kicked me out

14   from the company, like suspended.  Does that answer

15   your question?

16    Q.    Not really.  When did Delaware Park acknowledge

17   your injury?

18    A.    They acknowledged my injury I think -- they

19   told my attorney -- I don't know the date, but my

20   attorney she called me before -- before November.

21    Q.    Before that hearing date?

22    A.    Yeah, before that and she said, "We're going to

23   have the hearing because they acknowledge your

24   injury."

Sami Almakhadhi

120

1    Q.    This says you received worker's compensation

2   benefits for the period September 1, 2005 and August

3   25, 2006, did you also receive for the period April

4   13th to June 13th, 2005?

5    A.    From September to August -- I think, yes, it

6   was right, until August.

7    Q.    Did they also pay you for the time you missed

8   in June of 2005?

9    A.    They pay me for the time I missed, yes.

10    Q.    Paragraph 30 says you were required to call in

11   each day.  Who told you you had to call in each day?

12    A.    Sheryl Cartwright.

13    Q.    Did you do that?

14    A.    Yes.

15    Q.    Did you speak personally with Karlyn Dixon or

16   Stacey Suhr every time you called in?

17    A.    I called the office, dialed the extension

18   office.  Any supervisor, we have a lot of supervisors.

19   I called each day until the day of the -- each day

20   until February 12th.

21    Q.    So, you didn't talk with Karlyn or Stacey each

22   time?

23    A.    Yes, it could be, yes.

24    Q.    It could be, was it?

Sami Almakhadhi

121

1    A.    Every time in the office I don't remember who I

2    was talking to.    Every time -- it's, what, think about

3    how many September, October, November, December,

4    January, five months.

5    Q.    Did you talk with anyone other than Karlyn and

6    Stacey on those occasions you called in?

7    A.    As I told you, yes, all supervisors there.

8    Q.    Okay, that's fine.    Paragraph 31 you say that

9    Karlyn Dixon and Stacey Suhr decided to terminate you,

10   what do you base that on?

11   A.    When they send me home they told me call out

12   every day and ask if they can accommodate my work

13   restriction.    Then, it was like setup for me.

14   Q.    That's not my question actually.    My question

15   is you have said that you believe the decision to

16   terminate your employment was made by Karlyn Dixon and

17   Stacey Suhr, is that correct?

18   A.    Yes.

19   Q.    What evidence do you have that that was the

20   case, that that decision was actually made by either

21   of those two individuals?

22   A.    As I told you, same thing, when I said they

23   told me to call out every day.

24   Q.    Because you were told to call in?

Sami Almakhadhi

122

1    A.    They told me to call and check if there was

2    light duty and then I was terminated because of LOA,

3    leave of absence, and that's what is listed in the

4    Delaware Park that, you know, it was -- I think you

5    have it in the -- it was like setup.  I've been

6    working with this company for long time.  I know

7    people when you call out every day they give them LOA

8    and they can come out.

9    Q.    So, it happens to other people too?

10   A.    Yeah, when you call out if you didn't have FMLA

11   if you call out, yeah, but the difference is I was not

12   volunteered.  They forced me to go home.  They

13   suspended me and --

14   Q.    I understand that.

15   A.    I didn't volunteer.  They called me out.  For

16   example, Delaware Park, I call out and I'm not coming,

17   that is a volunteer, that is different; but, when they

18   force you and suspend you and later use that

19   suspension to terminate you, that was discrimination,

20   that was either retaliation.

21   Q.    But that wasn't exactly my question.  My

22   question was what evidence you have that the decision

23   to terminate your employment was made by Karlyn Dixon

24   or Stacey Suhr and you told me because you were told

Sami Almakhadhi

123

1    to call them every day.  Anything else?

2    A.    Karlyn Dixon is the head manager, either the

3    risk management can terminate me or Karlyn Dixon.

4    What happened Karlyn Dixon she is the one did not give

5    me the light duty since September 1st.  After Sheryl

6    Cartwright called her and asked her if she can

7    accommodate she did not give me.  She is the one that

8    told me go home and call out every day.  She told

9    Sheryl that I have to go home and we have evidence of

10   that.  Karlyn is the one that told me to go home.

11   Q.    You told me that already.  Anything else?

12   A.    I called about my -- I know it's small, but

13   that was like the fire starting or the spark.  I

14   called her about my gift, it was $200.00.  I didn't

15   receive it.  Other time -- I was financially really

16   bad, so I ask her I need the 200.  It's small amount,

17   but that's my right.

18   Q.    Just to clarify that was the Christmas gift you

19   are referring to?

20   A.    Yes, I did not receive it.  I called her to see

21   who terminated my job.  I called her -- I called

22   Stacey, I remember I called Stacey.

23   Q.    You didn't call Karlyn about the gift, you

24   called Stacey?

Sami Almakhadhi

124

1    A.    No, I called Stacey.  She told me call Karlyn

2    or Cindy.  Next Monday, when I called that week she

3    told me to call Karlyn about the gift or Cindy.  I

4    talked to Cindy and asked her about the gift and she

5    said she cannot do nothing, she has to talk to Karlyn.

6    Later on I called Cindy and she doesn't want to answer

7    the phone, you know.  Found out -- after -- the whole

8    thing was less than five days, you know, five, seven

9    days, the whole thing.  I found out Beverly called me.

10   Q.    Beverly Pope?

11   A.    Yes, Beverly Pope, either Monday or Tuesday.

12   Q.    Do you recall when you called in about the

13   Christmas gift?

14   A.    I was terminated February 12th so it was five,

15   seven days before that.

16   Q.    So, around February 7th?

17   A.    If you check the date when they issued the 200

18   was February 8th.

19   Q.    So, must have been before then?

20   A.    It was February 8th.  Later, I don't know, she

21   called me and she told me you have to come next

22   Sunday.

23   Q.    And "she" in that sentence was Beverly Pope?

24   A.    Beverly Pope.  She told me we have instructed

Sami Almakhadhi

125

1   that you have to come next Sunday.

2    Q.   What did you understand would happen if you

3   didn't come back to work next Sunday?

4    A.   Nothing.  Told me just come Sunday, you know,

5   with --

6    Q.   With a full release?

7    A.   With a full release.  I told her I've been

8   fighting for two years with my back.  I told her I

9   have to talk to my doctor and my doctor said --

10   Q.   Which doctor did you talk to?

11   A.   Dr. Banero.

12   Q.   I'm not familiar with that name.  Can you spell

13   it for me?

14   A.   His name is Dr. Banero or something.

15   Q.   I might be familiar with that name.  I think I

16   know who you are talking about.

17   Q.   What did he tell you?

18   A.   He told me you have to work with restriction or

19   give me a note.

20   Q.   When you first spoke with Beverly Pope, didn't

21   you tell her that you would get a full release?

22   A.   I told her I would talk to my doctor, you know,

23   if I can come to work; but, I called her later, I told

24   her, Listen, I'm going to work, but with -- I said, I

Sami Almakhadhi

126

1   will go -- I'm coming to work, I'm willing to come to

2   work, but it has to be with restriction.

3     Q.   And she said?

4     A.   I cannot violate what we told you.  I told her

5   she was new and the one who makes the decision is

6   Karlyn Dixon and everybody who knows told me she makes

7   the decision.

8     Q.   So, you didn't return to work on February 12th?

9     A.   I told her --

10    Q.   Yes or no?

11    A.   I did not, no.

12    Q.   What did you understand your status to be after

13  February 12th?

14    A.   He will have it.

15         MR. CONLEY:  Answer the question.

16  BY MS. VOSS:

17    Q.   I understand, but can you try to answer my

18  question?

19    A.   That's the answer to my question.  When I

20  called February 12th to call out every day I called

21  Alfred or something.

22    Q.   Was that Alfred Sheats?

23    A.   Could be, I don't know his last name.  I told

24  him, "What happened, did I get fired or something?"

Sami Almakhadhi

127

1   He said, "I don't know, you need to talk to Karlyn

2   Dixon."  He told me don't call out every day.

3      Q.   Why did you ask if you were fired?

4      A.   I was wondering, Why should I not call out

5   every day?  He said, "I don't know."  I was still

6   there.  It doesn't make sense to call out every day,

7   every day.  Maybe they got tired of me.  When you call

8   out every day, you know my situation.

9      Q.   You call Mr. Sheats twice, at least twice?

10      A.   I called him twice.  The first time my cell

11   phone was dying and then I think when I called him

12   again, yes, he did not tell me I got fired or

13   anything.

14      Q.   But you asked him if you were fired?

15      A.   He said, "I don't know."

16      Q.   And he told you you had to talk to Karlyn?

17      A.   Yes, or to Stacey.

18      Q.   Did you ever talk to Karlyn or Stacey?

19      A.   No.

20      Q.   Why not?

21      A.   I did not want to talk to them.  They kicked me

22   out.

23      Q.   So, you did not want to know if you were fired?

24      A.   I told them, "What happened?  Did I get fired?"

128

1    But that was react, but I never imagined I got fired,

2    I didn't think so because I was working for this

3    company for four years, they have respect.  I'm not a

4    horse.  You know, a horse get injured, they shoot him.

5    I thought they treat me as a human being.

6    Q.    Have you told me all the reasons why you

7    believe that Karlyn Dixon made the decision to

8    terminate you?

9    A.    Who signed my PAN, Karlyn Dixon and who?

10   Q.    I don't know.

11   A.    Kevin DeLucia, K was Kevin, that's her husband.

12   Q.    Because she signed that?

13   A.    As I understand from your letter to that

14   Department of Labor was Shannon DeLucia, director of

15   human resources, that was not true.  For ten months I

16   was trying to --

17   Q.    I understand you disagree with that.  What I

18   need to know now is the basis for your claim that

19   Karlyn Dixon made that decision and so far you have

20   told me you were told to call Karlyn every day and you

21   were told to call Karlyn about your Christmas gift and

22   Karlyn signed the personal action notice, is there

23   anything else?

24   A.    The only thing is either Karlyn Dixon or human

1  resources or both.

2    Q.   I believe the first time you said Karlyn Dixon

3  or risk meaning risk management?

4    A.   If I said it, I didn't say risk management.  If

5  I said it --

6             MS. VOSS:  (To the court reporter)  Excuse

7  me, could you find that part and read it for me?

8             (The following question and answer were

9  read back by the court reporter:

10            ("QUESTION:  But that wasn't exactly my

11  question.  My question was what evidence you have that

12  the decision to terminate your employment was made my

13  Karlyn Dixon or Stacey Shur and you told me because

14  you were told to call them every day.  Anything else?

15            ("ANSWER:  Karlyn Dixon is the head

16  manager, either the risk managment can terminate me or

17  Karlyn Dixon.")

18  BY MS. VOSS:

19    Q.   The question was read back, was that a mistaken

20  statement?  Do you wish to change that testimony?

21    A.   Yeah, I mean my head department, it was Karlyn

22  Dixon, and the HR.

23    Q.   So, not risk management, but HR?

24    A.   They would talk with risk management.  They

Sami Almakhadhi

132

```
 1      A.   Yes, we have 40 hours sick time and from

 2   September 1st to -- from September until my

 3   termination I had vacation, but vacation time not

 4   many, but it was vacation time -- I think vacation,

 5   I'm not sure about the sick or not, but sometimes at

 6   Delaware Park we are using to pay for my Blue Cross,

 7   Blue Shield portion.

 8      Q.   So, you now believe you may have had some time,

 9   is that correct?

10      A.   Yes.

11      Q.   Did you discuss any other questions that we

12   discussed in the morning with Mr. Conley?

13      A.   I think that's -- I think that's all.

14      Q.   Did you discuss any questions that might be

15   asked this afternoon?

16      A.   No.

17      Q.   I would like to follow-up on just a couple

18   things from this morning.

19      A.   Yes.

20      Q.   You told me that Karlyn Dixon made certain

21   statements about you being Arab?

22      A.   Yes.

23      Q.   Were there any witnesses to those statements?

24      A.   I don't remember because when we were talking,
```

Sami Almakhadhi

133

1   as I mentioned earlier, we were talking in the what do

2   you call, the food room, break room, the break room,

3   while we were eating and watching TV.

4   Q.   So, do you think anyone overheard that comment?

5   A.   I don't know.

6   Q.   You also told me that I think around the time

7   you came back from your FMLA leave in June of '05 you

8   moved to the morning shift, is that right?

9   A.   I believe so, yes.

10  Q.   Had you requested that move?

11  A.   They asked me if I want to switch and it was

12  yes.

13  Q.   Who asked you if you wanted to switch?

14  A.   Stacey.   They switch every -- you know, people

15  move to night.

16  Q.   Is that something you have to bid on through

17  the union system?

18  A.   It's -- they ask me because I'm more seniority.

19  So, if I'm number seven or eight, they should ask me

20  before, you know, other people, if I have a right.

21  So, they do it like, I don't know, two, three months

22  sometimes.   I kept my four to twelve for a long time,

23  even grave shift I work for a long time.

24  Q.   Your answer is, yes, you did want to move?

135

1    A.    Yes, she wants me to stay one more week.  So, I

2    worked three more weeks.

3    Q.    Do you believe it was these three weeks?

4    A.    It was in '04.  I worked as a satellite many

5    times, but not one time three weeks.

6    Q.    But for three weeks straight?

7    A.    Yes.

8    Q.    That was the only time you did it for three

9    weeks straight?

10   A.    Three weeks, yes.

11   Q.    And as of let's choose a date shortly before, I

12   don't know, I guess that's the pay period ending June

13   26 would have been the first one.  Are the pay periods

14   at Delaware Park one week, one-week pay periods, you

15   are paid a week at a time?

16   A.    Yes, every Friday, yes.

17   Q.    Presumably that pay period would have started

18   on June 19th.  As of June 19th, 2004 had you provided

19   any work restrictions to Delaware Park?

20   A.    June 19, '04.  No, I think after everything

21   from my FMLA, no.  The answer is no.

22   Q.    Any FMLA you were just referring to was in

23   2005?

24   A.    FMLA was '05.



Sami Almakhadhi

136

1    Q.   Okay, I think before lunch we were talking

2    about paragraph 31 of the amended complaint and in

3    paragraph 31 you also allege that Stacey Suhr

4    participated in the decision to terminate your

5    employment.

6    A.   Okay, what is your question?

7    Q.   My question is what evidence you have that

8    shows that Stacey Suhr was responsible for the

9    decision to terminate your employment?

10   A.   Well, Stacey Suhr and Karlyn, as I told you

11   before in this deposition, they are the decision-

12   makers of this department.

13   Q.   All the same reasons that you mentioned for

14   Karlyn are they the same reasons for Stacey?

15   A.   Both of them, yes, they don't -- you know, they

16   give reason.  You know, it's not like -- for example,

17   main bank job, I did not give the interview until I

18   was told that the position was filled.  Both of them,

19   I have a history combined with them from HR.  I

20   complained about discrimination in the job I believe

21   at least twice.  I complained to Roberta Evans and

22   they told her you should stop discriminating me --

23   Q.   But I don't understand why that shows that

24   Stacey Suhr made the decision to terminate your

Sami Almakhadhi

137

1    employment?

2    A.    Because we have history from discrimination

3    against them, against both.  And, as I told you, right

4    now the one who makes the decision is Karlyn and

5    Stacey.

6    Q.    Your evidence is you complained about her?

7    A.    They're the only ones that make decision.  If

8    you want to be promoted to another position, Stacey or

9    Karlyn.  Beverly Pope, she is a manager --

10   Q.    They're the normal decision-makers in the

11   company, correct?

12   A.    Correct.

13   Q.    Anything else?

14   A.    Anything else?  Yeah, one more thing.  I need

15   that thing for the -- when they used to promote me for

16   cashier it was -- that's after my injury, that was

17   kind of retaliation against me.  She knows I have back

18   injury.

19   Q.    Is this the satellite job you are talking

20   about?

21   A.    The satellite and she asked me to stay one more

22   week, you know.  I mean, I have no choice, I stayed,

23   based on her request.  Because they want to prove to

24   the company, look at him, he doesn't have back injury,

139

1   interview -- even interview by either Karlyn Dixon or

2   Stacey you have a job.  If they send you to somebody

3   else like they did to me, Beverly Pope, you are done.

4   That's why on August 25th when I applied for satellite

5   position, Stacey, she interviewed Penny Payne and

6   Beverly Pope she interviewed me.

7      Q.   Count I of your complaint that starts just

8   below paragraph 32, that's your claim for national

9   origin discrimination on a number of bases.  Do you

10  have any evidence to support your claim for national

11  origin discrimination that we haven't discussed

12  already?

13     A.   I'm the only one who treated badly than anyone

14  in Delaware Park.  I am the only one among my

15  co-workers from the date I got injured there until the

16  date I was termination -- I was terminated that I'm

17  the only one who, cashier, who did not offer them

18  light duty.

19     Q.   What is your national origin?

20     A.   Originally I'm from Yemen.

21     Q.   You are not from Jordan?

22     A.   My family originally from Jordan, but I was

23  raised and born in Yemen.  I think if you read your

24  history about the Arabs, we are one country, the whole

140

1    thing.

2        Q.    Yes, until the end of the World War.

3        A.    Yeah, there was nothing Jordan, it was all one.

4        Q.    They didn't do a good job on that, of dividing

5    that up.  In terms of your hostile work environment

6    claim based on your national origin do you have any

7    evidence to support that that we haven't already

8    talked about?

9        A.    I think we talked about that already enough.

10       Q.    And your retaliation claim for complaining

11   about discrimination based on your national origin, do

12   you have any evidence to support your retaliation

13   claim that we haven't talked about already?

14       A.    I need to mention to you something before this

15   question.  When I said before -- I did not complete my

16   -- I come in twice to the HR at least.  I complained

17   to Roberta Evans, I complained to Frank Penta.  I

18   wrote it even in my evaluation.  It's like I need to

19   scream, Hey, people, those people discriminate against

20   me, you need to stop them.  If you go, you go to HR,

21   they do nothing, we have no data, simple.  We went to

22   meeting to discuss, but, you know, we went without any

23   such fight.  All of them told me you have to be a

24   satellite first.  That's not true, that's not right.

Sami Almakhadhi

141

1    Q.    Didn't Karlyn tell you that you didn't have to

2    be a satellite first, it wasn't a requirement for the

3    job?  I think she agreed with you, it wasn't a

4    requirement for the job you were applying for?

5    A.    But Stacey said yes.

6    Q.    But Stacey recommended it would be a good plan

7    to do that?

8    A.    Even Karlyn, yes, you have to become a

9    satellite.  Even DeLucia, it's a good step to become a

10   satellite first before you move to the main bank and

11   this -- it only applied to me, not to the others.  To

12   prove that the people who were selected for the main

13   bank job they were not satellite.

14             MS. VOSS:  Please mark this.

15             (Almakhadhi Deposition Exhibit No. 12 was

16   marked for identification.)

17   BY MS. VOSS:

18   Q.    This Exhibit 12 is an incident report.  Up at

19   the top it says 5/22/2006.  I believe that was the

20   date it was printed just for this case, but if you

21   look at the beginning of the text it talks about a

22   meeting on February 14, 2005 between you and Micki

23   Nardo when you expressed a concern about not having

24   gotten the main bank position.

Sami Almakhadhi

142

1   A.   January 14, that's right.

2   Q.   So, that was one of the meetings with HR you

3 talked about, correct?

4   A.   Yes.

5   Q.   After that meeting you met with Stacey, I

6 believe, later on?

7   A.   I met with Stacey, yes.

8   Q.   Do you agree the purpose of the meeting with

9 Stacey was she was trying to explain to you again why

10 you had not received that position?

11   A.   Well, let me clarify this for you.  Stacey and

12 Micki told Stacey -- we know the one who makes the

13 decision is Stacey.  We agree about that?

14   Q.   We don't agree about that.

15   A.   We have documents.

16   Q.   I don't know who made the decision.

17   A.   We have documents, she is the one that made the

18 decision and Stacey is the one who made the decision

19 at main bank job.

20   Q.   I don't believe that's correct, but if that's

21 your testimony --

22   A.   It's not my testimony, I'm stating --

23          MR. CONLEY:  Just look at the document.

24

143

1    BY MS. VOSS:

2    Q.    All I want to do is confirm this is one of the

3    meetings with HR that you were talking about and this

4    is documentation of that meeting, do you agree?

5    A.    Do I agree about all this?

6    Q.    Not necessarily about all the contents, but

7    this would have been the date you went to HR?

8    A.    The date, yes.

9          MS. VOSS:    Let's mark this as 13.

10         (Almakhadhi Deposition Exhibit No. 13 was

11   marked for identification.)

12         MR. CONLEY:    Were you finished answering

13   that question?

14         THE WITNESS:    No, I wasn't finished, can I

15   say more?    Can I finish?

16   BY MS. VOSS:

17   Q.    I want to make sure I know what question you

18   are answering.    What question are you answering?

19   A.    You are talking about Stacey, the meeting.

20   Q.    It refers to a meeting with Micki Nardo on

21   February 14th and that's correct?

22   A.    Yes.

23   Q.    On the second page right in the midst it says,

24   "The following are the notes from your meeting between

144

1   Stacey Suhr and Mr. A," which I assume is you, and it

2   says, "I met --" I assume that's Stacey "-- with Sami

3   Almakhadhi on 2/18/05," do you agree you met with

4   Stacey on that date?

5   A.   Yes.

6   Q.   Was there something more you needed to tell me?

7   A.   No, before your comment.  Micki when she told

8   Stacey why did you not give him the position Stacey

9   answered because he missed a lot of time.  Micki

10  replied that was FMLA, he was using his rights.  I'm

11  not saying exact words, but he was using his rights

12  and you cannot pass somebody over for the position for

13  that.  Second reason, Stacey told Micki the other

14  reason is the word on the floor.

15  Q.   Right, I think we discussed this earlier.

16  A.   And this should not be happening because we

17  have a policy.

18  Q.   Okay.  Now, moving on to Exhibit 13 is another

19  incident report and under details on the first page it

20  says, "Recorded Date, 3/17/2005, Incident Date,

21  3/15/2005."  And then in the text it says, "Mr. A came

22  to the HR office at Kirkwood Services building on

23  3/14/05 at approximately four p.m." was that the

24  second time you met with Micki Nardo?

Sami Almakhadhi

145

1    A.    It could be, yes.

2    Q.    I understand that when you met with Micki Nardo

3    the second time you said you wanted to speak with

4    Kevin DeLucia, is that correct?

5    A.    She told me I need to speak with Karlyn Dixon.

6    I told her about Karlyn Dixon, you know, about she

7    yells at me and do you want to go move up to Kevin

8    DeLucia and I said, yes, I would love to solve this

9    problem.

10   Q.    You went and talked to Kevin DeLucia?

11   A.    We went, yes.  I was trying to do anything to

12   solve this problem without going up on that.

13   Q.    On the second page let's see if I can find the

14   right place.  If you don't mind may I make a little

15   mark on the page?  That will help make a clear record

16   later on.  Where you have just made the mark on the

17   page maybe I should put a number on that.  I'll just

18   put the number 1 next to it.  This report attributes

19   the following remark to Karlyn at that meeting.

20   "First of all, being a satellite cashier is not a

21   prerequisite for working in the main bank."  Do you

22   agree she said that at that meeting?

23   A.    Yes, but that's, you know, different what

24   Stacey told me that the person who picked the people

Sami Almakhadhi

157

1  all of them they want me to become a satellite. They

2  want me to become a satellite, you know, because

3  Karlyn and Stacey have to prove that they have

4  nothing, I'm okay. Especially even when I did not do

5  the surgery it's like he is fine, he is just a liar, a

6  big liar. She didn't believe even MRI something. I

7  have MRI from 2004. They sent me in August to the

8  doctor.

9  Q.   August when?

10  A.   August '05 to the doctor, first time.

11  Q.   For the worker's comp. complaint?

12  A.   If she sent me from the beginning I have MRI.

13  It was -- you know, and now the reason it was a lie.

14  The reason I violate Delaware Park policy, which, one,

15  I didn't have any copy from Delaware Park policy that

16  required light duty.

17  Q.   Can I ask one question about going to the

18  doctor in August of 2005?

19  A.   Yes.

20  Q.   Who do you understand wanted you to go to the

21  doctor?

22  A.   Delaware Park required me to go to see their

23  own doctor.

24  Q.   But some particular person at Delaware Park?

Sami Almakhadhi

160

1   for the position, it was within 90 days, less than 90

2   days.

3     Q.   I'm sorry, what was within 90 days, within 90

4   days of the date they applied?

5     A.   Yes.  Remember I told you before that I asked

6   Stacey do I have to apply for the impress supervisor

7   and she told me, no, you already have an active

8   application, you don't have to.  The day it was posted

9   -- it didn't matter what day they pick him, even pick

10  him in 2008, the day it was posted it was posted for

11  seven days, I should be competing with him.  He was

12  selected.

13          Even Karlyn Dixon in her statement was

14  provided Department of Labor she said I only know

15  about two positions, the Penny Payne and the main

16  bank, that's it.  She did not even mention anything

17  about Jonathan because, you know -- I don't know why.

18  I know you like to talk about Penny Payne.  It was a

19  good competitor, I agree with you.

20    Q.   Are you saying competent?

21    A.   No, good candidate, but I am, I think, if you

22  give to the jury my documents and give her documents

23  did you review her application --

24    Q.   I'm sorry?

Sami Almakhadhi

161

1          MR. CONLEY:  You can't ask her questions.

2    Doesn't work that way.

3    A.    She said she was a cashier --

4          MR. CONLEY:  Do you want to ask him

5    questions about Penny?

6    BY MS. VOSS:

7    Q.    I'll ask you a question about Penny Payne and

8    that may be what you are trying to say.  The job that

9    Penny Payne got was impress supervisor, is that

10   correct?

11   A.    Yes.

12   Q.    And you agree she was a good candidate.  Do you

13   believe you were better qualified than she was?

14   A.    Well, I don't know --

15         MR. CONLEY:  Hold on a minute because I

16   don't know what the relevance of that question is.

17         MS. VOSS:  He is saying he did not get that

18   job because of discrimination.

19         MR. CONLEY:  Well, maybe there needs to be

20   a point of clarification because maybe I'm missing

21   something because my understanding earlier was that

22   Penny because of the date of her application she

23   wasn't considered eligible for that, is that correct?

24         MS. VOSS:  No, I don't believe that's

Sami Almakhadhi

164

1  your question?

2     Q.    No.   I want to know -- I mean, in your lawsuit

3  you have alleged that Delaware Park did certain things

4  that were wrongful as a matter of law, right?

5     A.    Yes.

6     Q.    Are you alleging that not being selected for

7  impress supervisor in August 2005 was wrongful as a

8  matter of law?

9     A.    Yes.

10    Q.    Because for a minute there it sounded like you

11  weren't making a claim?

12    A.    No, first question was 2005 and then specific

13  was August of 2005.

14    Q.    I'm talking about the time when Penny Payne got

15  the job.  Do you believe you were better qualified for

16  Penny Payne?

17    A.    Now you are talking only about Penny Payne.

18    Q.    Not anybody else, just Penny Payne.

19    A.    I didn't know her qualification, but, I mean, I

20  didn't have her qualification in front of me; but,

21  what I believe is I am certain about that I have more

22  seniority than all the candidates that were selected,

23  all of them.  I have no violation of Delaware Park

24  policy preventing me from going up and, as I stated

Sami Almakhadhi

165

1    before, I used my FMLA to dismiss that point, to not

2    give any -- to not give any reason that Delaware Park

3    would not give me the position.

4    Q.    If you would turn back to Exhibit 12 for just a

5    moment and in terms of your marks what number are we

6    on?

7            MR. CONLEY:  The last one was 5.

8            MS. VOSS:  Which I failed to mark on my own

9    copy, I'm sorry, and that's on Exhibit 12, number 5.

10   BY MS. VOSS:

11   Q.    Did we have a mark on this, Mr. Almakhadhi?

12   Number 5 is at the top of the third page, correct?

13   A.    Yes.

14   Q.    And if you look just below that --

15   A.    Starts from here, from here.

16   Q.    Right, and that's where number 5 is.  If you

17   look just below that a few lines do you see where it

18   says, "Life is too short," do you see that part?

19   Here, I can mark it for you, if you would like.

20   Starting about here I'll mark that number 6.  Okay?

21   A.    Okay.

22   Q.    And starting with where I've marked it it says

23   that Sami started smiling and shaking his head and

24   said that life is too short and then he looked at

Sami Almakhadhi

170

1    BY MS. VOSS:

2      Q.    When did you see him?

3      A.    Who is this guy?  I didn't see him in 2006.

4      Q.    Do you recall when you saw him?

5      A.    I saw him once.  As I told you, I was looking

6    for anyone to heal me.  Even I went to Baltimore for

7    the meeting in the convention center, I went there to

8    find anyone.  I was trying to get help.

9      Q.    I understand.

10     A.    But in '06 I didn't see Dr. Khella in '06,

11   January '06, maybe a mistake.

12     Q.    Did you see him before your employment with

13   Delaware Park was terminated?

14     A.    I seen him when I was injured.  I don't

15   recognize even the year.  That doctor I see was only

16   one time.

17     Q.    You can't even tell me what year you saw him?

18     A.    I don't remember.

19              MR. CONLEY:  Can we go off the record a

20   second?

21              MS. VOSS:  Sure.

22              (Brief discussion off the record.)

23   BY MS. VOSS:

24     Q.    Let's wait and see if we can find out anything

Sami Almakhadhi

174

1  different jobs, not just your job as a booth cashier,

2  but many different jobs based on your disability?

3  A.    People in Delaware Park they think I can't do

4  many other jobs?

5  Q.    That's what I understand it to say.  Assuming

6  that's the case who specifically thought you could not

7  do many different jobs?

8  A.    I need to understand, can you read the question

9  again?  To me it's simple words, I speak English, but

10 I don't speak that way.

11         MR. CONLEY:  Obviously the complaint was

12 drafted by an attorney.

13         MS. VOSS:  And I understand that.

14 A.    That's why sometimes you send me words I don't

15 know.  That's why I bought law dictionary.

16 Q.    Let's start with the booth cashier job.  Do you

17 believe that there were any individuals at Delaware

18 Park who believed you could not perform the booth

19 cashier job because of your back problem?

20 A.    Are you asking people -- I told them I have

21 back injury, I cannot do it.  Most of the people they

22 do back-out time.  Before injury I was carrying full

23 bags, I was working hard, but after my injury I need

24 to follow my doctor's restrictions all.  I am my

Sami Almakhadhi

175

1    family, I am the way to get money for the living.  So,

2    the point is I never, ever violate my doctor's

3    restrictions.

4      Q.    I understand that, but back to booth cashier

5    are there specific people at Delaware Park that you

6    contend believed you could not perform that job?

7      A.    Delaware Park they have risk management, they

8    have MRI.

9      Q.    I'm not arguing about whether you injured your

10   back.  I want to know who you think thought you could

11   not do that job because of your back injury?

12     A.    Could be Shannon DeLucia, Karlyn Dixon, she

13   knows I injured and she told me how is your back,

14   everything is okay with you, are you going to stay in

15   this country or are you going to leave?  She was

16   telling me what going to happen next.  Are you going

17   to stay, continue in this country?  Or, you know, I

18   don't know what else you want me to answer.  Does this

19   answer your question?

20            You mean like ask my co-workers do you

21   believe -- I don't know, ask them.  I don't know what

22   they think, but I tell you facts that I gave my

23   medical records to the risk management.  They know I

24   have back injury and Shannon DeLucia she has been in

Sami Almakhadhi

183

1     A.    I remember the day I went to the EMT at the

2   same time, at the same time after I lift.

3     Q.    So, you believe, would it be correct then that

4   you went to the EMT on 5/20/2004?

5     A.    I remember it was 5/18, but I'm not sure about

6   these two days.

7     Q.    So, either 5/18 or 5/20?

8     A.    Yes, 5/18/04.

9     Q.    In paragraph 59 of the complaint, the very last

10   part of that, you say, "Delaware Park also sought to

11   prevent incurring costs concerning any future medical

12   leaves that Mr. Almakhadhi might have."  What do you

13   mean by that?

14            MR. CONLEY:  Objection to the extent that

15   he didn't draft it.

16   BY MS. VOSS:

17     Q.    What do you understand that to mean?

18     A.    I'm sorry, I don't understand this question.

19   What does it mean --

20     Q.    Do you understand the statement at the end of

21   paragraph 59?

22     A.    No, I don't understand it.

23     Q.    At the beginning of that paragraph you say that

24   Delaware Park retaliated against you for taking

Sami Almakhadhi

185

1   A.   Okay, sure.

2   Q.   Do you claim that Delaware Park terminated your

3   employment because you had taken FMLA leave, to

4   retaliate against you for taking FMLA leave?

5   A.   Terminate me because I took a FMLA?

6   Q.   Yes.

7   A.   They let me -- they let me use my FMLA to

8   terminate me.  That's the answer.  They let me use my

9   FMLA to fire me.  They tried to fire me after I took

10  FMLA.

11  Q.   And do you have any evidence that the reason

12  for letting you take FMLA leave was so they could fire

13  you?

14  A.   Absolutely, I have reasons.

15  Q.   What is that evidence?

16  A.   You have at least five, ten pages in the

17  Department of Labor that after I exhausted FMLA I got

18  fired.  That's why they let me use my FMLA.  So, there

19  is nothing to protect my job, get terminated.  And

20  even you said to the Department of Labor that I --

21  that my termination was administrative because I was

22  exhausted all my FMLA.

23  Q.   Anything else?

24  A.   No, that's it.



Sami Almakhadhi

186

1    Q.    In terms of your worker's compensation claim

2    you have also made a claim that you were terminated

3    because you had filed a worker's compensation claim,

4    right?

5    A.    Yes.

6    Q.    So that your firing was a retaliation for

7    having filed a worker's compensation claim?

8    A.    It was getting worse, yes.

9    Q.    For that worker's compensation retaliation

10   claim what is your evidence to support that claim?

11   A.    When they put me in the satellite cashier, as I

12   stated before, I told her it was too much because I

13   have back injury and they insisted, all of them --

14   Q.    Did you tell them it was too much for you

15   before they put you in the job?

16   A.    I'm sorry?

17   Q.    You applied for satellite cashier, right?

18   A.    Yes.

19   Q.    Did you do that voluntarily or did somebody run

20   up and say you have to apply?

21   A.    No, I did it voluntarily, but I got injured

22   after that.

23   Q.    But you had to accept the job, right, you

24   applied, yes?

Sami Almakhadhi

187

1    A.    I applied for the job.

2    Q.    You were interviewed, yes?

3    A.    Yes.

4    Q.    You were selected, someone came and told you

5    you got the job, yes?

6    A.    Yes.

7    Q.    And probably not that day, but a little bit

8    later, not much later, you started the job?  How long

9    between when they told you you were selected and when

10    you started?

11    A.    I was -- between the time I did the application

12    and the time they put me my back is getting worse.

13    Q.    How long between when they told you you were

14    selected and when you started working?

15    A.    I don't know.

16    Q.    A couple days maybe?

17    A.    You have documents.

18    Q.    I don't know if we have documents.  I'm asking

19    for your best recollection.

20    A.    I don't recall the time.

21    Q.    Did you know before you started or did they

22    just walk up and say go do it?

23    A.    Did I know what?

24    Q.    That you had the job.

Sami Almakhadhi

188

1    A.    We had an interview before, I believe.

2    Q.    So, when they came and told you you were

3  selected, did you immediately leave your booth cashier

4  job and go do the satellite job or did you start a day

5  or more later?

6    A.    I don't remember if it was one day or more

7  later.

8    Q.    But it was later?

9    A.    I don't know.  They gave me two weeks training,

10  you know, and I cannot do it because --

11    Q.    Who told you you were selected for the job?

12    A.    I don't recall.

13    Q.    Did you tell anyone that you didn't want the

14  job because it was too much for your back?

15    A.    I told Stacey.

16    Q.    When you said you wanted to leave the job, you

17  told her that, but how about before you started did

18  you tell anyone you didn't want that job because it

19  was too hard for you?

20    A.    Who should I tell at Delaware Park?

21    Q.    Just a yes or no.

22    A.    I don't know.

23    Q.    I'm not saying you had to do that, I'm just

24  asking if you did?

Sami Almakhadhi

189

1   A.    I don't remember if I talked to someone.   I

2   don't remember.

3   Q.    Did you not want the job before you started?

4   A.    I was selected -- I wanted the job, but because

5   I cannot do it because of my injury I told them I

6   can't do it.

7   Q.    When did you change your mind?  You said you

8   wanted the job because you applied, but at some point

9   later you changed your mind.  Did you change your mind

10  before you tried it or did you not want it after you

11  tried it?

12  A.    After I tried it.

13  Q.    All right, now, that's the satellite position.

14  Is there any other action by Delaware Park that you

15  think was retaliation for having filed a worker's

16  comp. claim?

17  A.    I'm sorry, I'm thinking about the first one

18  after I told them about the job after I was selected

19  or before.  I think I talked to Stacey or, I don't

20  know, maybe Carlyn, I'm not sure.  I told them -- I

21  don't recall exactly, but I'll stick with my first

22  one.

23  Q.    Okay.  Other than your termination is there

24  anything else you are claiming is retaliation for

**W&F**

Sami Almakhadhi

190

1    having filed a worker's comp. claim?

2      A.    Other than termination?  I was not selected for

3    -- did not have interview for the main bank --

4              MR. CONLEY:  Objection, do you mean other

5    than what we have discussed so far in the deposition

6    or do you want him to re-hash all that?

7              MS. VOSS:  I just want to know the specific

8    acts because we have not discussed them specifically

9    with regard to his worker's comp. claim.

10   BY MS. VOSS:

11     Q.    Being put in a satellite job is one thing and

12   not having an interview for main bank, is that

13   correct?

14     A.    It's not that I didn't have interview.  I said

15   I had interview.

16     Q.    That it came after?

17     A.    But I told you it was, you know --

18     Q.    Right, I understand, I apologize for misstating

19   that.  Anything else besides your termination?

20     A.    Only about promotion, they didn't want to give

21   me a promotion at all and harassment, as I told you,

22   by surveillance and tried to --

23     Q.    When you say "harassment by surveillance," can

24   you tell me a little more about that?

Sami Almakhadhi

191

1    A.    I was working every time surveillance called.

2    Q.    I'm sorry, working?

3    A.    When I work, I think they told them, Watch

4    Sami, something.  Every time I work they're trying to

5    send me a message, hey, we're watching you, don't do

6    any move.

7    Q.    Why do you think that?

8    A.    Because my worker's comp.

9    Q.    Why do you think they told surveillance to call

10   you?

11   A.    Because surveillance was called about me most

12   of the time.

13   Q.    How many times did surveillance call about you?

14   A.    Many times.

15   Q.    When did that start?

16   A.    Specifically, I mean, my memory is not that

17   good, but I don't know when, but during that year in

18   2005, 2000 -- after my injury, 2004.

19   Q.    And what would happen when surveillance would

20   call?

21   A.    But it's getting worse after I went to the

22   hospital after I think it was in April of '05, after

23   April after I, you know.

24   Q.    And what would happen when they called, when

**W&F**

Sami Almakhadhi

192

1    surveillance called?

2    A.    They call me and don't, don't change your --

3    anything, you know, any reason, you know.

4    Q.    Can you give me a specific example?

5    A.    They call me --

6    Q.    One thing you told me was that you were

7    counting money too fast.

8    A.    It's not about fast.  It's that put this 20

9    here, not here.  It's like too much harassment.  It's

10   like somebody watching where I don't do anything.  You

11   know, we are watching you, trying to give me a

12   message.

13   Q.    Did you ever complain about that?

14   A.    No, the surveillance called the supervisor and

15   supervisor called me.

16   Q.    Did you ever complain about that?

17   A.    I didn't complain.  To who?  After what

18   happened with Micki and she said she cannot I never

19   complain.  To who?  I complained to God.

20   Q.    When surveillance called, were you always given

21   a message about something having to do with the money?

22   I've heard two examples so far, that you were counting

23   money too fast and that you had misplaced a certain

24   denomination dollar bill, were those the kinds of

193

1    calls surveillance would make?

2    A.    Yeah, even for small things.  I did not put the

3    tag on the bag, that I did not weigh that bag.

4    Q.    Were you disciplined for any of the things that

5    surveillance called about?

6    A.    There was no discipline.  Just, as I said

7    before, they were trying to give me a message, We are

8    watching you.  When I got suspended in '05, it was

9    retaliation even for worker's comp.  I told you I was

10   suspended, no money.  They thought I was going to go

11   home, no pay, nothing, maybe I'll quit or something.

12   They asked me if I want to quit.  A lot of things

13   happened that year.

14              Even Mrs. Dixon she told me you did not

15   injure it here, you know, we checked the tape, me and

16   surveillance, and I don't know what kind of tape she

17   checked.  I only complained that I have numbness in my

18   leg.  She only just read the report that I did it.

19   It's going to say -- how are you going to say the

20   numbness in my leg?  I don't know.  She can not see

21   the numbness in my leg.  When I went to the hospital

22   in April, I believe it was in April of '05, I only

23   complained about numbness in my leg, but she told me

24   she watched the tape and I did not injure it there

195

1    stuff.  Termination?

2    Q.   Termination and worker's comp.

3    A.   Well, September 1st she suspended me.

4    Q.   She was?

5    A.   She --

6         MR. CONLEY:  Who is "she"?

7    A.   Karlyn Dixon is the one that makes the decision

8    to let me go home.  You like to say --

9    Q.   But the person who told you to go home was

10   Sheryl Cartwright?

11   A.   Yes.  While in the office she said, "I'm going

12   to talk to your manager to see if they can accommodate

13   you," and she went to the office.  I can hear you, she

14   was next -- risk management office is small, you can

15   hear everything.  She was talking to Karlyn and she

16   was willing to give me light duty even the Shannon

17   DeLucia in her E-mail or letter to Karlyn in -- I

18   think after the doctors saw me, after the 5th that she

19   asked if I have any restriction, you know, she asked

20   -- she said if we can talk about if we can

21   accommodate.  I have to go to my own doctor, get

22   restriction and then we can discuss if you can

23   accommodate his restriction, from Shannon to Karlyn.

24   Q.   When you came back with your doctor's note on

Sami Almakhadhi

207

A.    Yeah, I told her did I get terminated February 12th. She doesn't know, maybe I get this document or not, she has no idea.

Q.    You asked her if you were terminated on February 12th?

A.    Yes, same question I asked Dave.

Q.    What did she say?

A.    I think, I'm not sure, you know, she was in conversation with Dave when I was talking to Dave. I think she was listening, I'm not sure. Like she knows what I talked to Dave she sounds. She was -- because Dave told me February 12th. You can ask Dave what happened.

Q.    Did she agree you were terminated on February 12?

A.    She was telling me that I was terminated on February 12 and as a courtesy for me she extended the benefits.

Q.    So, those were her words, "as a courtesy"?

A.    That was her words.

Q.    Did she explain why she thought that was a courtesy?

A.    As I said, because the girl she left and we didn't know, she said, we didn't know what she did or

Sami Almakhadhi

208

1    didn't do.  She was telling me I don't have your file

2    in front of me she was telling me.

3      Q.    Was there anything else that you and Shannon

4    talked about?

5      A.    We talked about discrimination.

6      Q.    How did that come up?

7      A.    She was telling me that we give you all light

8    duty available.  We all work, you have exhausted all

9    your light duty, you know, you --

10     Q.    Excuse me, did you mean light duty?

11     A.    Light duty, yes.

12     Q.    You exhausted your light duty?

13     A.    She told me, yes.  She have no idea what

14   happened.

15     Q.    So, she said you exhausted your light duty?

16     A.    Yes, she told me we give you all light duty.

17   We can not extend it more than 90 days.

18     Q.    What else did she tell you?

19     A.    I told her that's discrimination treating me,

20   you know, you should have sent me at least a letter.

21   I'm a human being and, you know, something like that I

22   told her she should at least give me a warning my

23   termination was happening.

24     Q.    If you had a warning, could you have changed

Sami Almakhadhi

209

1  something, could you have come back to work?

2    A.   If I have warning?  If I have warning, could

3  be, yes, changed something.  I need to go back to

4  work.

5    Q.   I understand that you need work.  I get that.

6  What could you have changed to come back to work?

7    A.   If they give me work as a light duty, I have an

8  opportunity.  Everybody knows now that I'm not a liar

9  because even my co-workers they think Sami is a liar,

10  he did not injure here.  So, they don't want me to

11  come back to work.  The point is if I come back to

12  work, I can switch if they offer me light duty.  If

13  they offer me light duty like the rest of the people,

14  I can switch to another department.  The cage

15  department you have soft count, you can transfer to

16  another position.  It's a big company.

17    Q.   What else did you and Shannon talk about,

18  anything?

19    A.   About I told her about the letter.  You see

20  here, "You should have received a letter from human

21  resources several weeks ago advising that effective

22  March 10, 2006 Delaware Park had to terminate your

23  employment as business needs make it impossible to

24  hold your position."  I told her, "Where is the

1          "In addition, Beverly Pope had discussed

2     with you several times about returning to work."

3     Beverly Pope she called me first time she left me a

4     message that I have to call her back and I called her

5     and she said they want me to come next Sunday.  I

6     called her, I told her -- I called her back and I

7     said, "What happened?"  She told me that they need me

8     to come back next Sunday.

9     Q.    Was Sunday February 12th?

10    A.    February 12th.  The discussion is about

11    February 12th and I called her back and my doctor said

12    -- I told her I can come back with -- to work, but it

13    has to be with restriction.

14    Q.    But you did have several conversations with

15    Beverly Pope?

16    A.    Yes, I had several discussions, but she never

17    give me a final date to return.  She had never given

18    me a final date to return in February.

19    Q.    But she did tell you that they needed you to

20    return on February 12th?

21    A.    She didn't say final date.  She want you to

22    come back next Sunday, which is February 12th.

23    "Unfortunately, you stated that you were not released

24    to work full duty," and that was right, I did not, in

Sami Almakhadhi

217

1    fact, attend on that date or, here is the question,

2    any subsequent date. You just admit in this discovery

3    that I was terminated February 12th.

4    Q.    Right, but you said you didn't know that, so.

5    A.    Right, even if you get terminated how come you

6    going to come back to work after you were terminated?

7    She was telling me in the letter that I should -- I

8    got terminated February 12 so why come back to work

9    February 13? Doesn't make sense. That proves she

10   make up the story. And the rest, just contact your

11   attorney. That's it.

12              MS. VOSS:   I would like to mark this as

13   Exhibit 17.

14              (Almakhadhi Deposition Exhibit No. 17 was

15   marked for identification.)

16   BY MS. VOSS:

17   Q.    Exhibit 17 I believe is the letter or document

18   from Rose --

19   A.    I'm sorry, I need to have -- the reason when I

20   called Shannon again it was because of this letter.

21   It's not the reason because she was contacting me or

22   something.

23   Q.    Right, I understood that.

24   A.    So, I contacted her because I received this

Sami Almakhadhi

237

1    Q.    I want to ask you about George Bohatiuk,

2    Exhibit 6 as an example.  Is it your understanding

3    that that doctor is a specialist?

4    A.    I believe he has relation, says here muscle,

5    physical medicine.  He is not a family doctor.  Even

6    when somebody recommended him to me and the person who

7    recommended him to me her name is Tina, she was a

8    cashier worker.  She told me she went to this doctor

9    for, I don't know, muscle, and he is good.

10   Q.    But you went to see him because he is a back

11   specialist?

12   A.    Yes.

13   Q.    Between September 1st when you were sent home

14   and the time of your termination either in February or

15   March, whenever that was, did you receive any

16   correspondence from Delaware Park concerning your

17   absences?

18   A.    No.  Told me, no.

19   Q.    Did you receive any correspondence during that

20   same time frame from Delaware Park concerning your

21   FMLA status?

22   A.    No.

23   Q.    You talked a bit about taking pain medication

24   for your back.  Even with the medication, even when

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 07-78 ( JJF) |
| | ) | |
| DELAWARE PARK LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**Plaintiff SAMI ALMAKHADHI RESPONSE TO THE FIRST REQUEST FOR PRODUCTION OF DOCUMENTS FROM THE DEFENDANT DELAWARE PARK LLC**

BY: _____

**SAMI ALMAKHADHI
P.O.BOX7392
NEWARK,DE 19714**

A136

## DOCUMENTS TO BE PRODUCED

1.    Any and all documents identified by Plaintiff in his Rule 26(a) initial

disclosures.

**RESPONSE:**    1- Two termination letters (See Exhibit A₁).
2- Email from Karlyn Dixon (See Exhibit A₂).
3- list names of people who offer light duty with
some documents from witness who had light duty.
more than 6 months (see Exhibit A₃).
4- Other documents (See Exhibit A₄) and (A₅, A₆

2.    Any and all documents provided by Plaintiff to the Delaware Department

of Labor and/or the United States Equal Employment Opportunity Commission in regard to his

Charge of Discrimination, filed on or about April 26, 2006.

**RESPONSE:**    I don't have it all but you can obtain
a copy from Department of labor.

3.    Any and all documents identified in or reviewed in preparation for

Plaintiff's responses to Defendant's first set of interrogatories directed to Plaintiff.

**RESPONSE:**    See interrogatories Exhibit A .

5

A137

17.    The complete file(s) of any and all expert witnesses retained by Plaintiff and expected to testify at trial, including any expert reports, documents provided to said experts by Plaintiff, documents reviewed by said experts, and any documents or drafts created by said experts.

**RESPONSE:**    *None at this Time.*

By: *[signature]*
*Sami Almakhadhi*
*P.o Box 7392*
*Newark, DE 19714*

# EXHIBIT A3



## to whome it may concern

------------------------------------------------

MY NAME IS _Hollyhea_    I USED TO WORK FOR DELAWARE

PARK AND WHEN I INJERED THERE THEY GAVE ME LIGHT DUTY JOB. IF YOU NEED

MORE INFORMATION PLEASE CONTACT ME AT ( 302 ) 838 — 4536

SIGNATURE _Hollyhea_

They gave Holly more than
6 months
Light duty

8am
8/31/06

A141

TO WHOME IT MAY CONCERN

MY NAME IS *Mir Hadelli* ———————I USED TO WORK FOR

DELAWARE PARK AS  A  SATELLITE CASHIER, AND I KNOW WHEN ANY EMPLOEE

INJURED THERE DELAWARE PARK GAVE ( HIM OR HER )LIGHT DUTY. IF YOU NEED

ANY MORE INFORMATION  PLEASE CALL ME AT( 302) 897 – 5 4 3 7

*Mir Hadelli*

SIGNATURE

**A142**

## to whome it may concern

------------------------------------------

MY NAME IS MAMUN KORESHI      I USED TO WORK FOR DELAWARE

PARK AND WHEN I ~~I WAS~~ INJERED THERE ~~THEY~~ DELAWARE PARK GAVE ME LIGHT DUTY JOB. IF YOU NEED

MORE INFORMATION PLEASE CONTACT ME AT (3>2)345— 0726

SIGNATURE  7-2 6-06

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,                    )
                                    )
        Plaintiff                   )
                                    )
    v.                              )        C.A. No. 07-78 ( JJF)
                                    )
DELAWARE PARK LLC,                  )
                                    )
        Defendant.                  )

## Plaintiff SAMI ALMAKHADHI RESPONSE TO THE FIRST REQUEST TO THE FIRST SET OF INTERROGATORIES BY THE DEFENDANT DELAWARE PARK LLC

BY: _____

        SAMI ALMAKHADHI
        P.O.BOX7392
        NEWARK,DE 19714

A144

3.      Describe with particularity all facts supporting Plaintiff's allegation that

Defendant's termination of Plaintiff's employment was in retaliation for his complaints of

discrimination.

**RESPONSE:**   As I said in question # 1
It's not clear whats the real Termination
date, but all what I Know that I don't
treated like others who have Same Situation.

4.      Describe with particularity all facts supporting Plaintiff's allegation that

Defendant's failure to promote Plaintiff in or about August 2005 was in retaliation for his

complaints of discrimination.

**RESPONSE:**   See  answer  # 2

5.      Describe with particularity any and all terms or conditions of employment

and/or adverse employment actions by Defendant that Plaintiff's alleges were due to

discrimination and/or retaliation.

**RESPONSE:**   1-. Force me to apply for Satellite Cashier
and other Co-workers not.

5

A145

2- Send me home and give light duty to others.

3- On May 2005 they Force me to use my FMLA instead of light duty and I was home with out any income until I exhuasted my FMLA to try to terminate my job.

6.    State the name, address, and telephone number of any and all physicians, counselors or other persons who have been consulted by Plaintiff, or who attended, examined, or treated Plaintiff during the period February 1, 2001 to the present, including but not limited to medical doctors, nurses, psychiatrists, psychologists, counselors, members of the clergy, any hospitals, substance-abuse programs, clinics, and the like.

RESPONSE: This Case about discrimination not about workers Comp.

7.    State the monetary value of each and every damage of any kind claimed by Plaintiff to have resulted from Defendant's alleged wrongful acts, and the method by which such monetary value was calculated.

RESPONSE: I am Seeking Compensation for damages of $150,000 and Punitive damages of $150,000 including an award of lost Salary, benefits and accrued interest from the date of termination through the date of the entry of judgment against the defendants as well as other fees. 6

A146

8.    Identify with specificity any non-monetary damage claimed by Plaintiff, and the remedy sought by Plaintiff for such alleged damage(s).

**RESPONSE:**   None Available at this Time
I spend four Years of MY life
Serving this Company days and nights
and Delaware Park should Punish
for what the they did to me.

9.    Provide the following information regarding all inquiries or applications for employment made by Plaintiff during the period September 1, 2005 through the present, and for each inquiry or application identify the following:

a.    The entity to which the inquiry or application was made;

b.    The date and manner of such contacts; and

c.    Whether an offer of employment resulted from such contact or inquiry.

**RESPONSE:**
1— C&S Wholesale Grocers · May 22, 2007
2— 7 eleven · Monday, october 17, 2005
3— DART · September 19, 2006
4— DuPONT September 14, 2006
5— American Infrastructure August 4, 2006
6— RED CLAY CONSOLIDATED october 26, 2006
   School District october 26, 2006
7— Lowes
No employment resulted from any.

A147

13.     For each of Defendant's Requests for Admission that you do not

unequivocally admit, state all facts supporting your decision not to admit.

**RESPONSE:**  Only Worker's Comp Questions I cannot

answer it because the Case is over

I won the Case and this Case about

Discrimination.


BY: S___

Sami Almakhadhi
P.O Box 7392
Newark, DE 19714

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,                )
                                )
        Plaintiff               )
                                )
    v.                          )    C.A. No. 07-78 ( JJF)
                                )
DELAWARE PARK LLC,              )
                                )
        Defendant.              )

FILED U.S. DISTRICT COURT
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2007 AUG 14 PM 3: 59

## Plaintiff SAMI ALMAKHADHI RESPONSE TO THE FIRST
## REQUEST FOR ADMISSION BY THE DEFENDANT
## Delaware Park, L.L.C.

By: _____ 8/14/07

**Sami Almakhadhi**
**P.O. Box 7392**
**Newark, DE 19714**

A149

## REQUESTS FOR ADMISSION

1.  Admit that you never complained directly to Shannon DeLucia that you were the victim of discrimination at Delaware Park.

**RESPONSE:** Yes, I did complain directly to Shannon Delucia in April 4th 2006 after I received letter from her about the Termination.

2.  Admit that your back condition as it existed on May 17, 2005 continued through February 12, 2006.

**RESPONSE:** Yes. It's the Same. Only the Pain is diffrent.

3.  Admit that the work restrictions imposed by your physician effective May 17, 2005 (as per the attached Exhibit A) continued through February 12, 2006.

**RESPONSE:** No, thats not true.
It was only for Four weeks. on May 17 I wasn't under workers Compensition I took FMLA for 2 months then I Came back to my job.

3

4.     Admit that the work restrictions imposed by your physician effective September 2, 2005 (as per the attached Exhibit B) continued through your termination of employment by Delaware Park.

**RESPONSE:**     Yes. The doctor is different but back injury restraction almost the same.

5.     Admit that, as of February 12, 2006, you were unable to repeatedly lift 40 pounds without difficulty.

**RESPONSE:**     Yes. But let me tell you that question and most the Questions in this Admition is about Worker's Comp Not discriminato

6.     Admit that you currently are unable to repeatedly lift 40 pounds without difficulty.

**RESPONSE:**     Yes.

4

7.    Admit that, as of February 12 2006, the job description attached as Exhibit C was the job description for the position of Booth Cashier at Delaware Park.

**RESPONSE:**    Yes.

8.    Admit that, as of February 12, 2006, the ability to repeatedly lift 40 pounds without difficulty was a qualification for the position of Booth Cashier at Delaware Park.

**RESPONSE:**    Yes.

9.  Admit that your Delaware Park sponsored health insurance coverage (including dependent coverage) was initially terminated effective February 28, 2006.

**RESPONSE:**    Initially? NO

10.  Admit that your Delaware Park sponsored health insurance coverage (including dependent coverage) was later extended beyond February 28, 2006.

**RESPONSE:**  Yes, only as a courtesy for me.

5

A152

11. Admit that your Delaware Park sponsored health insurance coverage (including

dependent coverage) was finally terminated effective March 31, 2006.

**RESPONSE:** Yes. but let me tell You that on March 1st
to March 29th I did not have any Coverage
So, It was re active and re terminated It x48 hours
in
Why?

12. Admit that you were never actively at work at Delaware Park after September 2,

2005.

**RESPONSE:** They force me to go home↑. After that
and Call every day out.
on Noumber 2005 Delaware Park admit
that I injuried there and I talked to Ms Beverly
Bob If I Can go back to work and she Said No.

13. Admit that you continued to participate in Delaware Park sponsored health

insurance plan(s) (including dependent coverage) during the period September 1, 2005 through

your termination of employment.

**RESPONSE:** Yes.

6

A153

14.  Admit that Delaware Park continued to make its regular employer contribution to the cost of your Delaware Park sponsored health insurance coverage (including dependent coverage) during the period September 1, 2005 through your termination of employment.

**RESPONSE:**  Yes, they did

15.  Admit that you were selected for promotion to the position of Satellite Cashier at Delaware Park in 2004.

**RESPONSE:**  Yes for It is Promotion for People without back injury but for me with back injury It is not Promotion because the Position required 60 To 70% Mor Physical activity.

16.  Admit that you elected not to remain in the position of Satellite Cashier and to return to your former position of Booth Cashier in 2004.

**RESPONSE:**  Yes. and I explained to them why. and I am not the only One; Other Co-worker elected not to remain in the Position.

17.    Admit that you filed your Charge of Discrimination against Delaware Park with the Delaware Department of Labor and/or United States Equal Opportunity Commission on April 26, 2006.

RESPONSE:    Yes. But the day I went there was April 4, 2006 and give me appointment on April 26, 2006

---

BY: _____
SAmi Almakhadhi
P. O BOX 7392
Newark, DE 19714

8

A155

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | |
| | ) | |
| Defendant, | ) | |

## DEFENDANT DELAWARE PARK LLC'S RESPONSES
## AND OBJECTIONS TO PLAINTIFF SAMI ALMAKHADHI'S
## FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Delaware Park, L.L.C. ("Delaware Park" or "Defendant"), by and through its undersigned counsel, hereby submits its responses and objections to Plaintiff Sami Almakhadhi's First Set of Interrogatories.

## GENERAL LIMITATIONS AND OBJECTIONS

1.    Delaware Park's specific objections set forth below are in addition to the general limitations and objections set forth in this section. These limitations and objections form a part of the response to each and every interrogatory. Thus, the absence of a reference to a general limitation or objection should not be construed as a waiver of the general limitation or objection as to a specific interrogatory.

2.    Delaware Park submits these responses and objections without conceding the relevancy or materiality of the subject matter of any interrogatory and without prejudice to Delaware Park. Delaware Park expressly reserves the right to object to further discovery into the

2.    Explain why other co-workers were given light duty in the same time I was told nothing available.

**RESPONSE:**

Delaware Park objects to this Interrogatory on the grounds that it is vague and ambiguous, overly broad and unduly burdensome. In an attempt to be responsive, and without waiving its objections, Delaware Park interprets this Interrogatory as requesting information regarding the basis for Delaware Park's decisions regarding light duty assignments in the Cage Department where Plaintiff was employed during the period beginning on or about April 29 and through June 13, 2005 and/or from September 1, 2005 through Plaintiff's termination of employment, and states as follows:

The information available to Delaware Park at the time Plaintiff requested light duty in April 2005 did not support a finding that Plaintiff had suffered a workplace injury. The Cage Department offers light duty assignments only to employees who were injured on the job. During the period April 29 through June 13, 2005, Delaware Park received no further information that would establish a workplace injury. Other individuals who were given light duty assignments in the Cage Department during that time period had suffered workplace injuries.

Near the end of August 2005, Delaware Park received information that supported Plaintiff's claim of a workplace injury suffered in 2004, or possibly earlier, and that described appropriate medical restrictions for Plaintiff, including limitations on lifting, standing, bending and twisting. This information further indicated that Plaintiff's condition was continuing and that he had been treated by multiple healthcare providers who at times had provided duplicative services over a period of several months. Because the most recent information provided by Plaintiff to Delaware Park (in June 2006) indicated Plaintiff had no medical restrictions, Delaware Park sought clarification. Plaintiff then presented a note that confirmed he was subject to restrictions which were essentially the same as those noted above. Further, in a conversation with Ms. DeLucia Plaintiff made statement indicating that he knew he should have been working subject to restrictions, but had not provided Delaware Park with that information.

Delaware Park's Risk Management Department then sought information regarding light duty opportunities in the Cage Department, and was advised such opportunities were limited and that it would be difficult to identify work consistent with Plaintiff's restrictions. Because appropriate light duty work would have been difficult to identify in the Cage Department; and because Plaintiff previously had performed duties that were not consistent with his ongoing medical restrictions, and because Plaintiff already had been working in full duty status for approximately two and one-half months when it appeared he should have been subject to medical restrictions; and because the maximum period of light duty that is generally considered for employees with workplace injuries is 90 days; and because it is Delaware Park's general policy to not offer light duty to individuals who have violated their medical restrictions and/or sought treatment from multiple medical care providers for duplicative services, Delaware Park did not offer light duty work to Plaintiff.

4

To the best of Delaware Park's knowledge, other individuals to whom light duty assignments were offered in the period September 2005 through Plaintiff's termination from employment had suffered work place injuries, but had not provided inconsistent medical information, had not treated with multiple care providers, and had not worked in apparent violation of existing medical restrictions.

3A.     Provide the following information regarding all (Satellite, Main Bank and Booth cashiers) who were given light duty during the period of May 18, 2004 until my termination and for each individual identify the following:

a.     Name, address and phone number.
b.     The medical restriction for each one
c.     Delaware Park opinion about the severity of their restrictions comparing with mine.
d.     Whether or not Delaware Park terminate their job and after how long.

**RESPONSE:**

Delaware Park objects to this Interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, harassing, overly broad, and unduly burdensome. Delaware Park further objects to the extent that the Interrogatory calls upon Delaware Park to make a comparison between Plaintiff and other individuals, when in fact Delaware Park never made such a comparison. Subject to and without waiving the foregoing objections, Delaware Park identifies the following employees who were provided light duty assignments in the Cage Department during the identified period:

Samuel Brackbill, Booth Cashier

Helen Brown, Satellite Cashier

Andrew Davis, Satellite Cashier

Donna DiOrio, Booth Cashier

Christie Dow, Booth Cashier

Charlotte Foley, Main Bank

Kathleen Hannah, Satellite Cashier

Antoinette Hayes, Booth Cashier

Renee Hayes, Booth Cashier

Steveni Keeley, Satellite Cashier

5

A158

POTTER ANDERSON & CORROON LLP

By: _____
     Wendy K. Voss (#3142)
     Jennifer C. Wasson (#4933)
     Hercules Plaza, Sixth Floor
     1313 North Market Street
     P.O. Box 951
     Wilmington, DE  19899
     (302) 984-6000 – Telephone
     (302) 658-1192 – Facsimile
     wvoss@potteranderson.com - Email
     jwasson@potteranderson.com - Email

*Attorneys for Defendant Delaware Park, L.L.C.*

Dated:  October 4, 2007
816708v2 / 14672-132

11

**A159**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,                    )
                                    )
            Plaintiff,              )       Civ. A. No. 07-78-JJF
                                    )
    v.                              )
                                    )
DELAWARE PARK,                      )
                                    )
            Defendant,              )

### VERIFICATION

STATE OF DELAWARE          )
                           ) SS.
COUNTY OF NEW CASTLE       )


I, Nancy Myshko, being duly sworn, depose and state that I am Senior Vice President of Delaware Park Management Company LLC (successor in interest to Delaware Park, LLC), and that I previously served as Vice President and Senior Vice President of Delaware Park LLC. I verify Defendant Delaware Park LLC's Response and Objections to Plaintiff Sami Almakhadhi's First Set of Interrogatories for and on behalf of Delaware Park LLC. I further state that I am duly authorized to do so; that some or all of the facts and matters set forth therein are not within my personal knowledge; that the facts and matters set forth therein have been assembled by authorized employees and counsel of Delaware Park LLC and/or Delaware Park Management Company LLC, and that I am informed that the facts and matters set forth therein are true.

                                    _____
                                    Nancy Myshko

A160

SWORN TO AND SUBSCRIBED before a Notary Public for the County of New Castle on this *3rd* day of October, 2007.

Kathleen A. Van Luvanee

Notary Public

My Commission Expires  11/25/09

KATHLEEN A. VANLUVANEE
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Nov. 25, 2009

822508v1

**A161**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | |
| | ) | |
| Defendant, | ) | |

### DEFENDANT DELAWARE PARK LLC'S RESPONSES
### AND OBJECTIONS TO PLAINTIFF SAMI ALMAKHADHI'S
### FIRST REQUESTS FOR ADMISSION

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant Delaware Park, L.L.C. ("Delaware Park" or "Defendant"), by and through its undersigned counsel, hereby submits its responses and objections to Plaintiff Sami Almakhadhi's First Requests for Admission, as follows:

### GENERAL OBJECTIONS

Delaware Park submits these responses and objections without conceding the relevancy or materiality of the subject matter of any request and without prejudice to Delaware Park. Delaware Park expressly reserves the right to object to further discovery into the subject matters of the requests or to object to the introduction into evidence of any information provided.

### REQUESTS FOR ADMISSION

1.    Admit that I was terminated on February 12, 2006.

**RESPONSE:**

Admitted that plaintiff's employment with Delaware Park was terminated effective February 12, 2006; denied that all administrative steps in the termination process were completed by February 12, 2006. With the apparent exception of a letter to Plaintiff advising him in writing

15.     Admit that I never violated Delaware Park policy regarding light duty simply because I never had light duty.

**RESPONSE:**

Admitted that Plaintiff was never assigned light duty. Denied that Plaintiff did not violate Delaware Park policies. Plaintiff acknowledged to Delaware Park on at least two occasions that he had been working in a full duty capacity when he knew he should have been working subject to medical restrictions, and that he had not advised Delaware Park of such restrictions. Employees are expected to advise Delaware Park of medical restrictions that are inconsistent with the requirements of their positions and otherwise to engage in safe work place behaviors.

16.     Admit that Delaware Park was denying my worker's compensation claim from 5/18/04 until 11/8/05.

**RESPONSE:**

Delaware Park objects to this Request on the grounds that it is irrelevant to the claims and defenses in the litigation.

17.     Admit that when I was send home on September 1, 2005 I was not under worker's compensation benefits.

**RESPONSE:**

Delaware Park objects to this Request on the grounds that it is irrelevant to the claims and defenses in the litigation.

18.     Admit that I request light duty on April 29, 2005 and after a few minutes later I was called to the office and kicked out from the company.

**RESPONSE:**

Admitted that plaintiff requested light duty on or about April 29, 2005. Denied that plaintiff was kicked out from the company. At that time, plaintiff was subject to medical restrictions that prohibited him from performing all the functions of his job, and Delaware Park placed him on FMLA leave for the period April 13, 2005 through June 13, 2005. Plaintiff returned to his position on June 14, 2005.

7

Plaintiff's bargaining rights or any impermissible factor.  To the extent Delaware Park considered Plaintiff's decision to resign from his position as a Satellite Cashier and return to his former position as Booth Cashier, Delaware Park was concerned because Plaintiff had stated that the Satellite Cashier schedule would not work for him and the job was too demanding for him. In Delaware Park's opinion, the other jobs for which Plaintiff applied in 2005 were even more demanding and presented similar scheduling issues.

22.    Admit that during the investigation by Frank Penta, Employee Relations Manager after I complain from discrimination because I did not get the job of Impress Supervisor Mr. Penta was told that I did not fill a transfer form and that was not true.

**RESPONSE:**

Delaware Park objects to this Request on the grounds that it is compound, vague, and ambiguous.  Subject to and without waiving its objections, Delaware Park states as follows: Admitted that Plaintiff complained in or around  August 2005 because he had not been selected for the position of Impress Supervisor, and that this complaint was investigated by Frank Penta. Admitted that Mr. Penta determined that, at the time that position most recently had been filled, i.e., in May 2005, Plaintiff did not have an active transfer request on file.  Denied that information provided to Mr. Penta or Mr. Penta's determination was mistaken or untrue.  By way of further response and for clarification, on or about January 30, 2005, Plaintiff submitted a transfer request form for the position of Impress Supervisor.  Pursuant to the terms of the collective bargaining agreement between Delaware Park and UFCW Local 27, that application was active for a period of 90 days.  During the time that application was active, Plaintiff was considered for the position of Impress Supervisor, but two other candidates were selected.  After Plaintiff's application expired, additional candidates were considered for the position and, in May 2005, another candidate was selected.  When Plaintiff spoke with Mr. Penta, he did not specify exactly when he felt he should have been selected for the Impress Supervisor position.  Mr. Penta understood Plaintiff to be complaining about the selection of the other candidate in May 2005, and limited his investigation to this time period.

23.    Admit that Delaware Park extended my Benefits until the end of March, 2006. to fit their story about my termination on March 10th , 2006.

**RESPONSE:**

Denied.  Delaware Park extended Plaintiff's benefits until the end of March 2006 as a courtesy to him, after it learned that he had not received written notification of his termination (effective February 12, 2006), and that he had incurred medical expenses in March 2006, which the insurance carrier denied.  By way of further response and for purposes of clarification, please also see response to Request number 1.

9

agreement with UFCW Local 27, Delaware Park is required to consider light duty assignments "within the employee's own department." Bathroom duties are a function of the housekeeping department, and therefore such duty is not assigned to Cage Department employees, whether in the form of light duty or otherwise.

27.    Admit that at least Two Booth Cashiers were given light duty in the Delaware Park Bathrooms.

**RESPONSE:**

Delaware Park objects to this request as irrelevant, vague, and ambiguous, overly broad and unduly burdensome. The request is without time limitation, and fails to identify any Booth Cashiers with sufficient particularity to allow Delaware Park to respond. By way of further response, Delaware Park refers Plaintiff to its response to Request number 26.

POTTER ANDERSON & CORROON LLP

By: _____

Wendy K. Voss (#3142)
Jennifer C. Wasson (#4933)
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
wvoss@potteranderson.com - Email
jwasson@potteranderson.com - Email

*Attorneys for Defendant Delaware Park, L.L.C.*

Dated: October 4, 2007
816700v1 / 14672-132

11

**A165**



Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

Wendy K. Voss
Partner
Attorney at Law
wvoss@potteranderson.com
302 984-6076 Direct Phone
302 658-1192 Fax

November 5, 2007

Via Electronic & First Class Mail
Frank Conley, Esquire
The Conley Firm
7715 Crittendon Street, Suite 133
Philadelphia, PA 19118

Re:     *Almakhadhi v. Delaware Park*, Civil Action No. 07-78-JJF

Dear Frank:

I write in response to your letter of October 18, 2007 regarding Delaware Park's discovery responses. I will address each of your comments concerning the responses in the order in which they were raised, as follows.

General comments

Your initial assertion that Delaware Park has provided only documents produced to the Delaware Department of Labor is inaccurate. *See* DP0471-0670. Delaware Park has produced in good faith all documents responsive to Plaintiff's discovery requests insofar as they seek information relevant to his present claims. Should you have a legitimate reason to believe otherwise, please advise.

Also, your concerns regarding Delaware Park's privilege objections can be allayed without resort to production of a privilege log. These objections, which were asserted only in response to Plaintiff's Request for Production Nos. 4 and 5A, were necessary given the expansive scope of the requests, which seek "any and all documents reviewed in preparation for defendant's [discovery responses]." Under these broad requests, attorney work product and confidential attorney-client communications created in the course of preparing the responses would constitute responsive documents. Therefore, Delaware Park's objection on grounds of privilege was fully justified and necessary to protect privileged materials created in preparation of the responses. None of these materials have any factual relation to the subject matter of the requests.

A166

Frank Conley, Esquire
November 5, 2007
Page 4

represented by this firm and may be contacted through counsel. Delaware Park also refers Plaintiff to DP0661.

Request for Admission No. 16: Contrary to your assertion, Delaware Park's "discussions of Mr. Almakhadhi's doctor visits and repeated requests for light duty," to the extent such statements were made, pertain directly to Plaintiff's allegations of failure to accommodate, not to the administration or status of his workers compensation claim. Delaware Park's or its insurer's management of Plaintiff's workers compensation claim was not "central" in any respect to his Charge of Discrimination. Moreover, even assuming that the Court grants Plaintiff's motion to add a workers compensation claim to his Complaint, this request seeks information pertaining to the administration and status of Plaintiff's workers compensation claim, which is irrelevant to proving unlawful retaliation. Subject to and without waiving its objections, Delaware Park denies this request as stated. By way of further response, on September 12, 2005, Delaware Park gave approval to its worker's compensation insurance coverage provider to accept Plaintiff's claim. Delaware Park was later advised by its insurance provider that it formally accepted the claim on October 31, 2005, including coverage for lost wages beginning in April 2005.

Request for Admission No. 17: Delaware Park objects to this request for the reasons discussed in the preceding paragraph pertaining to Request for Admission No. 16. Delaware Park also objects to this request on the grounds that it is vague and ambiguous, as the meaning of the phrase "under worker's compensation benefits" is not reasonably discernable. Subject to and without waiving its objections, Delaware Park admits that on September 1, 2005, Plaintiff was not receiving payment from Delaware Park's worker's compensation coverage provider.

Request for Admission No. 19: Delaware Park's objections to this request as vague and ambiguous are entirely proper, as Plaintiff provided no explanation of the terms "old" and "new" with regard to FMLA leave, and the meaning of these terms was not reasonably discernable. Your purported clarification is of no avail, as your assumptions are incorrect. Further, to the extent this request actually relates to the notification/designation of Plaintiff's leave as FMLA-qualifying, Plaintiff's present Complaint does not include a claim for denial of FMLA leave, and information responsive to this request therefore is irrelevant until and unless the Court grants Plaintiff's motion to add the FMLA denial of leave claim to his Complaint.

Subject to and without waiving the foregoing objections, Delaware Park denies this request as stated. By way of further response, Delaware Park states that its submission to the DDOL included information on the status of Plaintiff's FMLA leave as of June 13, 2005, when Delaware Park's records reflected that he had exhausted all such available leave (see, e.g. DP0043), as well as information on the future date(s) on which Plaintiff might accrue additional leave, if any (see, e.g., DP0043–45).

A167

Frank Conley, Esquire
November 5, 2007
Page 6

       I trust that this letter addresses your concerns regarding Delaware Park's discovery responses.  Should you wish to discuss these responses further, please contact me.

Sincerely yours,

Wendy K. Voss

WKV:drt

cc:  Glenn A. Brown, Esquire (via electronic mail)

827995v1 / 14276-132

**A168**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA [X] EEOC | 060401 9(A) 17C-2006-00837 |

| Delaware Department of Labor | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(Indicate Mr., Ms., Mrs.)* **Sami Almakhadhi** | Home Phone *(Incl. Area Code)* **(302) 293-5064** | Date of Birth **06-20-1968** |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|
| **200 Westcreek Village Apts E6, Elkton, MD 21921** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name **DELAWARE PARK** | No. Employees, Members **500 or More** | Phone No. *(Include Area Code)* **(302) 355-1001** |
|---|---|---|

| Street Address | City, State and ZIP Code | | |
|---|---|---|---|
| **777 Delaware Park Blvd., Attn: Nancy L Myshko, Vp-Hr, Wilmington, DE 19804** | | | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| [ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [X] NATIONAL ORIGIN | Earliest **02-12-2006**  Latest **02-12-2006** |
| [X] RETALIATION  [ ] AGE  [X] DISABILITY  [ ] OTHER *(Specify below.)* | [ ] CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Jurisdiction: Charging Party was employed at Respondent's Delaware facility as a Both cashier since 1/18/02

Charging Party's protected class: Retaliation, Disability, National Origin ( Middle East )

Adverse employment action: Terms and Conditions of Employment, Reasonable Accommodation, Denied promotion, Discharge

Brief statement of allegations: Charging Party states that he was discriminated against based on national origin, disability and retaliation when he was denied a reasonable accommodation. Charging Party alleges that after incurring an injury on the job and presenting doctor prescribed medical restrictions to the Respondent he was denied a reasonable accommodation. Charging Party states that unlike for him the Respondent has provided light duty accommodations in the past for other individuals. Further, Charging Party alleges that based on national origin, disability and retaliation he was denied promotions after applying for various positions.  Charging Party alleges that ultimately he was discharged.

Respondent's explanation: No light duty

Applicable law(s): Title VII of the Civil Rights Act of 1964, The Americans with Disabilities Act, The Handicapped Persons Protection in Employment Act, and the Delaware Discrimination in Employment Act

Comparators(s) or other specific reason(s) for alleging discrimination: Charging Party alleges that based on national origin, disability and retaliation he was discriminated against when he was denied transfer options (light duty) by the Respondent as reasonable accommodations for his job related injury.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Apr 26, 2006** Date      *Charging Party Signature*  4/26/06 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

A169

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA<br>[X] EEOC | 06040190W<br>17C-2006-00837 |

| Delaware Department of Labor | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements<br>BRENDA L. SANDS<br>NOTARY PUBLIC, STATE OF DELAWARE<br>My Commission Expires 2/3/07 |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br>X |
| __Apr 26, 2006__ X ⌁<br>Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)<br>4/26/06   Sands |

A170

**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION PROGRAM**

Mr. Sami Almakhadhi
200 Westcreek Village, Apt. E6
Elkton, MD 21921
vs.
Delaware Park
777 Delaware Park Blvd.
Wilmington, DE 19804

State Case No: 06040190W

**FINAL DETERMINATION AND RIGHT TO SUE NOTICE**
Pursuant to 19 Del. C. § 710, et seq., the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

*No-Cause Determination and Dismissal with Corresponding Right to Sue Notice.*
In this case, the Department has completed its investigation and found that there is no reasonable cause to believe that an unlawful employment practice has occurred. The Department hereby issues a No-Cause Determination and Dismissal and provides the Charging Party with a Delaware Right to Sue Notice.

This No Cause determination is based on the following facts: In this discrimination case, Charging Party must show that Respondent discriminated against him because of his disability and national origin. The Charging Party further alleges the Respondent retaliated against him after he opposed an alleged discriminatory practice. He can show this by demonstrating that he was treated more harshly than similarly situated co-workers of another national origin. Additionally, Charging Party must show that he was denied a reasonable accommodation for his impairments. The Charging Party contends he was denied a 'light-duty' assignment as an accommodation. The Respondent provided evidence that both the Charging Party and other employees were denied light duty according to company guidelines and availability of such positions. Additionally, Respondent provided evidence that Charging Party's discharge was an administrative decision because he exhausted all of his available leave. The Respondent also submitted credible evidence indicating the Charging Party misrepresented the fact his physician cleared him to return to duty when he had not. Also, Respondent provided substantial evidence to support the contention the Charging Party was included in their interview process for a promotion. However, the Respondent selected another more qualified candidate. Conclusively, Respondent has shown the Charging Party was afforded leave time to address his medical condition and that they did not discriminate against him because of his membership within any protected class or because of participation in a legally protected activity. Therefore, Charging Party has failed to establish that illegal disability, national origin and/or retaliation.

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program.

9/29/06
Date issued

Julie Klein Cutler, Administrator
*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

DOL Form C-12NC : 01/06

**A171**

## NOTICE OF DELAWARE RIGHTS

*The Department of Labor Discrimination Unit provides the following excerpt from 19 Del. C. § 710, et seq. as information regarding the Delaware Right to Sue Notice. If you need legal advice, please seek your own legal counsel.*

### § 714. Civil action by the Charging Party; Delaware Right to Sue Notice; election of remedies.

     (a)     A Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same.

     (b)     The Delaware Right to Sue Notice shall include authorization for the Charging Party to bring a civil action under this Chapter in Superior Court by instituting suit within ninety (90) days of its receipt or within ninety (90) days of receipt of a Federal Right to Sue Notice, whichever is later.

     (c)     The Charging Party shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A Charging Party is barred by this election of remedies from filing cases in both Superior Court and the federal forum. If the Charging Party files in Superior Court and in a federal forum, the Respondent may file an application to dismiss the Superior Court action under this election of remedies provision.

### NOTICE OF FEDERAL RIGHTS

     1.     If your case was also filed under federal law and resulted in a "No Cause" finding, you have additional appeal rights with the Equal Employment Opportunity Commission. Under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the DDOL's final finding. To obtain this review, you must request it by writing to EEOC within *15 days of your receipt* of DDOL's final finding in your case. Otherwise, EEOC will generally adopt the DDOL's findings.

     2.     If your case was also filed under federal law, you have the right to request a federal Right to Sue Notice from the EEOC. To obtain such a federal Right to Sue Notice, you must make a written request directly to EEOC at the address shown below. Upon its receipt, EEOC will issue you a Notice of Right to Sue and you will have ninety (90) days to file suit. The issuance of a Notice of Right to Sue will normally result in EEOC terminating all further processing.

     3.     Requests to the EEOC should be sent to:

     Equal Employment Opportunity Commission
     The Bourse, Suite 400
     21 S. Fifth Street
     Philadelphia, PA 19106-2515

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

DOL Form C-13 : 05/04

**A172**

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Sami Almakhadhi
200 Westcreek Village Apts E6
Elkton, MD 21921

From: Philadelphia District Office - 530
21 South 5th Street
Suite 400
Philadelphia, PA 19106

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §.1601.7(a)) | |
|---|---|---|
| EEOC Charge No. | EEOC Representative | Telephone No. |
| 17C-2006-00837 | Charles Brown, III, State & Local Coordinator | (215) 440-2842 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this Notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred** more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Marie M. Tomasso,
District Director

January 16, 2007
(Date Mailed)

Enclosure(s)

cc: Wendy K. Voss, Esq.
Attorney for Respondent
POTTER ANDERSON & CORROON
1333 North Market Street
P.O. Box 951
Wilmington, DE 19899

A173



# COLLECTIVE BARGAINING AGREEMENT

## between

## UNITED FOOD AND COMMERCIAL WORKERS UNION
## LOCAL 27

## and

## DELAWARE PARK LLC

### Effective

### January 18, 2002

### through

### January 18, 2006

DP0663

A174

another classification and is unable to satisfactorily perform all duties of the position after receiving training, the employee shall have no further "bumping" rights and shall be subject to lay-off.

Employees displaced by this process shall have no "bumping rights." Employees who are displaced as a result of a lay-off shall be returned to their usual classifications in the reverse order in which they were "bumped" during the lay-off.

## ARTICLE 10 - JOB BIDDING

### Section 10.1

When a vacancy (other than temporary), new regular job opening, or job reclassification in any job occurs and Delaware Park deems it necessary to fill such job, Delaware Park will post a notice of such job opening for a period of seven (7) consecutive days, including the date of posting. All postings required by this Section shall consist of the job description for the job opening and the shift.

### Section 10.2

Any active employee who desires to be considered for a current or future job opening shall submit a written Request for Transfer to the Human Resources Department for consideration. An employee may file his or her request for consideration for up to three (3) positions simultaneously. Such requests will remain in effect for ninety (90) days unless the employee is unable or refuses, for any reason, to accept any desired position when offered, in which case the employee's request will not be considered again for the balance of the 90 day filing period. Nothing herein shall prevent an active employee from resubmitting a Request for Transfer for any job opening after the end of the filing period.

### Section 10.3

## SCHEDULE A – WAGES

Delaware Park's scale concerning wages for employees hired after January 17, 2002 is as follows:

| | Change Attendant | Impress Clerk | VLT "Slots" Impress Clerk | Soft Count Clerk | Hard Count Clerk | Booth Cashier and Floor Attendant | VLT Slot Technic-ian | Main Bank Cashier | Satellite Cashier |
|---|---|---|---|---|---|---|---|---|---|
| Hire | $8.00 | $8.25 | $9.50 | $8.75 | $9.50 | $9.00 | $10.50 | $12.00 | $10.50 |
| 6 months | $8.25 | $8.50 | $9.75 | $9.00 | $9.75 | $9.25 | $10.75 | $12.25 | $10.75 |
| 12 months | $8.50 | $8.80 | $10.09 | $9.32 | $10.09 | $9.57 | $11.02 | $12.68 | $11.13 |
| 24 months | $8.76 | $9.11 | $10.44 | $9.65 | $10.44 | $9.90 | $11.50 | $13.12 | $11.52 |

Employees at or above the top rate for their classification, as set forth in the above scale, shall receive an annual wage increase of 3.65% per annum for the term of this contract.

Holiday Gift

Employees will receive a cash gift payment annually in the amount of $200 after deduction of taxes. The gift will be given two weeks before Christmas. All employees who are on the payroll immediately preceding the distribution date and who are active employees as of November 15th of each year shall receive the gift.

Tips

All bargaining unit employees except hard count and soft count employees will share

Working Guide

## **Attendance Policy**

Every employee is an important part of the Delaware Park team. Absence and tardiness seriously impair our ability to provide the highest quality of guest services; therefore it is expected that you will be at your work station prepared to work at the time for which you are scheduled. If you will be late or absent, you must report that fact to your supervisor according to the following guidelines established by the Company.

Managers are responsible for documenting absences and tardiness and may review for patterns of excessive absenteeism at any time. Excessive absences and tardiness are not permitted and will be subject to counseling or discipline. Four (4) incidents in a twelve (12) month period will be considered a patterned absence and subject to discipline.

To provide a clear understanding of this policy the following terms and conditions apply:

| | |
|---|---|
| Absence: | Not reporting for your assigned duties or shift as scheduled. Missing 40% or more of a scheduled shift. |
| Tardy/Early In: | Clocking in more than 7 minutes after scheduled shift begins is considered "tardy". Employees who clock in earlier than 7 minutes before scheduled shift without prior approval will be considered "early in". |
| No Call/ No Show: | Not calling or showing for a scheduled shift |
| Early Leave: | Leaving work early (i.e. prior to the end of scheduled shift). |
| Extended Absence: | An absence in excess of three (3) days due to illness. The employee must provide documentation from a physician to return to work. The note is to confirm ability to return to work and is not considered an excuse for the absence. Delaware Park may request a doctor's note for an absence of a shorter duration based on management discretion. Employees are expected to contact their managers daily in the event of an absence unless a mutually agreed upon arrangement is made. |

**DP0122**

Policy Dated:   04/01/03
Supersedes Policy Dated:   12/01/00
Policy Number:   D3
Page Number:   27

**A177**

Working Guide

Approved
Absence:          Absences due to approved Leave of Absence under the
                  Family and Medical leave Act (FMLA), Personal Leave,
                  Bereavement Leave, and legitimate use of Paid Sick Time,
                  pre-approved absences for Civil Service (jury duty and
                  military duty), Vacation, Personal Days, Incentive Days
                  and Holidays are not considered grounds for disciplinary
                  actions.

     Reporting Absence or Tardiness:

                  If you will be absent from work you must notify your
                  manager no less than two (2) hours prior to the start of your
                  shift so that your manager can-redistribute work or call
                  another individual into work as a replacement.
                  Departments may have specific standards that are not
                  discussed here.  Your Supervisor or Department Head will
                  explain any departmental requirements.

     IN ALL CASES, EMPLOYEES MUST NOTIFY THEIR
     SUPERVISORS/MANAGERS ACCORDING TO THE PROCEDURES
     OF THEIR DEPARTMENT ON EACH DAY OF THEIR ABSENCE,
     UNLESS A MUTUALLY AGREED UPON ARRANGEMENT
     IS MADE, AND EXPLAIN THE NATURE AND EXTENT OF THE
     ABSENCE.

     Likewise when you know you will be late to work you are expected to contact
your supervisor/manager.

Policy Administration:

     For the Company to operate as efficiently as possible, you are expected to adhere
to the work schedule in your department.  A perfect attendance record is our desire,
however, we understand that every employee will not be able to maintain a perfect
attendance record.

     The administration of this policy is the responsibility of the immediate
supervising manager.  Attendance and tardiness will be tracked for a revolving twelve-
(12) month period.  All absences due to legitimate personal illness or illness of an
approved family member (spouse, child, foster child, or parent) will constitute paid sick
time, if available.

     For administrative purposes, all clocked time is automatically rounded to fifteen
(15) minutes on the daily time report.  It is important to note that a 7-minute grace period

Policy Dated:          04/01/03
Supersedes Policy Dated:  12/01/00
Policy Number:         D3
Page Number:           28

A178

DP0123

Working Guide

is extended to each employee. For example: You are scheduled to arrive for work at 8:00 AM. You have seven (7) minutes before and seven (7) minutes after your scheduled time for the time clock to calculate your arrival at 8:00 AM. If you clock in 8 to 15 minutes before 8:00 AM, the time clock will calculate your arrival as 7:45 AM. To clock in earlier than your scheduled time you must have approval in advance from your immediate supervisor. If you clock in 8 to 15 minutes after 8:00 AM, the time clock will calculate your arrival as 8:15 AM. This same calculation is automatically initiated for all 15-minute periods.

<u>Disciplinary Action:</u>

     This policy will be administered through the accumulation of points. No points will be assigned to absences resulting from requests initiated by management based on business needs. The points assigned to unapproved absences are as follows:

<u>Absence:</u>

| | |
|---|---|
| Full Day Absence | = 1 point |
| Early Leave, leaving with 60% or more of shift remaining | = 1 point |
| Partial, leaving with less than 60% of shift remaining. Not to include adjustments based on business levels or voluntary leaves. | = 1/2 point |
| Absences the day of, the last scheduled day before the holiday and/or first scheduled day after the holiday. | = 2 points |

     Employees have a duty at all times to provide appropriate notice and documentation regarding any absences. Failure to provide this information when requested or required may result in loss of leave and/or disciplinary action up to and including termination.

<u>Tardy:</u>

     Tardiness will be calculated based on the points listed below. The points will be calculated as part of the revolving calendar year.

| | |
|---|---|
| First two (2) occurrences | = 1/2 point each |
| Each additional tardy | = 1 point |

A179

| | |
|---|---|
| Policy Dated: | 04/01/03 |
| Supersedes Policy Dated: | 12/01/00 |
| Policy Number: | D3 |
| Page Number: | 29 |

DP0124

Working Guide

If more than 90 days passes between incidents of tardiness, points will again be calculated at a 1/2 point for the first two occurrences and one point for each additional incident. For example, if you are tardy on April 12 (1/2 point), May 14 (1/2 point), and June 25 you will have a total of 2 points for tardiness, and every incident after that will result in 1 additional point. If, however, you have no occurrences after June 25 for 90 days, up to and including September 23 and are tardy on September 24 or later you will receive a 1/2 point.

No Call/No Show (NCNS):

Incidents of No Call/No Show will be treated in the following manner.

| First Occurrence | = 6 points |
| Second Occurrence | = 1 additional point |

Due to the serious disruptive effect that a No Call/No Show incident has on business operations, progressive discipline will not apply. A total accumulation of 7 points or more in a revolving calendar year consisting of 1 or more incidents of No Call/No Show will result in termination, regardless of whether the employee has gone through any step of progressive discipline.

If you are absent for three (3) or more consecutive days without proper daily notice, it will be considered a voluntary resignation.

Patterned Absence or Lateness:

Patterned absences or lateness will follow progressive discipline if found to circumvent policy. This may consist of four (4) incidents in a twelve (12) month period.

Accumulation of Points:

Discipline for absences and tardiness will be based on the accumulation of points in a revolving calendar year. The accumulation of points will result in the following discipline:

| Borderline | - | 3 points | = | Verbal Warning |
| Unacceptable | - | 4 points | = | First Written Warning |
| Unacceptable | - | 5 points | = | Second Written Warning with 1 Day Suspension |
| Unacceptable | - | 6 points | = | Final Written Warning with 3 day Suspension |
| Unacceptable | - | 7 points | = | Termination |

| | |
|---|---|
| Policy Dated: | 04/01/03 |
| Supersedes Policy Dated: | 12/01/00 |
| Policy Number: | D3 |
| Page Number: | 30 |

A180

DP0125

Working Guide

The initiation of discipline must begin with a verbal warning and then continue to follow the guidelines as listed above regardless of point level accumulation. For example, if an employee accumulates 5 points and has not received a prior warning, he/she will receive a verbal warning. If that employee should accumulate 6 points he/she will receive a written warning and so on. Should any accumulation exceed 7 points, progressive discipline will be initiated for each additional half point.

The previous paragraph does not apply to No Call/No Shows because of the disruptive nature of such incidents. Refer to the policy statement on No Call/No Show for more information.

<u>Probationary Period:</u>

Employees in their probationary period (the first 90 days of employment) may be terminated with the accumulation of four (4) points. The following disciplinary procedures will apply:

| Unacceptable - | 2 points | = | Verbal Warning |
| Unacceptable - | 3 points | = | Final Written Warning |
| Unacceptable - | 4 points | = | Termination |

<u>Recovery Period:</u>

A recovery period is provided to allow you to achieve non-warning status. As an example, if you receive a final warning and you maintain zero accumulation of points for ninety (90) calendar days following the most recent incident that resulted in the warning, then one (1) point will be deducted. (For example, if you receive a second written warning at five (5) points and maintain zero accumulation during the subsequent 90-day calendar period you will have a one (1) point deduction placing you at four (4) points.) The deduction of one (1) point will occur for each ninety (90) calendar day period with no accumulation of points and will continue as applicable until a zero point accumulation is shown. Recovery points may not be used as point credit, for future infractions.

The 90 day recovery period is in addition to the annual recovery resulting from the conclusion of each twelve (12) month period.

In the event you go on an approved Leave of Absence (LOA) during the recovery period, the recovery process becomes temporarily suspended. Upon return to work, the recovery process picks up from where the process left off at the start of the LOA period.

Employees are expected to be aware of how many points they have accumulated in the revolving period.

All emergencies will be reviewed by management on a case by case basis.

Policy Dated:        04/01/03
Supersedes Policy Dated:    12/01/00
Policy Number:        D3
Page Number:        31

A181

DP0126

# DELAWARE PARK
## *Risk Management*

   

## Workers' Compensation

## Policy & Procedure

Policy Dated:
May 1999

A182
DP0078

# WORKERS' COMPENSATION

## What *You* Need To Know As Managers And Supervisors

### What is a Workers' Compensation Injury?
- Personal physical injury
- Happens due to an accident or incident
- "Arising out of and in the course of employment" – (have to be on the premises doing work for the employer)

### Who pays for Workers' Compensation?
- State law requires employers to carry Workers' Compensation Insurance.
- Delaware Park provides this insurance to all employees to cover job-related injuries or illnesses at no cost to the employee.

### How Workers' Compensation Operates:
- Employees that sustain work-related injuries or illnesses are entitled to "compensation" from our insurance carrier, The Hartford.
- This "compensation" includes medical coverage and possible indemnity payments for lost work time.
- Eligibility for lost time benefits under Workers' Compensation depend on time missed from work due to incapacity over a three-day period.
- Any lost time payments are not payable until the fourth day of incapacity.

*Note: On the day of injury, employees receive regular pay if they leave early for treatment AND they return to work the same day OR provide a doctor's note stating unable to work.*

## FORMS:
There are three forms that must be completed immediately when a work-related injury occurs:

### The First Report of Injury
- State of Delaware reporting form - EMT's complete for all injured employees.
- Every employee must report to an EMT whenever he or she sustains a work-related injury or illness.
- Employees have the right to refuse the services of an EMT only.
- Employees cannot refuse to provide all relevant information to the EMT and to sign the refusal form.
- Take all employee complaints of pain seriously.
- No employee is to leave property after reporting an injury without seeing an EMT!
- The First Report of Injury form initiates a claim with our insurance company.

A183

DP0079

**The Departmental Employee Injury Report**

- Completed by supervisors and/or managers for any employee that sustains a work-related injury or illness.
- Ideally, the supervisor who may have witnessed the incident must fill out this report. If you did not witness the incident, you need to sit down with the employee and complete this report, then go back and describe your observations of the scene.
- It is extremely important to identify any and all witnesses to the incident at this time. This will give Risk Management another view of the circumstances surrounding exactly what happened.
- Risk Management investigates all accidents or incidents in order to verify the veracity of a claim and to adequately document the file.

**Workers' Compensation Change of Status Form**

- Must complete this form anytime an employee's disability status changes under Workers' Compensation. For example, employees return to work light duty, return to work full duty, or go out of work altogether.
- This form keeps Risk Management current on any employee activity related to Workers' Compensation. Sometimes, an employee will return to work for a day and then go back out. Risk Management is usually unaware of this unless *you let us know.*
- Purpose of this form is for you to keep us informed of any fluctuations in an employee's work status that affect Workers' Compensation.

## Supervisors' Responsibility

- Call an EMT at extension 7267, using channel 2 on the radio, or in cases of true emergencies simply dial extension 7777 for all employee reports of injury or illness. The Fire Command Department staffs First Aid (next to Security) twenty-four hours a day and seven days a week.
- The EMT will examine the employee, obtain all the necessary information and complete the First Report of Injury. Remember that if an employee refuses the services of the EMTs, you must still notify an EMT to complete the required paper work.
- If the injured employee needs transport to Christiana Emergency Room in emergency situations, the EMTs make every effort to notify you before they leave.
- Upon your next conversation with the employee, this should prompt you to ask the employee for a doctor's note. Inquire about the employee's well being in addition to finding out about any potential work restrictions.
- An employee injured on the job may not return to work without a physician's release or other disability slip.
- Complete the Departmental Employee Injury Report and send it to Risk Management immediately.

A184

DP0080

- Send all original doctor's notes or other correspondence to Risk Management, immediately.
- Please call Risk Management to advise of an injury because the sooner we know about a work-related injury, the better.
- If an injury occurs after hours, please leave a message on ext. 7421 or 7163. Risk Management will get back to you.
- If an employee returns to work with an unclear note and you are unsure what to do, feel free to contact Shannon DeLucia at home for further instruction. Please do not automatically send an employee home because of some confusion over a disability slip, etc.
- If there are any unusual circumstances surrounding the injury, please make note and contact our office. For example:
  - An employee is about to be termed for Violation of Company Policy, and states he/she sustained an injury and it is questionable.
  - An employee reports an injury and they were not assigned to the area they indicated, etc.

## RISK MANAGEMENT'S RESPONSIBILITY

- To gather all information pertinent to this incident and initiate a claim for the employee. Prompt action is necessary in case further medical attention is needed or if the employee begins missing time from work.
- To send the insurance company all necessary information about these claims in order to coordinate the payment of all medical bills, to monitor care in the best interest of the employee, and to expedite the return to work of all employees. Risk Management will need to know the employee's normally scheduled days off as well as missed days due to the work-related injury.
- To notify the employee of his or her rights and responsibilities concerning Workers' Compensation.
- To track days missed from work due to the work-related injury so that the employee can be compensated appropriately.

## THE EMPLOYEE'S RESPONSIBILITY

- Must contact both Risk Management and the individual department in order to advise both parties of the work injury status.
- Normal procedures outlined in the Employee Handbook for missed time shall apply. The employee must also follow the guidelines in the handbook for proper call out procedures unless a mutually agreeable alternative arrangement has been made with the department.
- To provide RM with the original doctor's note to document the disability for all days lost. (The physician's office may be fax directly to Risk Management at 993-8976).

A185

DP0081

- Upon returning to work, the employee must present a written release from his or her physician. They cannot return to work without this authorization.
- If the doctor gives work restrictions, the employee must contact Risk Management immediately for modified duty placement evaluation (if available).
- To attend and be on time for all scheduled doctor's appointments, testing procedures, physical therapy sessions, or other medical evaluations.

## POTENTIAL PROBLEMS

Below are a few examples of some problems that Risk Management has experienced in the past:

- No one contacts our office. The employee is out of work and the doctor's office is calling us for a claim number and we have no knowledge that the employee is even out of work.
- An employee is supposed to be on modified duty and is working his or her regular duty job. (An absolute no-no!)
- An employee has been out of work, no one has contacted Risk Management and subsequently, the employee has not received a benefits check from Workers' Compensation.
- An employee refuses to attend doctor appointments or physical therapy. This is problematic because the employee will not get well. An employee must be pro-active in his or her own medical care.
- An employee is sent home because the doctors' note requires light duty. Risk Management does not receive the note and the employee stays out for days until brought back on light duty. Please read the physicians' notes carefully and discuss with Risk Management for further clarification.

## MODIFIED DUTY

- "Occupational Injury Management Program" - attempts to accommodate almost any light duty restriction, whenever possible.
- Modified duty must be within the employee's own department (unless there are unusual circumstances).
- All employees who return to work modified duty will maintain the same rate of pay as their pre-injury position.

## CASE MANAGEMENT

We use a medical case management company to help us ensure that our employees receive the best possible care and are kept informed of complicated developments. For more complicated cases, a nurse case manager will go to the doctor appointments with the employee in order to help properly manage and control various aspects of an employee's claim.

A186

DP0082

We utilize this service only for the more severe and/or more difficult cases, whether they are complicated injuries or complicated employees. We work with them along with our insurance adjuster in order to ensure that our employees receive the proper medical attention and return to work as quickly as possible.

## Supervisor Training

Whenever a department promotes an employee to the level of supervisor or manager, they must train them in Workers' Compensation policies and procedures in order to deal effectively with both the employees and Risk Management. We would be glad to assist departments with this training if necessary.

**THANK YOU FOR YOUR ASSISTANCE IN ADMINISTERING THIS POLICY!**

A187

DP0083

**ALL COPIES OF FIRST REPORT MUST BE TYPED OR PRINTED**

INDUSTRIAL ACCIDENT BOARD
CARVEL BUILDING, 6th FL.
820 N. FRENCH STREET
WILMINGTON, DE 19801
TELEPHONE 302-761-8200
LONG DISTANCE (TOLL FREE)
1-800-292-7885

**STATE OF DELAWARE**
**FIRST REPORT**
**OF**
**OCCUPATIONAL INJURY**
**OR DISEASE**

CASE OR FILE NO.

EMPLOYER'S UC REPORTING NUMBER

| | | |
|---|---|---|
| 1. EMPLOYEE:   FIRST        MIDDLE        LAST | | 2. EMPLOYEE SOCIAL SECURITY NO. |

**EMPLOYEE**

3. ADDRESS - INCLUDE COUNTY AND ZIP CODE    4. MALE ☐  FEMALE ☐    5. EMPLOYEE TELEPHONE NUMBER (INCLUDE AREA CODE)

6. DATE OF BIRTH    7. AGE    8. WAGE (SEE COMPUTATION ON BACK)    9. WEEKLY HOURS WORKED

10. OCCUPATION (REGULAR)    11. DEPARTMENT OR DIVISION REGULARLY EMPLOYED    12. HOW LONG EMPLOYED

**EMPLOYER**

13. EMPLOYER
**Delaware Park Racetrack & Slots**    14. PERSON MAKING OUT THIS REPORT

15. ADDRESS - INCLUDE COUNTY AND ZIP CODE
**777 Delaware Park Blvd, Wilmington, DE 19804,    New Castle County**    16. EMPLOYER TELEPHONE NUMBER (INCLUDE AREA CODE) 302-994-2521 Ext 421

17. MAILING ADDRESS - IF DIFFERENT THAN ABOVE
**Same As Above**    18. NATURE OF BUSINESS - TYPE OF MFG. TRADE, CONSTRUCTION, SERVICE, ETC.
**Service - Gaming & Racing**

**DATES**

19. DATE OF REPORT    20. DATE/TIME OF INJURY  ☐ AM ☒ PM    21. NORMAL STARTING TIME  ☐ AM ☒ PM    22. IF EMPLOYEE BACK TO WORK GIVE DATE:    23. AT SAME WAGE  YES ☒  NO ☐

24. IF FATAL INJURY, GIVE DATE OF DEATH    25. DATE EMPLOYER KNEW OF INJURY    26. DATE DISABILITY BEGAN    27. LAST FULL DAY PAID - DATE

**INJURY OR DISEASE**

28. DESCRIBE THE INJURY/ILLNESS AND PART OF BODY AFFECTED

29. SPECIFY THE DEPARTMENT WHERE INCIDENT OCCURRED AND THE WORK PROCESS INVOLVED

**OCCURRENCE**

30. LIST THE EQUIPMENT, MATERIALS, AND CHEMICALS EMPLOYEE WAS USING WHEN THE INCIDENT OCCURRED, E.G. ACETYLENE

31. DESCRIBE THE EMPLOYEE'S ACTIVITY AT THE TIME OF INJURY OR ILLNESS, I.E.

32. DESCRIBE HOW THE INJURY/ILLNESS OCCURRED

33. NAME OF PHYSICIAN    34. PHYSICIAN'S ADDRESS

35. HOSPITAL (IF APPLICABLE)
**N/A**    36. HOSPITAL ADDRESS
**N/A**

WORKER'S COMPENSATION INSURANCE COMPANY AND COMPLETE ADDRESS (PREPRINT OR STAMP INCLUDE IAB CODE)

POLICY NO.

DISTRIBUTION OF THIS REPORT

1. ORIGINAL MUST BE SENT IMMEDIATELY TO WORKER'S COMPENSATION INSURANCE CARRIER.
2. COPY TO THE INDUSTRIAL ACCIDENT BOARD
3. EMPLOYER'S COPY - RETAIN AS RECORD
4. EMPLOYEE'S COPY

A188

**Emergency Medical Technician**
SIGNATURE OF PERSON IN 14 ABOVE    OFFICIAL POSITION

DP0084

# *Delaware Park*
## THOROUGHBRED RACING AND SLOTS
777 Delaware Park Boulevard
Wilmington, Delaware 19804

(302) 994-2521                                                    Fax (302) 994-3567

*Risk Management*
Direct Dial: Ext. 421
Fax: 993-2376



## Important Things to Do in Case of Injury

### The Employer Should:

1. Provide all necessary medical, surgical, and hospital treatment from the date of accident.

2. Every employer shall keep a record of all injuries received by employees and make a report within 10 days thereof in writing to the Office of Workers' Compensation.

3. Ascertain the average weekly wage of the employee and provide compensation in accordance with the provisions of the law, for disability *beyond the third day* after the accident. All agreements as to compensation must be submitted to the Office of Workers' Compensation for approval.

### The Employee Should:

1. Immediately notify the employer in writing of accidental injury or occupational disease and request medical services. Failure to give notice or to accept medical services may deprive the employee of the right to compensation.

2. Give promptly to the employer, directly or through a supervisor, notice of any claim for compensation for the period of disability beyond the third day after the accident. In case of fatal injuries, notice must be given by one or more dependents of the deceased or by a person on their behalf.

3. In case of failure to reach an agreement with the employer in regard to compensation under the law, file application with the Industrial Accident Board for a hearing on the matters at issue within two years of the date of accidental injury or one year of knowledge of the diagnosis of an occupational disease or an ionizing radiation injury. All forms can be obtained from the Office of Workers' Compensation.

DP0085

In accordance with §2313 and §2306 of the Workers' Compensation Act, as amended by House Bill No. 158, this language, "Workers' Compensation Important Things to Do in Case of Injury," is verbatim from the back of the First Report of Injury as provided by the Department of Labor.

A189

# DELAWARE PARK

### OCCUPATIONAL INJURY MANAGEMENT PROGRAM
## DEPARTMENTAL EMPLOYEE INJURY REPORT

Date of Report: _____  Employee Badge No: _____

Employee's Name: _____  S.S. #: _____
                First         M.I.        Last

Employee Address: _____
                       City         State        Zip

Employee Telephone No:(_____) _____  Male: __ Date of Birth: _____
                                          Female: __

Department: _____  Position: _____

Date incident reported: _____  Date and time of injury: _____

Person making out this report: _____
                                       Please Print

Describe injury/illness and/or employee's specific complaints: _____

_____

Describe incident: _____

_____

Describe employee's activity at the time of the incident: _____

_____

Specify the department/location where incident occurred: _____

List equipment, materials and/or chemicals employee was using at the time of this incident: ___

_____

Describe your observations of the scene of the incident: _____

_____

Please identify any and all witnesses to this incident: _____

Employee's scheduled days off: _____  Did employee miss time from work due to injury?

____ Yes ____ No  If so, please list dates missed: _____


_____  _____
Signature of Person Making Out Report         Official Position

### DISTRIBUTION OF THIS REPORT

1. ORIGINAL MUST BE SENT TO RISK MANAGEMENT WITHIN 48 HOURS
2. COPY TO EMPLOYEE FILE

A190

DP0086



# Delaware Park

## THOROUGHBRED RACING AND SLOTS

777 Delaware Park Boulevard
Wilmington, Delaware 19804
Risk Management
Direct Dial: Ext. 324

(302) 994-2521                                    Fax (302) 993-2376

Patient's Name: _____    Date: _____

Return To Work Date: _____    Return To Office On: _____

☐ Regular Duty      ☐ Light Duty      ☐ Sedentary Duty      ☐ Medium Duty

☐ Full Time    ☐ Part Time    _____ Hrs./Day    _____ Days/Week    ☐ Overtime Allowed

---

### Classification of Degrees of Work in Terms of Strength Required
Volume II of the Dictionary of Occupational Titles
Published by the U.S. Department of Labor
Third Edition, 1965, Pgs. 654-655.

1. **Sedentary** ⇒ Lifting 10lbs. maximum and occasionally lifting and/or carrying such articles as dockets, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, certain amounts of walking and standing is often necessary in carrying out duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met.

2. **Light Work** ⇒ Lifting 20lbs. maximum with frequent lifting and/or carrying of objects weighing up to 10lbs. Even though the weight lifted may be only a negligible amount, a job falls into a category when it involves sitting most of the time, with a degree of pushing and pulling of arm and/or leg controls.

3. **Medium Work** ⇒ Lifting 50 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 25lbs.

4. **Heavy Work** ⇒ Lifting 100 lbs. with frequent lifting and/or carrying of objects weighing up to 50lbs.

---

Additional Restrictions: _____

Lifting Limit: _____ lbs.         Avoid Strenuous Use Of : _____

NO:
☐ Prolonged or Repeated Bending        ☐ Sudden Changes in Temperature
☐ Prolonged Standing                   ☐ Driving
☐ Prolonged Walking                    ☐ Reaching Overhead
☐ Stooping                             ☐ Twisting
☐ Squatting                            ☐ Running
☐ Pushing                              ☐ Jumping
☐ Climbing                             ☐ Repeated heavy use of the hands
☐ Operation of Machinery               ☐ Work at or above shoulder level

A191

Physicians Signature _____    Date _____

DP0087

<u>**Via Certified and First Class Mail**</u>

Date
Address

> **Read completely and carefully before signing!**

Dear :

Risk Management is aware of an incident that occurred on or about (Date), while you were working at Delaware Park. I would like to take this opportunity to explain some of an employee's rights and responsibilities under Workers' Compensation. You may also receive a separate FMLA packet, if eligible. Please be advised that Delaware Park will automatically designate any qualifying leave you may take due to a work-related injury or illness as FMLA leave (to run at the same time as any leave under Workers' Compensation).

Under state law, Delaware Park provides Workers' Compensation Insurance for losses resulting from on-the-job injuries or illnesses at no cost to the employee. If an employee sustains a work-related injury or illness, he or she is entitled to coverage for medical services, and possibly also to payments for any lost time from work beginning on the **fourth** day of incapacity (unless hospitalized).

Please be advised that as an injured worker, you have certain responsibilities to Delaware Park. You must keep <u>both</u> your department and Risk Management apprised of your work and injury status, including during any absence from work. The regular missed time procedures still apply concerning reporting absences, etc. as outlined in your Employee Handbook. To qualify your time under Workers' Compensation, you must present the original disability slip to Risk Management.

Before you may return to work, you must present a written physician's release to Risk Management and to your department. You will not be permitted to work without this authorization. If your physician imposes work restrictions, you will be expected to return to work modified duty for a limited amount of time. It is your responsibility under Workers' Compensation to advise your doctor of our light duty program and of our willingness to accommodate a variety of needs during your recovery period.

Delaware Park has this Occupational Injury Management Program for your benefit, and attempts to accommodate most light duty restrictions, whenever

Policy Dated: 11/12/00
Last Revised: 11/06/02

A192

DP0088

possible. Your regular position at Delaware Park will be held for a limited amount of time. You must contact Risk Management after a Workers' Compensation injury in order to obtain a modified duty placement and/or to receive further instruction as to your benefits and your responsibilities.

All of the policies and procedures concerning conduct, reporting absences, etc. outlined in the Employee Handbook continue to apply. In addition, Risk Management has policies concerning the administration of Workers' Compensation claims that will be explained to you when you contact this office. Employees are expected to comply with these and all policies and to remain compliant in all aspects of their injury claim under Worker's Compensation. You must attend and be on time for all scheduled appointments: doctors, specialists, clinics, therapy, testing, insurance exams, etc., and all appointments must be scheduled with no intrusion on your work schedule (on your own time) in all possible instances. Employees must also comply with any request for information, documentation, etc. by Risk Management, our insurance carrier or other appropriate representative.

Accurately, timely, and truthfully reporting facts relating to your claim is expected. Risk Management and/or our insurance company investigates and verifies all potential Workers' Compensation claims, and you must fully participate and cooperate in this process. Our insurance company will refer all instances of suspected fraud to the State for full investigation.

Our goal is to get you the best possible medical care and help you to return to your normal life as quickly and effectively as possible. Please do not hesitate to contact our office at extension 7421 with any further questions.

Once you have read and understood the preceding policy, you must acknowledge receipt of this document by placing your signature below and delivering to Risk Management.

_____        _____
Signature                                 Date

Very truly yours,

Shannon Maguire DeLucia
Director of Risk Management

Copy to employee?:    Yes    No            Initials: _____

A193

DP0089

Page 2 of 2

Policy Dated: 11/12/00
Last Revised: 11/06/02

DELAWARE ⊂⊃ PARK
RACING • SLOTS • GOLF

*Risk Management Department*

Name _____    Date _____

## OCCUPATIONAL INJURY MANAGEMENT PROGRAM
### EMPLOYEE MODIFIED DUTY FORM

*Length Approximately 90 days:*

Delaware Park has created a modified duty program under Workers' Compensation to assist injured employees with the transition back to their regular positions of employment during a reasonable recovery period. There is no obligation to bring any employee back to work modified duty, and we may deny an employee such duty at any time if we are no longer able to reasonably accommodate the restrictions. Delaware Park offers light duty with the expectation that participating employees will fully recover and return to regular duty within approximately ninety days. Such modified assignments are strictly temporary and the amount of time may be increased or decreased based upon a reasonable review of the circumstances.

*Modified Duty Checksheets:*

While on modified duty, each employee physically restricted due to a work-related injury must complete the modified duty checksheet and have it signed by a supervisor, or other appropriate witness, prior to the start and after the end of each scheduled shift. At the end of the shift, you must acknowledge that you did perform the work as assigned within the physician's restrictions. You must also affirm that you did not do any work that would violate the conditions of the return to work release. A copy of any work restrictions should accompany this form after each update. It is the employee's responsibility to notify his or her physician of the availability of modified duty. Check with Risk Management or your Department Head if you are unsure.

*Acknowledgment:*

By signing this form, you are accepting Delaware Park's offer of modified duty under the Occupational Injury Management Program, and agree not to undertake any work assignments, either voluntarily or otherwise, in violation of the physician's return to work release. All of the policies and procedures concerning conduct, reporting absences, etc. outlined in the Employee Handbook continue to apply. In addition, you shall remain compliant in all aspects of your Workers' Compensation claim. For example, you must attend and be on time for all scheduled appointments: doctors, specialists, therapy, testing, insurance defense exams, etc. Employees must also comply with any request for information, documentation, etc. by Risk Management, our insurance carrier or other appropriate representative related to this claim. Accurately, timely, and truthfully reporting facts relating to your claim is expected.

Date of Injury _____    Injury _____

Return to Work Date _____

Employee Signature _____

ID Number _____    Date _____

Risk Management Signature _____

ID Number _____    Date _____

Delaware Park Racetrack & Slots * 777 Delaware Park Boulevard * Wilmington, Delaware 19804
Phone: (302) 994-2521 Ext. 7421 * Fax: (302) 993-8976    A194

DP0090



### DELAWARE PARK
RACING • SLOTS • GOLF

## *Risk Management Department*

---

## HEALTH INFORMATION DISCLOSURE AUTHORIZATION FORM

Insured's Name _____    Birth Date _____

Address _____

_____

Home Telephone Number _____    Work Telephone Number **(302) 994-2521 Ext.** _____

Insured's l Social Security Number _____

I understand that I am under no obligation to sign this form and that the person(s) and/or organization(s) described below whom I am authorizing to use and/or disclose my information may not condition treatment, payment, enrollment in a health plan or eligibility for health care benefits on my decision to sign this authorization.

1. I Authorize the Following Health Information to be Used and/or Disclosed:
   All medical provider office notes, medical records, test results, physical therapy notes, Etc. potentially related to the treatment of _____
   Before and/or after (date) _____.

2. I Authorize the Following Persons/Organizations to Use and/or Disclose My Health Information.
   _____
   _____
   _____

3. I Authorize the Following Persons/Organizations to Receive and/or Use My Health Information:
   **Delaware Park Racetrack & Slots Risk Management**
   **Specialty Risk Services / The Hartford Insurance Company**
   Other: _____

4. I Authorize My Health Information to be Used and/or Disclosed for the Following Purpose(s):
   **For the administration, tracking, and payment related to a potential Workers' Compensation claim asserted by the above named individual.**

5. My Right To Revoke this Authorization. I understand that I have the right to revoke this authorization at any time. I also understand that my revocation of this authorization must be in writing. To obtain a copy of an authorization revocation form, I may contact Risk Management at (302) 994-2521, ext. 7421.

   I am aware that my revocation will not be effective if (i) this authorization was obtained as a condition for obtaining insurance and applicable law permits the insurer to contest the claim or the policy itself, or (ii) to the extend the person(s) and/or organization(s) identified above have already acted in reliance upon this authorization.

**A195**

---

Delaware Park Racetrack & Slots * 777 Delaware Park Boulevard * Wilmington, Delaware 19804
Phone: (302) 994-2521 Ext. 7421 * Fax: (302) 993-8976

DP0091



## HEALTH INFORMATION DISCLOSURE AUTHORIZATION FORM (Cont.)

6. <u>Redisclosure of My Health Information.</u> I understand that if the person(s) and/or organization(s) listed above are not health care providers, health plans or health care clearinghouses that are subject to the federal privacy standards, the health information disclosed pursuant to this authorization may no longer be protected by the federal privacy standards and such person(s) and/or organization(s) may redisclose my health information without obtaining my authorization.

7. <u>Expiration of Authorization.</u> This authorization will be effective until the following date or event: **Closure of the Workers' Compensation claim by The Hartford (SRS).**

_____          _____
Insured's Signature                                              Date

_____          _____
Witness' Signature                                               Date

A196

Delaware Park Racetrack & Slots * 777 Delaware Park Boulevard * Wilmington, Delaware 19804
Phone: (302) 994-2521 Ext. 7421 * Fax: (302) 993-8976

DP0092



**DELAWARE PARK**
RACING • SLOTS • GOLF

# *Risk Management Department*

## DISABILITY STATUS FORM

Name _____    Date _____

Date of Injury _____    Injury _____

Position _____    Department _____

- ☐ RELEASED FOR FULL DUTY
- ☐ RELEASED FOR MODIFIED DUTY
- ☐ RE-INJURED AND ON TOTAL DISABILITY
- ☐ OTHER

*Department Copy*

Restrictions    **No Lifting Greater Than** _____ **lbs.**

NO: _____

_____

_____

☐ None

Comments: _____

Risk Management Initials: _____    Date: _____

### ANY CHANGE IN DISABILITY STATUS OR ANY OTHER DOCUMENTATION SHOULD BE REPORTED TO RISK MANAGEMENT IMMEDIATELY

A197

Delaware Park Racetrack & Slots * 777 Delaware Park Boulevard * Wilmington, Delaware 19804
Phone: (302) 994-2521 Ext. 7421 * Fax: (302) 993-8976

DP0093



# DELAWARE PARK
### RACING • SLOTS • GOLF

## Risk Management Department

### Employee's Modified Duty Check Sheet

Employee's Name _____   Department _____

| | | |
|---|---|---|
| Date _____ | Time In _____ | Time Out _____ |

Work Restrictions _____

    Employee Initials _____    Witness Initials _____

Duties Preformed _____

Acknowledgement _____

Employee Signature _____    Witness Signature _____

| | | |
|---|---|---|
| Date _____ | Time In _____ | Time Out _____ |

Work Restrictions _____

    Employee Initials _____    Witness Initials _____

Duties Preformed _____

Acknowledgement _____

Employee Signature _____    Witness Signature _____

| | | |
|---|---|---|
| Date _____ | Time In _____ | Time Out _____ |

Work Restrictions _____

    Employee Initials _____    Witness Initials _____

Duties Preformed _____

Acknowledgement _____

Employee Signature _____    Witness Signature _____

| | | |
|---|---|---|
| Date _____ | Time In _____ | Time Out _____ |

Work Restrictions _____

    Employee Initials _____    Witness Initials _____

Duties Preformed _____

Acknowledgement _____

Employee Signature _____    Witness Signature _____

**COMPLETED FORMS SHOULD BE TURNED INTO RISK MANAGEMENT**

Delaware Park Racetrack & Slots * 777 Delaware Park Boulevard * Wilmington, Delaware 19804
Phone: (302) 994-2521 Ext. 7421 * Fax: (302) 993-8976.

A198

JOB TITLE:     Booth Cashier, Cage Operations, Accounting Operations
JOB CODE:      1129                   EEO - 9
DEPT. CODE:    112                    NON-EXEMPT
SALARY:        $9.00 - $13.00         BARGAINING UNIT
****************************************************************************************************

SUPERVISES:

REPORTS TO:  Cashier Shift Supervisors, Cashier Shift Manager, Asst. Cage Manager, Cage
             Manager

EDUCATION:   High School Diploma or equivalent preferred.

EXPERIENCE:  Previous money handling experience necessary. Excellent verbal and written
             communication skills required. Must be able to lift 40 pounds repeatedly without
             difficulty and walk and stand for extended periods of time.

SCHEDULE REQUIREMENTS:  Able to work a flexible schedule based on the needs of the
                        business. Must be able to work weekends and holidays as
                        required.

****************************************************************************************************
JOB RESPONSIBILITIES:

- Responsible for safeguarding of Company assets during cashiering procedures.
- Responsible to ensure Federal cash reporting requirements are met.
- Responsible for accurate exchange of currency and coin.
- Responsible for accurate disbursement of jackpot payouts and hopper fills.
- Responsible to work all front line window locations, including maintaining self-redemption
  booths.
- Counts and verifies all cash turn-ins to the Satellites Cashiers.
- Complies with State regulations and Company internal controls.
- Promotes outstanding customer service.
- Performs all other duties as assigned.

POSTED:

CLOSES:                                                          4/1/01

A199

DP0023

JOB TITLE:   Impress Supervisor, Cage Operations, Accounting Operations
JOB CODE:    1128              EEO - 5
DEPT. CODE:  112               NON-EXEMPT
SALARY:      K
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SUPERVISES:  Cage Impress Clerks

REPORTS TO:  Cashier Shift Supervisor, Cashier Shift Manager, Assistant Cage Manager, and
             Cage Manager.

EDUCATION:   High School Diploma or equivalent preferred.

EXPERIENCE:  One (1) to Two (2) years cashier experience. Knowledge of Currency Transaction
             Reporting requirements and the State of Delaware gaming regulations a plus.
             Must be able to lift 40 pounds without difficulty and walk and stand for long
             periods.

SCHEDULE REQUIREMENTS: Able to work flexible schedule on the needs of the business. Must
                        Able to work weekends and holidays as required.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JOB RESPONSIBILITIES:

- Responsible for direct supervision of all technical equipment.
- Maintain currency/coin impressments of all equipment.
- Reconciliation of equipment as assigned.
- Monitor equipment performance levels.
- Troubleshoots equipment errors and malfunctions.
- Compile and report equipment statistics.
- Responsible for custody of cage equipment inventories.
- Must be able to lift 40 pounds without difficulty. Walk and stand for long periods.
- Performs all other duties as assigned.
- Promotes outstanding customer relations.


POSTED:

CLOSES:                                                                    1/11/05

41627



**NAME**   **INFORMATION**

Pre-employment
Drug Testing
Required

BADGE | 1 | 5 | 8 | 5 | 6 | | |



R A C E T R A C K & S L O T S

# APPLICATION FOR EMPLOYMENT

All applicants will receive consideration without regard to race,
religious creed, gender, marital status, age, national origin,
disability, or other status protected by law.

## PERSONAL

Date 12/19/01

| Last Name | First SAMI | Middle M | Other |

ALMAKHADHI

Street Address  109 H Chestnut Crossing

Home Phone
(   ) 456-3970

City Newark    County New Castle    State DE    Zip 19713

Business Phone
(   )

Position Desired    1st Choice Job # Cashier    3rd Choice Job # EmT

Social Security # BB
REDACTED

2nd Choice Job # Security

Type of employment:
___Temporary  ___Seasonal  ✓ Full-time  ___Part-time

Shift Available   (1st)   2nd   3rd
Salary Requested _____

How did you learn about Delaware Park employment opportunities?  A friend.

Have you previously been employed by Delaware Racing Association / Delaware Park?  No

Are you related to anyone now working for Delaware Park / Delaware Racing Association?  No
NAME:                RELATIONSHIP:                POSITION:

BEFORE any applicant under 18 years of age will be hired they must obtain Delaware Work Papers at the schools they are attending,
or which they last attended. Are you 18 years or older? ☑ Yes ☐ No

## EDUCATION

DP0383

| SCHOOL | NAME & ADDRESS | COURSE OF STUDY | FULL-TIME OR PART-TIME | DEGREE OR DIPLOMA |
|---|---|---|---|---|
| HIGH SCHOOL OR EQUIVALENT | Abdul Nasser high school Sanaa Yemen | | Full Time | |
| COLLEGE OR ADDITIONAL SCHOOLING | Sanaa university Sanaa YEMEN | | | |
| OTHER | | | | A201 |

DUE TO THE NATURE OF THE RACETRACK BUSINESS, DAYS OFF AND SHIFTS ARE SUBJECT TO CHANGE.
If hired, all applicants must provide proof of eligibility to work in the United States.

DP# 120-05

# EMPLOYMENT RECORD

Give employment record for the last 10 years, beginning with the most recent. Include summer, part-time and temporary employment and volunteer work. Show dates and locations for any employed or self-employed periods. "Employment Gap" should be completed if there is a gap in time between periods of employment.

| COMPANY NAME, ADDRESS & PHONE NUMBER | DATES | SALARY | POSITION & WORK PERFORMED | REASON FOR LEAVING | SUPERVISOR |
|---|---|---|---|---|---|
| lion food market 6741 Ogontz Ave Phila. PA 19126. | FROM TO Oct 19 | STARTING $ LEAVING $ | Owner | | |

If currently employed, may we contact your present employer? ____Yes ____No  Initials_____

### EXPLAIN ANY EMPLOYMENT GAP

| | | | | | |
|---|---|---|---|---|---|
| u-Haul dealer western union Agent | FROM Jun 01 TO Oct 19 2001 | STARTING $ LEAVING $ | | | |

### EXPLAIN ANY EMPLOYMENT GAP

| | | | | | |
|---|---|---|---|---|---|
| | FROM TO | STARTING $ LEAVING $ | | | |

### EXPLAIN ANY EMPLOYMENT GAP

| | | | | | |
|---|---|---|---|---|---|
| | FROM TO | STARTING $ LEAVING $ | | | |

# OFFICE SKILLS

- ☐ Typing_____WPM
- ☐ Word Processing_____WPM
- ☐ PC Capabilities / Programs Used_____

- ☐ Autotote Machine
- ☐ Calculator
- ☐ Other Business Machines_____

# PERSONAL REFERENCES (not Employers or Relatives)

Please list 3 references who are **NOT** related to you.

| | Name | Address | Phone# | Occupation | Years Acquainted |
|---|---|---|---|---|---|
| 1. | Mohamed Yosef | 105 H Chestnut crossing | (302) 456-3970 | Employer | |
| 2. | Anwar Almbaisi | | (215) 927-5660 | manager 7/11 | 2 Yers |
| 3. | | | | | |

# ADDITIONAL INFORMATION                     A202

Include any hobbies, special skills, volunteer activities (etc.) that you feel would enhance your application for employment

_____

_____

_____

Note: A yes answer does not automatically disqualify you from employment since the nature of the offense, date and type of job for which you are applying will be considered. However, a falsification of the information requested may result in denial or dismissal of employment from Delaware Park.

1. Have you ever been **ARRESTED** for any crime (except traffic violations) but including Driving While Under the Influence of Alcohol and/or Drugs or Vehicular Homicide? _____ Yes  ✓ No. If yes, state all particulars. (When, Where, Why and the Disposition) include all charges even if the charge(s) were dropped, dismissed, Nolle Prosequi or Found Not Guilty. Use additional sheet if necessary.

   _____

   _____

2. Have you ever been **CONVICTED** of a crime (except traffic violations) but including Driving While Under the Influence of Alcohol and/or Drugs or Vehicular Homicide? _____ Yes  ✓ No. If yes, state all particulars. (When, Where, Why and Disposition) Use additional sheet if necessary.

   _____

   _____

3. Have you ever been excluded, evicted, ruled off, set down, suspended or otherwise barred from participation in racing or attending any racetrack by a racing organization, commission or other recognized racing authority in the United States or elsewhere? _____ Yes  ✓ No

4. Has any indictment of information ever been returned or complaint made against you by the United States or any state, charging sale, use or possession of narcotics or sports bribery or wire fraud? _____ Yes  ✓ No. If yes, state full details on last page. Use additional sheet if necessary.

---

The information provided in this Application for Employment is true, correct, and complete. If employed, any misstatement or omission of fact on this application may result in the denial or dismissal of employment from Delaware Park. I give Delaware Park the right to make a thorough investigation of my past employment, credit, or criminal history. I also authorize all confidential information from any sources to be released to Delaware Park for determination in qualifying me for employment. I understand that any future employment is contingent upon the truth of the statements made herein, reference checks, and other investigations.

I further understand that Delaware Park requires pre-employment Drug Testing and I hereby agree to give a urine sample at the testing site designated by the Management.

I further understand that nothing contained in this employment application or in the granting of an interview is intended to create an employment agreement. No promises regarding length of employment have been made to me, and I understand that no such promise or guarantee is binding unless made to me in writing.

_____
Signature

12/19/01
_____
Date

A203

DP0385

# APPLICATION FOR SELF IDENTIFICATION INFORMATION

It is the policy of this organization to provide equal employment opportunities to all qualified applicants for employment without regard to race, religious creed, gender, marital status, age, national origin, disability or other status protected by law. Various agencies of the government require employers to invite applicants to identify themselves as indicated below.

**COMPLETION OF THIS FORM IS VOLUNTARY AND IN NO WAY AFFECTS THE DECISION REGARDING YOUR APPLICATION FOR EMPLOYMENT. THIS FORM IS CONFIDENTIAL AND WILL BE MAINTAINED SEPARATELY FROM YOUR APPLICATION FORM.**

---

**Position Applied For (list only one):**

_____

**What is your race / ethnic origin? (select one)**

☑ **White** (Not of Hispanic origin)–All persons having origins in any of the original peoples of Europe. North Africa. or the Middle East.

☐ **Black** (Not of Hispanic origin)–All persons having origins in any of the Black racial groups of Africa.

☐ **Hispanic**–All persons of Mexican. Puerto Rican. Cuban. Central or South American. or other Spanish culture or origin. regardless of race.

☐ **Asian or Pacific Islander**–All persons having origins in any of the original peoples of the Far East. Southeast Asia. the Indian Subcontinent. or the Pacific Islands. This area includes. for example. China. India. Japan. Korea. the Philippine Islands. and Samoa

☐ **American Indian or Alaskan Native**–All persons having origins in any of the original peoples of North America. and who maintain cultural identification through tribal affiliation or community recognition.

**What is your sex?**    ☑ Male        ☐ Female

**A204**

DP0386

41627

BADGE | 1 | 5 | 8 | 5 | 6 | | |

**FOR PERSONNEL DEPARTMENT USE ONLY**

Interviewer _____ Date _____

Arrange Interview _____ Yes _____ No

Remarks _____

Hired _____ Yes _____ No

Hire Date _____ Department _____

Job Title _____ Hourly Rate/Salary _____

**A205**

**DP0387**

**ALL COPIES OF FIRST REPORT MUST BE TYPED OR PRINTED**

Delaware Department of Labor
Division of Industrial Affairs
P.O. Box 9954
Wilmington, DE 19809-9954
Telephone 302-761-8200
Fax 302-761-6601

**STATE OF DELAWARE**
**FIRST REPORT**
**OF**
**OCCUPATIONAL INJURY**
**OR DISEASE**

004-05-120

CASE OR FILE NO.

EMPLOYER'S UC REPORTING NUMBER

**EMPLOYEE**

| 1. EMPLOYEE: FIRST    MIDDLE    LAST | 2. EMPLOYEE SOCIAL SECURITY NO. |
|---|---|
| Sami M. Almakhadhi | REDACTED |

| 3. ADDRESS - INCLUDE COUNTY AND ZIP CODE | 4. MALE [x] FEMALE [ ] | 5. EMPLOYEE TELEPHONE NUMBER (INCLUDE AREA CODE) |
|---|---|---|
| 200 E-6 West Greek Village, Elkton, MD, 21921 | | (410) 398-2070 |

| 6. DATE OF BIRTH | 7. AGE | 8. WAGE (SEE COMPUTATION ON BACK) | 9. WEEKLY HOURS WORKED |
|---|---|---|---|
| 06/20/68 | 35 | | 40+ |

| 10. OCCUPATION (REGULAR) | 11. DEPARTMENT OR DIVISION REGULARLY EMPLOYED | 12. HOW LONG EMPLOYED |
|---|---|---|
| Booth Cashier | 112-Cage Operations | ~~2 1/2 years~~ 1/18/02 |

**EMPLOYER**

| 13. EMPLOYER | 14. PERSON MAKING OUT THIS REPORT |
|---|---|
| Delaware Park Racetrack & Slots | Robert Brennan  16919 |

| 15. ADDRESS - INCLUDE COUNTY AND ZIP CODE | 16. EMPLOYER TELEPHONE NUMBER (INCLUDE AREA CODE) |
|---|---|
| 777 Delaware Park Blvd, Wilmington, DE 19804,    New Castle County | 302-994-2521 Ext 7421 |

| 17. MAILING ADDRESS - IF DIFFERENT THAN ABOVE | 18. NATURE OF BUSINESS - TYPE OF MFG, TRADE, CONSTRUCTION, SERVICE, ETC. |
|---|---|
| Same As Above | Service - Gaming & Racing |

**DATES**

| 19. DATE OF REPORT | 20. DATE/TIME OF INJURY | 21. NORMAL STARTING TIME | 22. IF EMPLOYEE BACK TO WORK GIVE DATE: | 23. AT SAME WAGE |
|---|---|---|---|---|
| 5/20/2004 | 2030 hrs. 5/18/2004 [ ]AM [ ]PM | 1600 hrs. [ ]AM [ ]PM | | YES [x]  NO [ ] |

| 24. IF FATAL INJURY, GIVE DATE OF DEATH | 25. DATE EMPLOYER KNEW OF INJURY | 26. DATE DISABILITY BEGAN | 27. LAST FULL DAY PAID - DATE |
|---|---|---|---|
| N/A | 5/20/2004 | | |

**INJURY OR DISEASE**

28. DESCRIBE THE INJURY/ILLNESS AND PART OF BODY AFFECTED

Pain, Lower Back

29. SPECIFY THE DEPARTMENT WHERE INCIDENT OCCURRED AND THE WORK PROCESS INVOLVED

Booth 7, Lifting coin bags

30. LIST THE EQUIPMENT, MATERIALS, AND CHEMICALS EMPLOYEE WAS USING WHEN THE INCIDENT OCCURRED, E.G. ACETYLENE

Coin bags, Cash register

**OCCURRENCE**

31. DESCRIBE THE EMPLOYEE'S ACTIVITY AT THE TIME OF INJURY OR ILLNESS, I.E.

Lifting a coin bag

**RECEIVED**

**MAY 2 1 2004**

DELAWARE PARK
RISK MANAGEMENT

32. DESCRIBE HOW THE INJURY/ILLNESS OCCURRED

Patient was lifting a coin bag when his back pain worsened and he felt it necessary to come to First Aid.

| 33. NAME OF PHYSICIAN | 34. PHYSICIAN'S ADDRESS |
|---|---|
| N/A | N/A |

| 35. HOSPITAL (IF APPLICABLE) | 36. HOSPITAL ADDRESS |
|---|---|
| N/A | N/A |

A206

WORKER'S COMPENSATION INSURANCE COMPANY AND COMPLETE ADDRESS (PREPRINT OR STAMP INCLUDE IAB CODE)

Hartford Insurance Company of The Midwest
Hartford Plaza
Hartford   CT   06115

POLICY NO.    42WN J77800 02

DISTRIBUTION OF THIS REPORT
1. ORIGINAL MUST BE SENT IMMEDIATELY TO WORKER'S COMPENSATION INSURANCE CARRIER.
2. COPY TO THE INDUSTRIAL ACCIDENT BOARD
3. EMPLOYER'S COPY - RETAIN AS RECORD
4. EMPLOYEE'S COPY

SIGNATURE OF PERSON IN 14 ABOVE

Emergency Medical Technician
OFFICIAL POSITION

510255

MAY 2 8 2004

DP0039

**Christiana Care Family Med' ine Center**
1401 Foulk Road  Wilmington, DE  ₊803-2727
302-477-3300  Fax: 302-477-3311

*September 2, 2004*
*Page 1*
*Chart Document*

SAMI ALMAKHABHI                                    Home: 3024563970
Male  DOB:06/29/1968                  1392579-0220001

**03/12/2004 - Office Visit: LBP**
**Provider: Michael A. Krafchick DO**
**Location of Care: Christiana Care Family Medicine Center**

**Vital Signs**
  Initial BP: 168/94
  Repeat BP: 134/86
  Temp(F): 97.9   Temp site: oral
  Pulse: 62
  Weight: 199.5 pounds
  ............Theresa J Blair  March 12, 2004 10:02 AM
**History from:** patient
**Chief Complaint:** back pain
**History of Present Illness:** Pt is a 35yo male with chronic LBP x ~ 3 months. Pt states he works carrying bags of coins at Delaware Park and is constantly bending and twisting to lift the heavy bags. He admits to pain as 2/10 in severity and intermittent in nature. He denies any radiation of symptoms, fevers, saddle anesthesia or loss of bladder/bowel function.
**Past Medical and Surgical History:**
**Past Problems:**
  LUMBAR REGION, SPRAIN/STRAIN (ICD-847.2)

  Past medical/surgical history reviewed.

**Current Medications:**
  Current medications reviewed; compliance discussed with patient.

**REVIEW OF SYSTEMS**

**General:**
  Patient denies fever.

  **General comments:**  System reviewed.

**Musculoskeletal:**
  Patient complains of back pain.
  Patient denies neck pain.
  Patient complains of joint pain.
  Patient complains of stiffness.

  **Musculoskeletal comments:**  System reviewed.

**Neurology :**
  Patient denies weakness.
  Patient denies numbness.

  **Neurology comments:**  System reviewed.
  Repeat BP: 134/86

**PHYSICAL EXAM**                                            A207

  **General appearance:** *Patient is a well-developed, well-nourished 35 Year Old Male who is appropriately groomed.*

DP0040

Christiana Care Family Medicine Center
1401 Foulk Road  Wilmington, DE    )03-2727
302-477-3300  Fax: 302-477-3311

*September 2, 2004*
Page 2
Chart Document

SAMI ALMAKHABHI                                            Home: 3024563970
Male  DOB:06/29/1968                        1392579-0220001

**Musculoskeletal:**
Gait/station: + Lumbosacral tenederness b/l, - straight leg raisng b/l or Laseague tests b/l, slight decreased ROM in forward flexin

**Neurological:** DTR's 2+ b/l in LE
Testing for deficits shows CN II-XII intact.

## Assessment and Plan

**Problem List Updates:**
**Problems New/Removed/Changed/Assessed**
Assessed LUMBAR REGION, SPRAIN/STRAIN as unchanged

**Workup Plan and Other Comments:**
1) LBP-  Handout given to pt on exercises to try over the next few weeks.  Pt also to use Motrin 600mg TID for its antinflammatory benefit.  F/u in 4 weeks.
Case discussed with Dr. Viola

**Return to Office:**
Appt with: Primary provider
On or about: 1 month
For: Follow up visit

Signed by Michael A. Krafchick DO on 03/16/2004 at 8:41 PM
_____

I reviewed this patient's history, exam, assessment and plan with the resident at the time of the visit and I agree with the findings as documented.

Appended by Joanne Viola MD on 03/17/2004 at 9:08 AM
_____

**A208**

**DP0041**

**ATTENDANCE HISTORY** 2005

NAME (last) Almakhadi Soon (first) (middle)

DEPT __ DEPT# __ BADGE# 015852

**DELAWARE PARK**

R A C I N G • S L O T S • G O L F

POSITION Booth Cashier

TELEPHONE ___ HIRE-DATE ___

TRANSFER DATE ___   NEW DEPT ___   POSITION ___

| | A-PAID SICK TIME | M-TARDY EARLY IN |
|---|---|---|
| | B-VACATION | N-WORK STATION LATE |
| | C-INCENTIVE | O-NO CALL/NO SHOW |
| | D-FIXED HOLIDAY | P-EARLY/PART'L LEAVE |
| | F-BEREAVEMENT | S-SUSPENSION |
| | G-JURY DUTY | T-LAYOFF |
| | H-MILITARY LEAVE | V-WORKER'S COMP |
| | I-PAID PERS'L LEAVE | W-Forgot Badge |
| | J-PERSONAL LEAVE | Z- |
| | K-FAMILY/MED LEAVE | |
| | L-ABSENCE | |

DP# 120-16

A209

DP0539a

11/25/05 - WW. attach.

11/2/05 - "detail note"

- withdrawn for future

DP0539aa

A210

BADGE # ☐ 5 8 5 6 ☐



RACETRACK & SLOTS



RECEIVED
JAN 9

## DELAWARE PARK
## REQUEST FOR TRANSFER

NAME __Sami Almakhadhi__    DATE __1/16/05__

HOME PHONE# __(302) 293-5064__    OTHER# _____

**TRANSFER FROM:**

POSITION __Cashier__    DEPARTMENT __main bank 112__

**TRANSFER TO:**

POSITION __Main bank__    DEPARTMENT __112__

EMPLOYEE SIGNATURE __S 5856__

Describe your interest in this position and what you can bring to this position: __I'll do my best as usual.__

Date Received H.R. _____    H.R. Representative _____

Attempted Contact Dates __1/25/05__    _____    _____    A211

DP0245

White —— HR        Yellow —— Employee        DP# 120-24

· Booth Cashier.

Satelite — 2 weeks · move back
can not work evengs.

Main Bank - Hours don't matter.

Everyday is different. Like people
large People.

No Variance, no exceptions
# 9.

Don't Know - all managers different.
44- for evaluation.

Cashier. more responsible 1 million dollars.
3 yrs. - Change is good.
Nothing — Fees again.

**A212**

DP0246

ADGE # 1 5 8 5 6 □ □





## DELAWARE PARK
## REQUEST FOR TRANSFER

NAME _Sami AlmaKhadhi_     DATE JAN 31 AM 1:06  _1-30-05_

HOME PHONE# _(302) 293-5064_     OTHER# _____

TRANSFER FROM:

POSITION _Cashier_     DEPARTMENT _112_

TRANSFER TO:

POSITION _Impress Supervisor_ DEPARTMENT _112_

EMPLOYEE SIGNATURE _S 15856_

Describe your interest in this position and what you can bring to this position: _I'll do my best_

_____

_____

_____

_____

_____

_____

_____

_____

Date Received H.R. _2/1/05_     H.R. Representative _K Pugh_

Attempted Contact Dates _____     _____     _____

A213

DP0284

# MID ATLANTIC SPINE

100 Beck's Woods Drive
Suite 102
Bear, DE 19701
(302) 392-6501

126 E. High Street
Elkton, MD 21921
(410) 392-3385

Patient Name _Sami Almakhadhi_____ Date: _5·17·05_

Diagnosis: _hern. lumb. disc._____

Date of last treatment: _5.17.05_ Date of next appointment: _4weeks_

☐ **Patient is Totally Disabled**

No Work/School     From: _____ To: _____

☑ **Patient is Partially Disabled**

From: _5·17·05_ To: _4 wks._

May Work _8_ Hours Per Day

**Restrictions:**

☒ No stairs/climbing
☑ No prolonged standing/walking
☑ No prolonged sitting
☑ No lifting over _20_ lbs.
☐ No overhead work
☑ No squatting, crawling, kneeling, stooping
☑ No repetitive bending and twisting
☐ Other: _____

**Return to Work**

Patient may return to work without restrictions on _____

Comments: _pt. has procedures / diagnostic studies pending_

Physician Signature _Jouf J. Heibaigh PA-C_



DEPOSITION
EXHIBIT
ALMAKHADHI
9-CMN-11/8/07

MAP-028

A214

PAGE # 1 5 3 5 6 □ □



**DELAWARE PARK**
**REQUEST FOR TRANSFER**

AUG 15 2005

NAME _Sami Almekhadhi_          DATE _8/11/05_

HOME PHONE# _(302) 293-5064_          OTHER# _____

**TRANSFER FROM:**

POSITION _Cashier_          DEPARTMENT _Imprest Supervisor_   112

**TRANSFER TO:**

POSITION _Imprest Supervisor_ DEPARTMENT _112_

EMPLOYEE SIGNATURE _S. Iobst_

Describe your interest in this position and what you can bring to this position: _I'll do my best to do the job right with all my expreace and my skills._

Date Received H.R. _8-15-05_          H.R. Representative _CK_

Attempted Contact Dates _____  _____  _____

**A215**

**DP0376**

INTERNAL INTERVIEW
FIRST (HR)

Employee Name _Samr Almakha_____ Date _8-15-05_ Time _____

Current Position _Booth Cashier_____ Interviewer _CR_
(To be conducted by human Resources)

Time in current position _3yr 7mo_ Time with Company: _3yrs 7mo._

Position being applied for: _IMPRESS SUPERVISOR_

Before conducting an internal interview, a written request for consideration should be forwarded to the Human Resources Recruiter.
If the applicant has never participated in an internal interview before, begin by explaining the interview process to the applicant. If he/she has not already done so, explain that he/she must inform his/her current manager of his/her interest in the position.

1. Please describe your current position. (Probe for level of responsibility, other employees or departments with whom they interfaced, length of time in position, any changes in job duties.)

   _Sattelite Cashier, Booth Cashier_

2. Have you held any other positions with the Company? If so, please describe positions, duration in position, supervisor and relationship with supervisor and why you left the position.

   _Booth Cashier -_

3. What do you like about your present job?
   _likes people_

4. What do you dislike about your present job? Have you done anything to change those aspects you dislike?
   _when he sees people goofing off it makes him angry_

5. How would you rate your performance in your present job? (Probe for areas of strengths and weaknesses).
   _good_

6. How would your manager rate your performance in your present job? (Probe for relationship with current manager and performance appraisal ratings.)

   _very good_

A216

DP0377

7.  What prompted you to apply for this position?

_grow with the Company_

8.  What is your understanding of this position? (Probe for understanding on general job duties and department function.)

_take care of redemption Machines - supervise impluls Clerks_

At this point, the interviewer should describe the job in further detail, including any special qualifications needed, salary range, schedule and any change in status that may be affected (i.e. whether this would be a lateral move or a promotion). Applicant should be given opportunity to ask questions.

9.  How do you think your skills and experience relate to this position?

_3yrs as a Booth Cashier - has taken Accounting_

10. Did you have any job or educational experience prior to joining the Park that is relevant to this position? If so, please describe.

_Accounting_

11. If you are not selected for this position, what will you reaction be?

_Nothing_

12. Why should we select you for this position?

_I'm persistant_

13. Do you recommend further consideration as a candidate?    ☐ Yes    ☐ No

14. Why or why not?

(If applicant is moving to Bargaining Unit, interviewer should clarify Benefits changes)

*15856*

INTEROFFICE MEMORANDUM

NOTICE OF EXTERNAL/INTERNAL (highlight one)    INTERVIEW # 2

TO: _____ *Karlyn* _____

FROM: _____ *Carolyn* _____

DATE: _____ *8-15-05* _____

ATTACHMENT:    EMPLOYMENT APPLICATION

POSITION: _____ *Impress Supervisor* _____

CANDIDATE: _____ *Sami Almakhadi* _____

**Please advise the Employment & Retention Team of the status of this application within seven (7) days.**

To be completed by the hiring manager:

H.R. to make an offer: *NO*___ (Y/N)    Requested start date: _____

POSITION: _____    Scheduled Hours: _____

If NO, Please state reason: *Found someone within the Dept that have more experience and strong gaming knowledge*

Route to E&R contact: _____

Extension _____

6/14/04

**A218**

DP0379

TWO INTERVIEW

Applicant: _Sami Alrashedi_     Date/Time _8/18/05 3:50 pm_

Position: _Impress Supervisor_     Interviewer: _Beverly Pope_

*Rate all after completing the interview*

| | | |
|---|---|---|
| Rate Appearance _2_ | Rate Verbal Communication _2_ | Rate Preparation _2_ |
| Rate Enthusiasm _2_ | Rate Desire _2_ | (1—5 low to high) |

*Select at least one question from each category*

1. Why are you applying to Delaware Park *or* our department?

   _To move up & grow with this company_

2. What do you know about this position?

   _Balancing 85C's & 88's impressing slot machines & ticket TIC's_

3. Why do you want this job?

   _To move up & grow with the company_

4. What work experience or knowledge makes you the best candidate for this job?

   _Cashing / money handling experience._

5. What area of improvement was stated on your last performance review?


6. What do you expect from a supervisor?


7. Suppose your supervisor insisted you do something a certain way, when you know there is a better way. What would you do?


8. Who was the best/worst supervisor you ever had? Why?

9. What was your biggest contribution or accomplishment in your last position?

10. How would your former boss or fellow employees describe you?

11. How do you deliver excellent customer service?

*Satisfying customer with a smile*

12. Do you find that a lot of guests are leaving smaller tips these days?

13. How would you handle a guest that never tips?

14. Have you ever had to deal with a guest who is angry or complaining? How did you calm them down?

*yes I had the Supervisor handle it*

15. What do you consider to be the most important responsibilities of this position?

*Making sure all machines are working & Money being TRANSPORTED*

16. Have you ever worked weekends before? How often?

*YES, all the time.*

17. Is your transportation reliable?

*YES !*

18. How many times were you absent or late on your last job? Do you think that's normal?

*About Twice - yes*

19. How many days do you think is normal for a person to be absent or late?

*About 3 times absent a year - Same for late.*

20. Did you regularly work 40 hours?

_Yes._

21. Which shift do you enjoy working the most?

_All Shifts_

22. Which shift can't you work?

_NONe_

......................................................................

Department/Trade/Job-specific questions:

\* If you are chosen for this position, when could you start?

_Immediately_

A221

DP0382



## Acknowledgment Form

Applicant: *Sam Almathaalli*    Interviewer: *Benny D Pyne*

Date: *8/18/05*

I have had the opportunity during the interview process to ask questions and satisfy any concerns I had regarding this position.

Also, I understand the job responsibilities of the position of *Impress Supervisor*

I am aware that the starting rate for this position is *weekend, holidays evening & nights*

Applicant's
Signature: _____

                                    **DP0500**

Print Name: _____

                                    **A222**

I met with Sami Almakhadhi on 02/18/05 at approximately 7:35 p.m. to discuss the outcome of a discrimination complaint that had been handled by Micki Nardo. I explained to Sami that Micki had asked me to inform him that her investigation found that he had not been discriminated against regarding his denial for request to transfer to the Mainbank Cashier position. I explained to Sami that I wanted to help him understand the reasons he did not get the position and what he could do to better his future chances. There had been a breach in confidentiality regarding the candidates that were chosen and, unfortunately Sami had been informed by his peers that the position had been filled prior to his being interviewed. There was some further confusion during the interview itself when Roberta Evans advised Sami that he had not been chosen prior to actually completing the interview. I apologized to Sami for these events and advised him that in the future we will be re- evaluating the manner in which we disseminate this kind of information.

Having said that, I informed Sami that the reasons he was not selected for the position this time were the following:

At this time, we feel that Sami is not ready to fulfill the demands of the Mainbank Cashier position. Sami was previously offered and promoted to a Satellite Cashier position. We gave Sami a 14-day training period at the conclusion of which he advised us that he would like to rescind his acceptance and return to the Booth Cashier position. This caused a major delay in getting this position filled. Sami's reasons at the time were that it was just too much for him and that the schedule would not work for his family. We respect Sami's choice, but would be very hesitant to place him in a position, which requires an even greater commitment and longer hours on many occasions.

In the past, Sami has also had a few issues getting along with all of his co-workers. While we have seen a vast improvement and received no complaints in quite some time we felt that the pressure of the Mainbank position may be something that we are not sure that Sami is ready for.

Sami questioned why the two girls got the position. I advised him that we were not here to talk about them and why they were chosen but to talk about him. Sami then began addressing Darla Cherry stating that he had been here for two and a half years and never gets promoted and that he thinks that maybe Stacy does not like middle-eastern people. I advised Sami that I was speaking to him and I would appreciate it if he would look at me. I told him that I was very sorry he felt that way but that this statement was not true and that he could see evidence of that in the diversity of our entire staff. I advised Sami that this was a management team decision – not something I decided on myself. I informed him that we sought the opinion of all of the Supervisors, and that Darla, Noel, Karlyn, Kevin and myself then made a decision based on whom we felt was most qualified for the position.

I then explained to Sami that the perception of the management staff is that he wants to move up very quickly. I informed him that while we appreciated and respected his desire, we would not be comfortable putting him in another position until he was able to have some success as a Satellite Cashier. I informed him that there were two Satellite Cashier positions open right now that he could post for. Sami commented that he would then have to wait six months to move to another position and then wait for a Mainbanker to get fired. I explained to Sami that he would not have to wait six months to post for a job within the department and that it is important to always be prepared; you never know when someone will decide to change career paths and a position become available. Sami started smiling and shaking his head and said "Life is too short" and he then looked at Darla again and made the comment that when he applied for his next job that he would make sure that his Supervisor is not a woman. I advised Sami that I was highly offended by that statement and that I was sure Darla was too. I told him that comments like that would not help him to advance anywhere. We concluded our meeting at that time and I advised him that Micki would be in contact with him.

**A223**

5/22/2006

# Incident Report

## REDACTED

| | | | | | |
|---|---|---|---|---|---|
| Name/SSN: | *ALMAKHADHI, SAMI* | | | | |
| Department: | 112 | Cage Operations | Gender: | M | Union: Yes |
| Ethnicity: | 0 | | Position: | BOOTH CASHIER | |
| Date of Hire: | 1/18/2002 | | Age: | 37 | |

Date of Incident: 2/22/2005     Incident Type:    Discrimination

Disposition: Concern        Dispos. Date:    2/22/2005

Witnesses:

Details:     Recorded Date: 3/15/2005 10:23:25 AM
Recorded By: mnardo
Incident Date: 2/22/2005
Incident Type: Discrimination
HR Rep: M NARDO
Disp Date: 2/22/2005
Disposition: Concern
ECN IncType: N/A

Mr. Almakhadhi, Booth Cashier, met with Micki Nardo, Director of Human Resources, on Monday, February 14, 2005. Mr. A. expressed frustration about being turned down for the transfer he applied for as Main Bank Cashier. Mr. A stated that he did not understand why he did not get approved to work as Main Banker. He also applied in the past as Supervisor and Satelite Cashier. He has worked at DP for three years and he feels that he has not been given the opportunity to advance indicating that there might be discrimination against him in his department (Cage Ops.). He states that his management keeps telling him that he does not have enough experience in other positions to move on. He applied for Satelite Cashier, was placed in that position, however he could only work the position for two weeks. His father took ill (and consequently passed away) and he needed to take him to chemotherapy, the schedule did not work out. He alleges that he applied 3-4 times for Satelite before they gave him the job. This time around he alleges that they offered the positions to two females, and never interviewed him until they already made the decision. Micki asked him who interviewed him, he stated that Roberta (Evans). He did not understand what the purpose of interviewing him if he had no chance of being offered the position. Micki asked him if he asked Roberta why that happened. He said that it was a mistake that it even got out that the position was offered to someone else (alleged that Roberta stated this). He applied for Supervisor position and was told he needs more experience in other positions and this is the second time he applied for Main Bank. He feels that the two females that were offered the Main Bank position are inferior to his skills and noted that one female was Caucasian the other is Afro American. He added that he has no exceptions and no variances. Micki told Mr. A that she would look into his concerns and asked if he spoke to his management team about his concerns. Mr. A said yes he spoke to his supervisor and the supervisor simply said that he needs more experience. Micki asked for the Supervisor's name and he did not want to disclose who he spoke to. Micki asked if he spoke to Stacy Suhr or Karlyn Dixon, and Mr. A made a face (which Micki perceived as it would be of no use to speak to them-eyebrow up and lips pursed) and stated no. He added that he has a college degree from his country. They (not sure who they are) want him to join the Army and he will not join to "kill his people"(he stated that he is Arabian). His degree is not recognized in this country. Micki asked what his degree was in and he stated Political Science/Foreign Government. Micki asked if he changed careers, what brought him to Delaware Park? He started to laugh and said no, Delaware Park is not a career, it is just a job. Still laughing he then stated that he really does not need this job. But, while he is here ( at DP) why not make

A224

DP0030

the most of it. It is not about the money, he said, it is about learning all that he can learn.

Micki explained that it would be wise to speak to his superiors about his concerns. She told him again that she would look into the situation and someone would be in touch with him. He shook her hand and said thank you. Micki telephone Stacy Suhr, Assistant Manager, Cage Ops. She told Stacy that Mr. A met with her that day and also explained his concerns. Stacy stated that Mr. A did express an interest in moving up and Karlyn had spoken to him in the past telling him that he needed to gain experience in the area before he could move on to Supervisor. Stacy said that he has missed a lot of time (it turns out that it was FMLA time for his dad and not intermittant FMLA to care for his At Risk pregnant wife). Micki told Stacy that she cannot use that missed time to pass over someone for a potential position. Stacy also said that word "on the floor" so to speak is that he stated that he will apply for all the positions, work them for two weeks and go back to Booth Cashier, thinking he has experience so that he can be promoted. Micki told her that Stacy must confront him with that concern since there is a perception of this nature. Micki asked Stacy to meet with Mr. A.

The following are the notes from a meeting between Stacy Suhr and Mr. A:

I met with Sami Almakhadhi on 02/18/05 at approximately 7:35 p.m. to discuss the outcome of a discrimination complaint that had been handled by Micki Nardo. I explained to Sami that Micki had asked me to inform him that her investigation found that he had not been discriminated against regarding his denial for request to transfer to the Mainbank Cashier position. I explained to Sami that I wanted to help him understand the reasons he did not get the position and what he could do to better his future chances.
There had been a breach in confidentiality regarding the candidates that were chosen and, unfortunately Sami had been informed by his peers that the position had been filled prior to his being interviewed. There was some further confusion during the interview itself when Roberta Evans advised Sami that he had not been chosen prior to actually completing the interview. I apologized to Sami for these events and advised him that in the future we will be re-evaluating the manner in which we disseminate this kind of information.
Having said that, I informed Sami that the reasons he was not selected for the position this time were the following:
At this time, we feel that Sami is not ready to fulfill the demands of the Mainbank Cashier position. Sami was previously offered and promoted to a Satellite Cashier position. We gave Sami a 14-day training period at the conclusion of which he advised us that he would like to rescind his acceptance and return to the Booth Cashier position. This caused a major delay in getting this position filled. Sami's reasons at the time were that it was just too much for him and that the schedule would not work for his family. We respect Sami's choice, but would be very hesitant to place him in a position, which requires an even greater commitment and longer hours on many occasions. In the past, Sami has also had a few issues getting along with all of his co-workers. While we have seen a vast improvement and received no complaints in quite some time we felt that the pressure of the Mainbank position may be something that we are not sure that Sami is ready for. Sami questioned why the two girls got the position. I advised him that we were not here to talk about them and why they were chosen but to talk about him. Sami then began addressing Darla Cherry stating that he had been here for two and a half years and never gets promoted and that he thinks that maybe Stacy does not like middle-eastern people. I advised Sami that I was speaking to him and I would appreciate it if he would look at me. I told him that I was very sorry he felt that way but that this statement was not true and that he could see evidence of that in the diversity of our entire staff. I advised Sami that this was a management team decision - not something I decided on myself. I informed him that we sought the opinion of all of the Supervisors, and that Darla, Noel, Karlyn, Kevin and myself then made a decision based on whom we felt was most qualified for the position.
I then explained to Sami that the perception of the management staff is that he wants to move up very quickly. I informed him that while we appreciated and

A225

DP0031

respected his desire, we would not be comfortable putting him in another position until he was able to have some success as a Satellite Cashier. I informed him that there were two Satellite Cashier positions open right now that he could post for. Sami commented that he would then have to wait six months to move to another position and then wait for a Mainbanker to get fired. I explained to Sami that he would not have to wait six months to post for a job within the department and that it is important to always be prepared; you never know when someone will decide to change career paths and a position become available. Sami started smiling and shaking his head and said "Life is too short" and he then looked at Darla again and made the comment that when he applied for his next job that he would make sure that his Supervisor is not a woman. I advised Sami that I was highly offended by that statement and that I was sure Darla was too. I told him that comments like that would not help him to advance anywhere. We concluded our meeting at that time and I advised him that Micki would be in contact with him.

email between Nancy Myshko and Micki Nardo on 2/22/05:

I did read your documentation. I so like the way that Stacy handles herself. I believe you addressed all of his concerns relating to the allegation. The reasons that Stacy gave were legitimate. His statement regarding 'being supervised by a woman' is offensive and I think Stacy responded appropriately. I would let it go. We have it documented. Should he have an issue in the future, we will look into it in the same manner. He makes the conscious effort to decide if he will continue to support the cultural differences between his home land and ours. That is his opinion, fine, just as long as he doesn't act on it in a manner that will impact others. His opinion does not have an adverse impact on Stacy or Darla, it was offensive and she told him. Stacy and Darla need to ensure that they don't treat him differently because of his opinion. (I would not support a promotion to Supervisor because of his opinion of woman. I think 75% of that dept is woman. Bad move! He missed the class on Public Relations in Politics.)

-----Original Message-----
From: Micki Nardo
Sent: Tuesday, February 22, 2005 8:04 AM
To: Nancy Myshko
Subject: Sami Almakhadhi

Nancy,
Please enter ERProbe and review this documentation. Please not Mr. A's comment relating to making sure his next supervisor is not a woman. Please advise.
Micki
Ext.1002

A226

DP0032

5/22/2006

# Incident Report

REDACTED

| | | | | | |
|---|---|---|---|---|---|
| Name/SSN: | ALMAKHADHI, SAMI | | | | |
| Department: | 112  Cage Operations | Gender: | M | Union: | Yes |
| Ethnicity: | 0 | Position: | BOOTH CASHIER | | |
| Date of Hire: | 1/18/2002 | Age: | 37 | | |

| | | | |
|---|---|---|---|
| Date of Incident: | 3/15/2005 | Incident Type: | Miscellaneous |
| Disposition: | Concern | Dispos. Date: | 3/15/2005 |
| Witnesses: | | | |

Details:   Recorded Date: 3/17/2005 10:13:37 AM
Recorded By: mnardo
Incident Date: 3/15/2005
Incident Type: Miscellaneous
HR Rep: M NARDO
Disp Date: 3/15/2005
Disposition: Concern
ECN IncType: N/A

Mr. A. came to the HR office at Kirkwood Services Building on 3/14/05 at approximately 4PM. to meet with Micki N. He was still upset that he was not considered for a Main Bank position he applied for and felt that it was due to discrimination. Micki explained that she found no evidence to support his allegations. Micki suggested that if he was not satisfied with the outcome of his meeting with Stacy Suhr, Assistant Cage Manager, he should move up the chain of command and speak to Karlyn Dixon, Director of Accounting Operations. He said no, Karlyn does not like him and always yells at him. She speaks to him in a disrespectful manner. Micki said that he needs to address that with Karlyn. He again reiterated the fact that he did not agree with the Main Bank choices his management made, he feels that he can do the job, he feels that he has enough experience to move on from Booth Cashier. I told him that he needs to again apply for Satelite. He said "I know that job, I trained people in that job. I have trained Supervisors like Billy Joyner. They promote people that are not smart and know the job better than me like Doreen Casson." Micki said that while she respects his opinion, it is just that, his opinion. His management has the right to choose who they feel suits the job best and they do not have to explain their decisions where other people are concerned. They gave him advice as to how to proceed moving forward if he wants to enhance his career within his department. Just because he disagrees, does not change their guidelines for him. He continued to debate the point with Micki and Micki told him that there was nothing more to discuss. She extended the courtesy to meet with him without an appointment and now she must end there meeting (it was 4:45PM). Micki asked what he wanted from HR? He responded that he wanted to tell me that he still feels he is being discriminated against. Micki said that she already clarified that she found no evidence of discrimination. Her advice is to meet with Karlyn Dixon. He refused that advice and said he wants to meet with Kevin DeLucia, Vice President of Accounting Operations and he wants Micki to be there as a witness. Micki said she would contact Kevin but makes no promises. His scheduled is Tuesday -Saturday  3:30P to 11:30P.
3/15/05 Micki telephoned Kevin DeLucia and explained the meeting and desires of Mr. A. Kevin suggested that Karlyn, He and Micki meet with Mr. A to try to put an end to his concerns.  Micki called Karlyn D to try to set up an appointment today after Mr. A arrives for his scheduled shift.

3/15/05 meeting notes: in the presence of Kevin DeLucia, Vice President Accounting , Karlyn Dixon, Director, Accounting Ops.

A227

DP0033

This meeting took place at 3:30PM in the office of K.DeLucia. Micki stated, "We are meeting today to discuss some concerns that Sami has relating to not being chosen for the Main Bank position, the way his interview was conducted and the fact that he feels discriminated against in his as well as issues of disrespect he has with Karlyn Dixon."

Sami: Well, I want to know why I did not get the position at Main Bank. Stacy told me I must be satelite. I worked Satelite job for two weeks and I fill in for satelite all the time. I had to give it back because my father was ill, he died in December, I was using FMLA, my federal right. I was interviewed by Roberta after choice was made. Why? That is like giving someone a cell phone with no battery. Here go use cell phone...but no battery, so it is no use."
Micki: We already acknowledged that the circumstances surrounding your interview was a mistake, it should not have happened and it will not happen again." (Karlyn and Kevin nodded in support)
Sami: Yes, it was mistake, very upprofessional.
Micki: So what is it that you want to happen as a result of this mistake?
Sami: Just make sure that they (Kevin & Karlyn) know this happened. I don't understand why these two females got this job, I think it is because you like them.
Karlyn: First of all being a Satelite cashier is not a pre-requisite for working in the main bank. There are many things that are looked at like work history (here at DP and outside of DP) variances, attendance, interpersonal relations or how you get along with co-workers, customer service.
Sami: I had variances in the beginning. I worked too fast trying to give good service. People would jump in my line because I was fast. I realized that I must slow down. That was long ago, those write ups went away. I been here three years, longer than other two women that got job.
Karlyn: You recovered the progressive discipline, but the variances stay part of your bio for the remainder of your employment. And time in your position is taken into account but again is not the sole reason you were not chosen. We look at apples as apples. In other words, you fill in as satelites so did the two females, they may not have had variances, you have had your issues with getting along with others.
Sami interrupts: That one time was misunderstanding but that was only one time and it was not my doing, it was other person who made statement that I should go back to my own country. She got Final Warning with 3 day suspension and she apologized. I did not get disciplined because I did not do anything. I will be American Citizen next year, I am resident now..I want to work hard and have a good living in this country.
Karlyn: You applied for the satelite position last year. Other satelite positions came open, why have you not applied again? Openings have come up since December.
Sami: it is too late for me now. I am making almost what satelite makes and I am 7th in seniority. If I go to satelite now I go to bottom of seniority. Main Bank makes more hourly and there is plenty opportunity for overtime.

Kevin: While a satelite position is not a prerequisite, it is a good strategic step to move up within the Cage department. You now have a bank worth $30,000. Satelite is $250,000 and Main Bank is even more. The volume and responsibility increases with the position.
Sami: I understand that, and I am good at what I do. I see you have education (speaking to Kevin looking a Degree hung on the wall), so do I, in my country not count for some reason in United States. But this job is easy to me, (giggling) it is fun, it comes easy.
Kevin: Look Sami, we have a lot of responsibility (indicating Kevin and Karlyn) we are not going to give a person a position because we like them and jeopardize our careers our family wellbeing.
Sami: So why did these women get the job over me?
Karlyn: Because we felt they were more qualified.
Sami: Okay, more qualified than me? I don't know, Karlyn, I just felt like you don't like me. You have yelled at me in the past, saying to get back to your window, in front of my co-workers.
Karlyn: No, you are mistaking, I don't talk to people like that. (She kept shaking her head saying no, I don't do that kind of stuff).

A228

DP0034

Sami: Well, I guess that's it then.

It was 4:15PM and Karlyn and Kevin had a meeting to go to that started at 4PM. We had to end the meeting at that point but Sami thanked them and he was encouraged (by Karlyn and Kevin) to apply for positons within department as well as outside of the department He did not respond to this suggestion.

A229

DP0035

Sheryl Cartwright

**From:** Sheryl Cartwright
**Sent:** Friday, April 29, 2005 12:28 PM
**To:** 'Leo West/SRS Lost Time'
**Cc:** Shannon DeLucia; Dave Foraker
**Subject:** RE: Sami Almakhadhi - YLT C 05751

**Importance:** High

Leo,

Update. Sami came into Risk today complaining that he was told that his last report of incident was not work related. He contends that he injured himself by lifting a fallen rover machine some time ago at Delaware Park, he never reported the incident and that's how he herniated his discs. I explained to him that we have not received any documentation that supports that claim. Considering he has been with the company since Jan 2001, he should be well aware of our policy for reporting work related injuries.

He claims that he should be working with lifting restrictions, but has not been doing so, because he didn't want to pursue anything through Delaware Park, but he is having pain.

I explained his options for a non-work related injury and referred him to our Benefits area. I explained his options for pursuing re-opening the claim and referred him to contact you directly.

I have a feeling he will be obtaining legal counsel.

Respectfully,
Shari Cartwright
General Liability Coordiantor
Risk Management
X7163

------Original Message------
**From:** Sheryl Cartwright
**Sent:** Monday, April 18, 2005 12:39 PM
**To:** 'Leo West/SRS Lost Time'
**Subject:** Sami Almakhadhi - YLT C 05751
**Importance:** High

Leo,

DP0661

A230

Sami reported to our EMT's that his back was painful due to a previous back injury. He stated he has a herniated disk in L1 & L2 disks in his lower back and today's pain has worsened as the day progressed. No statement as to the herniated disks being work related.

Sought treatment at the CER on 04/13/05. Taken OOW 04/13/05 th 04/16/05, RTW FD on 04/17/05.

Previous claim for back – YCP C 57707 DOL 05/18/04 – was denied. MRI states herniation of discs L-4 & L-5 - small to moderate - central to left and herniation of discs L-5 th S-1 – central to left. MRI was taken 8 days prior to the DOL on 05/18/04 causing claim to be denied.

Faxing all documentation for recent incident. Please review for compensability or denial.

Respectfully,
Shari Cartwright
Risk Management
X7163



DELAWARE PARK
RACING • SLOTS • GOLF

May 5, 2005

Sami Almakhadhi
P O BOX 7392
Newark, DE 19714


Dear Sami,

This letter is to inform you that you have been approved for FMLA effective
4/13/05 until 6/13/05, at which time you will exhaust all of your FMLA time.


If you have any questions please call Donna Smith, Benefits Clerk @ 302-355-1027.


Sincerely,

Donna Smith

Donna Smith
Benefits Clerk

Cc: File

A232

DP0042

Almtuhadhi

**GEORGE M. BOHATIUK, M.D.**
500 Christiana Medical Center
Newark, DE 19702 • 302-455-1007

PATIENT'S NAME _Deni Alkamski_ _____    DATE _6/13/05_    AGE _____

ADDRESS _____    _____

CITY _____    STATE _____    ZIP _____

_released to full-time full duty
work on 6/14/05_

_J Bohatiuk_
PHYSICIANS SIGNATURE
SUBSTITUTION PERMISSIBLE

DEA# _____

REFILL ___ NO ___ YES ___ TIMES
IN ORDER FOR A BRAND NAME PRODUCT TO
BE DISPENSED, THE PRESCRIBER MUST
HANDWRITE "BRAND NECESSARY" OR
"BRAND MEDICALLY NECESSARY" IN THE

Jun. 13 2005 11:49AM P1    FAX NO. :    FROM :

DP0660

A233

# Staff Performan   Review

Badge # | 15856



DELAWARE PARK

RACING • SLOTS • GOLF

Probationary ☐
Six Month ☒
Annual ☐

Job Title/Code **BOOTH CASHIER/1129**

Name **SAMI ALMAKHADI**

Supervisor **STACY SUHR**

Length of Service **3-1/2 years**

Date **6/21/2005**

Evaluation Period **1/18/05-7/18/05**

Department Code **112**

For each of the expectations listed, determine how well the employee meets the expectation and place a check mark in the corresponding box.

**Customer Satisfaction:** *Patrons and internal customers expect to receive personalized, fast and accurate service; therefore employees are expected to:*

| | | Exceeds Expectations | Consistently Meets Expectations | Inconsistently Meets Expectations | Does Not Meet Expectations |
|---|---|---|---|---|---|
| 1. | Extend a warm greeting and farewell. | | ☑ | | |
| 2. | Demonstrate good communication skills (e.g., make eye contact, use a friendly tone of voice, display open body language, etc.) | | ☑ | | |
| 3. | Personalize service (by learning and using customers' names, interests, and preferences.) | | ☑ | | |
| 4. | Promote/understand marketing programs, promotions, products and services. | | ☑ | | |
| 5. | Resolves problems (listen, confirm, act, and follow-up). | | ☑ | | |
| 6. | Help/provide service in a professional manner. | ☑ | | | |
| 7. | Check for understanding when providing information and ask if anything more is needed. | | ☑ | | |

Total: 15

**Teamwork:** *Patrons and internal customers expect employees to provide consistent service across and within departments and to speak well about the company and; employees therefore, employees are expected to:*

| | | Exceeds Expectations | Consistently Meets Expectations | Inconsistently Meets Expectations | Does Not Meet Expectations |
|---|---|---|---|---|---|
| 8. | Be respectful to all people. | | ☑ | | |
| 9. | Be supportive of the company and co-workers by speaking positively about patrons, co-workers, supervisors, managers, the company and our business. Maintain confidentiality of sensitive issues. | | ☑ | | |
| 10. | Constructively bring issues to supervisor's attention, and actively discourage gossip and rumors. | | ☑ | | |
| 11. | Seek opportunities and share information to improve service delivery and offer assistance to contribute customer satisfaction. | | ☑ | | |
| 12. | Politely/accurately respond to customer and/or co-workers' questions. | | ☑ | | |

Total: 10

A234

DP0036

|  | Exceeds Expectations | Consistently Meets Expectations | Inconsistently Meets Expectations | Does Not Meet Expectations |
|---|---|---|---|---|

**Technical Skills:** *Patrons and internal customers expect to be acknowledged by knowledgeable and skilled employees who deliver fast and accurate service; therefore, employees are expected to:*

13. Comply with department/position specific policies, procedures, seeking out answers when unclear.

| ☐ | ☑ | ☐ | ☐ |
|---|---|---|---|

14. Meet expected service delivery/time guidelines.
    (1) *NUMBER OF TRANSACTIONS PERFORMED*
    (2) *COMPLETION TIME OF ALL PAPERWORK*

| ☑ | ☐ | ☐ | ☐ |
|---|---|---|---|

15. Keep errors to a minimum or within established guidelines.
    (1) *VARIANCES*
    (2) *ACCOUNTING ERRORNEOS'S*

| ☑ | ☐ | ☐ | ☐ |
|---|---|---|---|

16. Manage time well, giving priority to servicing customers without neglecting job duties.

| ☑ | ☐ | ☐ | ☐ |
|---|---|---|---|

Total: 11

**Work Habits:** *Patrons and internal customers expect a clean environment and professional employees who are well-groomed, punctual, consistent, and dependable; therefore, employees are expected to:*

17. Create a safe, secure, and clean work environment.

| ☐ | ☑ | ☐ | ☐ |
|---|---|---|---|

18. Maintain appropriate energy level and pace throughout the shift.

| ☑ | ☐ | ☐ | ☐ |
|---|---|---|---|

19. Be open to coaching, make efforts to improve, and learn from mistakes.

| ☐ | ☑ | ☐ | ☐ |
|---|---|---|---|

20. Meets standards regarding attendance and readiness.

| ☑ | ☐ |
|---|---|

21. Meets standards regarding appearance and conduct.

| ☑ | ☐ |
|---|---|

Total: 11

Total: 47

A235

DP0037

**Areas For Recognition and/or Opportunity** (e.g., Positive or Negative work history entries, etc.)

Sami continues to excel with his productivity, efficiency and customer service skills. Sami's hard work, dedication and overall performance is MUCH APPRECIATED.

**Improvement Plan/Goals** (required for "inconsistently" or "does not" meet expectations). Please be sure to indicate the objective, the action, and the timeline for completion. (Standard improvement period is 30 days.)

**Employee Comments:**

Thank You very much for All my supervisor. and for Carlyn Dixon I wish To learn how To respect her emploes and STOP discriminate me because my worker's comp. or my race.

**Senior Management Comments:**

Thanks for all of your hard work, Sami!
815

| | | Date |
|---|---|---|
| Employee Signature | S        15856 | 7-28-05 |
| Supervisor Signature | H. Lafferty 10988 | 7/4/05 |
| Manager Signature | S. S.         7431 | 7/4/05 |

| | Initials | Date |
|---|---|---|
| SVP | | |
| ED | | 7/15/05 |
| SB | | 7/14/05 |

A236

DP0038

Sheryl Cartwright

**From:** Shannon DeLucia
**Sent:** Wednesday, August 31, 2005 4:24 PM
**To:** Judith Passmore
**Cc:** Jim Bosco; Sheryl Cartwright
**Subject:** FW: Sami Almakhabhi - Booth Cashier

**Importance:** High

FYI - I have instructed Shari to have Cage send Sami home due to the fact that he is currently working his regular position and has not mentioned the need for restricted duty. According to his recent DME, he has a disc herniation that only allows him to work restricted duty. Due to the apparent lack of documentation of Sami's current status (we have nothing else on file for him), he must be sent home until such time as he is either released to full duty or can provide us with a list of restrictions we can properly evaluate our ability to accommodate his needs. I will have Shari follow-up with your office, but Sami will most likely be needing an FMLA packet (if eligible) to cover his time out of work. I believe that Sami has already missed time due to this same condition - we could verify for you as far as Workers' Comp. Thanks!

-----Original Message-----
**From:** Sheryl Cartwright
**Sent:** Wednesday, August 31, 2005 3:06 PM
**To:** Karlyn Dixon
**Cc:** Shannon DeLucia
**Subject:** Sami Almakhabhi - Booth Cashier
**Importance:** High

Karlyn,

Sami has a petition under Workers' Comp claiming an injury to his lower back as having been sustained while at work on 12/01/03. As discussed this morning, we received information stating from our counsel that Sami should be working with very specific work restrictions, which would have become effective 08/25/05. Additionally, Sami will be scheduled for surgery to his back in the very near future and will have a minimum 6 to 8 week recuperative period before being released back to Sedentary Duty.

Sami has not brought a doctors note listing the restrictions discussed above to Risk nor, to your knowledge, has one been provided to anyone in Cage. **Therefore, Sami must be told to go home and remain out of work until he returns with a note dated 08/25/05 or after stating in detail all restrictions, if any, or his ability to return Full Duty. This note must be produced to Risk ONLY.** Please remind him that Risk's office hours are Monday through Friday, 9 am to 5 pm, and may contact us at 302/994-2521 x7163. He can speak with Shannon, Dave or me.

I have asked Judy in Benefits to let me know if or how much FMLA time Sami has available to him currently.

A237
DP0106

I'll keep you updated as quickly as possible. Is there anyone else you would like me to keep in the loop with regard to Sami? Let me know.


Respectfully,
Shari Cartwright
Claims Coordinator
Risk Management
302/994-2521 x7163

**Judith Passmore**

| | |
|---|---|
| **From:** | Judith Passmore |
| **Sent:** | Wednesday, August 31, 2005 4:34 PM |
| **To:** | Shannon DeLucia |
| **Cc:** | Jim Bosco; Sheryl Cartwright |
| **Subject:** | FW: FMLA Question/ RE: Sami Almakhadhi |

I have been in touch with Sheryl today and am forwarding the correspondence we had today re this individual. We have a RTW dated 6/13/05, stating he is "released to full-time full duty work on 6/14/05". His FMLA had exhausted on 6/13/05.

Thank You,
Judy Passmore
Benefits Assistant
Ext 1026

| | |
|---|---|
| **From:** | Sheryl Cartwright |
| **Sent:** | Wednesday, August 31, 2005 3:58 PM |
| **To:** | Judith Passmore |
| **Cc:** | Jim Bosco |
| **Subject:** | RE: FMLA Question |

Thanks for the info, it was exactly what I needed. Sami is not very communicative with Risk, so, I'm not sure if you'll be getting the request for FMLA for the surgery from him or us. If I hear anything, Ill let you know as soon as possible.

Respectfully,
Shari Cartwright
Claims Coordinator
Risk Management
302/994-2521 x7163

-----Original Message-----

| | |
|---|---|
| **From:** | Judith Passmore |
| **Sent:** | Wednesday, August 31, 2005 3:41 PM |
| **To:** | Sheryl Cartwright |
| **Cc:** | Jim Bosco |
| **Subject:** | FW: FMLA Question |

After checking he would have 2 days and will not pick-up any days until 10/12/05. Sorry for being so long and drawn-out!

Thank You,
Judy Passmore
Benefits Assistant
Ext 1026

| | |
|---|---|
| **From:** | Judith Passmore |
| **Sent:** | Wednesday, August 31, 2005 3:26 PM |
| **To:** | Sheryl Cartwright |
| **Cc:** | Jim Bosco |
| **Subject:** | FW: FMLA Question |

A239

DP0043

5/22/2006

# Incident Report

### REDACTED

| | | | | | |
|---|---|---|---|---|---|
| **Name/SSN:** | *ALMAKHADHI, SAMI* | | | | |
| **Department:** | 112 | Cage Operations | **Gender:** | M | **Union:** Yes |
| **Ethnicity:** | 0 | | **Position:** | BOOTH CASHIER | |
| **Date of Hire:** | 1/18/2002 | | **Age:** | 37 | |

| | | | | |
|---|---|---|---|---|
| **Date of Incident:** | 8/3/2005 | **Incident Type:** | Miscellaneous | |
| **Disposition:** | Concern | **Dispos. Date:** | 8/3/2005 | |
| **Witnesses:** | | | | |

**Details:** This email was sent to Frank Penta, Employee Relations Manager to follow up on by Micki Nardo, Director HR on 8/3/05:

The above referenced Booth Cashier wrote on his review that Karlyn Dixon needs to learn respect for her employees and stop discriminating against him because of his Worker's Comp and Race. Please follow up with Karlyn and attempt to resolve. Document all that transpires.

On August 4th, Roberta Evans contacted Stacy Suhr about Sami's perception of how Karkyn Dixon views him (SEE BELOW). Sacy in turn contacted Frank Penta. Frank asked to met with Sami. Sami came to HR at the Park office at 2PM on 8/4/05. Sami expressed his displeasure over being passed over for not only the Man Bank position (twice) but also for the Impress Supervisors position. He expressed his dismay over treatment he has received in the past and currently regarding Karlyn's treatment of him due to his applying for FMLA (which was denied) and worker comp (which he mentioned he has a "hearing" late in August) Sami feels and if he is being "discriminated" against as "I have been here 3 .5 years. I know the jobs here. Why would not I not get it (a Management position" Frank told Sami he would look into his being passed over "without reason" and get back to him.

Frank discovered it was explained to him why he was passed over for the Main Bank position (refernce ER probe March of 2005). It was also discovered that Sami had not formally put in for the position of Impress Supervisor (Sami had not filled out a transfer form).

Frank met with Sami again on 8/11/05 and it was expalined to him he would be more than welcome to put in for Impress Supervisor, and he would go through the interview process. If it were felt he was not qualified, it would be explained to him why. As fo the Main Bank position, I re-explained what was stated to him in March of this year.

Sami filled out the transfer form, which Frank provided for him, and he seemed pleased that he could apply.

——Original Message——
From: Roberta Evans
Sent: Friday, August 05, 2005 6:12 PM
To: Micki Nardo
Cc: Karlyn Dixon
Subject: Sami Almakhadhi

Micki,

On Friday, August 5th I was approached by Sami Almakhadhi in Booth 8; he wanted to know if the Impress Supervisor job was still open. I told him that to

A240

DP0028

the best of my knowledge the position had not been filled. He then started to tell me that Stacy and Karlyn had discriminated against him and that he had applied for several positions and was always turned down saying he needed to be a satellite first i.e. Main Bank or Shift Supervisor. He then said others were given the positions without being satellites first. He said he wanted me to tell Karlyn and Stacy that what they were doing was illegal and that he was going to the Labor Board. I told him that I did not have any comments to make regarding this situation.

Roberta Evans
Cashier Training Supervisor

=====================================

Received the following e-mail on 8/24/05 from Stacy Suhr

Hello Noel,
We have to let Sami know that someone else has been chosen for the Impress Supervisor position and I think that it would be better if you spoke to him versus myself or Karlyn. You can let him know that the candidate we have chosen has more than 7 years of management experience as well as (and this is very important to the selection) experience in the gaming industry outside of DP in Las Vegas. They also have a rapport established with the swing shift Impress team already as a Satellite Cashier and have worked their way up at DP from Booth Cashier to Satellite. (The candidate we are choosing is Penny but we will hold off on making that public knowledge just yet.) Please speak to Karlyn before you talk to Sami to be sure there isn't anything that she wants to add. You will need to take detailed notes of your conversation with him and forward them onto Frank Penta in HR so there is no question as to why another candidate was selected. If you have any questions feel free to give me a call!

Thanks,
Stacy

NOTE SENT BY NOEL LAFFERTY TO FRANK PENTA REGARDING SAMI

Hi Frank,
I was asked by Stacy to forward my notes on my conversation with Booth Cashier Sami Almakhadhi about the department's decision on who was selected to fill the Impress Supervisor position and why.
On Friday, 08/26/05 I informed Sami that someone else had been chosen for the Impress Supervisor position because of the following reasons.
1. The person chosen has over 7 years of management experience as well as experience in the gaming industry from Las Vegas.
2. The person chosen started out as a Booth Cashier and has worked their way up to a Satellite Cashier and has already established a good rapport with the swing shift Impress team.

Sami's only response to me was ok. I asked him if he had any questions. He asked me who had made the decision. I told him that it was a Management decision based on the reasons that I just gave him. His response to me was that if Bev made the decision he is ok with it but if Karlyn was involved with the decision he said that he knows he will not be able to move up anytime. I told him that was not the case and that he needs to try again when another position becomes available. He said ok.
This is everything that was said. Please let me know if you have any questions.
Thanks,
Noel

A241
DP0029

**NEUROLOGY ASSOCIATES, P.A.**
774 Christiana Road
Suite 201
Newark, DE 19713
(302) 731-3017

8/25/05

George B. Heckler
P.O. Box 128
Wilmington, DE 19899

Re: Sami Almakhadhi

Dear Mr. Heckler:

I evaluated Mr. Almakhadhi at your request 8/25/05. The following summary is based on the patient's statements today as well as a review of notes from Dr. Bohatiuk, Mid Atlantic Spine, Christiana Cre, and Delaware Park. The patient understands that no care will be rendered based on this evaluation.

**PATIENT'S STATEMENTS TODAY:** He tells me that he was working as a cashier and in December of 2003 he notes that there were deep carts like a square that flip over. He notes that he was working overtime and he was having his money bags weighed and he notes that the cart flipped and he tried to grab the bags. He notes that he felt pain in his back. He notes that he never had back pain before. He tells me that he was working as two cashiers. He notes that the next day when he woke up he felt better, but when he walked he felt something in his left hip region. He then went to a doctor after two weeks. He tells me that he saw Dr. Orrin, a family doctor. She gave him stretches and Motrin. He saw her later and he notes that he kept working. He notes that he had to work hard in February to get his family from overseas. He went back to Dr. Orren and he saw another doctor there. He tells me that he got checked out again and he gave him the same thing. He notes that he had some more back pain in April from bending over at work,. He then saw another doctor who evaluated him and started treating for a work related low back complaint. He was sent for an MRI of the low back. He was then sent to PT at PRO PT. He notes that this didn't help much. He was then sent to a surgeon. He was told to consider injections. He then went to Dr. Bohatiuk who sent him to chiropractor. He was sent to a chiropractor and this didn't help. He then went to another chiropractor and went there for a while. He notes that this didn't help either. He eventually saw Dr. Katz who sent him to Dr. Falco. He also told him that he needed surgery.

**CURRENT COMPLAINTS:** He notes that he continues to have pain on the left side. He notes that his right side holds up his body. He notes that he gets pain from his low back to his buttock to his left leg to the calf. He notes that he can't stand and walk for a long time. He notes that he has to lean over more. He notes that he has no trouble with his bowels or his bladder.

He tells me that when he is at home he watches TV. He tries to do as little as possible.

**MEDICATIONS:** non-steroidal.

**WORK HISTORY:** He continues to work as a cashier at Delaware Park. He notes that he had applied for a variety of different jobs where he can sit. He notes that he was a college education. He notes that he was on FMLA for two months and hew then came back to work.

**PAST MEDICAL HISTORY:** None, he denies prior low back pain.

**REVIEW OF FILMS:** MRI May 2005: Two degenerative discs with herniations at L4-5 and L5-S1 with disc material in the left neuroforamina at L4-5.

**REVIEW OF RECORDS:** The patient had an MRI of the lumbar spine 5/10/04 ordered by Dr. Davis. This showed a left paracentral disc at L4-5 narrowing the left lateral recess. There was a small central and left sided protrusion at L5-S1 as well. There was also some associated facet hypertrophy. The patient was seen 7/26/04 by Dr. Bohatiuk. The patient suggested that he sustained a work related accident 4/04. He complained of left low back pain and left leg pain. The patient was noted to have two left sided disc herniations on his MRI. He had tenderness in the low back. He had weakness in the ankle and toe dorsiflexors. He was to see a chiropractor. The patient had an EMG 7/27/04 that showed 2+ sharp waves in the paraspinous muscles. The patient was back 8/2/04 and he was to continue chiropractic treatment. The patient followed with Dr. Palmer at the request of Dr. Bohatiuk and the patient complained of low back pain and was seen three times in August and one to two days a week in September of 2004.

The patient was seen by Dr. Falco's nurse practitioner 9/28/04. He gave a history of increasing low back pain since January. He complained of left leg pain and low back. The report suggested that the patient recalled no specific incident. She did a limited examination. The patient was seen at Delaware Park Fire Command stating that he had low back pain from working. The patient was evaluated at Christiana ER that day . The patient was taken out of work and given Percocet. The patient was released to light duty work by Mid Atlantic Spine 5/17/05.

The patient was back with Dr. Bohatiuk 5/25/05 complaining of left sided low back pain radiating down the left leg. He ordered an updated EMG that was unnecessary as the patient had a prior EMG interpreted as showing radiculopathy. The patient was back in Dr. Falco's office 5/27/05 and complained of pain at a 7-8/10. They suggested a lumbar epidural and gave the patient flexeril and Norco. Dr. Bohatiuk was seeing the patient every two weeks but was not really chanting the treatment in any way.

**PHYSICAL EXAMINATION:** This is a well developed male in mild distress with a blood pressure of 140/90, a heart rate of 78, and a respiratory rate of 12. The HEENT exam was normal. The lungs were clear and the cardiac examination revealed a regular rate wand rhythm without murmur, S3, or S4. The extremities were free of edema.

**LOW BACK EXAMINATION:** The patient had decreased lumbar range of motion. There was tenderness over the lumbar paraspinous muscles on the left side. there was no spasm. The patient had low back pain with SLR on the left at 30 degrees.

**NEUROLOGIC EXAMINATION:** The patient was alert and oriented x3 and answered questions appropriately.

The cranial nerve examination revealed pupils which were equally round and reactive to light and accommodation, extraocular movements which were full. The funduscopic examination revealed flat discs bilaterally with spontaneous venous pulsations. The visual fields were full to confrontation. The face was symmetric, the tongue in the midline and the palate elevated symmetrically.

Motor examination revealed 5+/5+ strength in the upper extremity with normal tone and bulk in the following muscles: trapezius, deltoid, infra and supraspinatus, biceps, triceps, brachioradialis, wrist extensors and flexors, finger extensors and interosseous muscles. In the lower extremity the patient had 5+/5+ strength and normal tone and bulk in the following muscles: hamstrings, quadriceps, anterior tibialis, gastrocnemius, extensor hallucis longus, peroneus longus and intrinsic muscles of the feet. He

A243
DP0778

had 4+/5 strength in the left EHL and peroneus longus.   Gait testing revealed no evidence of abnormality on heel, toe or tandem gait tasks.

Deep tendon reflexes were 2+ throughout in the following regions:  triceps, biceps, brachioradialis, wrist, knee, ankle and hamstring.  The plantar response was flexor bilaterally.

Sensory examination was within normal limits to pinprick, light touch, vibratory, proprioceptive and temperature sensations.

**IMPRESSION:**  This is a patient who claims a work related accident to the low back 12/1/03. The neurological examination today suggests an L5 radiculopathy on the left. In answer to your questions:

1) The patient's history of his alleged accident is noted above.

2) The patient related that his job involved lifting bags of coins and twisting and long standing. He related that this activity aggravates his low back and leg complaints.

3) The patient has weakness in the left leg in the extensor hallucis longus and the peroneus longus. The patient has an MRI showing an L4-5 disc herniation extending into the left neuroforamen.

4) If one accepts the patient's history then his current complaints would not have occurred but for the work accident of 12/3/03. The patient appears to have aggravated his low back in April of 2005 based on the records reviewed today.

5) It is my opinion that the patient would have been totally disabled for a period of 4 weeks after his flare up of symptoms April 13 2005. He could have returned to modified duty work thereafter.

6) It is my opinion that the patient will need ongoing restrictions related to his low back complaints. I have filled out a physical capabilities form which outlines a light duty job.

7) It is my opinion that the surgery suggested by Dr. Katz, I assume this is a microdiscectomy, would be reasonable treatment and likely would improve the patient symptomatically. If the patient's history of a work accident 12/3/03 is accepted then the need for surgery would be related to this event.

8) The patient would be totally disabled for 6-8 weeks following a lumbar microdiscectomy and would be able to perform at least sedentary work after that time period.

10) It is my opinion that the patient should choose one physician to direct his medical care. He has been seeing both Dr. Bohatiuk and Dr. Falco's office and these are duplicative services. The patient could be seen every 8 weeks for medication checks. There is no reason to evaluate the patient every 2 weeks as Dr. Bohatiuk has been doing. He would likely benefit from Neurontin for his leg complaints. He does not require chiropractic or PT art this time. He should engage in a home stretching program.

I hope that this answers your questions regarding this patient. All opinions have been stated to a reasonable degree of medical probability. It would be helpful to have a more complete set of medical records.

Sincerely,

John B. Townsend III, M.D.

**DP0779**

**A244**

Work restrictions for the period
8/25/05 and ongoing

156911·50

## PHYSICAL CAPACITIES EVALUATION

Physician: JOHN B. TOWNSEND, III, M.D.    Client Name: SAMI L. ALMAKHADHI

NOTE: If the client has made a full and complete recovery to pre-injury levels, please indicate here, sign below and return. Please indicate release date.

_____ Client has made a full and complete recovery. Release date: _____

A. In completing the following, please place an X (or an "F" for intermittent, "C" for constant in appropriate spaces.

1. In an eight hour day, the client can stand:
   ___ Not at all   ___ 2-3 hrs.   ___ 3-4 hrs.   X 5-6 hrs.   ___ 7-8 hrs   ___ no restriction
2. In an eight hour day, the client can walk:
   ___ Not at all   ___ 2-3 hrs.   X 3-4 hrs.   ___ 5-6 hrs.   ___ 7-8 hrs.   ___ no restriction
3. In an eight hour day, the client can sit:
   ___ Not at all   ___ 2-3 hrs.   ___ 3-4 hrs.   ___ 5-6 hrs.   X 7-8 hrs.   ___ no restriction

4. a) In an 8 hour day, the client can lift:    b) In an 8 hour day, the client can carry:

| | No Restriction | Frequent | Moderate | Occasional | Not At All | | No Restriction | Frequent | Moderate | Occasional | Not At All |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0-5 lbs. | | | X | | | | | | | | |
| 5-10 lbs. | | | | X | | | | | | X | |
| 10-20 lbs. | | | | X | | | | | | | X |
| 20-35 lbs. | | | | | X | | | | | | X |
| 35-50 lbs. | | | | | X | | | | | | X |
| 50-75 lbs. | | | | | X | | | | | | X |
| 75 + lbs. | | | | | X | | | | | | X |

5. In an eight hour work day, client is able to: (Please mark with an X)

| | No Restriction | Frequent | Occasional | Not at All |
|---|---|---|---|---|
| a) Bend | | | X | |
| b) Squat | | | | X |
| c) Climb | | | | X |
| d) Kneel | | | X | |
| e) Twist | | | X | |
| f) Push/Pull | | X | | |
| g) Reach | | X | | |
| h) Drive | | | | |

6. Client can use hands for: a) Gross grasping X yes ___ no   b) Fine manipulation X yes ___ no

7. Client can use feet for operation of foot controls: X yes ___ no

8. Client may perform:

___ Sedentary Work: Lifting 10 lbs. maximum and occasionally lifting and/or carrying such articles such as dockets, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met.

X Light Work: Lifting 20 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs. Even though the weight lifted may be only a negligible amount, a job is also in this category when it involves sitting most of the time with a degree of pushing/pulling of arm and/or leg controls.

___ Medium Work: Lifting 50 lbs. maximum with frequent lifting and/or carrying of objects up to 25 lbs.

___ Heavy Work: Lifting 100 maximum with frequent lifting and/or carrying of objects up to 50 lbs.

C. Client may return to work ___ Part-time X Full-time with above restrictions as of _____

Physician Signature _____   Date 8/25/05

Comments: _____

DP0780

A245

# HECKLER & FRABIZZIO

ATTORNEYS AT LAW

THE CORPORATE PLAZA

800 DELAWARE AVENUE

SUITE 200

POST OFFICE BOX 128

WILMINGTON, DELAWARE 19899-0128

GEORGE B. HECKLER, JR.
ANTHONY M. FRABIZZIO
MARIA PARIS NEWILL
RICHARD D. ABRAMS
WILLIAM D. RIMMER*
DANIEL P. BENNETT
JOHN GILBERT*
DAVID R. BATMAN
JOHN W. MORGAN
TIMOTHY H. ROHS
MIRANDA D. CLIFTON
CHERYL A. WARD
STEPHEN J. MILEWSKI
CASEY W. LESIAK+

AREA CODE 302
573-4800

TELECOPIER
573-4806

*DELAWARE AND PENNSYLVANIA BAR
+PENNSYLVANIA BAR ONLY

August 29, 2005
Refer to WC05-16246

Re:  Sami L. Almakhadhi v.
     Delaware Park Racetrack & Slots
     Your Claim No.: YLT-05751C
     D/A: 12/1/03

**VIA FACSIMILE: 856-985-0469**
**AND REGULAR MAIL**

Mr. Leo R. West, III
Specialty Risk Services
4 Greentree Centre
13000 Route 73, Suite 303
P.O. Box 799
Marlton, NJ 08053

*5-6 hrs. standing*
*3-6 hrs. walking*
*7-8 hrs sitting*
*No climbing*
*Occasional lifting or*
*carrying of 20 lbs,*
*bending, squatting, kneeling,*
*or twisting.*
*frequent push/pull, reaching or driving*

Dear Mr. West:

        Enclosed is a copy of our evaluating neurologist's, Dr. Townsend, 8/25/05 report
and Physical Capacities Evaluation report of the same date (both received by us by FAX
on 8/26/05) which are self-explanatory and concern his examination of the claimant in
the above-captioned matter on the same date.  The purpose for this examination is set
forth in my 8/10/05 report--to respond to the claimant's Petition for medical treatment
expenses, total disability for the limited period 4/13/05--6/13/05, and the date of
accident average weekly wage/compensation rate calculation issue, which claims are
based upon a 12/1/03 work accident/low back injury.

**A246**
**DP0108**

Mr. Leo R. West, III
August 29, 2005
Page 2

This case has been scheduled for <u>Hearing</u> before the Industrial Accident Board on <u>11/8/05 at 1:00 p.m.</u>--any settlement offers must, therefore, be extended by us <u>no later than 10/7/05</u> if we are to avoid the imposition of a claimant's attorney's fee and medical witness charges.

The claimant's history to Dr. Townsend, his medical record review, findings upon examination and impressions (L5 radiculopathy on the left with L4-5 disc herniation extending into the left neuroforamen by 5/10/04 MRI, causally related to the 12/3/03 work accident and aggravated by the 4/12/05 work incident/activities) are set forth in detail in Dr. Townsend's 8/25/05 report.

Based upon the claimant's history and Dr. Townsend's medical record review, Dr. Townsend has confirmed the causal relation between the low back problems/L4-5 disc herniation injury complained of and the work accident(s), at least a 4-week period of total disability beginning 4/13/05, that the surgery recommended by Dr. Katz and assumed to be a microdiscectomy would be reasonable and necessary treatment for the work-related injury, with 6-8 week recuperative period following which the claimant will be able to return to sedentary-type work, and need for continued medical treatment.

With regard to ongoing treatment, Dr. Townsend has stated that the claimant should direct his medical care to one physician, as seeing both Drs. Bohatiuk and Falco would result in duplicative services.

Dr. Townsend has also confirmed that the claimant should be working with restrictions in view of the low back problems referenced in his 8/25/05 report and in accordance with that which is set forth in his Physical Capacities Evaluation report of the same date--the applicable restrictions are for light-duty work which include 5-6 hours of standing, 3-6 hours of walking and sitting 7-8 hours per day, occasionally up to 20 lbs. but no lifting/carrying beyond such amount, frequent pushing/pulling, reaching and driving, occasional bending, squatting, kneeling and twisting, and no climbing.

Please confirm that the claimant's job duties are consistent with the light-duty restrictions assessed by Dr. Townsend, and confirm that the claimant's job duties presently do not exceed such restrictions.

Please also expedite the issuance to me of a written job description setting forth the physical requirements of the job duties presently performed by the claimant so that we may forward this document to Dr. Townsend for his review/approval, and so that we may protect the Employer against the allegation that subsequent to confirmation of

Mr. Leo R. West, III
August 29, 2005
Page 3

assessment of return to work restrictions the claimant was asked, permitted and/or encouraged to engage in work duties which exceeded his restrictions and which resulted in further injury/disability.

From the claimant's history and the information provided thus far, it appears that he was working full-time at the time of the work incident (by history it appears that the claimant was actually working overtime as he was trying to accumulate enough funds to bring his family to the U.S.).

As there is no information to contradict the claimant's history of the happening of the 12/1/03 work accident and aggravation of the low back injury which occurred at such time by the subsequent, 4/12/05, work activities, and as Dr. Townsend has confirmed causal relation, resulting period of disability, and reasonableness, necessity and causal relation of treatment, to include recommended low back surgery/micro-discectomy, and in view of the <u>Gilliard-Belfast</u> ruling, there is no apparent basis for us to proceed with our defense to this claim and <u>I am, therefore, requesting that you confirm my authority to advise the claimant's counsel that we will acknowledge the following:</u>

(1)   <u>Medical treatment expenses incurred to date</u> as a result of the 12/1/03 work accident;

(2)   <u>Total disability for the period 4/13/05--6/13/05 at the rate of $255.21 weekly based upon the date of accident average weekly wage of $382.80</u> ($9.57 per hour, 40 hours per week)--as I have advised in my 8/10/05 report, if the claimant is able to establish that he worked overtime with such regularity as to fairly constitute part of his regular work week at the time of the work accident, we will have to include such overtime in the date of accident average weekly wage and resulting compensation rate calculations. I again request that you expedite the issuance to us of the claimant's payroll/wage records for the period 12/1/02--12/1/03, as requested in my 8/10/05 report, so that we may calculate the date of accident average weekly wage/compensation rate;

(3)   <u>Authorization for performance of low back surgery, presumably micro-discectomy,</u> as approved by Dr. Townsend;

(4)   <u>Recurrence of total disability concomitant with the low back surgery</u> referenced in the preceding paragraph;

Mr. Leo R. West, III
August 29, 2005
Page 4

    (5)    <u>Confirmation that we will pay those medical treatment expenses from the date of Dr. Townsend's 8/25/05 examination of the claimant as approved by Dr. Townsend</u> (medical treatment coordinated by one physician, with no physical therapy or chiropractic treatment at this time).

    As this case has been scheduled for <u>Hearing</u> before the Industrial Accident Board on <u>11/8/05 at 1:00 p.m.</u>, and as any settlement offers must be extended by us <u>no later than 10/7/05</u> if we are to avoid the imposition of a claimant's attorney's fee and medical witness charges, your prompt attention to the above will be most appreciated.  Thank you.

                Very truly yours,


                George B. Heckler, Jr.

GBH, Jr./vlt/257425
Enc.

cc:    Ms. Shannon Maguire DeLucia
       Director of Risk Management
       Delaware Park Racetrack & Slots
       (via e-mail only: <u>shannon.delucia@delawarepark.com</u>)

**Christiana Care Family Medicine Center**
1401 Foulk Road
 Wilmington, DE 19803-2727
302-477-3300  Fax: 302-477-3311

September 2, 2005

SAMI ALMAKHABHI          YLTC 05751
PO BOX 7392
NEWARK, DE  19714

Dear Delaware Park, Risk Management,

Please note the following limitations for my patient:
No lifting greater than 20 lbs
No prolonged standing
No repetitive bending or twisting

Pt with disk herniation at L4-5 with compression on the dural sac and lateralizing to the left and occupying the L lateral recess of L4-5.

He has had a repeat evaluation by me 9/2/05.

          If there are any questions please feel free to call me.  Thank you.

Sincerely,

*Mary C Leddy DO*

Mary C. Leddy DO

**FAXED**
Leo/SS
SEP 0 2 2005

DELAWARE PARK
RISK MANAGEMENT

**RECEIVED**

SEP 0 2 2005

DELAWARE PARK
RISK MANAGEMENT

**A250**

**DP0105**

Sheryl Cartwright

**From:**      Sheryl Cartwright
**Sent:**      Friday, September 02, 2005 1:20 PM
**To:**        'Leo West/SRS Lost Time'
**Subject:**   FW: Sami Almakhabhi - Booth Cashier

**Importance:**      High

FYI!

Barry Heckler's letter dated 08/29/05 stated that Townsend (DME exam) imposed restrictions effective 08/25/05. These restrictions were supposedly in line with what Sami's physicians had indicated. When I questioned Sami's department, they had no knowledge that he should be working with restrictions. He was sent home yesterday, 08/31/05 until he could return with a physician's note stating his restrictions. He came in today, 09/01/05, with a note from his physician listing his work restrictions. His restrictions could not be accommodated at this time and he has been sent home. He was instructed to call out each day and request whether his restrictions can be accommodated and he can return to work. He was also instructed to contact his attorney to discuss his lost pay questions.

I do not have Barry's email address, can you please forward this information to him for me?

I'll let you know if and when Sami's status changes.

Thanks!
Shari

-----Original Message-----
**From:**      Sheryl Cartwright
**Sent:**      Friday, September 02, 2005 1:10 PM
**To:**        Karlyn Dixon
**Cc:**        Shannon DeLucia; Stacy Suhr
**Subject:**   RE: Sami Almakhabhi - Booth Cashier
**Importance:**      High

Karlyn,

Update! Sami came to Risk this morning with a doctors note indicating the following restrictions:
>No lifting greater than 20 lbs
>No prolonged standing
>No repetitive bending or twisting

A251

DP0044

You advised that these restrictions could not be accommodated. Sami was advised that the restrictions could not be accommodated at this time and he is to return home. He was also advised to call in each day to advise Cage that he is out and to verify whether the restrictions could now be accommodated and return to work or if he is to remain out of work.

He was concerned about compensation for lost pay. Because he is represented by legal counsel with regard to his Workers' Comp claim, he will need to have that discussion with his attorney.

If you determine going forward that you are able to accommodate him and have him return to work, please advise as soon as possible so that notice can be given to our insurer.

Respectfully,
Shari Cartwright
Claims Coordinator
Risk Management
302/994-2521 x7163

-----Original Message-----
**From:**      Sheryl Cartwright
**Sent:**      Thursday, September 01, 2005 12:58 PM
**To:**        Karlyn Dixon
**Cc:**        Shannon DeLucia
**Subject:**   RE: Sami Almakhabhi - Booth Cashier
**Importance:**   High

Good morning!

Sami came into Risk this morning. He and I had a long discussion about what is required of him before he can return to work. He is not a happy camper. I have no idea when he'll be able to obtain the doctors note to give you an idea of how long he will be out due to this situation, but will notify you as soon as he provides the appropriate documentation. At that time, we can discuss your ability or inability to accommodate the work restrictions given by his physician.

Judy in Benefits seems unclear as to how many days Sami actually has available to him under FMLA, but seems to think that he may 2 days available until 10/11/05 when he will accrue time back.

A252
DP0045

FYI – his surgery is scheduled for sometime in November, but I do not know the exact date.

If you need anything, let me know.

Respectfully,
Shari Cartwright
Claims Coordinator
Risk Management
302/994-2521 x7163

-----Original Message-----

| | |
|---|---|
| **From:** | Sheryl Cartwright |
| **Sent:** | Wednesday, August 31, 2005 3:06 PM |
| **To:** | Karlyn Dixon |
| **Cc:** | Shannon DeLucia |
| **Subject:** | Sami Almakhabhi - Booth Cashier |
| **Importance:** | High |

Karlyn,

Sami has a petition under Workers' Comp claiming an injury to his lower back as having been sustained while at work on 12/01/03. As discussed this morning, we received information stating from our counsel that Sami should be working with very specific work restrictions, which would have become effective 08/25/05. Additionally, Sami will be scheduled for surgery to his back in the very near future and will have a minimum 6 to 8 week recuperative period before being released back to Sedentary Duty.

Sami has not brought a doctors note listing the restrictions discussed above to Risk nor, to your knowledge, has one been provided to anyone in Cage. **Therefore, Sami must be told to go home and remain out of work until he returns with a note dated 08/25/05 or after stating in detail all restrictions, if any, or his ability to return Full Duty. This note must be produced to Risk ONLY.** Please remind him that Risk's office hours are Monday through Friday, 9 am to 5 pm, and may contact us at 302/994-2521 x7163. He can speak with Shannon, Dave or me.

I have asked Judy in Benefits to let me know if or how much FMLA time Sami has available to him currently.

A253
DP0046

I'll keep you updated as quickly as possible.  Is there anyone else you would like me to keep in the loop with regard to Sami?  Let me know.


Respectfully,
Shari Cartwright
Claims Coordinator
Risk Management
        302/994-2521 x7163

Sami Almakhadhi    YLTC 05751
11/11/05

**Surgical Discussion:** Sami Almakhahdi presents today for a surgical discussion. Sami is currently scheduled for microdiscectomy on 11/22/05. At this time, the risks benefits and alternatives to surgery for this procedure have been discussed at length with the patient. Risks not limited to, but including those associated with general anesthesia, including death, stroke, paralysis, heart failure, lung failure, kidney failure, blood clot formation, risk of blood loss, need for transfusion, risk of infection, risk of injury to the thecal sac, including a dural tear, injury to the nerve roots, recurrent disc herniation, continuation of lower back pain, leg pain, and the need for additional surgery have all been discussed at length. He does wish to postpone his surgery at this time. He will contact the office if he wishes to reschedule the surgery.

Bruce E. Katz, M.D./Deborah L. Hughes, PAC/stl

DEC 0 1 2005

Leo/ses
DEC 02 2005

Sami L. Khella, M.D.

UNIVERSITY OF PENNSYLVANIA
MEDICAL CENTER
## Presbyterian

Neurology
Neuromuscular Diseases
Electromyography

## OFFICE NOTE

RE:    Sami Almakhadhi
DATE: 1-12-06

This 37 year old man is here for an independent evaluation regarding his low back pain. On December 3, 2004 he states that while at work he was lifting roughly 1,000 lbs of coins. As he was pulling the cart it tipped over and it yanked him. He felt a pop in his back, but continued to work. Since that time he has had low back pain that radiates into the left leg. The pain has eased since the onset in December of 2004 at the time of the accident. He is now off of all medications. He had undergone a course of physical therapy.

Currently he states that the pain is worse upon arising in the morning, but improves as the day wears on. He had been on light duty, but is currently not working.

He states that during sexual intercourse he sometimes feels an increase in his back pain. He has had recent urinary frequency, but not incontinence.

Past Medical History: None.

Medications; None.

Examination: The straight leg raising sign was absent. Strength was 5/5 in the four extremities. The deep tendon reflexes were brisk at the knees and ankles bilaterally symmetrically. He was able to walk on his tiptoes and heels.

I reviewed his MRI films from 04 and these reveal a mild to moderate left L4,5 HNP.

DP0745

A256

Page 2, S. Almakhadhi
1-12-06

Impression: Mild chronic left L4,5 radiculopathy. I advised the patient against surgery because he didn't have leg weakness or severe intractable pain. I have asked him to continue his regular swimming routine. I will see him prn.

SAMI L KHELLA, M.D.
SK:pd



DP0781

A258

**Shannon DeLucia**

| | |
|---|---|
| **From:** | Beverly Pope |
| **Sent:** | Saturday, February 11, 2006 11:46 PM |
| **To:** | Shannon DeLucia |
| **Cc:** | Karlyn Dixon |
| **Subject:** | FW: Sami A. |
| | |
| **Importance:** | High |

Sami A. called again today and stated that he can return to work on light duty with restrictions, but he can not return to full duty with out any
restrictions. I explain to him that I could not change what was required for him to return to work. That was the end of the conversation.

Beverly P.

——Original Message——
| | |
|---|---|
| **From:** | Beverly Pope |
| **Sent:** | Wednesday, February 08, 2006 3:19 PM |
| **To:** | Shannon DeLucia; Karlyn Dixon |
| **Subject:** | RE: Sami A. |
| **Importance:** | High |

I spoke to Sami this morning and informed him that he needed to return to work on this coming Sunday February 12th, 2006
at 11:30am with a note from his doctor stating that he(Sami) is release to full duty without any restrictions. Sami called back
at 2:45pm stating that he is going tomorrow to the doctors and will be in on Sunday February 12th, 2006 with a release to full
duty note without any restrictions. So with that I hung the telephone up.

Thanks!!!
Beverly P.

——Original Message——
| | |
|---|---|
| **From:** | Beverly Pope |
| **Sent:** | Tuesday, February 07, 2006 6:26 PM |
| **To:** | Shannon DeLucia; Karlyn Dixon |
| **Subject:** | Sami A. |
| **Importance:** | High |

Hello,

I called Sami A. at his home number at 6:16pm and failed to get an answer, so I tried another number at 6:18pm listed for (302) 293-5064 and had
to leave a voice mail on this number. I instructed him to call me tonight by 7:00pm or early tomorrow morning since it is very important that I
speak to him. So if and when he calls me I will let you know.

Beverly P.

A259

1

DP0100

**Shannon DeLucia**

| | |
|---|---|
| **From:** | Beverly Pope |
| **Sent:** | Thursday, February 09, 2006 5:29 PM |
| **To:** | Karlyn Dixon; Shannon DeLucia |
| **Subject:** | Sami A. |
| | |
| **Importance:** | High |

Hello Ladies,

Well Sami A. called today (Thursday evening at 4:41pm) and stated that he will not be in on this coming Sunday at 11:30am with a
release to full duty and no restrictions note from his Doctor. Sami stated that his doctor stated that he would have to be on restrictions
(Light Duty) in order for him to return to work.


Beverly P.

A260

DP0101

**From:**  Alfred Sheats [Alfred.Sheats@dplocal.com]
**Sent:**  Tuesday, February 14, 2006 4:15 PM
**To:**  Karlyn Dixon
**Subject:** SAMI

Just to let you know when i did speak to samin for the second time when he called to tell me his phone died he then wanted to know if he was fired i told him i did not know anything that he would have to call you or staci or bev to find this out the he said they can just fire me i dont care i said well you would have to talk to them.

THANK YOU

AL

DP0655

A261



*BCBS*
*Conversion*

.N NO    37329

# PERSONNEL ACTION NOTICE (PAN)

| | | | | |
|---|---|---|---|---|
| DATE  3/10/2006 | SSN  REDACTED | EMP/PAYROLL #  102175 | BADGE #  15856 | |
| | | | CURR DEPT #  112 | |
| CURRENT DEPARTMENT  Cage Operations | | | NEW DEPT # | |
| NEW DEPARTMENT | | | MIDDLE INITIAL  M. | |
| LAST NAME  Almakhadhi | FIRST NAME  Sami | | | |
| | | | PHONE #: | |
| ADDRESS  200 Westcreek Village Apt. E6 | | | ZIP CODE  21921 | |
| CITY  Elkton | STATE  MD | | | |

EFFECTIVE DATE  (2/12/2006)  Term ——————— TYPE OF ACTION ———————

**HIRE CODES**
- ☐ Replacement
- ☐ Rehire
- ☐ Return LOA
- ☐ Additional Staff
- ☐ Posting

**TERM CODES**
- ☐ Seasonal
- ☐ Voluntary
- ☑ Involuntary
- ☐ Other

**LOA CODES**
- ☐ Military
- ☐ Personal
- ☐ Jury Duty
- ☐ FMLA
- ☐ Bereavement
- ☐ Workers Comp

**DELPARK**
- ☐ Staff Promotion
- ☐ Staff Transfer
- ☐ Correct/Add'l Data
- ☐ Intro Review
- ☐ Annual Review
- ☐ Wage Adjustment

| | Status | FT/PT | Job / Title / Codes | |
|---|---|---|---|---|
| NEW | | | | |
| CURRENT | Regular | FT | Booth Cashier | 1129 |

Expected Date of Return _____
Rehire?    Y ☐    N ☑

| | | | |
|---|---|---|---|
| REPLACED EMPLOYEE SSN | | TITLE  _____ | |
| DEPT HEAD APPROVAL | kdixon | DH APPROVAL DATE | 3/10/2006 |
| VP APPROVAL | kdeluciavp | VP APPROVAL DATE | 3/11/2006 |
| STAFF BUDGET APPROVAL | | SB APPROVAL DATE | |
| STRATEGIC APPROVAL | nneff1 | SP APPROVAL DATE | 3/13/2006 |
| HR RECEIVED | | HR DATE RECEIVED | 3-15-06 |

- ☐ Return Badge?
- ☐ Return Key?
- ☐ Return Uniform?

☐ Post    ☐ Advertise    DATE POSTED: (3/1) (4/1/06)  Extended TO

COMMENTS  *Sandy*
*BCBS*

DP0658

PAYROLL COPY

A262

# DELAWARE 🅓 PARK

## RACING ♦ SLOTS ♦ GOLF

*Risk Management*
Direct Dial: Ext. 7421
Fax: (302) 993-8976
shannon.delucia@delawarepark.com



March 30, 2006

Mr. Sami Almakhabhi
200 West Creek Village Apt E6
Elkton, MD 21921

Dear Mr. Almakhabhi,

This letter is in follow-up to your telephone call to Benefits today concerning your employment. Unfortunately, I have attempted to contact you several times with no success. You should have received a letter from Human Resources several weeks ago advising that effective March 10, 2006, Delaware Park had to terminate your employment as business needs make it impossible to hold your position. Your file indicates that you have been unable to return to work full duty since August 30, 2005 and you have exhausted all available FMLA time.

In addition, Beverly Pope (Cage Manager) had discussed with you several times about returning to work, and she had given you a final date to return on February 12, 2006. Unfortunately, you stated that you were not released to work full duty, and did not in fact return on that date or any subsequent date. You will need to contact your attorney to find out how this action affects your Workers' Compensation claim, but your related medical expenses currently are covered.

Also, you will receive a letter direct from Blue Cross explaining your options concerning continuation of your health insurance coverage. If you have any questions concerning your benefits, please contact Dave Foraker at (302) 994-2521, ext.7269. Delaware Park wishes you improved health and good luck in your future endeavors. Should you obtain a full duty work release, consider contacting Human Resources to check on any available work options.

Very truly yours,

Shannon Maguire DeLucia
Director of Risk Management

A263

777 DELAWARE PARK BOULEVARD ♦ WILMINGTON, DE 19804
☎302.994.2521  📠302.994.3567 ♦ www.delpark.com

DP0052

| \multicolumn{4}{c}{EXHIBIT K} | | | |
|---|---|---|---|
| EX K NO. | APPLICATION DATE | APPLICANT NAME | POSITION |
| 1 | 1/10/2005 | Porter, Mary Sue | Impress Supervisor |
| 2 | 1/11/2005 | Keeley, Steveni | Main Bank Cashier |
| 3 | 1/11/2005 | Woodrum, John | Main Bank Cashier |
| 4 | 1/12/2005 | Fields, Robyn Pawley | Main Bank Cashier |
| 5 | 1/12/2005 | Spencer, Tomiko | Main Bank Cashier |
| 6 | 1/16/2005 | Almakhadhi, Sami | Main Bank Cashier |
| 7 | 1/16/2005 | Hinton, Jodi | Main Bank Cashier |
| 8 | 1/19/2005 | Miller, Shane | Impress Supervisor |
| 9 | 1/19/2005 | Schenning, Michael | Impress Supervisor |
| 10 | 1/28/2005 | Walker, Dwight | Impress Supervisor |
| 11 | 1/29/2005 | Woodrum, John | Impress Supervisor |
| 12 | 1/29/2005 | Haley, Michele | Impress Supervisor |
| 13 | 1/30/2005 | Almakhadhi, Sami | Impress Supervisor |
| 14 | 1/31/2005 | DiMauro, Sabatino | Impress Supervisor |
| 15 | 1/31/2005 | Gonzales, Jeffrey | Impress Supervisor |
| 16 | 1/31/2005 | Navecky, Debbie | Impress Supervisor |
| 17 | 2/7/2005 | Hancock, Susan | Impress Supervisor |
| 18 | 2/11/2005 | Spencer, Tomiko | Impress Supervisor |
| 19 | 3/29/2005 | Loller, Jonathan | Impress Supervisor |
| 20 | 505/2005 | Brzoski, Richard | Impress Supervisor |
| 21 | 5/23/2005 | Hanna, Kathleen | Main Bank Cashier |
| 22 | 5/23/2005 | Ortiz, Melissa | Main Bank Cashier |
| 23 | 5/24/2005 | Jones, Cheryl | Main Bank Cashier |
| 24 | 6/14/2005 | Diogenes, Cruceta | Impress Supervisor |
| 25 | 6/20/2005 | Santos, Luz | Impress Supervisor |
| 26 | 7/27/2005 | Skomorucha, Joseph | Impress Supervisor |
| 27 | 8/11/2005 | Almakhadhi, Sami | Impress Supervisor |
| 28 | 8/14/2005 | Payne, Penny | Impress Supervisor |
| 29 | 1/11/2006 | Skomorucha, Joseph | Main Bank Cashier |
| 30 | 2/11/2006 | Praed, Kim | Main Bank Cashier |
| 31 | 2/11/2006 | Love, Natasha | Main Bank Cashier |
| 32 | 5/19/2006 | Brzoski, Richard | Impress Supervisor |
| 33 | 5/19/2006 | Stafford, Mark | Impress Supervisor |
| 34 | 5/19/2006 | Tarantino, Vincent | Impress Supervisor |
| 35 | 5/21/2006 | Skomorucha, Joseph | Impress Supervisor |
| 36 | 5/22/2006 | Banks, Craig | Impress Supervisor |
| | | | |

A264

CONFIDENTIAL

DP0204

**DENIALS OF REQUESTS FOR LIGHT DUTY:**

| Name: | Position: | Reason for Denial: |
|---|---|---|
| Keeley, Stephanie | Cage | Ms. Keeley's request could no longer be accommodated. |
| Delmar, Joyner | Receiving | Ms. Delmar went to physical therapy on company time without seeking the requisite authorization. |
| Kocijan, Marcus | Slots | Mr. Kocijan was simultaneously treating at multiple providers. Numerous and conflicting reports were received concerning his injuries. |
| Beavers, Laurie | Cage | No light duty was available. |
| Minus, Julia | Slots | Ms. Minus' request could no longer be accommodated. |
| Wright, Edwin | Maintenance | Mr. Wright went to physical therapy on company time without seeking the requisite authorization. Additionally, he missed doctor's appointments as well as his physical therapy appointments. |
| Bonds, Kenneth | Security | Mr. Bonds exhausted his FMLA time. Light duty was not available. |
| McDaniel, Jamie | Commissary | Employee failed to provide doctors' notes on a timely basis. |
| Stukes, Samuel | Housekeeping | Mr. Stukes failed to submit documentation on time. Additionally, he missed Workers' Compensation doctor appointments. |
| Ward, William | Maintenance | No light duty was available. |
| Searfass, Cindy | F & B | No light duty was available that complied with the restrictions provided by Ms. Searfass. |
| Twaddell, Holly | Cage | No light duty was available that complied with the restrictions provided for Ms. Twaddell. Additionally, Ms. Twaddell exhausted all available time. |
| Dowell, Kristy | Cage | Ms. Minus' request could no longer be accommodated. |
| Hayes, Antionette | Cage | No light duty was available as all spots for light duty were filled. |
| Morgan, Sandra | F&B | Ms. Morgan's request for light duty could no longer be accommodated. |
| St. Pierre, Miranda | | Ms. St. Pierre's violation of safety policies resulted in re-injury. |
| Stanton, Melvin | Security | Mr. Stanton's violation of safety policies resulted in injury. |
| Haskins, Marsalis | Cage | The request for light duty could not be accommodated. |
| Veach, Norma | | Ms. Veach's request for light duty could not be accommodated. |
| Mason, Bruce | Housekeeping | Mr. Mason's request for light duty could not be accommodated. |
| Bader, Miriam | Slots | Ms. Bader did not submit her doctors' notes on time. |
| Prince, Sandra | F & B | Ms. Prince's request for light duty could not be accommodated. |
| | | |
| | | |

**A265**

**DP0099**

5.    List all the employees discharged within the relevant period.  For each employee, include employee's name, position title, reason for and date of discharge, and a copy of the separation notice.

Delaware Park objects to this request as overly broad, unduly burdensome, and not reasonably calculated to lead to information relevant to the issues presented in the Charge. Approximately 130 employees were discharged during the relevant time period, mostly as a result of their violation of Company and/or Departmental procedures and related discipline.  In contrast, Mr. Almakhadhi was not discharged for disciplinary reasons. Delaware Park agrees to provide information related to employees who were discharged during the relevant period after exhausting FMLA leave and or their leave of absence (LOA); documentation regarding these employment actions is attached as Exhibit J:

**DELAWARE PARK EMPLOYEES DISCHARGED DURING THE RELEVANT PERIOD**

| Last name | First Name | Position Title | Reason for Termination | Date of Termination |
|---|---|---|---|---|
| Bonds | Kenneth | Security Surveillance Shift | Exhausted FMLA | 6/6/2005 |
| Williams | Corrine W. | Supervisor | Exhausted FMLA | 7/2/2005 |
| Payne | Thomas C. | Emergency Medical Technician | Exhausted FMLA | 12/22/2005 |
| Wilson | Jackson | Player's Club Representative | Exhausted FMLA | 9/15/2005 |
| McHugh | Lorraine | Host | Exhausted FMLA | 5/12/2005 |
| Glenn | Mary C. | VLT Floor Attendant | Exhausted FMLA | 8/17/2005 |
| Navecky | Deborah L. | VLT Technician | Exhausted FMLA | 8/17/2005 |
| Smith | Cynthia L. | VLT Floor Attendant | Exhausted FMLA | 7/27/2005 |
| Dean | Joshua | Booth Cashier | Exhausted LOA | 2/21/2006 |
| Almakhadhi | Sami | Booth Cashier | Exhausted LOA | 2/12/2006 |
| Prince | Sandra | Cocktail Server | Exhausted LOA | 8/4/2006 |
| Twaddell | Holly | Main Bank Cashier | Exhausted LOA | 8/24/2006 |

**Issue: <u>HIRING</u>**

**Delaware Park's General Statement:  Because Mr. Almakhadhi has made no allegations that Delaware Park failed to hire him for discriminatory reasons, and he in fact was employed by the Company, Delaware Park interprets the following requests as seeking information regarding the applications by Mr. Almakhadhi (and/or other employees of the Company) for internal <u>transfers</u> (including "promotions") that were, in part, the subject of his Charge.**

1.    Submit a copy of your [transfer or job bidding] policies.  If actual [transfer or selection] practice is different from the written policy, describe actual practice.

6



# D E L A W A R E 🦢 P A R K

R A C I N G   ◆   S L O T S   ◆   G O L F

*Risk Management*
Direct Dial: Ext. 7421
Fax: (302) 993-8976
shannon.delucia@delawarepark.com



March 30, 2006

Mr. Sami Almakhabhi
200 West Creek Village Apt E6
Elkton, MD 21921

Dear Mr. Almakhabhi,

This letter is in follow-up to your telephone call to Benefits today concerning your employment. Unfortunately, I have attempted to contact you several times with no success. You should have received a letter from Human Resources several weeks ago advising that effective March 10, 2006, Delaware Park had to terminate your employment as business needs make it impossible to hold your position. Your file indicates that you have been unable to return to work full duty since August 30, 2005 and you have exhausted all available FMLA time.

In addition, Beverly Pope (Cage Manager) had discussed with you several times about returning to work, and she had given you a final date to return on February 12, 2006. Unfortunately, you stated that you were not released to work full duty, and did not in fact return on that date or any subsequent date. You will need to contact your attorney to find out how this action affects your Workers' Compensation claim, but your related medical expenses currently are covered.

Also, you will receive a letter direct from Blue Cross explaining your options concerning continuation of your health insurance coverage. If you have any questions concerning your benefits, please contact Dave Foraker at (302) 994-2521, ext.7269. Delaware Park wishes you improved health and good luck in your future endeavors. Should you obtain a full duty work release, consider contacting Human Resources to check on any available work options.

Very truly yours,

Shannon Maguire DeLucia
Director of Risk Management

777 DELAWARE PARK BOULEVARD ◆ WILMINGTON, DE 19804
☎302.994.2521   ☎302.994.3567 ◆ www.delpark.com

A267
DP0149



DELAWARE PARK

RACING • SLOTS • GOLF

June 3, 2005                              Certified & Regular Mail

Kenneth Bonds
14 Oak Ave.
Wilmington, DE  19805

Re: Employment Status

Dear Ken:

　　　　Our records indicate that as of 4/28/05 you have exhausted FMLA. Your department approved a thirty day unpaid leave of absence which expired on 5/28/05.

　　　　Business needs in your department make it unreasonable to continue to approve any further absences. Therefore, effective June 6, 2005, your employment with Delaware Park is terminated. Your benefits will remain in effect until June 30, 2005. If you are eligible, Blue Cross/Blue Shield will contact you with COBRA information. If you participated in the 401K Plan, please contact Jim Bosco, Benefits Manager at 355-1028.

　　　　Should you have any further questions, please contact me at 355-1002.

Sincerely,

Micki Nardo
Director
Human Resources

**CONFIDENTIAL**

**DP0150**



DELAWARE PARK

RACING • SLOTS • GOLF

July 1, 2005                    Certified & Regular Mail

Corrine Williams
22 Fanwood Drive
New Castle, DE  19720

Re: Employment Status

Dear Ms. Williams:

Our records indicate that FMLA has been exhausted effective June 3, 2005 and you were approved for Short Term Disability from May 26, 2005 until June 28, 2005. You have exhausted all paid time and your department is unable to approve a Personal Leave of Absence.

Business needs in your department make it unreasonable to continue to approve any further absences. Therefore, effective July 2, 2005 your employment with Delaware Park is terminated.

Your medical benefits will expire July 31, 2005 and if you are eligible, Blue Cross / Blue Shield will notify you of your COBRA benefits.  If you participated in the 401k Plan, please contact Jim Bosco, Benefits Manager at (302) 355-1028.

Should you have any questions, you may contact me at (302) 355-1002.

Sincerely,

Micki Nardo
Director
Human Resources

**CONFIDENTIAL**

**DP0151**



DELAWARE ⚫DP⚫ PARK

R A C I N G   •   S L O T S   •   G O L F

December 21, 2005                    Certified & Regular Mail

Thomas C. Payne
92 Countryfive Drive
Dover, DE 19904

Re: Employment Status

Dear Mr. Payne:

Our records indicate that FMLA was exhausted as of November 17, 2005. Your department granted you an unpaid leave of absence which expired December 18, 2005.

Business needs in your department make it unreasonable to continue to approve any further absences. Therefore, effective December 22, 2005, your employment at Delaware Park is terminated.

If applicable, your medical benefits will remain in effect until December 31, 2005. If eligible, Blue Cross/Blue Shield will contact you regarding your COBRA options to continue coverage. If you participated in the 401K Retirement Plan, contact Jim Bosco, Benefits Manager, for further instructions at 302-355-1028.

Should you have any further questions, please contact me.

Sincerely,

Micki Nardo
Director
Human Resources
(302) 355-1002

**CONFIDENTIAL**

**DP0152**

777 DELAWARE PARK BOULEVARD • WILMINGTON, DE 19804
☎ 302.994.2521   📠 302.994.3567 • www.delpark.com          **A270**



DELAWARE DP PARK

R A C I N G  •  S L O T S  •  G O L F

September 14, 2005        Certified & Regular Mail


Wilson T. Jackson
215 Elderfield Road
Newark, DE 19713

Re: Employment Status

Dear Mr. Jackson:

       Our records indicate that your FMLA was exhausted as of 8/5/05 and your Short
Term Disability terminated as of 8/19/05. Your department also approved a thirty (30)
day personal leave of absence, which expired as of 9/6/05.

       Business needs in your department make it unreasonable to continue to approve
any further absences. Therefore, effective September 15, 2005, your employment at
Delaware Park is terminated.

       If applicable, your medical benefits will remain in effect until September 30,
2005. If eligible, Blue Cross/Blue Shield will contact you regarding your COBRA
options to continue coverage. If you participated in the 401(k) Retirement Plan, contact
Jim Bosco, Benefits Manager for further instructions at 302-355-1028.

       Should you have any further questions, please contact me at 355-1002.


       Sincerely,

       Micki Nardo
       Director
       Human Resources


**CONFIDENTIAL**

**DP0153**

**A271**

# DELAWARE 🅓🅟 PARK

### R A C I N G  •  S L O T S  •  G O L F

May 10, 2005                          Certified & Regular Mail

Lorraine McHugh
31 Cheswold Blvd.
Apt. 2-C
Newark, DE 19713

Re: Employment Status

Dear Lorraine:

Our records indicate that as of March 31, 2005, all FMLA has been exhausted and Short Term Disability terminated as of April 27, 2005. Your department approved a personal leave of absence for the month of April and has denied a personal leave for the month of May.

Business needs in your department make it unreasonable to continue to approve any further absences. Therefore, effective May 12, 2005 your employment with Delaware Park is terminated. Your medical benefits will remain in effect until May 31, 2005, at that time, if you are eligible, Blue Cross/Blue Shield will contact you concerning continuing your coverage through COBRA. If you participated in the 401K plan, please contact Jim Bosco at 302-355-1028.

Should you have any questions, please contact me at 302-355-1002.

Sincerely,

Micki Nardo
Director
Human Resources

**CONFIDENTIAL**

**DP0154**

**A272**



DELAWARE PARK

RACING • SLOTS • GOLF

August 16, 2005            Certified & Regular Mail

Mary C. Glenn
15 Cherry Road
New Castle, DE  19720

Re: Employment Status

Dear Ms. Glenn:

    Our records indicate that FMLA was exhausted as of 7/25/05 and your Short Term Disability was denied as of 7/13/05.

    Business needs in your department make it unreasonable to continue to approve any further absences. Therefore, effective August 17, 2005 your employment with Delaware Park is terminated. Your medical benefits will remain in effect until August 31, 2005. If you have participated in the company's 401(k)-Plan please contact Jim Bosco, Benefits Manager at 355-1028.

    If you have any questions please contact me at (302) 355-1002.

Sincerely,

Micki Nardo
Director
Human Resources

**CONFIDENTIAL**

**DP0155**

DELAWARE PARK BOULEVARD • WILMINGTON, DE 19804
302.994.2521 • 302.994.3567 • www.delpark.com

**A273**



DELAWARE ⟨DP⟩ PARK

RACING • SLOTS • GOLF

August 16, 2005          Certified & Regular Mail

Deborah Navecky
7 Morton Ave.
Wilmington, DE  19805

Re: Employment Status

Dear Ms. Navecky:

    Our records indicate that FMLA was exhausted as of 7/15/05 and your Short Term Disability expired 7/17/05.

    Business needs in your department make it unreasonable to continue to approve any further absences. Therefore, effective August 17, 2005 your employment with Delaware Park is terminated. Your medical benefits will remain in effect until August 31, 2005. If you have participated in the company's 401(k)-Plan please contact Jim Bosco, Benefits Manager at 355-1028.

    If you have any questions please contact me at (302) 355-1002.

Sincerely,

Micki Nardo
Director
Human Resources


**CONFIDENTIAL**

**DP0156**

**A274**

DELAWARE PARK BOULEVARD • WILMINGTON, DE 19804
302.994.2521  302.994.2527 • www.delpark.com

# D E L A W A R E ⬭ P A R K

R A C I N G  •  S L O T S  •  G O L F

July 27, 2005                    Certified & Regular Mail
Cynthia Smith
3021 W. Greenshire Court
Claymont, DE  19703


Re: Employment Status

Dear Ms. Smith:

Our records indicate that as of July 23, 2005 your FMLA has been exhausted and you have been approved for Long Term Disability effective July 6, 2005.

Business needs in your department make it unreasonable to continue to approve any further absences. Therefore, effective July 27, 2005, your employment at Delaware Park is terminated. Your benefits will remain in effect until July 31, 2005. If you are eligible, Blue Cross/Blue Shield will contact you with COBRA information. If you participated in the 401K Plan, please contact Jim Bosco, Benefits Manager at 355-1028.

If you have any further questions, please contact me at (302) 355-1002.


Sincerely,

Micki Nardo
Director
Human Resources


CONFIDENTIAL

DP0157

# DELAWARE ⬭DP⬭ PARK

### R A C I N G  •  S L O T S  •  G O L F

February 24, 2006

Mr. Joshua Y. Dean
7 Bushwick Drive
Newark, DE  19702

Via: Certified & First Class Mail

Re: Employment Status

Dear Mr. Dean:

Our records indicate that you have exhausted all paid and unpaid time available to you as of February 21, 2006.

Business needs in your department make if unreasonable to continue to approve any further absences. Therefore, effective February 27, 2006, your employment with Delaware Park is terminated. Your medical benefits will remain in effect until February 28, 2006. If you have participated in the company's 401(k) Plan, please contact Jim Bosco, Benefits Manager at (302) 355-1028.

If you have any questions, please contact me at (302) 366-1004.

Sincerely,

Diane C. Joseph
Vice President
Human Resources

**CONFIDENTIAL**

**DP0158**

# D E L A W A R E ⬭ P A R K

R A C I N G  •  S L O T S  •  G O L F

August 4, 2006

Ms. Sandra L. Prince
197 Biggs Highway
Rising Sun, MD  21911

Via: Certified & First Class Mail

Re: Employment Status

Dear Ms. Prince:

Our records indicate that you have exhausted all paid and unpaid time available to you as of July 9, 2006.

Business needs in your department make it unreasonable to continue to approve any further absences.  Therefore, effective August 4, 2006, your employment with Delaware Park is terminated.  Your medical benefits will remain in effect through August 31, 2006. If you have participated in the company's 401(k) Plan, please contact Jim Bosco, Benefits Manager at (302) 355-1028.

If you have any questions, please contact me at (302) 355-1001.

Sincerely,

Nancy L. Myshko
Senior Vice President

CONFIDENTIAL

DP0159



DELAWARE PARK

R A C I N G   •   S L O T S   •   G O L F

August 24, 2006

Ms. Holly Twaddell
216 Limestone Road
Oxford, PA 19363

Dear Ms. Twaddell:

I hope this letter finds you recovering well. Our records indicate that you have exhausted all paid and unpaid leave available to you as of July 4, 2006. Unfortunately, business demands in your department make it unreasonable to continue to grant any further leaves of absence. Therefore, Delaware Park will be separating you from your employment with this company effective August 24, 2006.

Your medical benefits will remain in effect through August 31, 2006, and you will be receiving continuation of coverage information directly from Blue Cross Blue Shield. If you have participated in the company's 401(k) Plan, please contact Jim Bosco, Benefits Manager, at (302) 355-1028.

If you have any questions, please do not hesitate to contact me at (302) 994-2521, x7421. Thank you for your years of service and we wish you luck in your future endeavors.

Sincerely,

Shannon Maguire DeLucia
Exec. Director of Human Resources

**CONFIDENTIAL**

**DP0160**

DELAWARE PARK BOULEVARD • WILMINGTON, DE 19804
(302) 994-2521 (302) 994-3567 • www.oelpark.com

**A278**

# *Delaware Park*
## THOROUGHBRED RACING AND SLOTS

### 777 Delaware Park Boulevard
### Wilmington, Delaware 19804

(302) 994-2521                                                                              Fax (302) 994-3567

February 28, 2005                         Certified & Regular Mail

Michael Talley
268 Harrington Rd.
Rising Sun, MD  21911

Re: Employment Status

Dear Mr. Talley;

    Our records indicate that you exhausted your FMLA on June 26, 2004 and your Short Term Disability was exhausted on June 2, 2004.

    Business needs in your department make it unreasonable to continue to approve any further absences. Effective March 2, 2005 your employment with Delaware Park is terminated. Your medical benefits will remain in effect until March 31, 2005. At that time Blue Cross/Blue Shield will contact you regarding your COBRA options to continue coverage. If you participated in the 401K Retirement Plan, contact Jim Bosco, Benefits Manager for further instructions at 302-355-1028.

    Should you have any further questions, please contact me.

Sincerely,

Micki Nardo
Director
Human Resources

**CONFIDENTIAL**

**DP0669**

**A279**



# DELAWARE 🅳🅿 PARK

R A C I N G  •  S L O T S  •  G O L F

December 1, 2005                        Certified & Regular Mail


Donald Lloyd
40 Simonds Drive
New Castle, DE 19720

Re: Employment Status

Dear Mr. Lloyd:

Our records indicate that your FMLA was exhausted as of November 8, 2005 and your Short Term Disability terminated as of November 23, 2005.

Business needs in your department make it unreasonable to continue to approve any further absences. Therefore, effective December 2, 2005, your employment at Delaware Park is terminated.

If applicable, your medical benefits will remain in effect until December 31, 2005. If eligible, Blue Cross/Blue Shield will contact you regarding your COBRA options to continue coverage. If you participated in the 401(k) Retirement Plan, contact Jim Bosco, Benefits Manager for further instructions at 302-355-1028.

Should you have any further questions, please contact me at 355-1002.


Sincerely,

*Micki Nardo*

Micki Nardo
Director
Human Resources

**CONFIDENTIAL**

**DP0670**



February 8, 2005

Sami Almakhadhi
P O Box 7392
Newark, DE 19714

Dear Sami:

This letter is to inform you that you have been approved for Intermittent FMLA effective 1/26/05 through 2/18/05.

If you have any questions please call Donna Smith, Benefits Clerk @ 302-355-1027.

Sincerely,

Donna Smith
Benefits Clerk

Cc: File
    Department

DP0890

A281

**Donna Smith**

| | |
|---|---|
| **From:** | Donna Smith |
| **Sent:** | Tuesday, February 08, 2005 10:14 AM |
| **To:** | Cindy Irwin; Karlyn Dixon |
| **Cc:** | Jim Bosco |
| **Subject:** | RE: Sami Almakhadhi |

Sami Almakhadhi has been approved for Intermittent FMLA eff. 1/26/05 to 2/18/05.

*Thank You,*

*Donna Smith*
*Benefits Clerk*
*ext. 1027*

DP0891

**A282**

**Nicole Cook**

| | |
|---|---|
| **From:** | Nicole Cook |
| **Sent:** | Tuesday, January 18, 2005 12:05 PM |
| **To:** | Cindy Irwin; Karlyn Dixon |
| **Cc:** | Donna Smith |
| **Subject:** | fmla |

Sami Almakhadhi has applied for an Intermittent FMLA for approx. several weeks (most 4 weeks) starting 1/18/05, Sami has also applied for a full 2 week FMLA to follow the Intermittent FMLA. We will notify you upon receipt of medical certification and when a determination has been made.

Thank you,

Nicole Cook
Benefits Assistant
x1026

DP0892

A283

1

# Certification of Health Care Provider
## (Family and Medical Leave Act of 1993)

DELAWARE PARK

RACING • SLOTS • GOLF

355-1298 - *Jeff* (*wife*)

| TO BE COMPLETED BY PHYSICIAN !!! |
| --- |

**1. Employee's Name**  Sami  Almakhadhi

**2. Patient's Name** (*If different from employee*)  AmatALRhman  ALMakedi

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) _____    (2) _____    (3) _X_   (4) _____    (5) _____    (6) _____ , or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

```
Wife is pregnant with an estimated date of confinement of 2/16/05.
```

5. a.   State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

```
LMP 5/12/04
```

b.   Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

If yes, give the probable duration:

c.   If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

```
Not currently incapacitated
```

**DP0893**

[1] Here and elsewhere on this form, the information sought relates **only** to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

**A284**

6.  a.  If additional **treatments** will be required for the condition, provide an estimate of the probable number
        of such treatments.

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent**
or **part-time** basis, also provide an estimate of the probable number of and interval between such
treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

  b.  If any of these treatments will be provided by **another provider of health services** (e.g., physical
      therapist), please state the nature of the treatments:

  c.  **If a regimen of continuing treatment** by the patient is required under your supervision, provide a
      general description of such regimen (e.g., prescription drugs, physical therapy requiring special
      equipment):

7.  a.  If medical leave is required for the employee's **absence from work** because of the **employee's own**
        **condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to**
        **perform work** of any kind?

                                    N/A

  b.  If able to perform some work, is the employee **unable to perform any one or more of the essential**
      **functions of the employee's job** (the employee or the employer should supply you with information
      about the essential job functions)?  If yes, please list the essential functions the employee is unable to
      perform:

  c.  If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment?**

DP0894

A285

8.  a.  If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

> Following delivery, wife will need assistance to care for baby and other child.

b.  If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

> N/A

c.  If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

---

_Janice Tildon-Burton, M. D._
Signature of Health Care Provider

_2600 Glasgow Avenue, Suite 207_
Address

_Newark, DE 19702_

OB/GYN
Type of Practice

302-832-1124
Telephone Number

Date

---

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

DP0895

---

Employee Signature

Date

A286

A "Serious Health Condition" means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

    **Inpatient care** (i.e., an overnight stay) in a hospital hospice, or residential medical facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment
    (a)  A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

    (1)  **Treatment[3] two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

    (2)  **Treatment** by a health care provider on **at least one occasion** which results in a **regimen of continuing treatment[4]** under the supervision of the health care provider.

3. Pregnancy

    Any period of incapacity due to **pregnancy**, or for prenatal care.

4. Chronic Conditions Requiring Treatments
    **A chronic condition** which:

    (1)  Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

    (2)  Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

    (3)  May cause **episodic** rather than a continuing period of incapacity[2] (e.g., asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

    A period of **incapacity[2]** which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be **under the continuing supervision of, but need not be receiving active treatment by, a health care provider.** Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

    Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, or for a condition that **would likely result in a period of incapacity[2] of more than three consecutive calendar days in the absence of medical intervention or treatment,** such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

---

[3]Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4]A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

DP0896

A287

4

REQUEST FOR FAMILY/MEDICAL LEAVE
BARGAINING UNIT

Date: _1/18/05_

To _Sami Almakhadhi_

From: _Nicole Cook_

On _1/18/05_, you notified us of your need to take family/medical leave due to:

☒ (a) the birth of your child, or the placement of a child with you for adoption or foster care; or

☐ (b) a serious health condition that makes you unable to perform the essential functions of your job; or

☒ (c) a serious health condition affecting your:

    ☒ spouse
    ☐ child
    ☐ parent

for which you are needed to provide care.

You notified us that you need this leave beginning on _Intermittent until baby is born then a full 2 week FMLA_ and that you expect leave to continue until on or about _approx. 2 weeks_

NOTE: IT IS YOUR RESPONSIBILITY TO RETURN MEDICAL LEAVE PAPERS BY THE DATE INDICATED BELOW. SUBMISSION OF MEDICAL LEAVE PAPERS DOES NOT AUTOMATICALLY GRANT APPROVAL. COMPANY POLICY REQUIRES THAT YOU CALL AND UPDATE YOUR MANAGER (see Attendance Policy) UNTIL YOU RECEIVE NOTICE THAT YOUR LEAVE IS APPROVED.

Except as explained below, you have a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period for the reasons listed above. Also, your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work, and you must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions for employment on your return from leave. If you do not return to work following FMLA leave for a reason other than (1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; or (2) other circumstances beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.
*Under certain circumstances for an employee's own illness or medical condition, additional leave may be granted. For further detail contact the Human Resources Office.

This is to inform you that:

                                                            **DP0897**

1. You ☒ are eligible ☐ not eligible for leave under the FMLA.

2. The requested leave ☒ will ☐ will not be counted against your annual FMLA leave entitlement.

3. You ☒ will ☐ will not be required to furnish medical certification of a serious health condition.

                                                            **A288**

If required, you must furnish certification by 2/2/05 (must be at least 15 days after you are notified of this requirement) or we may delay the commencement of your leave until the certification is submitted.

4.   We will require that you use available Sick Time, Vacation, Personal Time, and Incentive Time before FMLA Leave Time. You will continue to be paid, to the extent applicable on regular payroll dates.

5.   (a) If you normally pay a portion of the premiums for your health insurance, these payments will continue during the period of FMLA leave. Arrangements for payment have been discussed with you and it is agreed that you will make premium payments as follows:

_____

_____

_____

If you have any questions regarding your benefits please contact the Human Resources Department.

(b) You have a minimum 30-day grace period in which to make premium payments. If payment is not made timely, your group health insurance may be canceled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse, or, at our option, we may pay your share of the premiums during FMLA leave, and recover these payments from you upon your return to work, through payroll deductions pursuant to Delaware Code Title 11, Section 1107, subject to your agreement indicated by your signature.

(c) We ☑ will ☐ will not do the same with other benefits (e.g., life insurance) while you are on FMLA leave. If we do pay your premiums for other benefits, when you return from leave, you ☑ will ☐ will not be expected to reimburse us for the payments made on your behalf.

6.   You will be required to present a return to work certificate prior to being restored to employment. If such certification is not received, your return to work may be delayed until the certification is provided.

7.   While on leave, you will be required to furnish us with periodic reports every 30 days of your status and intent to return to work. If the circumstances of your leave change and you are able to return to work earlier than the date indicated, you will be required to notify us at least two work days prior to the date you intend to report to work.

8.   You ☑ will ☐ will not be requested to furnish re-certification relating to a serious health condition.

**IT IS YOUR RESPONSIBILITY TO RETURN MEDICAL LEAVE PAPERS BY 2/2/05.**

**DP0898**

**A289**

# FAMILY AND MEDICAL LEAVE ACT
# BARGAINING UNIT

The Family and Medical Leave Act ("FMLA") requires employers of fifty (50) or more individuals to provide up to twelve (12) weeks unpaid leave to eligible employees during a twelve (12) month period for one or more of the following:

- Because of the birth of a child of the employee or placement of a child with the employee for adoption or foster care and to care for such child.

- To care for the employee's immediate family, including spouse, child, or parent, who has a serious health condition.

- Because of the employee's serious health condition which renders the employee unable to perform his or her job or one or more of the essential functions of the job.

**Article, 22, Section 22.1 of Delaware Park's Collective Bargaining Agreement sets forth the Unpaid Leaves of Absence policy for all Bargaining Unit employees.**

To be eligible, an employee must have been employed by the employer (1) for at least twelve continuous uninterrupted months, (2) have worked at least 1250 hours during the prior twelve months, and (3) be employed at a work-site where the employer employs fifty (50) or more employees within seventy-five (75) miles. Reduced or intermittent leave may be available in some circumstances. An employee will be required to use his/her available Vacation, Personal Time, Sick Time, and Incentive Time earned before unpaid leave.

Ordinarily, employees must provide 30 days advance notice when FMLA leave is "foreseeable." The Company will require medical certification to support a request for leave due to a serious health condition, and may require second or third opinions (at the Company's expense) and/or a fitness for duty report to return to work.

Bargaining Unit employee's utilize a "forward" leave period based on the twelve month period measured forward from the date an employee's approved leave begins. If an employee takes a subsequent FMLA leave during that same 12 month period, the remaining leave entitlement would be any balance of the 12 weeks that was not used during the employee's first FMLA leave.

Eligible Bargaining Unit employees who take a FMLA leave of up to 12 weeks are entitled, on return from such leave, to be eligible for reinstatement to their former classification and shift, and seniority shall accrue for all purposes during the period of leave. In addition, an eligible employee is entitled to continuation of health care benefits according to Company policy during the period of FMLA leave. However, the FMLA does not protect employees against employment actions which would have been taken had the employee not been on leave.

**A290**

**DP0899**

FMLA NEW BU                                                                 01/25/02

# FAMILY AND MEDICAL LEAVE ACT
## BARGAINING UNIT
### (continuation)

If, due to an employees own illness or medical condition, the employee cannot return to work during the initial twelve (12) week leave period, but is able to do so within fifty-two weeks from the commencement of the employee's medical leave, the employee shall be re-instated to his/her former classification if there is an opening, or to an equivalent position if available, or to the first opening in the employee's classification that becomes available within fifty-two (52) weeks from the commencement of the employee's medical leave. The employee's seniority shall accrue for all purposes.

Failure to provide proper notification or to provide proper certification documenting the leave may result in a delay in leave or forfeiture of the right to such leave.

(Eff. 1/18/02)

DP0900

A291

01/25/02

FMLA NEW BU

## APPLICATION FOR FAMILY AND MEDICAL LEAVE

Name _SAmi  Alma KHADHi_ Position _Cashier_

Department _112_                Employee No. _15856_

Request Leave Dates: From: _____ To: _____

Reason for Requested Leave _CHild's BiRTH , Take care of my wife_
_and The child after he borne._
_____

☑ To care for my newborn son or daughter

☐ For the placement for adoption or foster care of a child.

☒ To care for my (circle one) spouse, son, daughter or parent with a serious health
     condition (medically necessary).

☐ For my own serious health condition which renders me unable to perform one or
     more functions of my job (medically necessary).

☐ I am requesting this leave on an intermittent or reduced work schedule basis.

Reason for Requested Schedule Change_____
_____
_____

☐     This is a change from my earlier request for Family and Medical Leave dated
     _____.

In making this request for Family and Medical Leave, I agree to provide Delaware Park
Racetrack and Slots with documentation requested to verify the reason for the leave,
including medical certification for leaves involving a serious health condition. I also
agree to provide medical re-certification (s) and medical verification of my ability to
return to work, as requested by Delaware Park If any of the information contained on
this form changes, I will notify Delaware Park within two (2) business days of such
change.

Employees Signature_____

Date _1/18/05_____

DP0901

**A292**



December 15, 2004

Sami Almakhadhi
109 H Chestnut Crossing
Newark, DE 19713

Dear Sami,

This letter is to inform you that your FMLA has ended as of 12/9/04.

You may contact your Department Manager for consideration of Unpaid Personal Leave of Absence beyond that time.

If you have any questions, please call the Benefits Office at (302) 355-1026.

Sincerely,

Nicole Cook
Benefits Assistant

Cc:File
        Department Head

**A293**

**DP0902**

FROM : MERSAL_TELCOM.                PHONE NO. : 009671402658        Dec. 22 2004 08:48PM  P01

Hashmite Kingodm of Jordan
Ministry of Interior
Civil Status and Passports Department

Province: the Capital
Office: Amman West

## Death Certificate No. 177729 / 001

### Particulars of the Deceased

| Name | Sex | Nationality | Religion | Place | Death Time | Date |
|------|-----|-------------|----------|-------|------------|------|
| Mohammed | M | Yemeni | Muslim | Amman | 04:20 | 09/12/2004 |

### Parents' Particulars

| Parent | Full Name | | | 
|--------|-----------|----------|------|
| | 1st | Middle | Last |
| Father | Abdullah | Yahya | Almakhadhi |
| Mother | | | |

Event No. 21 / 1091

Date: 09/12/2004

Director: Ahmed Alawdat
(Signature / Seal)



To Mr. Sami ALMAKHADI

Tel: 302-293-5064

**A294**

DP0903

158536

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | 32 | 5-31-05 |
| Certified Fee | | 2.30 | FMLA |
| Return Receipt Fee (Endorsement Required) | | 1.35 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | | |
| Total Postage & Fees | $ | 4.42 | |

Sent To  SAMI M ALMAKHADMI
Street, Apt. No.; or PO Box No.  200 WESTCREEK VILLAGE
City, State, ZIP+4  APT E-6 ELKTON, MD 21921

7005 0390 0005 6174 5475

PS Form 3800, June 2002          See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

   Sami M. Almakhadhi
   200 Westcreek Village Apt. E-6
   Elkton, Md. 21921

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
                                     6/2

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered          ☑ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Transfer from service label)    7005 0390 0005 6174 5475

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

A295

DP0904

15854

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ .32 | 12/6/04 |
| Certified Fee | 2.30 | |
| Return Receipt Fee (Endorsement Required) | 198 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ 4.65 | |

Sent To SAMI M ALMAKHADHI
Street, Apt. No.; or PO Box No. 109 N CHESTNUT CROSSING
City, State, ZIP+4 NEWARK, DE 19713

PS Form 3800, June 2002    See Reverse for Instructions

7002 2410 0003 7280 4994

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

X

B. R
C

D. Is de.
If YES,

1. Article Addressed to:

Sami M. Almakhadhi
109 H Chestnut Crossing
Newark, De. 19713

3. Service Type
☑ Certified Mail
☐ Registered
☐ Insured Mail

4. Restricted Delivery?

2. Article Number
(Transfer from service label)    7002 2410 0003 7280

PS Form 3811, February 2004    Domestic Return Receipt

DP0905

A296

**Nicole Cook**

| | |
|---|---|
| **From:** | Nicole Cook |
| **Sent:** | Wednesday, December 15, 2004 1:52 PM |
| **To:** | Cindy Irwin; Karlyn Dixon |
| **Cc:** | Donna Smith |
| **Subject:** | Sami Almakhadhi |

Sami's FMLA has ended eff. 12/9/04.  Sami is no longer on an Intermittent FMLA eff. 12/9/04.

Thank you,

Nicole Cook
Benefits Assistant
x1026

## Nicole Cook

| | |
|---|---|
| From: | Cindy Irwin |
| Sent: | Wednesday, December 15, 2004 1:46 PM |
| To: | Nicole Cook |
| Subject: | FW: Sami Almakhadhi |

-----Original Message-----

| | |
|---|---|
| From: | Roberta Evans |
| Sent: | Wednesday, December 15, 2004 12:57 PM |
| To: | Cindy Irwin |
| Cc: | Stacy Suhr |
| Subject: | Sami Almakhadhi |

Cindy,

Sami called this morning and said he was back in the country and wanted to know when we wanted him to return to work. I checked the schedule and found that he was scheduled to be in today at 3:30pm. When I told him this; he said he wanted to come back tomorrow. He also said he got the flu, saw a doctor who advised him to take a week off from work. I then told him I would check with you or Noel and call him back.

When I called him back; I told him he would be pointed if he called off sick and had no sick time. He said he was calling off using his FMLA; not sick. He plans on being back tomorrow.

*Roberta Evans*
*Site Nursing Supervisor*

DP0907

A298

**Nicole Casey**

| | |
|---|---|
| From: | Nicole Casey |
| Sent: | Tuesday, August 24, 2004 2:36 PM |
| To: | Karlyn Dixon; Cindy Irwin |
| Cc: | Peggy Alexander |
| Subject: | Sami almakhadhi |

Sami has been approved for an Intermittent FMLA eff. 8/10/04.

Thank you,

Nicole Casey
Benefits Assistant
x1026

DP0908

A299

**Nicole Casey**

| | |
|---|---|
| **From:** | Nicole Casey |
| **Sent:** | Monday, August 09, 2004 10:32 AM |
| **To:** | Cindy Irwin; Karlyn Dixon |
| **Cc:** | Jim Bosco; Donna Smith |
| **Subject:** | Sami Almakhadhi |

Sami Almakhadhi has applied for an Intermittent FMLA eff. 8/10/04. I will notify you upon receipt of medical certification and when a determination has been made.

Thank you,

Nicole Casey
Benefits Assistant
x1026

DP0909

A300

1

*TO BE COMPLETED BY PHYSICIAN !!!*

## Certification of Health Care Provider
### (Family and Medical Leave Act of 1993)

1. Employee's Name: Sani Almakhadhi

2. Patient's Name (if different from employee): Mohmad Abdul'h

3. The attached sheet describes what is meant by a "serious health condition" under the Family and Medical Leave Act. Does the patient's condition qualify under any of the categories described? If so, please check the applicable category.

   (1) ✓ (2)___ (3)___ (4)___ (5)___ (6)___, or none of the above ____

4. Describe the medical facts, which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories.
   Cancer of rectum with lymphatic mets and bone mets and Deep Vein Thrombosis

5. A. State the approximate date the condition commenced, and the probable duration of the condition and also the probable duration of the patient's present incapacity, if different):
      6/25/4

   B. Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in item 6 below)? _____

      If yes, give the probable duration: unknown

   C. If the condition is a chronic condition (condition #4) or pregnancy, state whether the patient is presently incapacitated and the likely duration and the frequency of episodes of incapacity.

      Presently pt is hospitalized ! Prognosis Guarded !

---

1. Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

2. *Incapacity,* for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom.

**DELAWARE PARK**
RACETRACK · SLOTS

DP0910

Nicole Casey
Benefits Assistant

777 Delaware Park Boulevard    Phone: (302) 355-1026
Wilmington, Delaware 19804    Fax:    (302) 355-1298

355.1298

A301

-2-

B.  If no, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery? _____

C.  If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need:

_____     _____
(Signature of Health Care Provider)            (Type of Practice)

4701  Ogletown-Stanton Rd       302-731-7782
(Address)  HFGCC  Ste. 2100         (Telephone number)
Newark, De. 19713

To be completed by the employee needing family leave to care for family member:

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_____     8-23-04
(Employee Signature)                (Date)

DP0911

A302

FROM :
FAX NO. :
Aug. 24 2005 09:46AM P3

-3-

A "Serious Health Condition" means an illness, injury, impairment, or physical or mental condition that involves one of the following:

1.    <u>Hospital Care</u>

Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity or subsequent treatment in connection with or consequent to such inpatient care.

2.    <u>Absence Plus Treatment</u>

(a) A period of incapacity of more than three consecutive calendar days (including any subsequent treatment or period of incapacity relating to the same condition), that also involves:

Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders, or on referral by, a health care provider, or

Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

3.    <u>Pregnancy</u>

Any period of incapacity due to pregnancy, or prenatal care

---

3    Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine examinations, eye examinations, or dental examinations.

4    A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

DP0912

A303

FROM :                      FAX NO.                      Aug. 24 2008 09:48AM P4

- 4 -

4.    Chronic Conditions Requiring Treatments

A chronic condition which:

(1)    Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(2)    Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(3)    May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

5.    Permanent Long-term Condition Requiring Supervision

A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by a health care provider. Examples include Alzheimer's a severe stroke, or the terminal stages of a disease.

6.    Multiple Treatments (Non-Chronic Conditions)

Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by; a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis).

DP0913

A304

6.  A.  If additional treatments will be required for the condition, provide an estimate of the probable number if such treatments.

*Currently undergoing treatment for DVT*

If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

B.  If any of these treatments will be provided by another provider or health service (e.g. physical therapist) please state the nature of the treatments.

C.  If a regimen of continuing treatment by the patient is required under your supervision, provide general description of such regimen (e.g. prescription drugs, physical therapy requiring special treatment):

7.  A.  If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind)? _____

B.  If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)? _____ If yes, please list the essential functions the employee is unable to perform:

C.  If neither (A.) nor (B.) applies, it is necessary for the employee to be absent from work or treatment? _____

8.  A.  If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation? _Yes_

DP0914

A305

**REQUEST FOR FAMILY/MEDICAL LEAVE**
**BARGAINING UNIT**

Date: _8/9/04_

To _Sanu Almakhadhi_

From: _Nicole Casey Benefits Assistant_

On _8/9/04_, you notified us of your need to take family/medical leave due to:

☐   (a) the birth of your child, or the placement of a child with you for adoption or foster care; or

☐   (b) a serious health condition that makes you unable to perform the essential functions of your job; or

☒   (c) a serious health condition affecting your:

            ☐  spouse
            ☐  child
            ☒  parent

for which you are needed to provide care. _8/10/04_

You notified us that you need this leave beginning on _____ and that you expect leave to continue until on or about _Intermittent_

**NOTE:**   IT IS YOUR RESPONSIBILITY TO RETURN MEDICAL LEAVE PAPERS BY THE DATE INDICATED BELOW. SUBMISSION OF MEDICAL LEAVE PAPERS DOES NOT AUTOMATICALLY GRANT APPROVAL. COMPANY POLICY REQUIRES THAT YOU CALL AND UPDATE YOUR MANAGER (see Attendance Policy) UNTIL YOU RECEIVE NOTICE THAT YOUR LEAVE IS APPROVED.

Except as explained below, you have a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period for the reasons listed above. Also, your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work, and you must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions for employment on your return from leave. If you do not return to work following FMLA leave for a reason other than (1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; or (2) other circumstances beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.
*Under certain circumstances for an employee's own illness or medical condition, additional leave may be granted. For further detail contact the Human Resources Office.

This is to inform you that:                                                      **DP0915**

1.   You ☒ are eligible   ☐ not eligible for leave under the FMLA.

2.   The requested leave ☒ will   ☐ will not be counted against your annual FMLA leave entitlement.

3.   You ☒ will   ☐ will not be required to furnish medical certification of a serious health condition.

FMLA NEW BU                                                                      04/08/02

**A306**

If required, you must furnish certification by 8/24/04 (must be at least 15 days after you are notified of this requirement) or we may delay the commencement of your leave until the certification is submitted.

4.  We will require that you use available Sick Time, Vacation, Personal Time, and Incentive Time before FMLA Leave Time. You will continue to be paid, to the extent applicable on regular payroll dates.

5.      (a) If you normally pay a portion of the premiums for your health insurance, these payments will continue during the period of FMLA leave. Arrangements for payment have been discussed with you and it is agreed that you will make premium payments as follows:

_____

_____

_____

If you have any questions regarding your benefits please contact the Human Resources Department.

(b) You have a minimum 30-day grace period in which to make premium payments. If payment is not made timely, your group health insurance may be canceled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse, or, at our option, we may pay your share of the premiums during FMLA leave, and recover these payments from you upon your return to work, through payroll deductions pursuant to Delaware Code Title 11, Section 1107, subject to your agreement indicated by your signature.

(c) We ☑ will ☐ will not do the same with other benefits (e.g., life insurance) while you are on FMLA leave. If we do pay your premiums for other benefits, when you return from leave, you ☑ will ☐ will not be expected to reimburse us for the payments made on your behalf.

6.  You will be required to present a return to work certificate prior to being restored to employment. If such certification is not received, your return to work may be delayed until the certification is provided.

7.  While on leave, you will be required to furnish us with periodic reports every 30 days of your status and intent to return to work. If the circumstances of your leave change and you are able to return to work earlier than the date indicated, you will be required to notify us at least two work days prior to the date you intend to report to work.

8.  You ☑ will ☐ will not be requested to furnish re-certification relating to a serious health condition.

IT IS YOUR RESPONSIBILITY TO RETURN MEDICAL LEAVE PAPERS BY 8/24/04

DP0916

A307

FMLA NEW BU

01/25/02

# FAMILY AND MEDICAL LEAVE ACT
## BARGAINING UNIT

The Family and Medical Leave Act ("FMLA") requires employers of fifty (50) or more individuals to provide up to twelve (12) weeks unpaid leave to eligible employees during a twelve (12) month period for one or more of the following:

- Because of the birth of a child of the employee or placement of a child with the employee for adoption or foster care and to care for such child.

- To care for the employee's immediate family, including spouse, child, or parent, who has a serious health condition.

- Because of the employee's serious health condition which renders the employee unable to perform his or her job or one or more of the essential functions of the job.

Article, 22, Section 22.1 of Delaware Park's Collective Bargaining Agreement sets forth the Unpaid Leaves of Absence policy for all Bargaining Unit employees.

To be eligible, an employee must have been employed by the employer (1) for at least twelve continuous uninterrupted months, (2) have worked at least 1250 hours during the prior twelve months, and (3) be employed at a work-site where the employer employs fifty (50) or more employees within seventy-five (75) miles. Reduced or intermittent leave may be available in some circumstances. An employee will be required to use his/her available Vacation, Personal Time, Sick Time, and Incentive Time earned before unpaid leave.

Ordinarily, employees must provide 30 days advance notice when FMLA leave is "foreseeable." The Company will require medical certification to support a request for leave due to a serious health condition, and may require second or third opinions (at the Company's expense) and/or a fitness for duty report to return to work.

Bargaining Unit employee's utilize a "**forward**" leave period based on the twelve month period measured forward from the date an employee's approved leave begins. If an employee takes a subsequent FMLA leave during that same 12 month period, the remaining leave entitlement would be any balance of the 12 weeks that was not used during the employee's first FMLA leave.

Eligible Bargaining Unit employees who take a FMLA leave of up to 12 weeks are entitled, on return from such leave, to be eligible for reinstatement to their former classification and shift, and seniority shall accrue for all purposes during the period of leave. In addition, an eligible employee is entitled to continuation of health care benefits according to Company policy during the period of FMLA leave. However, the FMLA does not protect employees against employment actions which would have been taken had the employee not been on leave.

DP0917

## APPLICATION FOR FAMILY AND MEDICAL LEAVE

Name _Ami Almakhodhi_ Position _____

Department _112_ _____ Employee No. _____

Request Leave Dates: From: _8-10-04_ To: _enT._ _____

Reason for Requested Leave _To Take care of my father_

_____

_____

☐ To care for my newborn son or daughter

☐ For the placement for adoption or foster care of a child.

☑ To care for my (circle one) spouse, son, daughter or (parent) with a serious health condition (medically necessary).

☐ For my own serious health condition which renders me unable to perform one or more functions of my job (medically necessary).

☐ I am requesting this leave on an intermittent or reduced work schedule basis.

Reason for Requested Schedule Change _____

_____

☑ This is a change from my earlier request for Family and Medical Leave dated _____

In making this request for Family and Medical Leave, I agree to provide Delaware Park Racetrack and Slots with documentation requested to verify the reason for the leave, including medical certification for leaves involving a serious health condition. I also agree to provide medical re-certification (s) and medical verification of my ability to return to work, as requested by Delaware Park If any of the information contained on this form changes, I will notify Delaware Park within two (2) business days of such change.

Employees Signature _____ 15856 _____

Date _8-8-04_ _____

DP0918

A309

To Whom It May Concern

### FMLA Question

I have been approved for FMLA effective 8/10/04 and I used it three times for my father and my wife and my self and it was exhausted in 6/13/05. During that period I used all my 12 weeks time and the time I wasn't using my FMLA I was working full time which is at least 40 hours a week. Delaware Park used the measured forward leave period based on the 12 months period from the date an employee's approved leave begins. **My question is when I am eligible for a new FMLA?**

Thank You
Sami Almakhadhi
302-293-5064



DEPOSITION EXHIBIT
PENGAD 1-800-631-6989
ALMAKHADHI-
19-CMN-11/8/07

**A310**



## Certification of Health Care Provider
(Family and Medical Leave Act of 1993)

DELAWARE PARK

RACING • SLOTS • GOLF

TO BE COMPLETED BY PHYSICIAN !!!

1. Employee's Name

Sami Almakhadhi

2. Patient's Name (if different from employee)

Self

3. Page 4 describes what is meant by a "**serious health condition**" under the Family and Medical Leave Act. Does the patient's condition' qualify under any of the categories described? If so, please check the applicable category.

(1) _____ (2) _X_ (3) _____ (4) _____ (5) _____ (6) _____, or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

Patient seen starting 12/19/2003 with progressive low back pain
Status post osteopathic manipulation, NSAIDS, home exercises, pt aggravates
iBP due to heavy lifting at work. Pending Referral to MidAtlantic Back Special
5/17/05 Pt developed sciatica, has MRI has L4-5 discherniation and L5-S1
consistent with symptoms.

5. a. State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity²** if different):

12/19/03 commenced
4/18/05 → light duty requested not available

b. Will it be necessary for the employee to take work only **intermittently** or to **work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

Yes, light duty

If yes, give the probable duration:   ~2 months

c. If the condition is a **chronic condition** (condition #4) or pregnancy, state whether the patient is presently incapacitated² and the likely duration and frequency of episodes of incapacity²:

yes chronic but limited incapacity for ~2 months
to ensure return to baseline, rehab, PT, specialist
referral

**A311**

¹ Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

² "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

1

DEPOSITION
EXHIBIT
ALMAKHADHI-
2-CMN-11/8/07

6. a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments.

*unknown*
*referral made to back specialist*

If the patient will be absent from work or other daily activities because of treatment on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

b. If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

*Referrals to Mid Atlantic Back Pain Specialist.*
*PT, additional visits as yet to be determined.*

c. **If a regimen of continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):

*Naprosyn 500mg po BID*
*Home exercise program*
*Osteopathic Manipulation*
*Referral.*

7. a. If medical leave is required for the employee's absence from work because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work of any kind?**

*No; needs light duty no lifting > 10 lbs.*

b. If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

*carrying heavy bags of coins*

c. If neither a. nor b. applies, is it necessary for the employee to be absent from work for treatment?

**A312**

8. a. If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?

N/A

b. If no, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery?

N/A

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

_Signature of Health Care Provider_

JOHN LAWRENCE MD
Address
1401 Foulk Rd Suite 100
Wilmington DE 19803

_Type of Practice_
Family Practice

(702) 477 3300
Telephone Number

5/5/05
Date

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_Employee Signature_                              Date

**A313**

3

A "Serious Health Condition" means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

   Inpatient care (i.e., an overnight stay) in a hospital hospice, or residential medical facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

   (a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

   (1) Treatment[3] **two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

   (2) Treatment by a health care provider on **at least one occasion** which results in a **regimen of continuing treatment**[4] under the supervision of the health care provider.

3. Pregnancy

   Any period of incapacity due to **pregnancy**, or for prenatal care.

4. Chronic Conditions Requiring Treatments
   **A chronic condition** which:

   (1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

   (2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

   (3) May cause **episodic** rather than a continuing period of incapacity[2] (e.g., asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

   A period of **incapacity**[2] which is permanent or **long-term** due to a condition for which treatment may not be effective. The employee or family member must be **under the continuing supervision of**, but need **not be receiving active treatment by**, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

   Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, or for a condition that **would likely result in a period of incapacity**[2] **of more than three consecutive calendar days in the absence of medical intervention or treatment**, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

---

[3]Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4]A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

**A314**

# RETURN TO WORK
# APPROVAL FORM

Employee Name: _____

To Be Completed By Attending Physician:

Date last examined: _____

Date of this report: _____

Date employee can return to work: _____

     ☐   The employee is not released to work

     ☐   The employee is released to work with no restrictions

     ☐   The employee is released to work with the following restrictions:

_____
_____
_____
_____

Date restrictions can be lifted: _____

Physician's Name: _____

Signature: _____

Address: _____

Phone #: _____

Date: _____

**A315**

5

## CERTIFICATE OF SERVICE

I hereby certify this 27th day of November, 2007, that true and correct copies of the foregoing **APPENDIX TO OPENING BRIEF IN SUPPORT OF DEFENDANT DELAWARE PARK, L.L.C.'S MOTION FOR SUMMARY JUDGMENT** was electronically filed with U.S. District Court District of Delaware via CM/ECF (Official Court Electronic Document Filing System) which will send notification of such filing that the document is available for viewing and downloading via CM/ECF to the following counsel of record:

>      Glenn A. Brown, Esquire
>      Real World Law, PC
>      916 North Union Street, Suite #2
>      Wilmington, DE  19805


>      Wendy K. Voss (#3142)
>      POTTER ANDERSON & CORROON LLP
>      Hercules Plaza, Sixth Floor
>      1313 North Market Street
>      P.O. Box 951
>      Wilmington, DE  19899
>      (302) 984-6000 - Telephone
>      (302) 658-1192 - Facsimile
>      wvoss@potteranderson.com