# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,           :
                              :
    Plaintiff,             :    No. 07-78-JJF
                              :
                              :
    v.                 :    **JURY TRIAL DEMANDED**
                              :
DELAWARE PARK LLC,        :
                              :
    Defendant.          :

---

### ANSWERING BRIEF IN OPPOSITION TO
### DELAWARE PARK, L.L.C.'S
### MOTION FOR SUMMARY JUDGMENT

---

Frank J. Conley, Esquire
**THE CONLEY FIRM**
7715 Crittenden Street, Suite 113
Philadelphia, PA 19118
(215) 836-4789
FConley@ConleyFirm.com

Glenn Brown, Esquire
Bar No. 4669
**Real World Law**
916 N. Union St #2
Wilmington, DE 19805
(302)225-8340
glenn.brown@realworldlaw.com

*Attorneys for Plaintiff Sami Almakhadhi*

Date: 14 December 2007

Table of Contents

*Table of Citations* _____ *iii*

**I.    Statement of the Nature and Stage of the Proceeding** _____ **1**

**II.    Summary of Argument** _____ **5**

**III.    Counter Statement of the Facts** _____ **6**

  **A.    Undisputed Basic Facts** _____ **6**
    1.    Mr. Almakhadhi's Background and Work History _____ 6
    2.    Mr. Almakhadhi's Efforts to Advance _____ 7
    3.    Mr. Almakhadhi's Complaints of Discrimination _____ 8
    4.    Mr. Almakhadhi's Work Injury _____ 8
    5.    Mr. Almakhadhi's Use of FMLA _____ 9
    6.    Delaware Park's Termination of Mr. Almakhadhi's Employment_____ 9

  **B.    Disputed Material Facts** _____ **10**
    1.    Delaware Park's Discrimination Against Mr. Almakhadhi_____ 10
    2.    Delaware Park's Retaliation Against Mr. Almakhadhi Because of his Complaints about Discrimination and Because of his Application for Worker's Compensation Benefits _____ 13

**IV.    Argument** _____ **21**

  **A.    Summary Judgment is Inappropriate where, as here, the Employer's Intent is at Issue** _____ **22**
    1.    Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's ADA claims_____ 24
      a.    Mr. Almakhadhi is disabled within the meaning of the ADA. ____ 25
        i.    Mr. Almakhadhi's back injury limits one or more of his major life activities. _____ 25
        ii.    Mr. Almakhadhi has a record of an impairment. _____ 27
        iii.    Delaware Park regarded Mr. Almakhadhi as disabled. _____ 28
    2.    Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's Title VII claims _____ 29
      a.    Mr. Almakhadhi has shown direct and circumstantial evidence of race and national origin discrimination._____ 31
      b.    Mr. Almakhadhi has shown direct and circumstantial evidence of a hostile work environment_____ 32
      c.    Mr. Almakhadhi has shown direct and circumstantial evidence of retaliation _____ 34
    3.    Delaware Park is not entitled to summary judgment on  Mr. Almakhadhi's Worker's Compensation Retaliation Claim _____ 35
    4.    Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's FMLA claims_____ 37

**V.    Conclusion** _____ **39**

TABLE OF CITATIONS

*Cases*

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) _____ 22

Averbach v. Rival Mfg. Co., 879 F.2d 1196 (3d Cir. 1989) _____ 3

Bates v. Jean, 745 F.2d 1146 (7th Cir. 1984) _____ 2

Birl v. Estelle, 660 F.2d 592 (5th Cir. 1981) _____ 2

Bragdon v. Abbott, 524 U.S. 624 (1998) _____ 26

Cardenas v. Dorel Juvenile Group, Inc., 2006 U.S. Dist. LEXIS 37465 (D. Kan. 2006) _____ 7

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) _____ 22

Collins v. Sload, 212 Fed. Appx. 136 (3d Cir. 2007)_____ 30

Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499 (7th Cir. 1998). _____ 27

Deane v. Pocono Med. Ctr., 142 F.3d 138 (3d Cir. 1998)_____ 24, 28

Desert Palace, inc. v. Costa, 539 U.S. 90 (2003) _____ 23

Emory v. AstraZeneca Pharms. LP, 401 F.3d 174 (3d Cir. 2005) _____ 26

Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378 (3d Cir. 2004)_____ 26

Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219 (2d Cir. 1994) _____ 22, 23

Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313 (3d Cir. 2000)_____ 22

Harris v. Forklift Sys., 510 U.S. 17 (1993) _____ 33

Hickman v. Taylor, 329 U.S. 495 (1947) _____ 3

Jensen v. Potter, 435 F.3d 444, (3d Cir. 2006) _____ 33

Jones v. School Dist. of Phila., 198 F.3d 403 (3d Cir. 1999) _____ 30

Kunin v. Sears Roebuck & Co., 175 F.3d 289 (3d Cir. 1999) _____ 32

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) _____ 22

Mayle v. Felix, 545 U.S. 644 (2005)_____ 36

Medical Protective Co. v. Watkins, 198 F.3d 100 (3d Cir. 1999) _____ 22

Mondzelewski v. Pathmark Stores, 162 F.3d 778 (3d Cir. 1998) _____ 25

Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002) _____ 38

Sarullo v. United States Postal Serv., 352 F.3d 789 (3d Cir. 2003) _____ 30

Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535
    (3d Cir 2006) _____ 30

Sherrod v. Phila. Gas Works, 57 Fed. Appx. 68 (3d Cir. 2003) _____ 33

Stewart v. Rutgers, The State University, 120 F.3d 426 (3d Cir. 1997) _____ 23

Taylor v. Pathmark Stores, Inc., 177 F.3d 180 (3d Cir. 1999) _____ 29

Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) _____ 30

Traguth v. Zuck, 710 F.2d 90 (2d Cir. 1983) _____ 2

U.S. v. Procter & Gamble Co., 356 U.S. 677 (1958) _____ 3

Verdin v. Weeks Marine, Inc., 124 Fed. Appx. 92 (3d Cir. 2005)_____ 32

Webner v. Titan Distributing, Inc., 267 F.3d 828 (8th Cir. 2001) _____ 26

West v. Phila. Elec. Co., 45 F.3d 744 (3d Cir. 1995) _____ 33

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997)_____ 34, 35

**Statutes**

29 U.S.C. § 2617 _____ 38

42 U.S.C. § 12102(2) _____ 25

42 U.S.C. § 12111(8) _____ 25

**Rules**

Fed. R. Civ. P. 56(a) _____ 4, 29

**Treatises**

2  CHARLES A. SULLIVAN, MICHAEL J. ZIMMER & REBECCA HANNER WHITE,
    EMPLOYMENT DISCRIMINATION LAW AND PRACTICE 455 (3d ed. 2002) _____ 33

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On January 18, 2002, Defendant Delaware Park, LLC ("Defendant" or "Delaware Park") hired Plaintiff Sami Almakhadhi as a Booth Cashier at its casino. (A38)[1] Mr. Almakhadhi began suffering discrimination shortly after he began working at Delaware Park, and sought the assistance of his supervisors and Delaware Park's Human Resources Department. (Pl. Dep. at 76-78, A63-A65)

After failing to achieve any satisfaction through Delaware Park's internal complaint mechanisms, and following Defendant's termination of his employment, on April 26, 2006, Mr. Almakhadhi filed a Charge of Discrimination with the Delaware Department of Labor. (A169) On September 29, 2006, the Delaware Department of Labor issued a Final Determination and Right to Sue Notice. (A171) The U.S. Equal Employment Opportunity Commission issued its Dismissal and Notice of Suit Rights on January 16, 2007. (A173)

Because Mr. Almakhadhi was unable to obtain counsel, he filed timely his original Complaint pro se, using a Title VII complaint form provided by the Clerk of Court. (D.I. 1) On March 21, 2007, Delaware Park filed a Motion to Dismiss Mr. Almakhadhi's Pro Se Complaint based upon a technical service of process issue. (D.I. 6) Mr. Almakhadhi corrected the problem and on April 13, 2007, Delaware Park filed its Answer. (D.I. 14)

On June 24, 2007, this Court entered a Scheduling Order. (D.I. 21) Thereafter, Delaware Park served on Mr. Almakhadhi interrogatories and document requests, to which Mr. Almakhadhi has responded. Mr. Almakhadhi

---

[1]    Delaware Park made no effort to agree to a Joint Appendix. To reduce duplication, where possible Mr. Almakhadhi cites to Defendant's Appendix. Relevant documentary evidence Delaware Park failed to include in its Appendix is attached hereto as Appendix B ("B ___") or referred to by Docket Index number where appropriate.

likewise served written discovery requests on Delaware Park.

On September 12, 2007, the undersigned filed a Motion for Pro Hac Vice Admission on behalf of Mr. Almakhadhi. (D.I. 40) The Court granted that motion on October 2, 2007. Because of deficiencies in Mr. Almakhadhi's Pro Se Complaint (caused, in part, by his use of a form and also his limited language proficiency), on October 2, 2006, Mr. Almakhadhi filed a Motion for Leave to Amend his Pro Se Complaint. (D.I. 41) That Motion is outstanding.

With the assistance of counsel Mr. Almakhadhi also determined that Delaware Park's responses to his discovery requests were lacking. Indeed, Delaware Park has not fully responded to Mr. Almakhadhi's discovery requests nor complied with its Rule 26 obligations, necessitating Mr. Almakhadhi's filing on November 14, 2007, of a Motion to Compel Discovery and for Sanctions. (D.I. 46.) Because Delaware Park failed to respond to Mr. Almakhadhi's Second Set of Discovery Requests (which largely sought information that should have been provided under Rule 26 to a pro se plaintiff[2]), on November 21, 2007,

---

[2]  Pro se litigants are the beneficiaries of special treatment. They are "commonly required to comply with standards less stringent than those applied to expertly trained members of the legal profession." Bates v. Jean, 745 F.2d 1146, 1150 (7th Cir. 1984). This is so because it is fundamental to our legal system that implicit in the right to self-representation is an obligation on the part of the judicial system "to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983). Although the right "does not exempt a party from compliance with relevant rules of procedural and substantive law," Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981), "it should not be impaired by harsh application of technical rules." Traguth at 95.

Here, Mr. Almakhadhi acted not only pro se, but he also is a recent immigrant. English is Mr. Almakhadhi's second language, and he speaks with a heavy accent. He has difficulty understanding English. Additionally, Mr. Almakhadhi's ability to read and write is below average. At best, Delaware Park consistently took advantage of Mr. Almakhadhi's disadvantages (e.g., filing technical motions and parsing Mr. Almakhadhi's poor language to avoid its discovery obligations).

Mr. Almakhadhi filed his Second Motion to Compel Discovery and for Sanctions. (D.I. 48) Briefing is complete on both the First and Second Motions to Compel and for Sanctions. The Court has not yet ruled on either of them.

Among Mr. Almakhadhi's requested sanctions for Delaware Park's discovery violations was that the Court disallow Delaware Park from filing a motion for summary judgment. Mr. Almakhadhi requested this relief because, among other things, Delaware Park admits it failed to conduct a diligent search of its records in response to Mr. Almakhadhi's discovery requests[3]; it is undisputed that Delaware Park has withheld investigation files and electronic records; and Delaware Park has apparently failed to obtain or review boxes of potentially dispositive records. (See, e.g., D.I. 46 at Exhibits D and E; D.I. 48 at Exhibits E and F.) Mr. Almakhadhi cannot fairly be required to meet his burden in opposing Delaware Park's instant Motion when Delaware Park has been (thus far) successful in its effort to make this case a game of blind man's bluff—in the dark. Delaware Park's gamesmanship has prejudiced Mr. Almakhadhi.[4]

---

[3]     See also B17, which is a December 5, 2007, letter from Delaware Park seeking to amend substantively one of its Interrogatory responses (in fact, completely reversing its original response). That Delaware Park only now—after more than 19 months during which it was on notice of Mr. Almakhadhi's claims—has sought to investigate Mr. Almakhadhi's allegations is an apt example of its approach to discovery in this litigation.

[4]     "Our system of civil litigation cannot function if parties . . . suppress information called for upon discovery." Averbach v. Rival Mfg. Co., 879 F.2d 1196, 1201 (3d Cir. 1989). Instead, the aim of the liberal discovery rules is to "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." U.S. v. Procter & Gamble Co., 356 U.S. 677, 683 (1958). As the Supreme Court stated in Hickman v. Taylor, "civil trials . . . no longer need be carried on in the dark. The way is now clear . . . for the parties to obtain the fullest possible knowledge of the issues and facts before trial." 329 U.S. 495, 501 (1947).

Pursuant to the Court's June 24, 2007 Rule 16 Scheduling Order, discovery ended on October 31, 2007. (D.I. 21) The Court has scheduled a Pretrial Conference for February 7, 2008. (D.I. 22)

On November 27, 2007, Delaware Park filed its Motion for Summary Judgment. (D.I. 52) On November 28, 2007, Delaware Park filed a "Corrected" version of its Motion for Summary Judgment. (D.I. 55) Continuing the gamesmanship it has practiced since Mr. Almakhadhi first complained about the discrimination against him, Delaware Park now seeks to dictate to Mr. Almakhadhi and to this Court which claims should be addressed on summary judgment. (Opening Brief in Support of Defendant Delaware Park, LLC's Motion for Summary Judgment at 2 (hereinafter "Defendant's Brief at ___.")) Delaware Park's attempted end-run around this Court's authority is wholly inappropriate. To the extent this Court does not strike Delaware Park's Motion for Summary Judgment (as requested by Mr. Almakhadhi as a sanction for Delaware Park's discovery violations[5]), and to the extent the Court grants Mr. Almakhadhi's Motion for Leave to Amend, pursuant to Fed. R. Civ. P. 56(a), Mr. Almakhadhi respectfully requests that the Court enter judgment in his favor on those claims Delaware Park did not address in its Motion for Summary Judgment.

To comply with this Court's deadlines, Mr. Almakhadhi respectfully submits his Answering Brief in Opposition to Delaware Park's Motion for Summary Judgment. Because the reasons for Mr. Almakhadhi's termination are in marked dispute, this Court should deny Defendant's Motion for Summary Judgment as a matter of law.

---

[5]    Mr. Almakhadhi incorporates by reference his First and Second Motions to Compel Discovery and for Sanctions.

## II.  SUMMARY OF ARGUMENT

A.    Taking the facts and reasonable inferences drawn therefrom in the light most favorable to Mr. Almakhadhi, Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's ADA claims because he is a qualified individual with a disability and Delaware Park discriminated against him because he is disabled, because of his record of disability, and/or because it regarded him as disabled.

B.    Taking the facts and reasonable inferences drawn therefrom in the light most favorable to Mr. Almakhadhi, Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's Title VII claims because he has satisfied his initial burden and can show that the reasons for Delaware Park's actions were pretext for discrimination and retaliation.

C.    Taking the facts and reasonable inferences drawn therefrom in the light most favorable to Mr. Almakhadhi, Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's state Worker's Compensation Act claim because he has satisfied his initial burden and can show that the reasons for Delaware Park's actions were pretext for retaliation.

D.    Taking the facts and reasonable inferences drawn therefrom in the light most favorable to Mr. Almakhadhi, Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's FMLA claims because he has satisfied his initial burden, can show that Delaware Park denied him FMLA leave to which he was entitled, and that the reasons for Delaware Park's actions were pretext for retaliation.

## III.  COUNTER STATEMENT OF THE FACTS

### A.  Undisputed Basic Facts

A skeleton of undisputed basic facts exists in this matter.

### 1.  _Mr. Almakhadhi's Background and Work History_

Sami Almakhadhi was born in Yemen, and emigrated with his wife to the United States in 1996. He and his wife have three children. Although Mr. Almakhadhi is educated, English is his second language. He speaks with a heavy accent and his ability to read and write is below average. Mr. Almakhadhi became a Citizen in 2006.

Delaware Park is a gambling and casino operation.  It hosts thoroughbred horse racing and betting, a casino, and a golf course.  On January 18, 2002, Defendant hired Mr. Almakhadhi as a Booth Cashier at its casino. As a Booth Cashier, Mr. Almakhadhi was required to stand at a booth window, accept cash, coins, and coupons from customers, count the money, bag it, and carry the bagged money to the Satellite Cashier station. (A199) Mr. Almakhadhi worked a variety of shifts. Mr. Almakhadhi's performance was excellent. (See, e.g., A234; B42; B43)

Mr. Almakhadhi worked in the Cage Operations department. He had two direct supervisors: Karlyn Dixon, Director of Accounting, and Stacy Suhr Assistant Manager of Cage Operations. (A13 at ¶ 2) Ms. Dixon and Ms. Suhr made hiring, firing, promotional, and all other decisions affecting Cage Operations. (Statement of K. Dixon at B23; B37-B38; A14 at ¶ 5)

## 2. *Mr. Almakhadhi's Efforts to Advance*

Mr. Almakhadhi believed in the possibilities and promise that America and Delaware Park offered, and he made every effort to improve. Accordingly, during his employment with Delaware Park, Mr. Almakhadhi applied for at least 13 positions, for all of which he met the required experience and qualifications:[6]

| Date of Application | Position Sought | Citation |
|---|---|---|
| April 30, 2002 | Heavy Equipment Operation | B15 |
| August 29, 2002 | Satellite Cashier | B15 |
| May 6, 2003 | Satellite Cashier | B15 |
| June 23, 2003 | Satellite Cashier | B15 |
| July 14, 2003 | Cashier Shift Supervisor | B15 |
| December 8, 2003 | VLT Technician | B15 |
| February 5, 2004 | Cashier Shift Supervisor | B15 |
| May 24, 2004 | Satellite Cashier | B15 |
| September 2, 2004 | Main Bank Cashier | B15 |
| January 16, 2005 | ***Main Bank Cashier (two open positions)*** | A211 |
| January 30, 2005 | ***Impress Supervisor (two open positions)*** | A213 |
| April 5, 2005 | Surveillance Officer | B4 |
| August 11, 2005 | Impress Supervisor | A215 |

---

[6] There are at least 5 additional positions to which Mr. Almakhadhi applied, but Defendant has not provided any documents concerning them. Instead, Defendant asserts that it "changed its record-keeping systems regarding applications for transfer." (B14) That Defendant failed to investigate its own records until after November 8, 2007 is in contravention of Rule 26. <u>Cardenas v. Dorel Juvenile Group, Inc.</u>, 2006 U.S. Dist. LEXIS 37465, *22 (D. Kan. 2006).

### 3. *Mr. Almakhadhi's Complaints of Discrimination*

Because of Delaware Park's repeated failure to promote him, and because of the treatment he received from his supervisors as well as their comments to him, Mr. Almakhadhi made repeated complaints of discrimination to Delaware Park. Mr. Almakhadhi made formal complaints in February 2005 (A224); March 2007 (A227; A240); as well as in June 2005 (A236), as well as numerous verbal complaints.

### 4. *Mr. Almakhadhi's Work Injury*

Mr. Almakhadhi injured himself at work in December 2003. (A242) Delaware Park refused to acknowledge Mr. Almakhadhi's injury for 16 months.[7] During that time, Mr. Almakhadhi continued to work, taking FMLA to cover the time needed to treat his disabling injury. (A232)

After Delaware Park's medical expert determined that Mr. Almakhadhi had, in fact, injured himself while at work (A242-244), Mr. Almakhadhi's supervisors refused to assign him light duty work as required by Delaware Park's doctor. (A245) Instead, on September 2, 2006, Delaware Park sent Mr. Almakhadhi home and required him to call in each day to inquire about light duty assignments.[8] From the time it sent him home until it terminated his

---

[7]    Delaware Park refused to produce discovery concerning Mr. Almakhadhi's worker's compensation claims. (See D.I. 46 and D.I. 48)

[8]    Delaware Park's rendition of facts is inconsistent and not credible on many points, including this one. In its Responses to Mr. Almakhadhi's Request for Admission, Delaware Park "denied that Plaintiff was required to verify his restrictions each day between September 2, 2005 and his termination and/or to ask each day whether he would be assigned work that accommodated such

employment, Delaware Park failed to find any light duty work for Mr. Almakhadhi even though light duty was provided to non-Arabs. (B2-B3; B29; Witness Statements at A141-A143) In fact, Delaware Park made no effort to locate any light duty work for Mr. Almakhadhi. (Statement of S. DeLucia, B20 at ¶ 8; Statement of K. Dixon, B26 at ¶ 13; Affidavit of S. DeLucia, A5 at ¶ 11, A6 at ¶ 12.)

####    5.   *Mr. Almakhadhi's Use of FMLA*

It is uncontested that through October 12, 2005, Mr. Almakhadhi used all of his FMLA. (A239) It is also uncontested that he worked more than 1,250 hours in 2005. The record evidence from Delaware Park's Benefits Assistant, Judy Passmore, shows that Mr. Almakhadhi was entitled to another 12 weeks of FMLA beginning October 12, 2005. (Id.)

####    6.   *Delaware Park's Termination of Mr. Almakhadhi's Employment*

Delaware Park terminated Mr. Almakhadhi's employment first on February 12, 2006, and again on March 10, 2006. (A7-A8) Mr. Almakhadhi did not receive any notice about the termination of his employment. (A8) Instead, he discovered that his health care benefits had been cut off when he tried to obtain an antibiotic for his newborn son on March 29, 2006. (Pl. Dep. at 199, B70)

---

restrictions." (B6)  Ms. DeLucia, however, states that Mr. Almakhadhi was required to do just that. (See A6; see also A252)

Defendant also responded in its Responses to Mr. Almakhadhi's Request for Admissions that Ms. DeLucia made the decision not to accommodate the restrictions Delaware Park's own doctor placed on Mr. Almakhadhi. (B7) Claims Coordinator Sheryl Cartwright's September 2, 2005 e-mail is clear, however, that Ms. Dixon made the decision not to accommodate Mr. Almakhadhi's restrictions. (A251-A252)

**B.  Disputed Material Facts**

Beyond the skeleton of facts set forth above, the material facts concerning Mr. Almakhadhi's employment and the termination thereof are greatly disputed. The record is replete with genuine issues of material fact and credibility issues that should be decided by a jury.

Contrary to Delaware Park's assertion in its Opening Brief, Delaware Park's "wrongful acts" were not simply its failure to promote Mr. Almakhadhi, its failure to provide him with light duty assignments for an injury he suffered at work, and its termination of his employment. Those acts are simply a sample of the overt evidence of Delaware Park's illegal discrimination against Mr. Almakhadhi because of his race, national origin, and his disability, and its retaliation for his resistance to that discrimination. Its willful wrongful acts are legion.

### 1.  *Delaware Park's Discrimination Against Mr. Almakhadhi*

Mr. Almakhadhi began suffering discrimination shortly after he began working at Delaware Park. For example, Mr. Almakhadhi was commonly referred to as "the terrorist of Delaware Park." (Pl. Dep. at 71-73, B 63-65) A Cashier Supervisor also told him that the United States is "not your country." (Pl. Dep. at 29-30, B61-B62)[9] When he complained about the discrimination, Ms. Dixon and Ms. Suhr retaliated against him for his complaint, including by stating in his annual Performance Evaluation that *he* had been the cause of the

---

[9]    Although Mr. Almakhadhi believed Delaware Park made an investigation into his complaint about this remark, Delaware Park produced no documents demonstrating that it did so or that it took any other action.

problem. (Pl. Dep. at 29-30, B61-B62; B41) Moreover, Ms. Dixon even used the racist comments made *against* Mr. Almakhadhi as reasons not to advance him. (A228)

Ms. Dixon went so far as to instruct Mr. Almakhadhi not to apply for any supervisory positions "because Americans don't like to be supervised by Arabs . . . . ." (Pl. Dep. at 76, A63) Ms. Dixon also told Mr. Almakhadhi that "all Americans hate Arabs. . . . " (Id.)

Despite this overt discrimination, Mr. Almakhadhi sought to fit in to his new country and tried to advance. (Pl. Dep. at 76, A63) Accordingly, as recounted above, he repeatedly sought transfer into better positions. Each time he applied for a promotion or a new position, however, Delaware Park thwarted his efforts. Ms. Dixon reminded Mr. Almakhadhi that he would never be promoted:

> A; . . . She told me, "You can't apply for satellite or main bank," but I told her, "I look like Spanish, don't worry."  She said, "No, your accent, everybody knows you are Arab."
> Q.  Based on your accent?
> A.  . . . -- she said, "Don't go high, stay like satellite, main bank job, but don't go for  supervisor."  And that's the reason why she keep my transfer form for 2002, I believe 2003, even 2004.[10]]

(Pl. Dep. 78, A65)

---

[10]    Notably, Delaware Park withheld evidence concerning Mr. Almakhadhi's efforts to advance until November 16, 2007, (safely after the close of discovery) when it suddenly announced that it had discovered transfer application documents Mr. Almakhadhi had originally requested when he was acting pro se. (B15) To date, however, Delaware Park has not produced the hard copies of these applications, depriving Mr. Almakhadhi of relevant information contained on the applications and in the interview notes. Delaware Park has also failed to provide any information concerning the status of such documents or their spoliation. (Id.)

Notably, Delaware Park makes no argument concerning 12 of Mr. Almakhadhi's 13 applications for promotion. Instead, Delaware Park focuses only upon Mr. Almakhadhi's last application for promotion and the job experience of Penny Payne—the person selected for the job. (Defendant's Brief at 4-5; A16-A17; A24) Even assuming, *arguendo*, that Ms. Payne was more qualified than Mr. Almakhadhi for one particular job, Mr. Almakhadhi's complaints of discrimination to Delaware Park's Human Resources Department, the Department of Labor, in his Pro Se Complaint, and in his Proposed Amended Complaint pertained to all of his efforts to advance. (See, e.g., A224; A227; A240; A236; A169; D.I. 1; D.I. 41) Accordingly, there are genuine issues of material fact concerning Delaware Park's state of mind and intent in denying Mr. Almakhadhi the other 12 positions.[11]

Mr. Almakhadhi sought the assistance of Delaware Park's Human Resources Department for the discrimination and retaliation he was suffering. Delaware Park's Human Resources Department failed to perform a meaningful investigation, and instead simply rubber-stamped the actions of Ms. Dixon. Indeed, Ms. Dixon's anti-Arab attitude is also shared by Micki Nardo, then Director of Human Resources, whom Delaware Park tasked to investigate

---

[11]    Delaware Park admits that for at least one job it selected a candidate before even interviewing Mr. Almakhadhi. (Pl. Dep. 155-56, B68-B69; A224-A225) Again, however, as set forth in Mr. Almakhadhi's Motions to Compel Discovery and for Sanctions, Delaware Park has refused to provide documents concerning many of Mr. Almakhadhi's applications, the entire interview notes for jobs for which he was interviewed, or any electronic documents concerning his applications or his interviews.

Mr. Almakhadhi's February 14, 2007 complaint of discrimination.[12]   In fact, neither Ms. Nardo nor anyone else from Human Resources interviewed Ms. Dixon about Mr. Almakhadhi's allegations of discrimination. (See A224-A226; A15 at ¶ 6)

    **2.    *Delaware Park's Retaliation Against Mr. Almakhadhi Because of his Complaints about Discrimination and Because of his Application for Worker's Compensation Benefits***

    Delaware Park used Mr. Almakhadhi's December 2003 workplace injury as another avenue of discrimination and retaliation against him. [13] Specifically, on December 3, 2003, Mr. Almakhadhi injured his back while pushing a cart full of approximately 1,000 pounds of coins at work. At first he believed the resulting pain would go away, but as the weeks passed his symptoms worsened. (Pl. Dep.

---

[12]    Included as part of an Incident Report concerning Mr. Almakhadhi's February 22, 2005 complaint of discrimination is an e-mail from Ms. Nardo in which she states:

> [Mr. Almakhadhi] makes the conscious effort to decide if he will continue to support the cultural differences between **his** home land and **ours** . . . . (I would not support a promotion to Supervisor because of his opinion of woman. [sic]  I think 75% of that dept is woman. Bad move! He missed the class on Public Relations in Politics.)

(A226) (emphasis added; parentheses in original) Despite Mr. Almakhadhi's repeated discovery requests, Delaware Park did not produce the entire investigation file for this complaint, or any other of Mr. Almakhadhi's complaints of discrimination. Delaware Park also refused to respond to Mr. Almakhadhi's requests for information concerning other relevant complaints of discrimination made against Ms. Nardo and Ms. Dixon.

[13]    Despite Mr. Almakhadhi's discovery requests, Delaware Park has refused to provide any documents concerning the handling of Mr. Almakhadhi's worker's compensation claim. Delaware Park's efforts to withhold relevant and potentially dispositive documents has prejudiced his ability to respond to Delaware Park's instant Motion.

at 44-45, A46-A47) Finally, on April 13, 2005, Mr. Almakhadhi went to the Emergency Room at Christiana hospital. (B58) Doctors there instructed him to remain off of work through April 17, 2005, and to follow up with his regular doctor. (B56; B59)

On April 18, 2005, Doctor John Lawrence examined Mr. Almakhadhi and instructed him to remain home until April 23, 2005. (B57) Pursuant to Delaware Park's policies, Mr. Almakhadhi reported his injury to Defendant's Risk Management department on April 18, 2005. (A230) He returned to work on April 25, 2005.

Rather than following Delaware Park's stated policy to immediately determine the extent of an employee's injury so that he can get "back to work as soon as possible while working with the employee to ensure that he does not engage in activities that might exacerbate the injury" (A2, ¶ 3), Ms. Dixon and Ms. Suhr denied that Mr. Almakhadhi had been injured at work and denied him any recourse. Specifically, because of his doctor's instructions, on April 29, 2005, Mr. Almakhadhi asked Training Supervisor Roberta Evans about light duty work. (Pl. Dep. at 102-103, A80-81) Ms. Evans stated that only Ms. Dixon and Ms. Suhr approve light duty work. (Id.) Shortly after he spoke with Ms. Evans, Ms. Dixon and Ms. Suhr summoned Mr. Almakhadhi to Ms. Dixon's office and Ms. Dixon suspended him without pay and told him to "get out." (Pl. Dep. at 102, A80; B8.) When Mr. Almakhadhi asked why he was suspended, Ms. Dixon told him that she had discussed the situation with Shannon DeLucia and that they had determined he was not injured at work. (Pl. Dep. at 102-103, A80-81) Ms. Suhr then asked Mr. Almakhadhi if he wanted to quit his job. (Id.) Ms. Suhr also asked if Mr. Almakhadhi if he would leave the country. (Pl. Dep. at 234, B71)

Because he would not resign, Mr. Almakhadhi was suspended. (Pl. Dep. at 102-103, A80-81)

Each day Mr. Almakhadhi missed work would count as an attendance point against him. (A180) Because Mr. Almakhadhi knew Ms. Dixon's actions were an effort to terminate his employment in retaliation for his complaints of discrimination, to avoid accumulating attendance points Mr. Almakhadhi took FMLA leave. (B54; B55) Mr. Almakhadhi also indicated that he would seek legal counsel. (A230)

Even after Mr. Almakhadhi obtained medical proof of his injury (A214), Delaware Park refused to provide him with light duty assignments even though Delaware Park routinely provided non-Arabs with light duty. (B29; B2-B3; Witness Statements at A141-A143) These actions were in contravention of Delaware Park's stated policies. (B34) Instead, Delaware Park's actions were in retaliation for Mr. Almakhadhi's worker's compensation claim, as well as in retaliation for his February 2005 complaints of discrimination against Ms. Dixon.

Resisting Delaware Park's discriminatory acts, Mr. Almakhadhi obtained worker's compensation counsel. He also obtained a release from his doctor to return to work. (B46) Because Delaware Park refused to acknowledge his work-related injury, however, Mr. Almakhadhi continued to work while his worker's compensation claim was pending.[14] So that he could perform fully his job

---

[14]    Illustrating that Delaware Park intended to make it impossible for Mr. Almakhadhi to work under any set of circumstances, Delaware Park incredibly claims that the reason it denied Mr. Almakhadhi light duty work after it sent him home on September 2, 2006, was *because* he continued to work in 2004 and 2005 after Defendant decided he was not injured. (See Defendant's Brief at 28.) As presented by Mesdames DeLucia, Dixon and Suhr, Mr. Almakhadhi's Catch-22 had only one possible outcome: Mr. Almakhadhi's loss of employment. That Delaware Park continues in its Brief to this Court to repeat its

without exacerbating his back problem, he lifted only one bag of coins at a time. Mr. Almakhadhi was able to perform his job fully with this self-created accommodation for his disability. (Pl. Dep. at 84-85, A68-A69)

Upon his return to work, Ms. Dixon continued to retaliate against Mr. Almakhadhi. For example, she frequently tasked surveillance to monitor Mr. Almakhadhi; stood behind him while he performed his job to intimidate him; and raised her voice at him to embarrass him in front of customers. (Pl. Dep. at 98-99, B66-B67)

More than 16 months after he reported his injury, on August 25, 2005, mere days before the November 8, 2005 worker's compensation hearing, Delaware Park finally sent Mr. Almakhadhi to Doctor John Townsend, a company-designated doctor. Dr. Townsend determined that Mr. Almakhadhi's injury was work related, and reiterated Mr. Almakhadhi's long-standing restrictions of not lifting more than 20 pounds. (A242-244; B30-33)

Despite Doctor Townsend's conclusion, and as part of its pattern of discrimination, to retaliate against Mr. Almakhadhi for his complaints of discrimination, and in retaliation for Mr. Almakhadhi's pursuit of his worker's compensation claim, Delaware Park refused to allow Mr. Almakhadhi to work with a reasonable accommodation. It further refused to provide him with light duty work. (A237)

Instead, in an effort to compel Mr. Almakhadhi to quit his job, Ms. Dixon

---

baseless assertion that Mr. Almakhadhi worked outside his doctor's restrictions is all the more surprising because Defendant knows that it is not true: as discussed at Mr. Almakhadhi's deposition, on May 17, 2005, Mr. Almakhadhi's doctor limited his diagnosis to four weeks. Accordingly, he was not under medical restrictions when he returned to work. (Pl. Dep. At 60-61, A58-A59 and B74)

sent him home and required him to call in *every day* to inquire about light duty assignments. (A251-A252) Delaware Park has not identified any non-Arab employee required to comply with such a process.[15]

Unsurprisingly, Delaware Park failed to have any light duty available for Mr. Almakhadhi after it sent him home on September 2, 2006, even though light duty was provided to non-Arabs. (B29) Indeed, Delaware Park admits that it made no effort to locate any light duty work for Mr. Almakhadhi despite making him jump through the humiliating hoop of calling in each day to request such work. (Statement of S. DeLucia, B20 at ¶ 8; Statement of K. Dixon, B26 at ¶ 13; A5 at ¶ 11; A6 at ¶ 12)[16]

In further retaliation against Mr. Almakhadhi, in December 2005 Delaware Park failed to provide Mr. Almakhadhi with an annual "Christmas gift," to which he was entitled. (A176) Accordingly, on February 7, 2007, Mr. Almakhadhi contacted Ms. Suhr and Ms. Dixon about the bonus. (Pl. Dep. at 123-124, A92-A93) Alerted that Mr. Almakhadhi had not yet quit, Ms. Dixon took steps to terminate Mr. Almakhadhi's employment on a technicality. Consulting with Ms. DeLucia, Ms. Dixon requested that Ms. DeLucia terminate Mr. Almakhadhi's employment. (Statement of S. DeLucia at B21) Ms. DeLucia recommended that Ms. Dixon give Mr. Almakhadhi a return to work date and require that he be

---

[15]    Delaware Park has not identified *any* employee other than Mr. Almakhadhi who was subjected to such treatment. (See, e.g., A6 at ¶ 12)

[16]    On this point, Ms. DeLucia's and Ms. Dixon's self-serving affidavits to this Court are in contravention of the statements they signed and submitted to the Department of Labor. Because Defendant understandably failed to provide the Court with Mesdames DeLucia and Suhr's statements to the Department of Labor, Mr. Almakhadhi provides them in full at B18-B22, and B23-B27, respectively.

able to perform "full duty," (Id.) which Delaware Park knew he could not because Delaware Park's own expert had stated that he could not. (B31; see also A251.)

In early February 2006, Ms. DeLucia instructed Beverly Pope (who was not Mr. Almakhadhi's supervisor) to demand that he return to work without any limitation. (A25) Ms. Pope telephoned Mr. Almakhadhi with that demand on February 12, 2006. (Pl. Dep. at 216, A133) In response, Mr. Almakhadhi reiterated the permanency of his injury, and that he was able to perform his job with a reasonable accommodation that he lift only one bag at a time. (A25; Pl. Dep. at 216, A133) Indeed, Delaware Park admits that Mr. Almakhadhi was fully capable of performing his job with just such an accommodation. (See Defendant's Brief at 8) Nevertheless, Delaware Park refused to allow Mr. Almakhadhi to return to work and perform his job as he had for the 16 months Delaware Park had wrongfully contested his worker's compensation claim.

Delaware Park understandably goes to great lengths to distance Ms. Dixon from the termination decision, attempting to lay that responsibility on Ms. DeLucia. Ms. DeLucia, however, creates the genuine issues of material fact necessary to defeat Delaware Park's Motion for Summary Judgment. Moreover, Ms. DeLucia is simply not credible.

In her affidavit, Ms. DeLucia claims that on February 12, 2006, she terminated Mr. Almakhadhi's employment.[17] (A7 at ¶15; A9 at ¶ 18; Statement of S. DeLucia, B21 at ¶ 12; 13.) In mid-February 2006, however, Ms. DeLucia was

---

[17]    Before the Department of Labor, Delaware Park relied on the March 10, 2006 termination date. (B39) Here, Delaware Park relies on the February 12, 2006 date.

Director of Risk Management. (A1) In that position she would not have had the authority to terminate Mr. Almakhadhi's employment. Accordingly, and in contravention of Ms. DeLucia's sworn statement, the termination paperwork shows that Ms. DeLucia's husband, Kevin DeLucia, and Karlyn Dixon approved Mr. Almakhadhi's termination paperwork. (A262)[18] Nevertheless, Delaware Park misrepresented to the Department of Labor that Ms. DeLucia was Executive Director of Human Resources and that she terminated Mr. Almakhadhi's employment. (B36.)[19]

Moreover, in her June 30, 2006 Statement, Ms. DeLucia denies any knowledge of any complaints by Mr. Almakhadhi of discrimination. (Statement of S. DeLucia, B22 at ¶ 13) Delaware Park relies on this denial in its Summary Judgment Motion. (See Defendant's Brief at pp. 11 and 30.) To the Department of Labor, however, Delaware Park admitted that Mr. Almakhadhi *had* raised his concerns about discrimination to Ms. DeLucia.[20] (B39)

---

[18]    In her affidavit, Ms. Dixon attempts to explain away her approval of Mr. Almakhadhi's termination. (A19-A20) Her tortured explanation is inconsistent with the record evidence and simply not believable. Indeed, Ms. Dixon states in her affidavit that after February 12, 2006, "I was not involved in any of the administrative steps regarding [Mr. Almakhadhi's] termination, other than signing the Personnel Action Notice. . . ." (A19)  On March 7, 2006, however, Ms. Dixon e-mailed Vice President of Human Resources Diane Joseph requesting a termination date for Mr. Almakhadhi. (B45) Ms. Dixon did not carbon copy Ms. DeLucia, or anyone else, on her e-mail. (Id.) Clearly, Ms. Dixon was directly involved in the steps, administrative and otherwise, concerning Mr. Almakhadhi's termination.

Notably, Delaware Park fails to provide an affidavit from Kevin DeLucia supporting Ms. Dixon.

[19]    Delaware Park also misrepresented to the Department of Labor that Mr. Almakhadhi was a member of the UFCW union. (B35-B36) He was not.

[20]    Delaware Park's strained explanation of Ms. DeLucia's understanding of the word "discrimination" is unbelievable. Indeed, Ms. DeLucia was a high-ranking executive, supposedly intimately involved with employment decisions,

Similarly, in attempting to cover for and justify Ms. Dixon's decision not to provide Mr. Almakhadhi light duty work, Ms. DeLucia asserts that "in the Cage Department, there is very little, if any, light duty work that is available." (A6 at ¶ 11.) In its Interrogatory Response No. 3A, however, Delaware Park lists 19 employees "who were provided light duty assignments in the Cage Department" between May 18, 2004 and February 12, 2006. (B2-B3) That represents one available light duty position each month, on average.

Delaware Park and Ms. DeLucia's repeated misrepresentations and distortions are evidence of Delaware Park's attempt to obfuscate the truth about Mr. Almakhadhi's termination. Whether Ms. DeLucia's efforts are to protect the Company or to protect her friends (B21), her credibility must be assessed by a fact-finder because her Statement to the Department of Labor and Affidavit to this Court are not believable.

Indeed, that Mesdames DeLucia, Dixon and Suhr contrived Mr. Almakhadhi's termination date is further shown by the fact that Delaware Park had scheduled Mr. Almakhadhi for a follow-up doctor visit with the Company's doctor, Doctor Townsend, on March 6, 2006.[21] (B51-B53) Realizing that her hasty, unauthorized, and improper termination of Mr. Almakhadhi's employment on February 12 could be shown for what it truly was—discrimination and retaliation—Ms. DeLucia decided to terminate Mr. Almakhadhi *again* on March 10, 2007—after Mr. Almakhadhi's appointment with Dr. Townsend and after her transition to Executive Director of Human

---

and was even promoted to Executive Director of Human Resources. At a minimum, her credibility must be tested by a jury.

[21] As Director of Risk Management, Ms. DeLucia would have been aware of Mr. Almakhadhi's follow-up appointment. (A4 at ¶ 7; A10 at ¶ 22)

Resources.[22]

Delaware Park failed to inform Mr. Almakhadhi of the termination of his employment.[23] Instead, Mr. Almakhadhi only discovered he did not have a job on March 29, 2006, when he attempted to obtain medicine for his infant son and was denied pharmacy benefits. (Pl. Dep. at 199, B70)

On March 30, 2006, Mr. Almakhadhi called Delaware Park to inquire about his job status. He was told to call the decision-makers, Ms. Suhr and Ms. Dixon for further information. (Pl. Dep. at 127, A96; A261.) On April 4, 2006, Mr. Almakhadhi finally received notice from Delaware Park that his employment had been terminated.

## IV.   ARGUMENT

In its Motion, Delaware Park has reordered Mr. Almakhadhi's claims. Mr. Almakhadhi assumes Delaware Park's purpose is not simply to make

---

[22]    Despite making the decision to terminate Mr. Almakhadhi's employment on February 12, 2006, Ms. DeLucia asserts in her Affidavit that she had to fire Mr. Almakhadhi, *again*, because the entire Human Resources Department—except her—failed to follow procedure:

> I had assumed that the outgoing Director of Human Resources, Micki Nardo, had completed the administrative process with regard to Mr. Almakhadhi's termination before her departure from Delaware Park. Apparently she had not done so, and the new Vice President of Human Resources, Diane Joseph, apparently had failed to do so as well.

(A8, at ¶ 16.) Ms. DeLucia's assertions are not believable, and indeed do not make sense.  Instead, it is necessary for a fact-finder to determine her credibility, intent, and state of mind.

[23]    In contravention of its statements to the Department of Labor that "Non-disciplinary discharge procedures for employees who are medically unable to perform the duties of their positions, such as Mr. Almakhadhi, are not in writing" (see B36), Delaware Park does provide written notice to non-Arabs, and only after all FMLA leave has been exhausted. (See A268 through A280; B 13)

21

reference to the pleadings more difficult, but also to address what it believes to be Mr. Almakhadhi's weakest claims first, and his strongest claims last. To avoid contributing to the confusion, and to assist the Court in its analysis of the issues, Mr. Almakhadhi presents his arguments in the same order as Delaware Park's.

### A.   Summary Judgment is Inappropriate where, as here, the Employer's Intent is at Issue

When deciding a motion for summary judgment under Federal Rule of Civil Procedure 56(c), a court must determine "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." Medical Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999). A fact is "material" if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Accordingly, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. In making this determination, courts view the facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). For its part, the non-moving party must, through affidavits, admissions, depositions, or other evidence, demonstrate that a genuine issue exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

The Third Circuit Court of appeals has explained that in an employment discrimination case "a trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 321 (3d Cir. 2000) (quoting Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir.

1994). See also, Stewart v. Rutgers, The State University, 120 F.3d 426, 431 (3d Cir. 1997) ("This standard is applied with added rigor in employment discrimination cases, where intent and credibility are the crucial issues.") In the context of employment discrimination cases, the Gallo court described summary judgment as "a drastic . . . remedy." Gallo at 1224.

These cautions are reinforced by the Supreme Court's unanimous decision in Desert Palace, inc. v. Costa, in which the Court clarified that employer liability attaches whenever an unlawful motive was a motivating factor for *any* employment practice, even though other factors also motivated the practice. 539 U.S. 90, 99 (2003). In reaching its holding, the Court expressly rejected a heightened "direct evidence" standard and instead concluded that a plaintiff may use direct or circumstantial evidence to support his claims. Highlighting the significance of circumstantial evidence, the Court stated:

> We have often acknowledged the utility of circumstantial evidence in discrimination cases. For instance, in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), we recognized that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of *circumstantial evidence* that is probative of intentional discrimination." Id., at 147 (emphasis added). The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 508, n. 17, 1 L. Ed. 2d 493, 77 S. Ct. 443 (1957),

Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-100 (2003). Accordingly, the Supreme Court concluded that mixed-motive plaintiffs need only present sufficient evidence for a reasonable jury to find, by a preponderance of the evidence, that race or national origin was a motivating factor for a contested employment

practice.

In its Brief, Delaware Park understandably glosses over the history of Mr. Almakhadhi's mistreatment and the circumstances surrounding its termination of his employment because those facts raise genuine issues that must be tried to a jury. Indeed, the record is replete with both direct and circumstantial evidence of Delaware Park's discriminatory motives, as well as substantive questions about its credibility and intent. The facts demonstrate that discrimination and retaliation were more likely the cause of Delaware Park's adverse actions than its proffered reasons. Accordingly, summary judgment should be denied and this case should be decided by a jury.

1. *Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's ADA claims*

Contrary to Delaware Park's arguments, the evidence taken in the light most favorable to Mr. Almakhadhi requires a fact-finder to determine whether Delaware Park violated the ADA.

"In order to make out a prima facie case under the ADA, a plaintiff must be able to establish that he . . . (1) has a disability (2) is a qualified individual and (3) has suffered an adverse employment action because of that disability." Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998) (citation and quotation omitted). Delaware Park does not contest that that Mr. Almakhadhi is a qualified individual or that he suffered an adverse employment action. (See Defendant's Brief at 11-17.)[24]

_____

[24]    Even if Delaware Park had contested these prongs of Mr. Almakhadhi's prima facie case, it is clear that Mr. Almakhadhi is a qualified individual with a

### a.   Mr. Almakhadhi is disabled within the meaning of the ADA.

A person is disabled "within the meaning of the ADA" if he has "[1] a physical . . . impairment that substantially limits one or more of the major life activities of such an individual; [2]] a record of such an impairment; or [3] has been] regarded as having such an impairment." 42 U.S.C. § 12102(2). The Third Circuit has emphasized that the evaluation of disabilities is an individualized process, and "requires . . . consider[ation of] the individual's training, skills, and abilities in order to evaluate 'whether the particular impairment constitutes for the particular person a significant barrier to employment.'" Mondzelewski v. Pathmark Stores, 162 F.3d 778, 784 (3d Cir. 1998) (Alito, J.) (citation omitted).

### i.   Mr. Almakhadhi's back injury limits one or more of his major life activities.

Delaware Park argues wrongly that because Mr. Almakhadhi can dress and

---

disability, and that he suffered multiple adverse employment actions, including termination of his employment.

The ADA defines a qualified individual as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). As a Booth Cashier, Mr. Almakhadhi was required to stand at a booth window, accept cash, coins, and coupons from customers, count the money, bag it, and carry the bagged money to the Satellite Cashier station. (Pl. Dep. at 55-56, A53-A54)

Delaware Park refused to acknowledge Mr. Almakhadhi's injury and disability for more than 16 months. During that time, Mr. Almakhadhi continued to perform the essential functions of his job by only lifting one bag of coins at a time. In this way he was able to abide by his doctor's lifting restriction, but still maintain his excellent performance. (Pl. Dep. at 56, A54)

Even with his disability Mr. Almakhadhi was able to perform the essential functions of his job with a reasonable adjustment to his lifting requirements. Accordingly, he is a "qualified individual" under the ADA.

bathe himself, he cannot be disabled.[25] Contrary to Defendant's interpretation of the ADA, a person does not have to be bound to a wheelchair to be disabled under the Act. Indeed, the Supreme Court has made clear that "the [ADA] addresses substantial limitations on major life activities, not utter inabilities," Bragdon v. Abbott, 524 U.S. 624, 641 (1998). See also Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378 (3d Cir. 2004) ("We also read the Supreme Court to hold that a substantial limitation of a major life activity does not mean impossibility or even great physical difficulty; rather, substantial limitation is weighed in a broad, practical sense."); Emory v. AstraZeneca Pharms. LP, 401 F.3d 174, 179 (3d Cir. 2005) (same).

Mr. Almakhadhi has a permanent back injury. (See, e.g., B48-B50; A242-A244; A255; Pl. Dep. at 237-238, B72-B73) He is in constant pain of varying degrees. (Pl. Dep. at 237-238, B72-B73) As found by Delaware Park's own expert, Dr. Townsend, because of the injury to Mr. Almakhadhi's spine he is limited in his ability to lift and also has weakness and numbness in his left leg. (Pl. Dep. at 51-53, A49-51; A244) Because of the injury, Mr. Almakhadhi is limited to light duty tasks. (A242-244) Moreover, because of the limits of Mr. Almakhadhi's education, language ability, and work experience, his lifting restrictions and leg problems limit him to a narrow range of jobs. He is, accordingly, an individual with a disability as defined by the ADA. See, e.g., Webner v. Titan Distributing,

---

[25]    In support of its argument, Delaware Park cites to portions of Mr. Almakhadhi's deposition transcript. As a review of almost any portion of the transcript will reveal, Mr. Almakhadhi had great difficulty understanding counsel's questions during the deposition. Likewise, counsel for Delaware Park had great difficulty understanding Mr. Almakhadhi. Mr. Almakhadhi had hoped to avoid this difficulty by use of a translator. (B10) Delaware Park, however, refused to provide a translator and proceeded with the deposition over Mr. Almakhadhi's objection. (B12)

Inc., 267 F.3d 828 (8th Cir. 2001) (individual's back problems limited ability to perform all but light duty tasks and, therefore, substantially limited major life activity of working).

### ii.    Mr. Almakhadhi has a record of an impairment.

The "record of" prong of an ADA claim "is a close sibling to the 'perceived impairment'" or "regarded as" claim. Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 509 (7th Cir. 1998). It is uncontested that Delaware Park relied upon Mr. Almakhadhi's record of disability in making its adverse employment decisions.

As discussed *infra* and *supra*, over a period of 16 months Mr. Almakhadhi was treated for his back and leg problems. Delaware Park was aware of these treatments, and even discussed Mr. Almakhadhi's condition with Dr. Townsend—Delaware Park's medical expert. In making its employment decisions, Delaware Park relied directly upon Mr. Almakhadhi's record indicating that he has or had a substantially limiting impairment. Based on its knowledge of his record Delaware Park concluded that Mr. Almakhadhi's injury was so severe that he was unable to work at its facility, even with his requested reasonable accommodation. (See, e.g. Statement of S. DeLucia, B20 at ¶ 8; Statement of K. Dixon, B26 at ¶ 13; Affidavit of S. DeLucia, A5 at ¶ 11, A6 at ¶ 12)

Because Delaware Park relied upon Mr. Almakhadhi's record of disability, summary judgment should not be granted. Indeed, based upon the affidavits of Mesdames DeLucia and Dixon, a fact-finder must determine Delaware Park's state of mind and intent concerning Mr. Almakhadhi's record of impairment.

27

### iii.    *Delaware Park regarded Mr. Almakhadhi as disabled.*

Even if the Court does not find that Mr. Almakhadhi is disabled, there is a genuine issue of material fact about Delaware Park's state of mind and intent concerning Mr. Almakhadhi's back problem. Specifically, it is undisputed that on September 2, 2007, Delaware Park sent Mr. Almakhadhi home from work against his wishes because it regarded him as unable to perform the essential functions of his job due to his back injury. (A237; Statement of S. DeLucia, B20 at ¶ 8; Statement of K. Dixon, B26 at ¶ 13; Affidavit of S. DeLucia, A5 at ¶ 11, A6 at ¶ 12) Indeed, Mesdames DeLucia and Dixon regarded Mr. Almakhadhi as so completely disabled that they made no efforts to find any light duty work for him which would have been within his doctor's restrictions. (Id.) "[E]ven an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." Deane v. Pocono Med. Ctr., 142 F.3d 138, 144 (3d Cir. 1998).

Moreover, Delaware Park's discussion in its Brief of jobs that Mr. Almakhadhi has sought (or might try to pursue) is, at best, inapposite.[26]

---

[26]    In fact, Delaware Park misrepresents and distorts the record when it states that Mr. Almakhadhi's "actions in applying for and obtaining other employment confirm that he is not substantially limited from working." (Defendant's Brief at 14) As the sole income earner for his family, Mr. Almakhadhi has sought any kind of work available since Delaware Park terminated his employment. (Pl. Dep. at 53, A51) Other than thirty-hours of work at a pizza shop, his disability has kept him from obtaining a job. (See, e.g., Pl. Dep. at 16-17, A35-A36, concerning his interview for a job at Lowes Home Improvement: ". . . –he told me can you lift 40 pounds? . . . I said, no, I have back injury, I cannot lift, but I can lift 20, 25, you know, I can manage. I said is it okay? He said okay. I think they sent me a note or something that I can apply again in the future or something.") Because of his disability, he did not get the job.

Mr. Almakhadhi's "subsequent work history could, at most, reflect [his] lack of an actual disability, and it therefore sheds no light whatever on whether, at the time of [his] termination, [Delaware Park] regarded [his] impairment as substantially limiting [his] ability to work." Deane, 142 F.3d at 144.

Because a jury could reasonably conclude that Delaware Park regarded Mr. Almakhadhi as disabled under the ADA, summary judgment must be denied. See Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 183 (3d Cir. 1999) (finding company's statements that employee unable to perform any job at company supported conclusion that company perceived employee as disabled and sufficed to make out "regarded as" claim).

> **2.    Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's Title VII claims[27]**

Mr. Almakhadhi's Title VII claims encompass race and national origin discrimination, a hostile work environment, and retaliation. In an effort to distance itself from the facts supporting these allegations, Delaware Park focuses solely upon Mr. Almakhadhi's termination and Delaware Park's mistaken interpretation of what constitutes an adverse employment action in this Circuit.[28]

Delaware Park concedes, as it must, that Mr. Almakhadhi has established

---

[27]    Delaware Park fails to provide any argument concerning Mr. Almakhadhi's hostile work environment claims. Accordingly, pursuant to Fed. R. Civ. P. 56(a), Mr. Almakhadhi respectfully requests that the Court grant summary judgment in his favor on the hostile work environment portions of his claims. See Rule 56(a).

[28]    As set forth in Mr. Almakhadhi's Motions to Compel Discovery and for Sanctions, Delaware Park's refusal to engage in appropriate discovery has unduly prejudiced Mr. Almakhadhi's ability to respond to its arguments here. Nevertheless, it is clear that because Mr. Almakhadhi is able to show both direct and indirect evidence of discrimination and retaliation, Delaware Park's argument fails, and his Title VII claims require trial.

his prima facie case—except that it curiously alleges that he cannot show that similarly situated individuals were not terminated from employment.[29] Although Delaware Park's termination of Mr. Almakhadhi's employment was certainly an adverse employment action, it was not the only adverse employment action under Title VII that Mr. Almakhadhi suffered, nor is it the only adverse employment action that supports Mr. Almakhadhi's Title VII claims. "An adverse employment action may be a discharge or a failure to hire, *or any action that alters an employee's compensation, terms, conditions, or privileges of employment*." Collins v. Sload, 212 Fed. Appx. 136, 140 (3d Cir. 2007) (emphasis added). Mr. Almakhadhi does, however, appreciate Delaware Park's desire to distance itself from its history of adverse employment actions against him.

Delaware Park also incorrectly defines similarly situated persons as those "who have exhausted available leave time and cannot return to work." (Defendant's Brief at 18.) Again, Mr. Almakhadhi appreciates Delaware Park's

---

[29]     To establish a prima facie case of discrimination on the basis of race and national origin under Title VII, a plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) he suffered an adverse employment action, and (4) similarly situated persons outside of his protected class were treated more favorably, or the circumstances of the adverse employment action give rise to an inference of discrimination. See Jones v. School Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999). "[T]here is a low bar for establishing a prima facie case of employment discrimination." Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir 2006). The Supreme Court has stated that once the prima facie case is established, it will presume that the employer's action is "more likely than not based on the consideration of impermissible factors." Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).
        Should the plaintiff establish his prima facie case, the burden of production shifts to the defendant to articulate some legitimate and nondiscriminatory reason for the employer's action. Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). The plaintiff must then demonstrate by a preponderance of the evidence that the employer's articulated reason was merely a pretext for discrimination, and not the actual motivation behind its decision. Id.

desire to obfuscate the facts in this case. Even accepting Delaware Park's incorrect definition of similarly situated employees, however, its argument fails because the record evidence shows that Mr. Almakhadhi had not exhausted his available leave, and that he was able to return to work with a reasonable accommodation (and indeed under the conditions which he had worked during the 16 months Delaware Park contested his workplace injury). Accordingly, there are clearly genuine issues of material fact that must be tried to a jury.

> **a.    Mr. Almakhadhi has shown direct and circumstantial evidence of race and national origin discrimination.**

Notwithstanding Delaware Park's attempt to gloss over the record, it is clear that Mr. Almakhadhi was singled out for discrimination because of his race and national origin. As recounted fully above, Mr. Almakhadhi's evidence includes direct evidence of race and national origin based animus (including racist comments from supervisors, including Ms. Dixon, as well as written statements by Ms. Nardo indicating her anti-Arab bias). The record also contains a panoply of circumstantial evidence (including Defendant's failure to promote Mr. Almakhadhi to over a dozen positions for which he was qualified; Defendant's refusal to follow its policies concerning Mr. Almakhadhi's workplace injury; Defendant's refusal to even attempt to locate light duty work when such work was given to non-Arabs (but still requiring him to call in daily to ask for such work); excessively monitoring and harassing Mr. Almakhadhi during the performance of his duties; withholding Mr. Almakhadhi's Christmas bonus payment; depriving Mr. Almakhadhi of his FMLA leave; and failing to provide any notice of Mr. Almakhadhi's termination while providing such notice to non-Arabs).

In the face of a record replete with a wide-range of comments and treatment that reflect Delaware Park's discriminatory animus against Mr. Almakhadhi because of his race and national origin, and which bear directly on the contested employment decisions, Delaware Park responds only with distortions of the record and self-serving, implausible, and inconsistent affidavits. Because Mr. Almakhadhi has identified evidence showing that Defendant's articulated reasons are merely a pretext for discrimination, and not the actual motivations behind its decisions, this court should deny summary judgment.

###       b.       Mr. Almakhadhi has shown direct and circumstantial evidence of a hostile work environment

Mr. Almakhadhi suffered a hostile work environment, and Delaware Park makes no argument to the contrary. Even if Delaware Park had in any way opposed this claim (which it has not), the record evidence fully establishes the violation.

To establish a prima facie case of hostile work environment, a plaintiff must show that (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position; and (5) the existence of respondeat superior liability. See Verdin v. Weeks Marine, Inc., 124 Fed. Appx. 92, 2005 U.S. App. LEXIS 2649 at *7-8 (3d Cir. 2005); Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999). Factors which may indicate a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is . . .  humiliating. . .  and whether it unreasonably interferes with an employee's work performance."

Sherrod v. Phila. Gas Works, 57 Fed. Appx. 68, 75, 2003 U.S. App. LEXIS 1428 at *18-19 (3d Cir. 2003) (quoting Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)).

As discussed fully above, the record evidence shows that Mr. Almakhadhi suffered a hostile work environment. For example, Mr. Almakhadhi was referred to as "the terrorist of Delaware Park"; he was told that America was not his country and he should go home; Ms. Dixon, his supervisor, told him that Americans hate Arabs and that because he was an Arab he would never be allowed to supervise Americans.[30]

After the September 11, 2001 Attacks, comments and statements to an Arab-American like those made to Mr. Almakhadhi are simply outrageous and are more than enough to establish a hostile work environment.[31]

Additionally, however, Mr. Almakhadhi was singled out for humiliating treatment, such as over a course of months being made to call in each work day

---

[30] These comments were part of an ongoing pattern and practice of discrimination against Mr. Almakhadhi. West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995). Racist comments against him occurred within Mr. Almakhadhi's filing period, and the discrimination against him was more than isolated, sporadic acts. See Rush v. Scott Specialty Gases, 113 F.3d 476, 481 (3d Cir. 1997).

[31] The Third Circuit recently held that in analyzing discriminatory comments, numerosity is not dispositive:

> [The Court of Appeals has] often stated that discriminatory harassment must be "pervasive and regular." But the Supreme Court's standard is "severe *or* pervasive." The difference is meaningful and the Supreme Court's word controls . . . .

Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (emphasis in original). See also 2 CHARLES A. SULLIVAN, MICHAEL J. ZIMMER & REBECCA HANNER WHITE, EMPLOYMENT DISCRIMINATION LAW AND PRACTICE 455 (3d ed. 2002) ("The disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive.").

for light duty work when Delaware Park never intended to provide him any. Moreover, despite Mr. Almakhadhi's complaints, Delaware Park took no action to remedy this environment. Instead, its own Director of Human Resources shared in the anti-Arab animus, emboldening the harassers' conduct.

Based on the foregoing, the record shows that Mr. Almakhadhi suffered a hostile work environment.

### c.  Mr. Almakhadhi has shown direct and circumstantial evidence of retaliation

To establish discriminatory retaliation under Title VII, Mr. Almakhadhi must show that: (1) he engaged in activity protected by Title VII; (2) Delaware Park took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).

As discussed fully above, it is uncontested that Mr. Almakhadhi made repeated complaints to his supervisors and to Delaware Park's Human Resources Department about discrimination against him because of his race and national origin. (See, e.g., A224; A227; A236; A240) It is uncontested that these complaints were protected activities.

Delaware Park disputes only that its chain of adverse employment actions against Mr. Almakhadhi was causally connected to his complaints. As set forth in detail above, and incorporated herein, the record is clear that Delaware Park took every opportunity to retaliate against Mr. Almakhadhi for his complaints.

Considering the wide-range of adverse actions Mr. Almakhadhi suffered over such a long period of time, it is clear that Ms. Dixon and Ms. Suhr were

emboldened by the support they received from Delaware Park's Human Resources Department after Delaware Park failed to take any action against them following Mr. Almakhadhi's complaints. Indeed, Delaware Park's Director of Human Resources shared their racial animus. As explained by the Third Circuit, this pattern of continuing discrimination and harassment supports a causal connection:

> Evidence that the employer condoned a harasser's conduct can contribute to an inference that subsequent adverse employment action taken by the harasser against the plaintiff was causally linked to the plaintiff's complaint about the harassment. This observation rests upon the recognition that, if the harasser got away with the harassment, it is more likely that he or she will believe that retaliation will be safe as well, and conversely, if the employer took prompt and adequate action against the harasser, the harasser will be less confident of his or her ability to engage in retaliation with impunity.

Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997).

Here, the record is clear that, emboldened by Delaware Park's support, Ms. Dixon and Ms. Suhr continued and escalated their retaliation against Mr. Almakhadhi, ultimately terminating his employment. Accordingly, summary judgment is inappropriate.

**3.    *Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's Worker's Compensation Retaliation Claim***

As set forth in Mr. Almakhadhi's Motions to Compel Discovery and for Sanctions, Delaware Park failed to provide complete discovery concerning Mr. Almakhadhi's Worker's Compensation claims. For instance, Mr. Almakhadhi requested documents about internal discussions concerning his worker's compensation claims, as well as communications between Delaware Park and its insurance carrier. Delaware Park provided neither, and now seeks to

benefit from its wrongful conduct by arguing that Mr. Almakhadhi cannot show Delaware Park's intent. Delaware Park should not be allowed to so benefit. Instead, a fact-finder must determine Delaware Park's state of mind and intent concerning its actions.[32]

Faced with the undisputed facts in this case, Delaware Park seeks to parse the events surrounding Delaware Park's handling of Mr. Almakhadhi's Worker's Compensation claim to include only his termination, and then argues that Mr. Almakhadhi's claim is time barred. Delaware Park is wrong.

Mr. Almakhadhi's Worker's Compensation retaliation claim is closely tied to his other discrimination and retaliation claims because they arise from the same operative facts. Simply, as described in detail above, Ms. Dixon and Ms. Suhr took every opportunity to prevent Mr. Almakhadhi's advancement because of his race and national origin, deprived him of the opportunity to work, deprived him of his leave benefits, and retaliated against him for the complaints he made against them. When Mr. Almakhadhi injured himself at work, Mesdames Dixon and Suhr took that opportunity, as well, to discriminate and

---

[32]    That Delaware Park seeks to rely upon pro se discovery responses Mr. Almakhadhi submitted prior to the addition of his Worker's Compensation claim belies the validity of its arguments. In his complaints of discrimination to Delaware Park, the filing his Department of Labor Charge, and in his Pro Se Complaint, Mr. Almakhadhi has been consistently clear that Delaware Park's handling of his worker's compensation claims was retaliatory and part of Delaware Park's pattern of discrimination. More importantly, Delaware Park waived any relation back argument under Rule 15 by failing to raise it when Mr. Almakhadhi filed his Motion for Leave to Amend, and instead providing its consent to the claim. Even had Delaware Park timely objected (which it did not), Rule 15(c) permits the relation back of Mr. Almakhadhi's Worker's Compensation retaliation claim. As stated by the Supreme Court, "So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." Mayle v. Felix, 545 U.S. 644, 664 (2005). That is the case here.

retaliate against Mr. Almakhadhi.

Too, their retaliation concerning Mr. Almakhadhi's Worker's Compensation claim was specific. As recounted fully above, Mesdames Dixon and Suhr confronted Mr. Almakhadhi about his claim, denied that he had been injured at work, and sent him home without pay. After he was able to obtain a medical release to return to work, Mesdames Dixon and Suhr subjected Mr. Almakhadhi to humiliating surveillance and assigned him work they knew would exacerbate his injury.[33] When Delaware Park's own doctor finally confirmed that Mr. Almakhadhi had been injured at work—16 months after he reported the injury—Ms. Dixon again sent Mr. Almakhadhi home without pay, required him to call in each day to check for light duty, but failed and refused to even look for any such work.

Based upon the direct and circumstantial evidence Mr. Almakhadhi has shown, Delaware Park's purported reasons for its actions should not be believed. Instead, Mr. Almakhadhi's Worker's Compensation claims should be tried to a jury.

### 4. *Delaware Park is not entitled to summary judgment on Mr. Almakhadhi's FMLA claims*[34]

Delaware Park misapprehends Mr. Almakhadhi's FMLA claims. Mr. Almakhadhi does not allege that Delaware Park compelled him to take

---

[33] In June 2004, Ms. Dixon assigned Mr. Almakhadhi to work as a Satellite Cashier. (Pl. Dep. at 34, A41; B40) Mr. Almakhadhi was not able to perform the job because of the pain it caused. (Pl. Dep. at 34, A41)

[34] As with Mr. Almakhadhi's Worker's Compensation claim, Delaware Park waived any "relation back" argument when it provided its consent to the retaliation portion of Mr. Almakhadhi's FMLA claim.

FMLA leave when it sent him home on September 2, 2006, as Defendant argues. To the contrary, at no time after he was sent home did Mr. Almakhadhi ask to use his FMLA leave, nor did Delaware Park provide notice that it was going to use Mr. Almakhadhi's FMLA time. (See B15; Pl. Dep. at 237, A135) Mr. Almakhadhi had no reason to believe that Delaware Park was using his FMLA time because in the past he had always received a letter about such use. (See, e.g., B28.) Nor at any point after September 2, 2006 did Delaware Park inform Mr. Almakhadhi that his absence from work would jeopardize his job. (Pl. Dep. at 237, A135; see also B16) Indeed, because Mr. Almakhadhi complied with Defendant's instructions and called in each day to ask about light duty work, he had no reason to believe that his job was in jeopardy.

As discussed *supra*, Mr. Almakhadhi had an additional 12 weeks of FMLA time, which became available on October 12, 2005. (A.239; A252)[35] If Delaware Park had informed him that it intended to terminate his employment, he would have used his FMLA time to seek an other position at Delaware Park. (Pl. Dep. at 234, B71) By Delaware Park's actions, Mr. Alkmakhadhi was restrained in the exercise of his FMLA rights and was harmed by his inability to find another position within Delaware Park. As explained by the Supreme Court in See Ragsdale v. Wolverine World Wide, Inc., employer liability is established when an employer fails to properly advise an employee of his FMLA eligibility. Ragsdale, 535 U.S. 81 (2002) (liability under 29 U.S.C. § 2617 lies where employee has been prejudiced by employer's violation). That is the case here.

---

[35] To the extent Defendant relies upon its statement to Mr. Almakhadhi at the time of his termination that he had exhausted his available leave, that statement is in conflict with Defendant's contemporaneous calculation of Mr. Almakhadhi's available leave and therefore creates a genuine issue of material fact. (See A239)

Moreover, the record is clear that Delaware Park's actions in denying Mr. Almakhadhi his FMLA leave were part of its pattern of discrimination and retaliation against him. Indeed, the record evidence shows that Ms. Suhr specifically retaliated against Mr. Almakhadhi because of his prior FMLA use. (A225)

Delaware Park's proffered reasons were not its true reasons, but were merely a pretext for its illegal action. Accordingly, this Court should deny Delaware Park's Motion for Summary Judgment.

## V.    CONCLUSION

For all the foregoing reasons, Plaintiff Sami Almakhadhi respectfully requests that this Court deny Defendant's Motion for Summary Judgment and allow him to test his claims on the merits.

Frank J. Conley, Esquire
**THE CONLEY FIRM**
7715 Crittenden Street, Suite 113
Philadelphia, PA 19118
(216)  836-4789
FConley@ConleyFirm.com

Glenn Brown, Esquire
Bar No. 4669
**Real World Law**
916 N. Union St #2
Wilmington, DE 19805
(303)225-8340
glenn.brown@realworldlaw.com

*Attorneys for Plaintiff Sami Almakhadhi*

Date: 14 December 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SAMI ALMAKHADHI,           :
                                   :
       Plaintiff,          :    No. 07-78-JJF
                                   :
                                   :
v.                                :
                                 :
DELAWARE PARK LLC,       :
                                 :
       Defendant.      :

---

**APPENDIX TO
ANSWERING BRIEF IN OPPOSITION TO
DELAWARE PARK, L.L.C.'S
MOTION FOR SUMMARY JUDGMENT**

---

Frank J. Conley, Esquire
**THE CONLEY FIRM**
7715 Crittenden Street, Suite 113
Philadelphia, PA 19118
(215) 836-4789
FConley@ConleyFirm.com

Glenn Brown, Esquire
Bar No. 4669
**Real World Law**
916 N. Union St #2
Wilmington, DE 19805
(302)225-8340
glenn.brown@realworldlaw.com

*Attorneys for Plaintiff Sami Almakhadhi*

Date: 14 December 2007

**TABLE OF CONTENTS**

Excerpts from Defendant's Responses to
Mr. Almkhadhi's First Set of Interrogatories ----------------------------------------B1

Excerpts from Defendant's Responses to
Mr. Almkhadhi's First Requests for Admission ---------------------------------------B5

September 25, 2007 Letter from F. Conley to W. Voss
concerning, inter alia, need for translator -----------------------------------------B10

October 26, 2007 Letter from W. Voss to F. Conley
concerning Plaintiff's deposition -------------------------------------------------B12

November 16, 2007 Letter from W. Voss to F. Conley
concerning substantive discovery response changes ----------------------------------B13

December 5, 2007 Letter from W. Voss to F. Conley
concerning substantive discovery response changes ----------------------------------B17

Statement of Shannon DeLucia, Executed June 30, 2006  ----------------------------B22

Statement of Karlyn Dixon, Executed June 30, 2006  -------------------------------B23

May 5, 2005 Letter from Delaware Park's Benefits
Department concerning FMLA time --------------------------------------------------B28

Delaware Park's Approvals for Light Duty Requests --------------------------------B29

August 29, 2005 Letter from G. Heckler to L. West
Concerning Mr. Almakhadhi's work related injuries --------------------------------B30

Excerpts from Defendant's Department of Labor Response ---------------------B34

July 29, 2004 Payroll Adjustment Request -----------------------------------------B40

February 17, 2004 Employee Evaluation --------------------------------------------B41

April 19, 2002 Employee Evaluation ------------------------------------------------B42

April 21, 2005 Service Award -------------------------------------------------------B43

E-mail chain begun by Cindy Irwin -------------------------------------------------B44

June 12, 2005 Note from Dr. Bohatiuk ----------------------------------------------B46

June 13, 2005 Letter from Dr. Bohatiuk --------------------------------------------B47

June 26, 2006 Report by Dr. Townsend ----------------------------------------------------B48

March 6, 2006 Report by Dr. Townsend ----------------------------------------------------B51

May 6, 2005 E-mail from N. Cook to C. Irwin and S. Suhr
Concerning 2005 FMLA ----------------------------------------------------------------------B54

May 2, 2005 E-mail from N. Cook to C. Irwin
Concerning 2005 FMLA ----------------------------------------------------------------------B55

April 13, 2005 Note from Christiana Hospital Emergency Department -------B56

April 18, 2005 Note from Dr. Lawrence concerning
time off from work -----------------------------------------------------------------------------B57

April 13, 2005 Discharge Instructions from
Christiana Hospital Emergency Department ------------------------------------------B58

Excerpts from Mr. Almakhadhi's November 8, 2007 Deposition ---------------B60

Exhibit 4 from Mr. Almakhadhi's November 8, 2007 Deposition ---------------B74

Cardenas v. Dorel Juvenile Group, Inc.,
2006 U.S. Dist. LEXIS 37465 (D. Kan. 2006) ----------------------------------------B75

Collins v. Sload, 212 Fed. Appx. 136 (3d Cir. 2007) ---------------------------------B85

Sherrod v. Phila. Gas Works, 57 Fed. Appx. 68 (3d Cir. 2003) -------------------B91

Verdin v. Weeks Marine, Inc., 124 Fed. Appx. 92 (3d Cir. 2005) ---------------B100

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | |
| | ) | |
| Defendant, | ) | |

**DEFENDANT DELAWARE PARK LLC'S RESPONSES**
**AND OBJECTIONS TO PLAINTIFF SAMI ALMAKHADHI'S**
**FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Delaware Park, L.L.C. ("Delaware Park" or "Defendant"), by and through its undersigned counsel, hereby submits its responses and objections to Plaintiff Sami Almakhadhi's First Set of Interrogatories.

**GENERAL LIMITATIONS AND OBJECTIONS**

1.      Delaware Park's specific objections set forth below are in addition to the general limitations and objections set forth in this section. These limitations and objections form a part of the response to each and every interrogatory. Thus, the absence of a reference to a general limitation or objection should not be construed as a waiver of the general limitation or objection as to a specific interrogatory.

2.      Delaware Park submits these responses and objections without conceding the relevancy or materiality of the subject matter of any interrogatory and without prejudice to Delaware Park. Delaware Park expressly reserves the right to object to further discovery into the

To the best of Delaware Park's knowledge, other individuals to whom light duty assignments were offered in the period September 2005 through Plaintiff's termination from employment had suffered work place injuries, but had not provided inconsistent medical information, had not treated with multiple care providers, and had not worked in apparent violation of existing medical restrictions.

3A.     Provide the following information regarding all (Satellite, Main Bank and Booth cashiers) who were given light duty during the period of May 18, 2004 until my termination and for each individual identify the following:

   a.     Name, address and phone number.
   b.     The medical restriction for each one
   c.     Delaware Park opinion about the severity of their restrictions comparing with mine.
   d.     Whether or not Delaware Park terminate their job and after how long.

**RESPONSE:**

Delaware Park objects to this Interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, harassing, overly broad, and unduly burdensome. Delaware Park further objects to the extent that the Interrogatory calls upon Delaware Park to make a comparison between Plaintiff and other individuals, when in fact Delaware Park never made such a comparison. Subject to and without waiving the foregoing objections, Delaware Park identifies the following employees who were provided light duty assignments in the Cage Department during the identified period:

Samuel Brackbill, Booth Cashier

Helen Brown, Satellite Cashier

Andrew Davis, Satellite Cashier

Donna DiOrio, Booth Cashier

Christie Dow, Booth Cashier

Charlotte Foley, Main Bank

Kathleen Hannah, Satellite Cashier

Antoinette Hayes, Booth Cashier

Renee Hayes, Booth Cashier

Steveni Keeley, Satellite Cashier

B2

Holly Lea, Booth Cashier

Natalya Love, Satellite Cashier

Shelby Rayfield, Booth Cashier

Janet Small, Satellite Cashier

Heather Steele, Booth Cashier

Michael Thompson, Booth Cashier

Michele Thompson, Booth Cashier

Holly Twaddell, Booth Cashier

Lawrence Young, Booth Cashier

Delaware Park identifies the following individuals whose employment was terminated during the period May 2005 through August 2006, after each employee had been provided with and exhausted available medical leave, but was unable to return to full duty:

Kenneth Bonds, Security Department

Joshua Y. Dean, Cage Department, Booth Cashier

Mary C. Glenn, Slots Department, Floor Attendant

Wilson T. Jackson, Slots Department, Players Club Representative

Donald Lloyd, Housekeeping Department

Lorraine McHugh, Player Development Department, Host

Deborah Navecky, Slots Department, VLT Technician

Thomas C. Payne, Emergency Medical Technician

Sandra L. Prince, Food & Beverage Department, Cocktail Server

Cynthia Smith, Slots Department, Floor Attendant

Michael Talley, Restorer

Holly Twaddell, Cage Department, Main Bank

Corrinne Williams, Surveillance Shift Supervisor

Please also see documents with Bates numbers DP-0149 - 0160 and DP0669 - 0670.

6

**B3**

for payment of the 2005 "holiday gift" was not a factor in the decision to terminate his employment.


8.    Explain why I did not have interview for surveillance officer when I filed transfer form on 4/5/05.

**RESPONSE:**

Delaware Park is unable to provide specific information in response to this Interrogatory. Individuals responsible for the recruiting process in the Surveillance Department have no specific recollection of Plaintiff's request for transfer or the reasons he was not interviewed for the position. Delaware Park has confirmed that Plaintiff submitted a transfer application for a Surveillance position to Delaware Park's Human Resources Department on or about April 6, 2005, and that the application form was forwarded to the Surveillance Department shortly thereafter.


9.    Explain why you provide incorrect information during the investigation by Department of Labor regarding the employees who denied light duty such as ( Hayes, Antionette and Keeley, Stephanie and Dowell, kristy) and some names unknown like Haskins, Marsalis and Beavers, Laurie even you went beyond the Relevant period like Ms. Twaddell who was terminated on August, 2006.

**RESPONSE:**

Delaware Park objects to this Interrogatory on the grounds that it is vague, ambiguous, unintelligible, overly broad, and unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, it is argumentative and assumes facts as true which are not true. Delaware Park denies that it is provided incorrect information to the Delaware Department of Labor during the agency's investigation.


10.    For each of Plaintiff's request for Admission that you do not unequivocally admit, state all facts supporting your decision not to admit.

**RESPONSE:**

Delaware Park incorporates as though fully set forth herein its responses to Plaintiff's First Requests for Admission, and refers Plaintiff to those responses.

**B4**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT DELAWARE PARK LLC'S RESPONSES
AND OBJECTIONS TO PLAINTIFF SAMI ALMAKHADHI'S
FIRST REQUESTS FOR ADMISSION**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant Delaware Park, L.L.C. ("Delaware Park" or "Defendant"), by and through its undersigned counsel, hereby submits its responses and objections to Plaintiff Sami Almakhadhi's First Requests for Admission, as follows:

**GENERAL OBJECTIONS**

Delaware Park submits these responses and objections without conceding the relevancy or materiality of the subject matter of any request and without prejudice to Delaware Park. Delaware Park expressly reserves the right to object to further discovery into the subject matters of the requests or to object to the introduction into evidence of any information provided.

**REQUESTS FOR ADMISSION**

1.    Admit that I was terminated on February 12, 2006.

**RESPONSE:**

Admitted that plaintiff's employment with Delaware Park was terminated effective February 12, 2006; denied that all administrative steps in the termination process were completed by February 12, 2006. With the apparent exception of a letter to Plaintiff advising him in writing

dated March 30, 2006, Shannon DeLucia informed plaintiff in writing that his employment was terminated effective March 10, 2006. By way of clarification, please also see response to Request number 1.

8.      Admit that Delaware Park told me on their letter to me dated on March 30, 2006 that I supposed to receive a letter from human resources several weeks ago advising me about the termination on March 10th, 2006 and that was not true.

**RESPONSE:**

Delaware Park admits that, by letter from Shannon DeLucia dated March 30, 2006, plaintiff was advised that Delaware Park's Human Resources Department should have advised him several weeks ago that his employment was terminated. Delaware Park denies that this statement was not true. The usual practice of Delaware Park's Human Resources Department is to complete its administrative process, including a letter to the employee providing written notice of termination, shortly after the effective date of the termination. Such a letter should have been sent to Plaintiff when Delaware Park went through its administrative process of documenting the termination, and apparently was not.

9. Admit that Delaware Park force me to go home on September02, 2006. and inform me to call in each day to advise my supervisor that I will be out and verify whether my restrictions could be accommodated and return to work or if I remain out of work. Then terminate my job because I was calling out every day leave of absence (LOA).

**RESPONSE:**

Delaware Park objects to this Request on the grounds that it is compound, vague and ambiguous, and argumentative. Subject to and without waiving its objections, Delaware Park states as follows: Admitted that Plaintiff was sent home on September 2, 2005 and instructed to call his department during his absence. Admitted that Plaintiff's employment was terminated. Denied that Plaintiff was required to verify his restrictions each day between September 2, 2005 and his termination and/or to ask each day whether he would be assigned work that accommodated such restrictions. Denied that Plaintiff employment was terminated because he called in repeatedly to his department during his absence. By way of further response, Delaware Park states that on September 2, 2005, in response to Plaintiff's questions regarding the availability of light duty work, and because Plaintiff seemed unwilling to accept the decision that he would not be offered a light duty assignment, Plaintiff was told he could also discuss these issues with his department. Plaintiff's employment was terminated on February 12, 2006 (and later modified to March 10, 2006) as a result of Plaintiff's long period of absence and continuing inability to return to work. The fact that Plaintiff called in repeatedly to his department during his absence was not a factor in Delaware Park's decision to terminate Plaintiff's employment. In making its decision to terminate Plaintiff's employment, Delaware Park considered the following information: (1) Plaintiff had not been actively at work since August 2005, (2) Plaintiff

4

continued to be subject to medical restrictions that were inconsistent with his job duties; further, Plaintiff had represented that he was unable to perform those duties, and (3) based on the information available to Delaware Park, it appeared that Plaintiff would not be released from his medical restrictions or able to perform his job duties in the foreseeable future.

10. Admit that Ms. Karlyn Dixon is the one who made the decision to not accommodate my restriction on September 02, 2006.

**RESPONSE:**

Denied.  Shannon DeLucia made this decision.

11. Admit that Delaware Park told me that they have my address wrong and they send the termination letter on February 12, 2006. to the wrong address and all that lie because there was no letter sends.

**RESPONSE:**

Denied.  In response to Plaintiff's inquiry, a Delaware Park employee advised Plaintiff that his termination letter might have been sent to the wrong address and that he (the employee) would check to see if that was the case.  The employee told Plaintiff he would receive a letter, but did not tell Plaintiff a letter had been sent on February 12, 2006.

12. Admit that I had the interview for the position in main bank on January,2005 after I was told by my supervisor that the positions were filed and I was not chosen and that was a management team decision.

**RESPONSE:**

Delaware Park objects to this Request on the grounds that it is compound, vague and ambiguous, irrelevant and not reasonably calculated to lead t the discovery of admissible evidence.  Subject to and without waiving its objections, Delaware Park states as follows: Admitted that Plaintiff was interviewed for a Main Bank Cashier position in January or February 2005.  Admitted that the successful candidate was chosen prior to Plaintiff's interview. Admitted that the management team in the Cage Department made the decision regarding the successful candidate.  By way of further response, Delaware Park apologized to Plaintiff for this error in procedure.

5

B7

15.    Admit that I never violated Delaware Park policy regarding light duty simply because I never had light duty.

**RESPONSE:**

Admitted that Plaintiff was never assigned light duty. Denied that Plaintiff did not violate Delaware Park policies. Plaintiff acknowledged to Delaware Park on at least two occasions that he had been working in a full duty capacity when he knew he should have been working subject to medical restrictions, and that he had not advised Delaware Park of such restrictions. Employees are expected to advise Delaware Park of medical restrictions that are inconsistent with the requirements of their positions and otherwise to engage in safe work place behaviors.

16.    Admit that Delaware Park was denying my worker's compensation claim from 5/18/04 until 11/8/05.

**RESPONSE:**

Delaware Park objects to this Request on the grounds that it is irrelevant to the claims and defenses in the litigation.

17.    Admit that when I was send home on September 1,2005 I was not under worker's compensation benefits.

**RESPONSE:**

Delaware Park objects to this Request on the grounds that it is irrelevant to the claims and defenses in the litigation.

18.    Admit that I request light duty on April 29, 2005 and after a few minutes later I was called to the office and kicked out from the company.

**RESPONSE:**

Admitted that plaintiff requested light duty on or about April 29, 2005. Denied that plaintiff was kicked out from the company. At that time, plaintiff was subject to medical restrictions that prohibited him from performing all the functions of his job, and Delaware Park placed him on FMLA leave for the period April 13, 2005 through June 13, 2005. Plaintiff returned to his position on June 14, 2005.

B8

# THE CONLEY FIRM

7715 CRITTENDEN STREET
SUITE 113
PHILADELPHIA, PA 19118-4421
www.conleyfirm.com

FRANK J. CONLEY

TELEPHONE 215.350.5885
FACSIMILE 215.689.0946
E-MAIL fconley@conleyfirm.com

25 September 2007

Wendy Voss
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington Delaware • 19801

Re:    Almakhadhi v. Delaware Park, D.DE. No. 07-78 (JJF)

Dear Wendy:

Thank you for your letter and e-mail of last night, attaching discovery responses from Mr. Almakhadhi that Delaware Park contests are insufficient. As you know from my letter of 19 September, access to these documents was not an issue—my concern was to ensure that both parties were working from the same set of documents so that we could avoid any unnecessary waste of resources and the needless expenditure of time.

Now that these documents are in hand, I will be able to review them, discuss them with my client, and determine if any supplements are necessary.  Although I share Delaware Park's interest in the expeditious resolution of these discovery issues, I must, however, decline to be held to any arbitrary deadline unilaterally set by Delaware Park. As you know, I entered my appearance little more than a week ago, and my attention has been focused on reviewing the relevant documents and amending Mr. Almakhadhi's Complaint to enable this case to proceed more efficiently than it has to date. Moreover, Delaware Park's arbitrary response deadline of "the end of the week" is unreasonable: I only received the relevant discovery documents from you yesterday evening.

If your client nevertheless believes that it is in its best interest to file a motion to compel, so be it. I suggest, though, that any such motion would likely be moot by the end of Mr. Almakhadhi's motion response period. Moreover, Delaware Park's intended gamesmanship concerning the delivery of its responsive discovery documents to Mr. Brown rather than directly to my attention tends to undercut any motion to compel it may file.

**B9**

Wendy Voss
25 September 2007
Page 2

Concerning Mr. Almakhadhi's deposition, please provide dates you are available and I will coordinate my schedule with Mr. Almakhadhi's. In the meantime I will determine what dialect of Arabic Mr. Almakhadhi speaks so that Delaware Park may obtain an appropriate translator for his deposition.

Finally, concerning Mr. Almakhadhi's Amended Complaint, you will recall that when we spoke by telephone on 13 September I made a good-faith, collegial effort to provide you with an outline of Mr. Almakhadhi's Amended Complaint, and explained that the purpose of the Amended Complaint was to clarify the factual and legal bases for his lawsuit so that this litigation might proceed more efficiently and expeditiously. As you know, Mr. Almakhadhi is a recent emigrant with limited language abilities and he is unschooled in law. His Pro Se Complaint is, accordingly, inadequate.

As I further explained when we spoke on 13 September, Mr. Almakhadhi's Amended Complaint will describe his claims with more specificity than allowed on the form complaint the Clerk's office provided to Mr. Almakhadhi. The claims in his proposed Amended Complaint are fairly within the scope of his Pro Se Complaint and his Delaware Department of Labor Charge of Discrimination and, indeed, have been the subject of the discovery that has taken place thus far between the parties (and before my recent entry in the case). Accordingly, none of Mr. Almakhadhi's amendments will surprise or prejudice Delaware Park.

To continue my good faith and collegial efforts, I will reiterate the explanation I provided during our conversation on 13 September, to wit, that the claims in Mr. Almakhadhi's Amended Complaint arise under Title VII and the Delaware Discrimination in Employment Act for national origin and race discrimination, etc.; the ADA and the Delaware Handicapped Persons Protection in Employment Act for disability discrimination, etc.; the FMLA for denial of leave and retaliation; and the Delaware Worker's Compensation Act for wrongful termination and retaliation.

This summary of Mr. Almakhadhi's claims should be sufficient for Delaware Park to determine its position concerning Rule 15 consent. (Based upon the approach to this litigation that Delaware Park has taken thus far, I do not believe that it is in my client's best interest to provide Delaware Park with an advance copy of Mr. Almakhadhi's Amended Complaint, as you requested in your 14 September 2007 letter.)  Therefore, please let me know whether Delaware Park will provide its written consent

**B10**

Wendy Voss
25 September 2007
Page 3

to Mr. Almakhadhi so that he may amend his complaint, allowing this litigation to proceed more efficiently and expeditiously than it has thus far. I trust Delaware Park will be timely in its response.

Best regards,

Frank Conley

cc:    Glenn Brown, Esquire (via e-mail)

**B11**



**Potter Anderson & Corroon LLP**

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

Wendy K. Voss
Partner
Attorney at Law
wvoss@potteranderson.com
302 984-6076  Direct Phone
302 658-1192  Fax

October 26, 2007

<u>Via Electronic & First Class Mail</u>
Frank Conley, Esquire
The Conley Firm
7715 Crittendon Street, Suite 133
Philadelphia, PA  19118

Re:    *Almakhadhi v. Delaware Park*, Civil Action No. 07-78-JJF

Dear Frank:

   I am writing in regard to Mr. Almakhadhi's deposition date.  Since you have not responded to my request for a date (and my calendar is rapidly filling up), I will notice the deposition for November 6, 2007.  In light of the case scheduling order, I do not believe we can reasonably delay beyond that date.  As you are aware, I do not believe a translator will be required, as Mr. Almakhadhi was employed for a significant period of time, continuously communicated in English during his employment, and effectively communicated for purposes of self-representation prior to your entry in the case.

Sincerely yours,

Wendy K. Voss

WKV:drt/827958

cc:  Glenn A. Brown, Esquire (w/ encl., via electronic mail)

**B12**



**Potter Anderson & Corroon LLP**

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

Wendy K. Voss
Partner
Attorney at Law
wvoss@potteranderson.com
302 984-6076  Direct Phone
302 658-1192  Fax

November 16, 2007

**Via Electronic & First Class Mail**
Frank Conley, Esquire
The Conley Firm
7715 Crittendon Street, Suite 133
Philadelphia, PA  19118

Re:    *Almakhadhi  v. Delaware Park*, Civil Action No. 07-78-JJF

Dear Frank:

I am writing in response to your letter of November 10, 2007 regarding Delaware Park's discovery responses, and in regard to a few "miscellaneous" discovery matters.

As to the "miscellaneous" matters, enclosed herewith please find those additional medical records we have received to date (Bates Nos. DP0782-DP0791), a copy of the Satellite Cashier position description (Bates No. DP0792), and documentation of matters raised in Mr. Almakhadhi's deposition on November 8 (Bates Nos. DP0781, DP0793-DP0796).

In regard to your letter of November 10, please be advised that Delaware Park has not withheld relevant discovery or acted contrary to its obligations in this litigation.  Contrary to the wholly unsupported assertions in your letter, Delaware Park made a diligent search of its files and records and – as agreed with Mr. Almakhadhi at the parties' Rule 26(f) conference – produced responsive documents in hard copy form.  In an attempt to allay your unfounded fears, we nonetheless have reviewed our document production.  In doing so, we identified one copy error, which resulted in the omission of Mr. Almakhadhi's 2005 attendance chart from his personnel file.  That document (front and back side) has been numbered as DP0539a and DP0539aa, and is enclosed.  (I am endeavoring to obtain a better copy, and will provide a substituted copy if that effort is successful.)

In regard to the specific discovery responses discussed in your letter, we respond as follows:

Request for Production Nos. 2 and 5B:  As stated in my earlier letter, I fail to see how Delaware Park's grant of FMLA leave to Plaintiff on each occasion he sought such leave is

**B13**

Frank Conley, Esquire
November 16, 2007
Page 2

evidence of discrimination, and your unsupported assertion that documentation regarding Plaintiff's various requests for FMLA leave is relevant to his discrimination claims does not make it so. Furthermore, I continue to find these requests to be unintelligible, as they do not clearly identify the documents sought by Plaintiff. In an attempt to finally resolve this, and subject to and without waiving its objections, Delaware Park is producing herewith documents evidencing Plaintiff's various requests for FMLA leave (e.g., FMLA certification forms), Delaware Park's response thereto, and any internal communications concerning such request(s)), to the extent such documents have not already been produced. See Bates Nos. DP0866-DP0918.

Interrogatory No. 3A: As agreed in my earlier letter, enclosed herewith please find responsive documents setting forth the work restrictions of the Booth, Satellite, and Main Bank Cashiers who were granted light duty during the responsive period (Bates Nos. DP0797-DP0865), which have been marked "Highly Confidential – Attorneys' Eyes Only" in accordance with the agreement in your letter of November 10 to treat them as such. It was necessary to recall these documents from storage (all of which have not yet been located by the storage company – Delaware Park is working with the storage company on this issue), so it has taken some time to assemble the responsive information. Delaware Park's search for responsive documents is continuing, and we reserve the right to produce additional documentation, if and when such documents are located.

Also, enclosed as Bates No. DP0919 is the information regarding the initial dates of light duty and termination dates (if applicable) of those Booth, Satellite, and Main Bank Cashiers who were granted light duty in the responsive time period.

Interrogatory No. 5: Delaware Park hereby amends its response to this interrogatory as contained in my letter of November 5, 2007. By way of explanation (and to assure you that Delaware Park was not attempting to avoid discovery or provide incorrect information), in making that response I relied upon Mr. Almakhadhi's supervisors, who advised me they had no specific recollection that he had applied for transfer to any position(s) prior to 2004, and a review of his personnel file (where I understood such documentation normally would be filed). At that time, I was unaware that in 2004 Delaware Park had changed its record-keeping system regarding applications for transfer. To the extent my inquiry was insufficient, the failing was my own. Based on Mr. Almakhadhi's deposition testimony, I made further inquiries regarding positions for which Mr. Almakhadhi may have applied during the period 2002 – 2004. Delaware Park's Human Resources Department advised me of the change in record-keeping procedure, and was able to provide further information regarding applications made by Plaintiff. Subject to and without waiving Delaware Park's objections regarding the relevancy of the information, that information is set forth below:

**B14**

Frank Conley, Esquire
November 16, 2007
Page 3

| App. Date | Position | Disposition |
|---|---|---|
| 4/30/2002 | Heavy Equipment Operation | Referred to department |
| 8/29/2002 | Satellite Cashier | Referred to department |
| 5/6/2003 | Satellite Cashier | Filed |
| 6/23/2003 | Satellite Cashier | Referred to department |
| 7/14/2003 | Cashier Shift Supervisor | Referred to department |
| 12/08/2003 | VLT Technician | Filed |
| 2/05/2004 | Cashier Shift Supervisor | Referred to department |
| 5/24/2004 | Satellite Cashier | Selected for position |
| 9/02/2004 | Main Bank Cashier | Referred to department |

Each of the applications was submitted to the Human Resources Department for initial review. In those cases where the application was "filed," the application was not referred to the department. In each of the remaining cases, the application was referred to the department for further consideration.

Request for Admission No. 16: A response to this Request for Admission was provided in my prior letter, subject to Delaware Park's continuing objections. Delaware Park does not agree to withdraw its objections – if in fact that was the point of the comments in your letter (and which otherwise make no sense to me with respect to the status of Request for Admission No. 16, given that a response was provided.)

As to the Requests for Production discussed in your letter (i.e., Requests Nos. 6, 7, 8, and 9), it is apparent that you are simply trying to re-write these requests to obtain additional discovery better suited to the claims asserted in the (proposed) First Amended Complaint. Delaware Park already has responded to the actual requests, which certainly did not "encompass communications between Delaware Park and its insurance carrier" (presumably in reference to Plaintiff's worker's compensation claims). Regardless, responsive documents between Delaware Park and its insurance carrier already have been produced.

Request for Admission No. 19 and 20: I do not agree with your characterization of Plaintiff's DDOL Charge, his pro se complaint, or even his (proposed) First Amended Complaint. Further, I note again that I provided a response to Request for Admission No. 19 in my prior letter.

In regard to Request for Admission No. 20, subject to and without waiving its objections, Delaware Park provides the following response: Delaware Park denies this Request as stated. By way of further response, Delaware Park states it advised Plaintiff by letter dated May 5, 2005 (Bates No. DP0042) that he was approved for FMLA leave for the period 4/13/05 until 6/13/05, and that he would exhaust all available FMLA leave time on 6/13/05; Plaintiff returned to work from FMLA leave on June 14, 2005. By letter dated March 30, 2006 (Bates No. DP0052), Delaware Park again advised Plaintiff that he had exhausted all available FMLA

**B15**

Frank Conley, Esquire
November 16, 2007
Page 4

leave.  Between the dates September 2, 2005 and March 29, 2006, inclusive, Delaware Park did not correspond with Plaintiff in regard to his FMLA status.

Sincerely yours,

Wendy K. Voss

WKV:drt
Enclosures (by mail only)
cc:  Glenn A. Brown, Esquire (w/encl., via first class mail)

832030v1 / 14276-132

**B16**



**Potter Anderson & Corroon LLP**

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

Wendy K. Voss
Partner
Attorney at Law
wvoss@potteranderson.com
302  984-6076  Direct Phone
302  658-1192  Fax

December 5, 2007

**<u>Via Electronic & First Class Mail</u>**
Frank Conley, Esquire
The Conley Firm
7715 Crittendon Street, Suite 133
Philadelphia, PA  19118

Re:    *Almakhadhi  v. Delaware Park*, Civil Action No. 07-78-JJF

Dear Frank:

I am writing to amend Delaware Park's response to Plaintiff's Interrogatory number 5.  Recently it came to my attention that Delaware Park's response to Interrogatory number 5 was mistaken, in part.  Specifically, that response incorrectly stated that Mr. Almakhadhi's January 2005 application for the position of Impress Supervisor was forwarded to the Cage Department for its consideration and that he was not awarded the position because of concerns of Department management.  The response should have stated (and Delaware Park hereby amends its response) as follows in regard to that application:

On or about January 30, 2005 Plaintiff filled out a transfer application for an Impress Supervisor (Cage Department) position.  This request was submitted to Delaware Park's  Human Resources Department on February 2, 2005, where it was reviewed by Human Resources department representative Kim Pugh.  Ms. Pugh made no record that she had forwarded the application to the Cage Department for its further review; upon information and belief, Delaware Park believes she did not do so.  The Cage Department managers were not aware that Mr. Almakhadhi had filed this application.  Ms. Pugh left Delaware Park's employment some time ago, and current employees have no knowledge regarding the reasons for her actions.

Sincerely yours,

Wendy K. Voss

WKV/drt
835393v1

**B17**

## STATEMENT OF SHANNON DELUCIA

1. My name is Shannon DeLucia. I am employed by Delaware Park LLC ("Delaware Park" or the "Company") and am aware of the charge of discrimination filed by Mr. Sami Almakhadhi against the Company on or about April 26, 20062, No. 06040190W/17C-2006-00837 (the "Charge"). I make this statement in connection with the Delaware Department of Labor's investigation of that Charge.

2. At all times relevant to the Charge, I served in the position of Director of Risk Management. (I currently serve as Executive Director of Human Resources.) In that position, among other duties, I was responsible for monitoring worker's compensation claims filed by the Company's employees and administering the Company's return-to-work and light duty procedures.

3. Generally, when an employee of Delaware Park is injured at work, we attempt to get the employee back to work as soon as possible while working with the employee to ensure that he or she does not engage in activities that might exacerbate the injury. If employees are released to work by their treating physicians under restriction, the Company will provide light duty work consistent with those restrictions, **if** such work is available. Even then, employees are advised that such assignments are by definition temporary, and that the Company cannot ensure that it will have light duty work available. When such work is available, employees are explicitly informed (and are required to sign a document acknowledging) that they are responsible for complying with all such restrictions. If an employees fail to comply with his/her doctor's restrictions, which obviously could put the employee at risk for further injury, the employee is not permitted to perform further light

1

duty work and may only return to work upon presentation of a full release from the treating physician.

4. In 2005, Mr. Almakhadi suffered a workplace injury to his back that resulted in his being out of work from April 13 until June 13, 2005. On or about May 18, 2005, he filed a worker's compensation claim based on this injury, which he reported was related to a prior injury he had suffered at work in late 2003. During the period he was out of work, he used FMLA leave, which he fully exhausted immediately before returning to work. When he returned to work on June 14, 2005, he presented a note from his doctor stating that he was fully released to work. At that time, he returned to his regular position, and performed all of his regular duties.

5. In late August 2005, I received a report regarding the results of a defense medical examination of Mr. Almakhadhi that had been conducted at the request of Delaware Park's attorney responsible for defending the worker's compensation suit brought by Mr. Almakhadhi. That report, from Dr. Townsend, advised that Mr. Almakhadhi had been placed under certain restrictions by his treating physician, and that Dr. Townsend agreed that such restrictions were both necessary and appropriate. The restrictions included limited lifting, standing, walking, bending, and twisting, and apparently had been imposed up to several months prior to Dr. Townsend's report by Mr. Almakhadhi's own physician.

6. This information was in conflict with the information that had been provided by Mr. Almakhadhi upon his return to work the prior June (i.e., that he was fully released for work). Therefore, I immediately got in touch with his department director, Karlyn Dixon, to see if she was aware of any restrictions that had been imposed on Mr.

2

Almakhadhi. She was not, and reported that Mr. Almakhadhi had been performing his job and had not mentioned being under any restrictions.

7.  I immediately instructed that Mr. Almakhadhi be sent home until his situation could be clarified, and requested that he provide a doctor's note dated August 25, 2005 (the date of Dr. Townsend's report) or later specifying what, if any, restrictions he might have. On or about September 2, 2005, Mr. Almakhadhi provided his doctor's note, confirming the various restrictions listed above. These restrictions were completely inconsistent with the requirements of his position, and it was clear that he would not be able to perform his regular job duties while subject to such restrictions. When I discussed this with Mr. Almakhadhi, he mentioned that this was why he had not told anyone about the restrictions – he assumed he would be sent home. In short, he purposefully withheld this information from Delaware Park .

8.  Thereafter, I again discussed the situation with Ms. Dixon. She was in agreement that Mr. Almakhadhi's restrictions prohibited him from performing nearly all of his job duties and that it would be difficult to identify any appropriate, light duty work. In light of her comments, and my concern that he purposefully had violated his doctor's restrictions for a period of several months, I felt it was in the Company's best interests not to assign him to light duty (and which in any event would be difficult to identify and perhaps unavailable). Furthermore, in light of the physical requirements of the jobs of all employees in the Cage Department, there is very little, if any, light duty work that is available. Even if Mr. Almakhadhi's restrictions had not been so severe it still would have been difficult to find a light duty placement for him.

3

9. Therefore, based on my conversation with Karlyn Dixon, I could not offer light duty work to Mr. Almakhadhi, and I instructed his department management that Mr. Almakhadhi should be informed that he could not return to work until his medical situation was reevaluated or he was released by his physician to full duty.

10. Mr. Almakhadhi never was released to full duty.  However, Delaware Park was later informed that he was scheduled to have surgery in November 2005 to remedy his back problem.  At that point, I decided to wait to reevaluate his situation until after the surgery. In early December 2005,  I learned that Mr. Almakhadi had declined to have the surgery performed, and had also declined certain other treatments recommended by his physician, and that his medical condition had not changed.

11. In early February 2006, when we had received no further information regarding Mr. Almakhadhi's situation, I instructed his department managers to give Mr. Almakhadhi a deadline of February 12, 2006 to return to work, and told them to tell him that a full release from his physician would be required.  His management reported back to me that Mr. Almakhadhi first said that he would be returning to work and would provide a release, but later stated that he would not be returning to work because his physician would not release him and that he was unable to perform his job duties.

12. Based on this report by Mr. Almakhadhi, I made the decision to terminate his employment.  His department managers needed to fill the position, and there was no expectation at that point that Mr. Almakhadhi would be returning to active work.  After several attempts to reach him by telephone, I sent him a letter telling him that his employment was terminated effective March 10, 2006.

B21
DP0016

13. Throughout this time period, including when I made the decision regarding light duty and to terminate his employment, I was completely unaware that Mr. Almakhadhi had made complaints of discrimination in the past. I only became aware of this as a result of the investigation of the allegations made by Mr. Almakhadhi in his Charge.

14. I deny absolutely that I made these decisions on the basis of Mr. Almakhadhi's race or national origin, any alleged disability, or any other prohibited basis. Light duty was inappropriate for Mr. Almakhadi due to the very significant limitations on his physical activities, the fact that he had violated these restrictions over a period of time, and his failure to even advise the Company that he was subject to such restrictions. As stated above, if the Company becomes aware that an employee is violating their work restrictions, that employee will be sent home – which was exactly the result with Mr. Almakhamadhi. The decision to terminate his employment was based on the need to fill the position, coupled with the lack of any information indicating that Mr. Almakhadhi might return to work in the near future.

SHANNON MAGUIRE DELUCIA

Dated: June 30, 2006

739083

5

B22
DP0017

## STATEMENT OF KARLYN DIXON

1. My name is Karlyn Dixon. I am employed by Delaware Park LLC ("Delaware Park" or the "Company") and am aware of the charge of discrimination filed by Mr. Sami Almakhadhi against the Company on or about April 26, 20062, No. 06040190W/17C-2006-00837 (the "Charge"). I make this statement in connection with the Delaware Department of Labor's investigation of that Charge.

2. During the time period relevant to the Charge, I served in the positions of Assistant Director of Accounting and Director of Accounting. In both these positions, Mr. Almakhadhi, who was a Booth Cashier, ultimately reported to me (through several levels of management).

3. In 2004, Mr. Almakhadhi applied for and was selected for the position of Satellite Cashier, which was considered a promotional opportunity. He completed the two week training period for the new position, but then exercised his right under the applicable Collective Bargaining Agreement to return to the Booth Cashier position. Like other Booth Cashiers, Mr. Almakhadhi occasionally worked after that on a temporary basis as a Satellite Cashier, but he never formally assumed the position of Satellite Cashier.

4. On two subsequent occasions (most recently in February 2005), Mr. Almakhadhi applied to be a Main Bank Cashier, which again was considered a promotional opportunity. Both times the department managers (including Stacy Suhr, Assistant Cage Manager and the other managers in the department) came to a consensus that he was not the most qualified candidate. The managers recommended other candidates for the position, and I

1

approved those selections; the selections also were approved by Kevin DeLucia, Vice President for Finance, before the decisions were finalized.

5.  When he was not selected in February 2005 to be Main Bank Cashier, I understand that Mr. Almakhadhi complained to Micki Nardo, Delaware Park's Director of Human Resources, that he had not been selected because of "discrimination" or because I did not like him. That is not true. The selections were made based on the consensus opinion of all the department managers and, while I approved and agreed with those decisions, I did not change the outcome of the selections made by the group. I am confident based on discussions with his managers that the decisions were made without regard to the race, national origin, or other protected characteristics of the individuals involved. Rather, the decisions were made based on a number of factors, including the candidates' work history and relevant experience. While Mr. Almakhadhi was not the first choice for the particular positions he sought, he was encouraged to apply again for the position of Satellite Career, which we all felt would be a developmental step in his career and would put him in a better position to compete for even higher level positions. Unfortunately, he did not take that advice.

6.  In any event, I understand that Ms. Nardo found no evidence to support his claim of discrimination and after she had met with him privately she arranged a group meeting that she, Mr. Almakhadhi, Kevin DeLucia and I all attended. The purpose of that meeting was to clear the air and to try to explain once again to Mr. Almakhadhi why he had not been selected for the Main Bank Cashier position and what he might do to enhance his career prospects.

B24
DP0019

7. Despite these efforts, Mr. Almakhadhi did not appear to accept and certainly did not follow our advice. Other employees reported that he intended to apply for various positions, get the initial training, and then withdraw his application – all with the (misguided) intent of gaining sufficient experience in a variety of positions to ultimately be promoted to a supervisory position.

8. Mr. Almakhadhi's final application for a promotional opportunity occurred in August 2005, when he applied for an open position at an even higher level as an Impress Supervisor. Again, it was determined by his supervisors, including Ms. Suhr, that he was not the most qualified candidate, and on their recommendation the job went to Penny Payne. Unlike Mr. Almakhadhi, who did not have any of the following qualifications, Ms. Payne had over seven years' supervisory experience, previous experience working in Las Vegas as a Cage Cashier, experience with Delaware Park working on a regular basis as a Satellite Cashier and, while working as a Satellite Cashier, experience working closely with Delaware Park Impress Clerks with whom she had established a positive working relationship. Under all of the circumstances, Ms. Payne was the candidate with the best qualifications for the job and was offered the position.

9. I deny absolutely that Mr. Almakhadhi's race, national origin, alleged disability, or any other improper factor was considered when these decisions were made. The supervisors in the department never discussed such matters with me, and used sound business judgment based on the candidates' qualifications in making their recommendations.

10. In regard to his alleged disability, I know only that in 2005 Mr. Almakhamadi suffered a workplace injury to his back and was out of work for approximately two months beginning in April 2005. When he returned to work in June 2005, he provided a full

B25

DP0020

release from his doctor, and returned to performing his regular job duties. I was not aware of any condition that might be a disability, and since he was performing his job (which can be quite physically demanding) on a daily basis, do not believe that he suffers from a disability.

11. In late August, however, I was contacted by Shannon DeLucia, who was then Delaware Park's Director of Risk Management, who wanted to know if I was aware of any restrictions imposed on Mr. Almakhadhi by his doctor. I told her I was not and that Mr. Almakhadhi was performing his regular job. Apparently, Ms. DeLucia had been advised that he had some restrictions, and shortly after our conversation she directed that he be sent home until he could provide further clarification from his doctor.

12. From that point forward, Ms. DeLucia was responsible for decisions regarding Mr. Almakhadhi's work status (in regard to his work restrictions and worker's compensation claim) and I and the other department managers were no longer involved, other than to convey information to Mr. Almakhadhi as directed by Ms. DeLucia.

13. Not too long after our first conversation, Ms. DeLucia and I spoke again to review restrictions confirmed by Mr. Almakhadhi's doctor, and whether as a department we would be able to provide work within those restrictions. I told Ms. DeLucia that the restrictions were quite stringent in light of the job requirements, that it was unlikely that we would be able to find much for him to do, if we could find anything at all. Ms. DeLucia ultimately made the decision that light duty work would not be offered, and that Mr. Almakhadhi would not be permitted to return to work until his medical situation was reevaluated or he was released by his physician to full duty. He did not return to work, and I understand that he never got such a release.

4

14. In early February 2006, we still had not received any information from Mr. Almakhadhi's about his situation, and we therefore asked Ms. DeLucia whether we needed to continue to hold his job. Mr. Almakhadhi had been out of work for a long time, and business demands required that we fill the position. Ms. DeLucia told us to give Mr. Almakhadhi a deadline of February 12, 2006 to return to work, and to tell him that a full release from his physician would be required. The Cage Manager (i.e., the department manager), Bev Pope, provided that information to Mr. Almakhadhi, who ultimately told her that he would not be able to return to work, that he had not been and would not be released by his doctor and was unable to perform his job duties. Ms. DeLucia then made the decision to terminate his employment and let us know that we could fill the position.

15. I never told Ms. DeLucia about Mr. Almakhadhi's complaints of discrimination, both because they were not true and because they had no bearing on the issues surrounding Mr. Almakhadhi's worker's compensation leave. In fact, I only provided the information requested by Ms. Lucia, since that was all that seemed relevant.

KARLYN DIXON

Dated: June 30, 2006

739083

5

B27
DP0022



May 5, 2005

Sami Almakhadhi
P O BOX 7392
Newark, DE  19714

Dear Sami,

This letter is to inform you that you have been approved for FMLA effective
4/13/05 until 6/13/05, at which time you will exhaust all of your FMLA time.

If you have any questions please call Donna Smith, Benefits Clerk @ 302-355-1027.

Sincerely,

Donna Smith
Benefits Clerk

Cc: File

## APPROVALS OF LIGHT DUTY REQUESTS

| Name | Dept | Time Period | |
|------|------|-------------|---|
| Hughes, Angela | Slots | 09/27/2005 | 10/03/2005 |
| Love, Natalya | Cage | 10/04/2005 | 10/12/2005 |
| Martinez, Genesis | Cage | 09/16/2005 | 09/19/2005 |
| Minus, Julia | Slots | 11/16/2005 | 12/31/2005 |
| Passwater, Kevin | Cage | 11/08/2005 | 12/16/2005 |
| Rios-Soto, Juan | Slots | 12/21/2005 | 12/28/2005 |
| Clack, Jamisha | Slots | 09/13/2005 | 09/18/2005 |
| Fennell, David | Cage | 10/11/2005 | 10/25/2005 |
| Germanovich, Kennet | Slots | 09/15/2005 | 10/14/2005 |
| Hanna, Kathleen | Cage | 08/03/2005 | 09/01/2005 |
| Hobson, Scott | Cage | 08/04/2005 | 08/25/2005 |
| Thompson, Michael | Cage | 08/23/2005 | 09/01/2005 |
| Thompson, Michelle | Cage | 10/03/2005 | 11/03/2005 |
| Minus, Julia | Slots | 01/01/2006 | 02/22/2006 |
| Naqvi, Ahar | Slots | 03/06/2006(changed jobs) | |
| Passwater, Kevin | Cage | 01/01/2006 | 01/12/2006 |
| Thompson, Michael | Cage | 02/14/2006 | 03/19/2006 |
| Garner, Leah | Slots | 05/20/2006 | 05/31/2006 |
| Goines, Donald | Slots | 05/12/2006 | 06/09/2006 |
| Harris, Jill | Slots | 04/05/2006 | 05/05/2006 |
| Hayes, Antoinette | Cage | 03/11/2006 | 03/12/2006 |
| Hobson, Scott | Cage | 07/26/2006 | 07/31/2006 |
| Hughes, Angela | Slots | 01/28/2006 | 02/17/2006 |
| Hussain, Said | Cage | 04/23/2006 | 04/25/2006 |
| Wheeler, Fane | Cage | 06/08/2006 | 08/25/2006 |

1

B29

DP0098

# HECKLER & FRABIZZIO

ATTORNEYS AT LAW

THE CORPORATE PLAZA

800 DELAWARE AVENUE

SUITE 200

POST OFFICE BOX 128

WILMINGTON, DELAWARE 19899-0128

GEORGE B. HECKLER, JR.
ANTHONY M. FRABIZZIO
MARIA PARIS NEWILL
RICHARD D. ABRAMS
WILLIAM D. RIMMER*
DANIEL P. BENNETT
JOHN GILBERT*
DAVID R. BATMAN
JOHN W. MORGAN
TIMOTHY H. ROHS
MIRANDA D. CLIFTON
CHERYL A. WARD
STEPHEN J. MILEWSKI
CASEY W. LESIAK⁺

AREA CODE 302
573-4800

TELECOPIER
573-4806

*DELAWARE AND PENNSYLVANIA BAR
⁺PENNSYLVANIA BAR ONLY

August 29, 2005
Refer to WC05-16246

Re:  Sami L. Almakhadhi v.
     Delaware Park Racetrack & Slots
     Your Claim No.: YLT-05751C
     D/A: 12/1/03

**VIA FACSIMILE: 856-985-0469**
**AND REGULAR MAIL**

Mr. Leo R. West, III
Specialty Risk Services
4 Greentree Centre
13000 Route 73, Suite 303
P.O. Box 799
Marlton, NJ 08053

Dear Mr. West:

5-6 hrs. standing
3-6 hrs. walking
7-8 hrs sitting
No climbing
Occasional lifting or
carrying of 20 lbs,
bending, squatting, kneeling,
or twisting.
frequent push/pull, reaching & driving

　　　Enclosed is a copy of our evaluating neurologist's, Dr. Townsend, 8/25/05 report and Physical Capacities Evaluation report of the same date (both received by us by FAX on 8/26/05) which are self-explanatory and concern his examination of the claimant in the above-captioned matter on the same date.  The purpose for this examination is set forth in my 8/10/05 report–to respond to the claimant's Petition for medical treatment expenses, total disability for the limited period 4/13/05–6/13/05, and the date of accident average weekly wage/compensation rate calculation issue, which claims are based upon a 12/1/03 work accident/low back injury.

**B30**
**DP0108**

Mr. Leo R. West, III
August 29, 2005
Page 2

This case has been scheduled for <u>Hearing</u> before the Industrial Accident Board on <u>11/8/05 at 1:00 p.m.</u>--any settlement offers must, therefore, be extended by us <u>no later than 10/7/05</u> if we are to avoid the imposition of a claimant's attorney's fee and medical witness charges.

The claimant's history to Dr. Townsend, his medical record review, findings upon examination and impressions (L5 radiculopathy on the left with L4-5 disc herniation extending into the left neuroforamen by 5/10/04 MRI, causally related to the 12/3/03 work accident and aggravated by the 4/12/05 work incident/activities) are set forth in detail in Dr. Townsend's 8/25/05 report.

Based upon the claimant's history and Dr. Townsend's medical record review, Dr. Townsend has confirmed the causal relation between the low back problems/L4-5 disc herniation injury complained of and the work accident(s), at least a 4-week period of total disability beginning 4/13/05, that the surgery recommended by Dr. Katz and assumed to be a microdiscectomy would be reasonable and necessary treatment for the work-related injury, with 6-8 week recuperative period following which the claimant will be able to return to sedentary-type work, and need for continued medical treatment.

With regard to ongoing treatment, Dr. Townsend has stated that the claimant should direct his medical care to one physician, as seeing both Drs. Bohatiuk and Falco would result in duplicative services.

Dr. Townsend has also confirmed that the claimant should be working with restrictions in view of the low back problems referenced in his 8/25/05 report and in accordance with that which is set forth in his Physical Capacities Evaluation report of the same date--the applicable restrictions are for light-duty work which include 5-6 hours of standing, 3-6 hours of walking and sitting 7-8 hours per day, occasionally up to 20 lbs. but no lifting/carrying beyond such amount, frequent pushing/pulling, reaching and driving, occasional bending, squatting, kneeling and twisting, and no climbing.

Please confirm that the claimant's job duties are consistent with the light-duty restrictions assessed by Dr. Townsend, and confirm that the claimant's job duties presently do not exceed such restrictions.

Please also expedite the issuance to me of a written job description setting forth the physical requirements of the job duties presently performed by the claimant so that we may forward this document to Dr. Townsend for his review/approval, and so that we may protect the Employer against the allegation that subsequent to confirmation of

Mr. Leo R. West, III
August 29, 2005
Page 3

assessment of return to work restrictions the claimant was asked, permitted and/or encouraged to engage in work duties which exceeded his restrictions and which resulted in further injury/disability.

From the claimant's history and the information provided thus far, it appears that he was working full-time at the time of the work incident (by history it appears that the claimant was actually working overtime as he was trying to accumulate enough funds to bring his family to the U.S.).

As there is no information to contradict the claimant's history of the happening of the 12/1/03 work accident and aggravation of the low back injury which occurred at such time by the subsequent, 4/12/05, work activities, and as Dr. Townsend has confirmed causal relation, resulting period of disability, and reasonableness, necessity and causal relation of treatment, to include recommended low back surgery/micro-discectomy, and in view of the <u>Gilliard-Belfast</u> ruling, there is no apparent basis for us to proceed with our defense to this claim and <u>I am, therefore, requesting that you confirm my authority to advise the claimant's counsel that we will acknowledge the following:</u>

(1)     <u>Medical treatment expenses incurred to date</u> as a result of the 12/1/03 work accident;

(2)     <u>Total disability for the period 4/13/05–6/13/05 at the rate of $255.21 weekly based upon the date of accident average weekly wage of $382.80</u> ($9.57 per hour, 40 hours per week)—as I have advised in my 8/10/05 report, if the claimant is able to establish that he worked overtime with such regularity as to fairly constitute part of his regular work week at the time of the work accident, we will have to include such overtime in the date of accident average weekly wage and resulting compensation rate calculations. I again request that you expedite the issuance to us of the claimant's payroll/wage records for the period 12/1/02–12/1/03, as requested in my 8/10/05 report, so that we may calculate the date of accident average weekly wage/compensation rate;

(3)     <u>Authorization for performance of low back surgery, presumably micro-discectomy,</u> as approved by Dr. Townsend;

(4)     <u>Recurrence of total disability concomitant with the low back surgery</u> referenced in the preceding paragraph;

(5)     <u>Confirmation that we will pay those medical treatment expenses from the date of Dr. Townsend's 8/25/05 examination of the claimant as approved by Dr. Townsend</u> (medical treatment coordinated by one physician, with no physical therapy or chiropractic treatment at this time).

As this case has been scheduled for <u>Hearing</u> before the Industrial Accident Board on <u>11/8/05 at 1:00 p.m.</u>, and as any settlement offers must be extended by us <u>no later than 10/7/05</u> if we are to avoid the imposition of a claimant's attorney's fee and medical witness charges, your prompt attention to the above will be most appreciated. Thank you.

Very truly yours,

George B. Heckler, Jr.

GBH, Jr./vlt/257425
Enc.

cc:     Ms. Shannon Maguire DeLucia
        Director of Risk Management
        Delaware Park Racetrack & Slots
        (via e-mail only: <u>shannon.delucia@delawarepark.com</u>)

## RESPONSE OF RESPONDENT DELAWARE PARK, LLC
## TO REQUEST FOR INFORMATION

### Sami Almakhadhi v. Delaware Park, Charge No. 06040190W / 17C-2006-00837

1. Submit copies of all written rules, policies and procedures relating to the issue(s) raised in the charge. If such does not exist in written form, explain the rules, policies, and procedures.

**Please see Exhibits A, B, and C, as discussed further below.**

**Procedures applicable to internal transfers to positions (and, thus, promotional opportunities) in Delaware Park's Cage Department are set forth in the collective bargaining agreement between Delaware Park and the United Food and Commercial Workers, Local No. 27 (the "UFCW"), attached as Exhibit A.**

**With respect to light or modified duty assignments for individuals who have suffered a Worker's Compensation injury, employees who have submitted a doctor's note setting forth work limitations and who are approved for light duty work by the Risk Management Department (in consultation with the employee's department) are provided written information regarding Delaware Park's modified duty program. These requirements include specific "compliance" requirements on the part of the employee. Written instructions to supervisory personnel regarding Worker's Compensation procedures and a sample employee letter regarding modified duty are attached as Exhibit B.**

**In addition to procedures provided in Exhibit B, Delaware Park observes the following procedures in regard to modified duty assignments: Individuals requesting light or modified duty may bring their request along with a physician's note indicating work restrictions to the Risk Management Department. The Risk Management Department then evaluates whether light duty accommodations may exist, considering the employee's restrictions, the essential job functions and the needs of the respective department. Where possible, Delaware Park will accommodate light duty assignments for a period up to 90 days. Any employee found to be non-compliant with the worker's compensation management procedures or otherwise engaging in unsafe behaviors will be denied (further) light duty. Additional information regarding the discharge of individuals who are unable to perform the duties of their positions after exhausting leave and/or being medically stabilized is provided in response to Request 2 in the section of this Request regarding Discharge.**

**With regard to Delaware Park's generally applicable policies on discrimination and equal employment opportunities, please see policies attached as Exhibit C.**

2. Please provide any instances of light duty request and any reasons for approvals or denials for any of Charging Party's similarly situated co-workers during his tenure.

1

Delaware Park maintains records for the sole purpose of monitoring light duty assignments. Records documenting denials of light duty requests are not maintained. The following lists identify those individuals who were granted and/or denied light duty to the best of Delaware Park's current knowledge.

For a list of employees who were approved for light duty assignments and the dates of such leave during the relevant time period, please see Approval of Requests for Light Duty, Exhibit D. Light duty assignments were provided when Delaware Park could accommodate such work restrictions while continuing to meet departmental needs.

For a list of employees as to whom Delaware Park was unable to provide light duty assignments or otherwise determined that such duty was inappropriate, please see Denial of Requests for Light Duty, Exhibit E. In addition to those individuals listed in Exhibit E, certain other employees also were denied light duty because Delaware Park was unable to accommodate their particular restrictions (*e.g.*, use of crutches, foot boot that was slippery, light duty within restrictions unavailable) or the individuals violated their work restrictions or other Company policies relating to safety (*e.g.*, worked another job at night, missing physical therapy appointment, parked in restricted lane and fell), or the individual otherwise was subject to termination from employment for violations of Company or Departmental policy. At this time, responsible individuals at Delaware Park cannot recall the names of such individuals, but can relate the circumstances of the denial of light duty assignments as stated above.

## Issue: DISCHARGE

1.    If the charging party was discharged, submit the following:

    a.    date of discharge:

        **March 10, 2006**

    b.    reason for discharge:

        **Mr. Almakhadhi was discharged due to his continuing inability to perform the duties of his position for a period in excess of six months after a worker's compensation injury. For additional information, please see Delaware Park's Statement of Position submitted on June 30, 2006.**

    c.    statement of whether the charging party had any right of appeal, and whether the charging party made use of any appeal rights:

        **Mr. Almakhadhi was a member of the bargaining unit represented by the UFCW. Pursuant to the UFCW's Collective Bargaining Agreement with Delaware Park, Mr. Almakhadhi had grievance rights, which he did not exercise.**

2

In addition, under the Collective Bargaining Agreement, Mr. Almakhadhi was entitled to reinstatement in the event he was able to perform the duties of his job within one year of the commencement of his leave. Procedures regarding the reinstatement rights of union employees who are out of work for a period in excess of twelve weeks are set forth in Article 22 of the parties' collective bargaining agreement, regarding Unpaid Leaves of Absence (attached at Exhibit A). Pursuant to the agreement, and assuming there is an appropriate opening, employees who are medically able to do so are entitled to reinstatement to their positions for a period up to 52 weeks of the commencement of the employee's medical leave. Mr. Almakhadhi enjoyed such reinstatement rights until approximately August 30, 2006. However, he never reapplied for employment or advised Delaware Park that he was medically able to return to work.

d. person recommending the discharge, including name, position held:

**Shannon DeLucia, Executive Director of Human Resources**

e. person making final decision to discharge the charging party, including name, position held. Attach copy of any evaluation or investigation report relating to the discharge.

**Shannon DeLucia, Executive Director of Human Resources, made the final decision to discharge Mr. Almakhadhi. While no formal investigatory report was prepared relating to Mr. Almakhadhi's discharge, Ms. DeLucia reviewed documentation and various correspondence relating to his medical condition and working restrictions prior to his discharge. Please see Exhibit F.**

f. copies of all pertinent documents in the charging party's personnel file relating to the subject discharge.

**Attached at Exhibit F, please find documentation regarding the defense medical expert report, various internal correspondence regarding Mr. Almakhadhi's medical condition, work restrictions, and employment status, and the letter from Ms. DeLucia to Mr. Almakhadhi confirming his discharge.**

2. Explain your discharge procedures in effect at the time of the alleged violation. If the procedures are in writing, submit a copy.

**Non-disciplinary discharge procedures for employees who are medically unable to perform the duties of their positions, such as Mr. Almakhadhi, are not in writing. Generally, Delaware Park waits until an employee has exhausted all available FMLA leave and/or the employee's condition is medically stabilized before making any decision regarding his or her continued employment. Employees who have exhausted all available leave, are medically stabilized, and who are still unable to perform the duties of their positions (with or without reasonable accommodation) are terminated from employment.**

3

| Mary Sue Porter | 2/6/05 |
| --- | --- |
| **Main Bank Cashier** | |
| Robin (Pawley) Fields | 2/13/05 |
| Jodi Hinton | 2/13/05 |

7.          State each and every reason why the charging party was not selected for the position in question. Provide any written documents which reflect the bases of the decision not to select the charging party. For each person involved in the decision not to select the charging party, list their name, position.

## Main Bank Cashier:

Mr. Almakhadhi applied for and was considered for the position of Main Bank Cashier; however, ultimately he was not selected. His application was initially reviewed and forwarded to the Cage Department by Human Resources Employment and Retention Specialist Kim Pugh.

Mr. Almakhadhi was not selected by his department management primarily because he lacked experience as a Satellite Cashier and because of his previous "self-demotion" from Satellite Cashier to Booth Cashier after receiving 14 days of training. The department was hesitant to place Mr. Almakhadhi in a position with a more demanding time schedule than Satellite Cashier, when he had indicated that he found such a position too stressful and could not meet the schedule due to family demands. (The position of Main Bank Cashier had a more demanding schedule than that of Satellite Cashier.) Additionally, there was concern about past incidents relating to his rapport with his co-workers. Finally, in light of his prior decision not to accept the position of Satellite Cashier (which he described as too stressful and which had a schedule that he could not meet) the department wished to see him demonstrate success as a Satellite Cashier before hiring him as Main Bank Cashier, a position with even greater responsibilities and a more demanding schedule. (*See* Human Resources Incident Report dated 2/22/2005 and Human Resources Incident Report dated 3/15/2005, submitted with Delaware Park's Statement of Position.)

Mr. Almakhadhi was interviewed for Main Bank Cashier by Darla Cherry, Cashier Shift Manager. The decision not to select or recommend Mr. Almakhadhi for the position was made by Stacy Suhr, Assistant Cage Manager, in conjunction with Ms. Cherry, and Noel Lafferty, Cashier Shift Manager.

## Impress Supervisor:

In January 2005, Mr. Almakhadhi also submitted a written Request for Transfer to the position of Impress Supervisor. Upon information and belief, Mr. Almakhadhi's application was reviewed in the Human Resources Department, but was not forwarded to the Cage Department. Members of management in the Cage Department

13

have no recollection that Mr. Almakhadhi applied for the position of Impress Supervisor at or about this time. The application was processed by Human Resources Employment and Retention Specialist, Kim Pugh.[4]

       In August of 2005, Mr. Almakhadhi again applied for the position of Impress Supervisor by submitting a written Request for Transfer. At that time his application was processed by Human Resources Employment and Retention Specialist Carolyn Rutkowski. He was interviewed in his department by Cage Manager Beverly Pope. The decision not to select him for the position was made by Ms. Pope in consultation with Stacy Suhr, Assistant Cage Manager, Darla Cherry, Cashier Shift Manager, Noel Lafferty, Cashier Shift Manager, and Mark Joswick, Cashier Shift Manager. In addition to the concerns discussed above, which were continuing, Mr. Almakhadhi lacked many of the qualifications of the candidate who was selected, as discussed below. Also, Ms. Pope (who had been hired as Cage Department Manager in May 2005, and who was unaware of Mr. Almakhadhi's prior complaints of discrimination) did not recommend him for the position, as she found him somewhat difficult to interact with during the interview and thus had some concerns about his supervisory skills as they related to personal interactions.

8.       State each and every reason why you contend the person(s) selected for the position was/were selected instead of the charging party. Provide any written documents which reflect the bases of your decision to select those persons who were hired into the position. List all persons hired during the relevant period, including name, hire date, position applied for, position hired to.

<u>Impress Supervisor</u>

       In January 2005 the position of Impress Supervisor was posted. At that time there were four openings for this newly created position, which were filled over time. Upon information and belief, at that time Mr. Almakhadhi's application was reviewed by Human Resources Employment and Retention Specialist Kim Pugh but was not forwarded to the Cage Department. Members of management in the Cage Department have no recollection that Mr. Almakhadhi had applied for the position at or about this time. However, at about this same time Mr. Almakhadhi was under consideration for the position of Main Bank Cashier.

       In February 2005, Mary Sue Porter and Jeffrey Gonzalez were transferred (promoted) to the position of Impress Supervisor. Among other qualifications, Ms. Porter had previous supervisory experience with the Company and had successfully worked in a regular capacity as a Satellite Cashier. Immediately prior to his transfer, Mr. Gonzalez was employed as an Impress Clerk, so he was familiar with the requirements of the position and departmental procedures. In addition, he had previous supervisory experience outside the Company. Both individuals were flexible in regard to schedule, and indicated that they would be able to work the required schedule.

---

[4] Ms. Pugh no longer is employed by the Company. This information is provided to the best of Delaware Park's current knowledge.

14

Park's Statement of Position.  By way of further information, Delaware Park states as follows:

Due to his back injury, Mr. Almakhadhi was absent from work from April 13, 2005 to June 13, 2005, thereby, exhausting his FMLA leave. (Statement of K. Dixon; Statement of S. DeLucia; submitted with Delaware Park's Statement of Position.) On June 14, 2005, Mr. Almakhadhi returned to work.  At that time, he presented a note from his doctor stating that he was fully released to work without restrictions.  He returned to his position and performed all of his regular duties without incident.

It was not until August 2005 that Shannon DeLucia received a report from Delaware Park's worker's compensation insurance carrier regarding a defense medical expert report.  For the first time Delaware Park learned that Mr. Almakhadhi's physician had imposed severe limitations on his return to work (including limited lifting, standing, walking, bending, and twisting).  Further, Delaware Park's defense medical expert agreed that such restrictions were appropriate.  Mr. Almakhadhi never had advised the Company of these restrictions.

After considering the severity of his restrictions, his violation of Company policy by working beyond those restrictions, and the limited amount of light duty available in his department, on August 31, 2005, Ms. DeLucia sent Mr. Almakhadhi home until he could provide a full medical release from his physician.  He was unable to do so.

Although Mr. Almakhadhi had already exhausted his FMLA, Ms. DeLucia chose to refrain from making any decision regarding his employment once it was discovered that Mr. Almakhadhi had back surgery scheduled for November 2005.  However, in December 2005, Delaware Park learned that Mr. Almakhadhi had postponed the procedure indefinitely.  Not knowing the state of Mr. Almakhadhi's condition, Ms. DeLucia advised his department managers to give Mr. Almakhadhi a February 12, 2006 deadline to return to work with a full release from his physician.

Soon thereafter, Mr. Almakhadhi informed his department managers that he would be unable to return to work with a full release.  Without a full release and having exhausted all available leave, Ms. DeLucia was forced to terminate his employment.  Mr. Almakhadhi was terminated March 10, 2006.

At the time of her decision, Ms. DeLucia was not aware that Mr. Almakhadhi had engaged in any act protected by Title VII or protected by state discrimination law.  In early conversations with Ms. DeLucia, Mr. Almakhadhi voiced his dissatisfaction with Ms. DeLucia and Ms. Dixon's actions. He expressed his disapproval of the Company's decision to promote another individual to Impress Supervisor.  Although Mr. Almakhadhi made reference to "discrimination," Ms. DeLucia understood Mr. Almakhadhi to complain of unfair treatment, and never "discrimination" as prohibited under Title VII.  Ms. DeLucia did not become aware of Mr. Almakhadhi's claim of discrimination based on race or national origin until Mr. Almakhadhi filed the present Charge. (Please see Exhibit F, and

18

*faxed*



## PAYROLL ADJUSTMENT REQUEST (PAR)

DATE OF REQUEST  7/29/04

EMPLOYEE # 102175  EMPLOYEE NAME  Sami Almakhadi

DEPT. # 112          JOB CODE  1129

DATE OF ERROR P/E 6/26, P/E 7/3, P/E 7/10/04

(ADD) / SUBTRACT _____ HOURS (# OF)

REASON FOR ADJUSTMENT

Sami worked as a Satellite for 3 wks Please
pay him the difference to # 10.50 for the following hrs.

|  |  |  |
|---|---|---|
| P/E 6/26 - | 40 reg. | 8.5 OT |
| P/E 7/3 - | 40 reg. | 2 OT |
| P/E 7/10 - | 33.25 reg. | 8 Hol. worked. |

_____  1272

DEPARTMENT HEAD APPROVAL

✱ Union

DP0534

B40

NOTE: FORM MUST BE FILLED OUT COMPLETELY, INCLUDING
REASON BEFORE THE ADJUSTMENT WILL BE MADE

**EMPLOYEE'S REMARKS**

_Employee Signature_                        _Date_

8___-15856                        2-17-04

**Employee's Comments:** lets say I was lucky last
Year. I didn't have any variances or exeptions
and I never called sick for the whole year.

**Employee's Goals:** With me good luck again.

**SUPERVISOR'S REMARKS**

_Supervisor's Signature_                        _Date_

Darla Cheers     10649     1-11-04

**Areas for Employee Improvement:** Sami needs to learn to
take constructive criticism in a positive
manner and to be show a little more
constraint when disagreeing with fellow co-worker

**Employee Strengths:** Sami shows and an extreme
level of confidence. He takes extra care with
his paperwork. He has only had 1 exception this
year and has great attendance.

**Supervisor's Goals for Employee:** To undertake more
Responsibilities in the booth and to
look toward a satellite position and cross
train in main Bank

DP0636

**DEPARTMENT HEAD AND/OR**
**VICE PRESIDENT'S REMARKS**

_Department Head's Signature_                        _Date_

Vaughn 14,714     1-13-04

Great Job Sami. Thank You for your hard work and dedication.
Good Luck for this Year and the future. For this year I
Would like you to look into increasing your overall knowledge of the
Satellite position, Main Bank Please use back of page or attach any additional relevant documentation or records.
and Credit area.

B41                        6

**EMPLOYEE'S REMARKS**

[signature] 15856 4-19-02
Employee Signature Date

DP0650

**Employee's Comments:** every Thing is good but I'd like To be more flixeble if faster Cashier did small mistake Compare with New Cashier or slow Cashier also some bank's drawars They need be fix

**Employee's Goals:** I Start The first step as Cashier and The next step I'd like To be asatTleight

**SUPERVISOR'S REMARKS**

[signature] 10990 4-4-0
Supervisor's Signature Date
NOEL M LAFFERTY

**Areas for Employee Improvement:** Sami should continue to learn all policies and procedures relevant to his position.

**Employee Strengths:** Sami is a very reliable, dependable productive booth cashier who works well with his co-workers and Supervisors and will work overtime whenever he is asked. Great Job!!

**Supervisor's Goals for Employee:** Sami should continue his growth as a booth cashier and should seek advancement if he so desires.

**DEPARTMENT HEAD AND/OR VICE PRESIDENT'S REMARKS**

[signature] 4/8/02
Department Head's Signature Date

Sami's positive attitude and strong work ethic have not gone ~~un~~ unnoticed. Keep up the good work! ~~SAS~~ Sami's paperwork is always neat and accurate and his willingness to help when staffing shortages arise are most [illegible] Thanks. KL

Please use back of page or attach any additional relevant documentation or records.



## Delaware Park
### THOROUGHBRED RACING AND SLOTS
777 Delaware Park Boulevard
Wilmington, Delaware 19804

(302) 994-2521

Fax (302) 994-3567

April 21, 2005

Sami M. Almakhadhi
200 Westcreek Village
Apt. E-6
Elkton, MD 21921

Dear Mr. Almakhadhi:

Congratulations on your (3) year anniversary with Delaware Park Racetrack & Slots, an important milestone for you and our company.

We are proud of your accomplishments, and of the contributions which your years of service represent. Your loyalty and dedication strengthen our company and help us achieve our goals.

To help us honor your commitment in a lasting and meaningful way, we hope you will see your department manager for your Service Award.

You are a valued member of the Delaware Park Racetrack & Slots team; we extend our sincere thanks for your past contribution, as well as for those yet to come!

Sincerely,

William I. Fasy
Chief Operating Officer

DP0651a

**B43**

From: Cindy Irwin
Sent: Wednesday, September 26, 2007 5:00 PM
To: Karlyn Dixon
Subject: FW: Sami Almakhadi

---

*Cindy Irwin*
*Accounting Operations*
*Ext. 7496*

From: Shannon DeLucia
Sent: Thursday, March 09, 2006 5:21 PM
To: Cindy Irwin; Sonja Rowland
Cc: Cathy Johnson; Diane Joseph; Karlyn Dixon
Subject: RE: Sami Almakhadi

The effective date of Sami's termination should be 02/12/06, the day Sami was supposed to return to work full duty and failed to do so. I misunderstood that a PAN had not already been entered after my conversation with Karlyn and Beverly about Sami's return. After Micki left, I was trying to figure out what had or had not been done on this file and I was not familiar that you were waiting on an email to enter the PAN. I apologize for the confusion. Thanks!

From: Cindy Irwin
Sent: Thursday, March 09, 2006 10:54 AM
To: Sonja Rowland
Cc: Cathy Johnson; Diane Joseph; Karlyn Dixon; Shannon DeLucia
Subject: RE: Sami Almakhadi

I was not given permission to put a term. PAN through on Sami. I sent an e-mail to Shannon last week asking the status on him and she never responded. Once I receive an e-mail that a letter has been sent to him and I can process the PAN I will do so.

Thanks!!
Cindy

**DP0656**

**B44**

**From:** Sonja Rowland
**Sent:** Thursday, March 09, 2006 10:23 AM
**To:** Cindy Irwin
**Cc:** Cathy Johnson; Diane Joseph; Karlyn Dixon
**Subject:** FW: Sami Almakhadi

Good Morning Cindy:

He is still active in the system. Can't term until the PAN comes thru.

Thanks
Sonja

——Original Message——
**From:** Diane Joseph
**Sent:** Wednesday, March 08, 2006 8:26 AM
**To:** Sonja Rowland
**Subject:** FW: Sami Almakhadi

**From:** Karlyn Dixon
**Sent:** Tuesday, March 07, 2006 3:55 PM
**To:** Diane Joseph
**Subject:** FW: Sami Almakhadi

Can you please get us a date?   Thanks a bunch!

KD

**From:** Cindy Irwin
**Sent:** Friday, March 03, 2006 4:10 PM
**To:** Shannon DeLucia
**Cc:** Karlyn Dixon
**Subject:** Sami Almakhadi

I never received notification to term Sami in SSS  and I thought he was notified by letter.   If so, can you please let me know what the effective date should be?

Thanks,
Cindy   << File: Ivy.gif >>

DP0657

**B45**

Almthadhi

**GEORGE M. BOHATIUK, M.D.**
500 Christiana Medical Center
Newark, DE 19702 • 302-455-1007

PATIENT'S NAME _Deni Alkmda_          AGE ____
                                      DATE _6/12/05_
ADDRESS _____
CITY _____ STATE _____ ZIP _____

_released to full-time full duty_
_work on 6/14/05_

_G Bohatiuk_
PHYSICIAN'S SIGNATURE
SUBSTITUTION PERMISSIBLE
DEA # _____

REFILL ___ NO ___ YES _____ TIMES
IN ORDER FOR A BRAND NAME PRODUCT TO
BE DISPENSED, THE PRESCRIBER MUST
HANDWRITE "BRAND NECESSARY" OR
"BRAND MEDICALLY NECESSARY" IN THE

FAX NO. :                                    FROM :

Jun. 13 2005 11:49AM P1

**DP0660**

**B46**

# GEORGE M. BOHATIUK, M.D.

PHYSICAL MEDICINE & REHABILITATION
MUSCULOSKELETAL INJURIES
EMG's & NERVE CONDUCTION STUDIES

*Board Certified Physical Medicine & Rehabilitation*
*Board Certified Internal Medicine*

---

June 13, 2005

## PHYSIATRIC FOLLOW-UP VISIT

### RE: Sami Almakhadhi

Sami's left-sided lower back pain still radiates into his left leg with paresthesias.

**PHYSICAL EXAMINATION:** Tenderness and guarding in the left lumbosacral paraspinal muscles. He can forward flex his lumbar spine 75 degrees and extend 15 degrees. Side-bending 10 bilaterally. Positive left-sided Kemp's and seated straight leg raising test. Weakness noted in the left ankle and toe dorsiflexors as well as the left ankle plantar flexors (4+/5). Diminished left Achilles reflex. Otherwise equal and symmetrical reflexes. He ambulates with an antalgic gait favoring his right leg.

**IMPRESSION:**

1. L4-L5 disc protrusion/herniation secondary to 4/04 work injury.
2. L5-S1 disc bulge/protrusion secondary to 4/04 work injury.
3. Left-sided L5-S1 radiculopathies secondary to 4/04 work injury.

**DISCUSSION:** He will return to work full-time full duty tomorrow and see how he can handle it. He will keep me informed of his progress.

Sincerely,

George M. Bohatiuk, M.D.

**DP0702**

156911.53

## Neurology Associates
774 Christiana Road
Suite 201
Newark, DE 19713
302-731-3017

John B. Townsend III, M.D.

6/26/06

George Heckler
P.O. Box 128
Wilmington, DE 19899

Re: Sami Almakhadhi

Dear Mr. Heckler:

I evaluated at your request. The following summary is based on the patient's statements today as well as a review of notes from Dr. Bandera and Dr. Katz. The patient understands that no care will be rendered based on this evaluation. The patient was a good historian. The history given was consistent with the medical records reviewed.

**Patient's Statements Today:** He tells me that he has had massage since August of last year. He tells me that after he was terminated. He is seeing Dr. Bandera. He gives him pain medication.

**Current Complaints:** He tells me that he still has pain in his low back. He notes that if he swims too much he gets more pain. He tells me that if he walks too much or stands too much he gets the same pain. He tells me that he gets numbness when he walks. He has numbness on the left side only. He tells me that he has problems with urination which was a burning. He tells me that if he is active 8/10. He rates his average pain at a 6/10. He tells me that when he wakes up AM his left leg feels weak and he has to walk slowly.

**Activities at Home:** He tells me that he does as little as possible around the house. He notes that he stays home and watches TV. He goes outside with his son intermittently. He does some swimming, but no stretching.

**Medications:** Oxycodone, Hydrocodone

**Previous Accidents/Additional Accidents:** None

1

DP0770    **B48**

**Past Medical History:** Hypertension.

**Occupational History:** He tells me that he was terminated from his job.

**Review of Films:** MRI Lumbar: Disc desiccation at L4-5 and L5-S1. + disc protrusion at L4-5 towards the left neuroforamen.

**Review of Records:** The patient had another MRI 6/30/05. This showed a medium herniation at L4-L5 lateralized to the left lateral recess of L4-5. The patient had a surgical discussion with Dr. Katz 11/11/05 and the patient decided to postpone his surgery.

The patient began treating with Dr. Bandera 1/26/06 and he suggested that he found diffuse muscle spasm and guarding in the low back. HE stated that there was a positive SLR on the left but did not indicate whether there was a provocation of leg symptoms. The patient stated that he wanted conservative care and he was said to be capable of light duty work. HE was given ibuprofen and Percocet. Dr. Bandera suggested that the patient was interested in a VAX-D program and he was referred to a facility in PA for this.

**Physical Examination:** This is a well developed, well nourished male in no distress wearing a back brace.

**Low Back Examination:** The patient had some tenderness over the lumbosacral junction. There was no spasm. There was no step off. There was decreased flexion on ROM testing. SLR produced a complaint of low back pain at 20 degrees on the left and 50 degrees on the right.

**Neurological Examination:** Mental Status: The patient was alert and oriented x 3. There was no evidence of confusion, dysarthria, or dysnomia.

Motor Examination: There was 5/5 strength and normal tone and bulk in the following upper extremity muscles: trapezius, deltoids, infraspinatus, supraspinatus, triceps, biceps, wrist extensors, finger extensors, and interosseous muscles. In the lower extremity there was 5/5 strength and normal tone and bulk in the hamstrings, quadriceps, anterior tibialis, gastrocnemius, peroneus longus, EHL, and foot flexors

The gait was normal with heel and tandem gait tasks.

2

DP0771

B49

The DTR's were 2.5+ and symmetrical at the knee, and ankles. The plantar response was flexor bilaterally.

The sensory examination was normal for pin, vibration, and temperature sensations.

**Impression:** This is a patient with a history of low back pain who continues with the same complaints. He has no evidence for a nerve or nerve root injury on examination. In answer to your questions:

1) The patient's history of activities is noted above. He continues to complain of low back pain with intermittent symptoms into his left leg.

2) The patient is apparently not interested in surgery. He is not currently pursuing Vax-D, but he is going to massage therapy.

3) There are no objective findings on physical examination.

4) The patient has chronic low back pain with underlying degenerative discs at L4-5 and L5-S1. It is my opinion that the low back complaints and likely the disc herniation are related to the 12/3/03 activities at work.

5) It is my opinion that the patient is capable of working full time in a light duty job with no lifting of more than 20 pounds. He should avoid repetitive bending at the waist. The restrictions would be related to the subjective complaints related to the 12/2/03 accident.

6) It is my opinion that the treatment reviewed, that being occasional office visits for medication checks is reasonable and related to the 12/3/03 accident.

7) It is my opinion that the patient would benefit from an ongoing self-directed exercise program with stretching and strengthening of the low back. He could continue to use medications on an as needed basis. He could be followed by his family doctor or Dr. Bandera every 8-12 weeks for medication checks. He does not require additional facility based PT or computerized traction (Vax-D).

I hope that this answers your questions regarding this patient. All opinions have been stated to a reasonable degree of medical probability.

Sincerely,

John B. Townsend III, M.D.

3

DP0772

B50

**NEUROLOGY ASSOCIATES, P.A.**
774 Christiana Road
Suite 201
Newark, DE 19713
(302) 731-3017

3/6/06

David Batman, Esquire
P.O Box 128
Wilmington, DE 19899

RE: Sami Almakhadhi
ACCT #: 156911

Dear Mr. Batman:

I reevaluated Mr. Almakhadhi at your request. The following summary is based on the patient's statements today as well as a review of notes from Dr. Falco, Dr. Katz, Dr. Rastogi, and the patient's family doctor. The patient understands that no care will be offered based on this evaluation.

**PATIENT'S STATEMENTS TODAY:** He tells me that he is currently treating with Dr. Bandera. He is giving him medications. He sees him when he is needed. He gets massages in Dr. Bandera's office, but he notes that it was not particularly helpful. He tells me that he is being sent up to Philadelphia for another evaluation for questionable decompression. He notes that he was told to see his old doctor and get a light duty release. He tells me that he went to his family doctor and she would not give him a work note. He tells me that he then went to Christiana Care and he was given a note to go back to work. He was then told that he could not be accommodated on a light duty job. He tells me that he also talked to Dr. Katz and he was supposed to have surgery on October 8th. He notes that he had to reschedule his surgery.

**MEDICATIONS:** Non-steroidals.

**CURRENT COMPLAINTS:** He tells me that he has ongoing low back pain. He tells me that he has pain going down in to the left leg. He tells me that if he walks too much he gets increased pain in the leg. He notes that he will take medication if he has to exercise. He tells me that his back feels worse if he stands up too long. He states that he has urinary frequency.

I asked him what he does around the house and he notes that he watches TV and really has very little to do.

**WORK HISTORY:** He notes that he calls work everyday to see if there is light duty.

**REVIEW OF FILMS:** MRI: protrusion at L4-5 and L5-S1.

Plain film: Normal.

**REVIEW OF RECORDS:** The patient had an MRI of the lumbar spine 5/10/04 ordered by Dr. Davis. This showed a left paracentral disc at L4-5 narrowing the left lateral recess. There was a small central

and left sided protrusion at L5-S1 as well. There was also some associated facet hypertrophy. The patient was seen 7/26/04 by Dr. Bohatiuk. The patient suggested that he sustained a work related accident 4/20/04. He complained of left low back pain and left leg pain. The patient was noted to have two left sided disc herniations on his MRI. He had tenderness in the low back. He had weakness in the ankle and toe dorsiflexors. He was to see a chiropractor. The patient had an EMG 7/27/04 that showed 2+ sharp waves in the paraspinous muscles. The patient was back 8/2/04 and he was to continue chiropractic treatment. The patient followed with Dr. Palmer at the request of Dr. Bohatiuk and the patient complained of low back pain and was seen three times in August and one to two days a week in September of 2004.

The patient was seen by Dr. Falco's nurse practitioner 9/28/04. He gave a history of increasing low back pain since January. He complained of left leg pain and low back. The report suggested that the patient recalled no specific incident. She did a limited examination. The patient was seen at Delaware Park Fire Command stating that he had low back pain from working. The patient was evaluated at Christiana ER that day. The patient was taken out of work and given Percocet. The patient was released to light duty work by Mid Atlantic Spine 5/17/05.

The patient was back with Dr. Bohatiuk 5/25/05 complaining of left sided low back pain radiating down the left leg. He ordered an updated EMG that was unnecessary as the patient had a prior EMG interpreted as showing radiculopathy. The patient was back in Dr. Falco's office 5/27/05 and complained of pain at a seven to eight out of 10. They suggested a lumbar epidural and gave the patient Flexeril and Norco. Dr. Bohatiuk was seeing the patient every two weeks but was not really changing the treatment in any way.

The patient was seen by Dr. Rastogi 12/21/05 who noted that the patient was injured at work two years before. The patient noted that he did not want surgery nor did he want injections. He reviewed the MRI which showed a large disc herniation at L4-5. He was told that he could live with it or have surgery.

**PHYSICAL EXAMINATION:** This is a well developed male in no distress.

**LOW BACK EXAMINATION:** The patient has decreased range of motion in his low back. He has tenderness over the left buttock and SI region. There is no spasm noted. There is no leg pain with straight leg raising at 60 degrees supine.

**NEUROLOGIC EXAMINATION:** The patient was alert and oriented x3 and answered questions appropriately.

Motor examination revealed 5+/5+ strength in the upper extremity with normal tone and bulk in the following muscles: head extensors and flexors, trapezius, deltoid, infra and supraspinatus, biceps, triceps, brachioradialis, wrist extensors and flexors, finger extensors and interosseous muscles. In the lower extremity the patient had 5+/5+ strength and normal tone and bulk in the following muscles: quadriceps, anterior tibialis, gastrocnemius, extensor hallucis longus, peroneus longus and intrinsic muscles of the feet. Gait testing revealed no evidence of dystaxia on heel, toe or tandem gait tasks.

Deep tendon reflexes were 2+ throughout in the following regions: triceps, biceps, brachioradialis, wrist, knee, ankle and hamstring. The plantar response was flexor bilaterally.

Sensory examination was within normal limits to pinprick, light touch, vibratory, proprioceptive and temperature sensations.

**IMPRESSION:** This is a patient with a complaint of chronic low back pain. The neurological examination was normal. There is no evidence for nerve or nerve root injury. In answer to your

questions:

1) The patient's history of activities is noted above.

2) Interestingly, he told me that he was scheduled for surgery in October and cancelled it whereas he told Dr. Rastogi in December that he did not want surgery.

3) There is evidence on imaging for a disc herniation. There are no objective physical findings. If one accepts the patient's history, then his complaint would be related to his work activity of 12/3/03.

4) The low back complaints and disc herniation are related to the work activity of 12/3/03.

5) He is able to work full time with restrictions. The restrictions would be unchanged from my last evaluation.

6) It is my opinion that the treatment reviewed today was reasonable and related to the work accident.

7) It is my opinion that the patient does not need to have scheduled appointments with any physician at this point as he is not taking prescription medications or being treated surgically. He could see his family doctor for flare ups of his pain complaints.

I hope that this answers your questions regarding this patient. All opinions have been stated to a reasonable degree of medical probability.

Sincerely,


John B. Townsend III, M.D.


DP0776

B53

__Donna Smith__

| | |
|---|---|
| **From:** | Nicole Cook |
| **Sent:** | Friday, May 06, 2005 10:17 AM |
| **To:** | Cindy Irwin; Stacy Suhr |
| **Cc:** | Karlyn Dixon; Donna Smith |
| **Subject:** | Sami Almakhadhi |

Sami Almakhadhi has been approved for FMLA eff. 4/13/05 until 4/18/05.  Effective 4/18/05 Sami will need to be on light duty for 2 months (no lifting > 10 lbs.).  If the department is not able to accommodate the light duty then Sami will remain out on FMLA until 6/13/05.  Please note that Sami's FMLA will exhaust eff. 6/13/05.

Thank you,

Nicole Cook
Benefits Assistant
X1026

DP0866

1

**B54**

**Nicole Cook**

| | |
|---|---|
| **From:** | Nicole Cook |
| **Sent:** | Monday, May 02, 2005 10:56 AM |
| **To:** | Cindy Irwin |
| **Subject:** | RE: Sami Almakhadhi |

Thank you.

Thank you,

Nicole Cook
Benefits Assistant
x1026

-----Original Message-----
| | |
|---|---|
| **From:** | Cindy Irwin |
| **Sent:** | Monday, May 02, 2005 10:50 AM |
| **To:** | Nicole Cook; Stacy Suhr; Karlyn Dixon |
| **Cc:** | Jim Bosco; Donna Smith |
| **Subject:** | RE: Sami Almakhadhi |

I'm not sure if it matters or not, but Sami is upset at the fact his worker's comp. claim was denied and he received points for the days missed. This may or may not have an impact on his FMLA request, but I wanted to make you aware of the situation.

Thanks!
Cindy

| | |
|---|---|
| **From:** | Nicole Cook |
| **Sent:** | Monday, May 02, 2005 11:45 AM |
| **To:** | Stacy Suhr; Karlyn Dixon; Cindy Irwin |
| **Cc:** | Jim Bosco; Donna Smith |
| **Subject:** | Sami Almakhadhi |

Sami Almakhadhi has applied for FMLA from 4/13/05 until 4/23/05. I will notify you upon receipt of medical certification and when a determination has been made.

Please note that his Intermittent FMLA has ended as of 2/18/05.

Thank you,

Nicole Cook
Benefits Assistant
x1026

**DP0868**

1

**B55**

CHRISTIANA CARE HEALTH SERVICES
EMERGENCY DEPT: CHRISTIANA HOSPITAL
4755 Ogletown-Stanton Rd.
Newark, Delaware 19718
(302) 733-1000

---

Patient:Almakhadhi,Sami                    Date:Apr 13, 2005

---

Off work from Apr 13 thru Apr 16, 2005.
Return to work on Sun Apr 17, 2005.

SIGNATURE: _____

~ Andrew Duckworth, PA-C MD0323030
> Dorothy Dixon, M.D.

- - - - - - - - - - - - - - - - - - - - -

**DP0880**

**Christiana Care Fam.    Medicine Center**
1401 Foulk Road
 Wilmington, DE 19803-2727
302-477-3300  Fax: 302-477-3311


April 18, 2005


RE:    SAMI ALMAKHABHI
       Date of Birth:  06/20/1968


To Whom It May Concern:

        SAMI ALMAKHABHI is currently under my medical care.

    Please excuse SAMI ALMAKHABHI from  work  until 4/23/05

    Please call my office with questions or concerns (302) 477-3300.

Thank you.


Sincerely,


John R. Lawrence MD

(signature)

**Almakhadhi,Sami**              Wed Apr 13, 2005    Page 1
                                 12:47 AM

Discharge Instructions from:
Dorothy Dixon, M.D. / Andrew Duckworth,PA-C MD0323030
Christiana Care Health Services - Wilmington Hospital

Christiana Hospital, 4755 Ogletown-Stanton Rd,Newark,DE 302-733-1000
Wilmington Hospital, 14th & Washington St, Wilmington,DE 302-733-1000

Any Concern,...Return!   .

DIAGNOSIS: Backache

**BACK PAIN:**
Back pain is a very common problem in our society. It is also one of the most frustrating problems that patients have to endure. Unlike back pain related to lifting or other injuries, sometimes the pain becomes chronic, or occurs in sporadic episodes.

Possible causes may include: - Poor posture - Excess body weight-Obesity - Weak muscles in the back and abdomen - Muscle fatigue - Stress, or emotional problems such as depression

The first treatment of low back pain is rest to remove the strain on muscles and ligaments.  Any comfortable position is all right.  Use a pillow under your knees when you lie on your back.  Sleep on a firm mattress.  Try to keep on your feet as much as possible, taking periods of rest when soreness begins to return.

Avoid any excessive bending or lifting until your symptoms are completely better.  When you are recovered be sure to lift properly by bending your knees (not your back) and using your leg muscles to help.

Anti-inflammatory and analgesic drugs are often prescribed.  Skeletal muscle relaxants may be helpful also.

Use ice or heat to your back several times daily for 30-40 minutes each time.  Ice is probably better for acute injuries, but use whichever gives you greater comfort.

If you are over weight, it is a neccesity that you begin a weight loss program. You must understand that if you do not lose weight, your back pain may NEVER go away and could get worse! The human body and bone frame are not designed to carry excess weight. Excess weight causes increased stress on the body frame, causing pain.

If you have never had your back pain evaluated by a family doctor it is necessary that you have a through evaluation to rule out any other serious causes. Call your doctor at once for an appointment for an evaluation of your back pain.

**NOTIFY YOUR DOCTOR or return here in case of the following:**
    - Back pain is worsening or is not improved within 4-5 days.
    - Abdominal pain or change in the location of pain.
    - Any numbness, weakness, or increased pain in your legs.
    - Difficulty with urination or bowel movements.

RX: MOTRIN (IBUPROFEN) 800 MG    Disp: # 20 / 0
Directions: 1 tablet every 8 hours with food to reduce
        inflammation and mild/moderate pain. - Used for inflammation (especially arthritis) and relief of pain. - Take regularly unless used for mild pain.  It can take 1-2 weeks   to be effective in arthritis. - Try taking with food if it causes stomach upset. - Can cause gastrointestinal bleeding. - Other common side effects - dizziness, rash.

        ---- Instructions are continued on next page. ----

DP0882

**B58**

**Almakhadhi,Sami**          Wed Apr 13, 2005   Page 2
                             12:47 AM

RX: PERCOCET 5.0/325 MG    Disp: (20)-twenty / 0
Directions: 1-2 tablets every 6 hours as needed for severe pain. - Narcotic - usually used for relief of
pain or cough. - Causes drowsiness. - Narcotics are habit-forming.  They should not be used on a
regular basis, and you should not increase the dosage without    your doctor's advice. - YOU SHOULD
NOT DRIVE or operate heavy machinery while taking   narcotic medication due to the drowsiness often
caused. - Other common side effects - gastrointestinal upset, constipation,   dizziness, allergic
symptoms of rash, itching or breathing   difficulty.

FOLLOW UP INSTRUCTIONS: Your Doctor
**Call  Your Doctor today or as soon as possible.** Let the office know that you were seen in the
Emergency Department and that you were told to call the office to arrange a follow-up visit.

DOCTOR'S NOTE Off work from Apr 13 thru Apr 15, 2005. Return to work on Sat Apr 16, 2005.


====================================================
STARTER PACKS/SAMPLE MEDICATIONS:

I understand and acknowledge that I may have received medication in a NON-CHILD PROOF container.
I understand if a child is in the presence of this container the container could be opened.

I understand that this and all medications should be kept out of the reach of children. ==========
====================================================

I understand that the treatment I have received was rendered on an emergency basis only and that further
treatment may be necessary. I have been given a copy of the above instructions. I understand these
instructions; and I will arrange for follow-up care as outlined above. If my condition worsens, I will
call my doctor or return to the Emergency Department.

                              _____(Signature)
_____


Circle One: PATIENT   PARENT   SPOUSE   RELATIVE   FRIEND   GUARDIAN

NOTE: Your insurance company may require you to contact them or your primary
care physician as soon as possible after your Emergency Room visit.

*** PHYSICIAN REFERRAL:If you need assistance obtaining a local physician or
   dentist you may call the "Christiana Care Referral Service" help line at 302-428-4100.

*** LAB RESULTS/MEDICAL RECORDS: You may call at 302-428-6852.

====================================================
*** FLU SEASON HAS ARRIVED, AND THE CDC EXPECTS THIS YEAR TO BE A BAD ONE!
   PLEASE CONTACT YOUR FAMILY PHYSICIAN AND ARRANGE TO HAVE THIS SEASON'S
VACCINE. PEOPLE THAT ARE ELDERLY, VERY YOUNG, OR SUFFER FROM ASTHMA OR
      RESPIRATORY ILLNESSES ARE PARTICULARLY AT RISK *** ==================
====================================================

DP0883

**B59**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,                    )
                                    )
            Plaintiff,              )
                                    )   Civil Action
v.                                  )   No. 07-78 (JJF)
                                    )
DELAWARE PARK, LLC,                 )
                                    )
            Defendant.              )

            Deposition of SAMI ALMAKHADHI taken
pursuant to notice at the law offices of Potter,
Anderson & Corroon, LLP, Hercules Plaza, Sixth Floor,
1313 North Market Street, Wilmington, Delaware,
beginning at 9:30 a.m. on Thursday, November 8, 2007,
before Christina M. Vitale, Certified Shorthand
Reporter and Notary Public.

APPEARANCES:

        FRANK J. CONLEY, ESQUIRE
        THE CONLEY FIRM
          7715 Crittendon Street, Suite 133
          Philadelphia, Pennsylvania   19118
          For the Plaintiff


        WENDY K. VOSS, ESQUIRE
        JENNIFER C. WASSON, ESQUIRE
        POTTER ANDERSON & CORROON, LLP
          Hercules Plaza, 6th Floor
          1313 N. Market Street
          Wilmington, Delaware   19899
          For the Defendant


                WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477
                   www.wilfet.com

1    A.    Yes.

2    Q.    Consistently each year?

3    A.    Each year except one time.

4    Q.    And when was that?

5    A.    When I had a problem with a satellite cashier,

6    her name was Keisha, she told me -- I think I talked

7    to you before.  She told me that's not your country

8    and stuff and that HR investigated.

9    Q.    And what happened?

10    A.    I believe they give her three days suspended,

11    but my manager she was blaming me for that.  It was

12    not even my fault.

13    Q.    Who was your manager?

14    A.    Karlyn Dixon and Stacey.

15    Q.    When you say your manager blamed you, what do

16    you mean?

17    A.    They gave me a bad -- for that time my

18    evaluation she says I need to respect, you know --

19    Q.    Respect your co-workers?

20    A.    Yeah.  Even when they did my evaluation the

21    people -- I mean, the one who did the interview with

22    me, you know, he told me before, Sami, I know what

23    happened, we're sorry about what happened and stuff,

24    and he reviewed the interview with Noel.  The one that

1    did the interview at that time was Darla --

2    Q.    Darla Cherry?

3    A.    Yes, Darla cherry.

4    Q.    Which interview are you talking about?

5    A.    For the evaluation, you know, to do the

6    evaluation.  I mean, she talked to me in the booth, I

7    know what happened, I know what happened, we apologize

8    for you and stuff, but in the evaluation I was

9    suprised.  The one who wrote the interview because I

10   have to come and sign it.  After I sign it I was

11   suprised, I said, "Who wrote this one?"  I remember at

12   that time I talked to Noel.

13   Q.    When you say "Noel," is that Noel Lafferty?

14   A.    Yes.  He said, I have to finish it with, you

15   know.

16   Q.    Keisha was disciplined, correct?

17   A.    I heard from other co-workers because you have

18   witnesses and she told me in front of everybody that

19   that I should not act like this, it's not like -- I'm

20   not saying exact words she said, but it's not your

21   country, don't act like this, something like that, and

22   people heard her in the booth.

23   Q.    And she was disciplined as well?

24   A.    People told me for three days or something like

1    the company, you know.  Because I was doing my job

2    right I didn't have -- that's why I stayed more.

3    Other people they kicked out, they terminated.

4       Q.    When you are determining who is number seven

5    and who is number 30 -- let me finish my question,

6    please.  When you are determining who is number seven

7    and who is number 30 or any other number, is anything

8    other than time taken into consideration?

9                MR. CONLEY:  To the extent that you know.

10   BY MS. VOSS:

11      Q.    I'm asking for your understanding.

12      A.    Time, the more time, yeah.

13      Q.    Just time?

14      A.    Yeah.

15      Q.    In the next paragraph you talk about an

16   incident with Keisha and I think we have talked about

17   that already.  You also talk about another cashier

18   supervisor named Janet.  Do you recall her last name

19   at this point?

20      A.    No, I don't recall her last name.

21      Q.    And you said Janet --

22      A.    Either Janet or Jane.  She was a cashier

23   supervisor and she was involved with Keisha when that

24   problem happened.

72

```
1    Q.   Did these two incidents happen around the same
2    time?
3    A.   No, I'm saying -- what is this, number 14?
4    Q.   Number 13.
5    A.   This one it happened -- it's not like in the
6    same time, but during 2001 she was working there.
7    Q.   During 2001?
8    A.   Yes, she called me --
9    Q.   What did you understand that comment to mean?
10   Wait a minute, you didn't start working until 2002 so
11   I don't think it happened in 2001.
12   A.   I didn't say 2001, I said 2004.
13   Q.   I didn't hear that, but Janet made her comment
14   in 2004?
15   A.   Yeah, 2004, 2003, I'm not sure when she was
16   working there.
17   Q.   Did she still work there?
18   A.   No, she left.
19   Q.   And her job was cashier supervisor?
20   A.   She was cashier supervisor.
21   Q.   Do you know if she left voluntarily?
22   A.   I have no idea.  I don't know.
23   Q.   What did you understand her comment to mean?
24   A.   She was calling me a terrorist of Delaware Park
```

73

1    or Delaware Park terrorist.

2    Q.    Who did she say that to?

3    A.    To me.

4    Q.    And what was happening when she said that?

5    A.    She was, "Hey, Delaware Park terrorist."

6    Q.    Did you report that?

7    A.    To who?

8    Q.    To anyone, to your supervisors?

9    A.    I didn't report it to anyone.

10   Q.    Did you report that to HR?

11   A.    No.

12   Q.    Why not?

13   A.    Well, I don't want to talk anything like about

14   terrorists.  This one should not be talking, but she

15   said it and, as I told you, I'm a family with kids and

16   I came here to find good living.  I did not come here

17   to argument and, you know.

18   Q.    Well, you complained about Keisha?

19   A.    Keisha, they told me I have to go to the HR.

20   They told me to go to the HR.

21   Q.    Who told you to go to HR?

22   A.    Stacey, she send me.  She called me in the

23   booth, she told me, "Go see a guy named Mark," I

24   believe, Mark in HR.

1    time.  She suggested that we can go talk with Kevin

2    DeLucia and stuff, make appointment, that's what she

3    suggested.

4        Q.    In paragraph 25 you say that Ms. Dixon and Ms.

5    Suhr increased their discriminatory and retaliatory

6    actions after you complained.  What exactly did they

7    do.  Let's start with Ms. Dixon, what did she do?

8        A.    About 25?

9        Q.    Yes.

10       A.    Give me a minute and let me read it.  That's

11   what happened.  She was raising -- she always tried to

12   put me down among all my workers.  Whether I did good

13   job or not doesn't matter with that.  She always like

14   to show me disrespect.

15       Q.    What specifically did she say to you that was

16   disrespectful?

17       A.    Disrespect, yelling at me in front of -- for

18   nothing, I don't know why.

19       Q.    Can you tell me any specific thing she said?

20       A.    She is younger than me and call me, Yo, she was

21   calling me, Yo.  You know when someone talks to you

22   with no respect, you feel it.

23       Q.    She called you Yo, what else did she say?

24       A.    It's not only Yo.  That raising her voice

Almakhadhi v. Delaware Park, LLC
Sami Almakhadhi

99

1   against me, raising her voice for something, tried to
2   like harass with surveillance.  She called me and say
3   I count money fast.  Because when she came to the
4   booth, opened the booth, she stand behind me, make me
5   nervous all the time.  I need to work, I need to be --
6   without somebody watching me from the back.  It was
7   like, I don't know what to tell you.
8       Q.   She called you Yo, she indicated that --
9       A.   It's not only called me Yo.  I said it's no
10  respect.  When she call me, Yo, you know, she say, Yo,
11  it's not good in front of my customers.
12      Q.   I understand, that's one example, right, and at
13  some point she said you were counting money too fast?
14      A.   Yeah, she stand behind me just watching me for
15  no reason.  She called the surveillance watching me,
16  you know.
17      Q.   When she was speaking to you in a disrespectful
18  tone, was she discussing work matters, things like
19  counting money?
20      A.   Sometimes even if I'm walking, you know, just,
21  What are you doing here?  She has no respect for me at
22  all.  I don't know why, ask her why.
23      Q.   Do you recall any other specific comments she
24  made to you?

1   A.   This page it's in 12.

2   Q.   Okay, let me move back to 12.  Which page, last
3   page?

4   A.   Yes, page three.

5   Q.   Can you please read this one?  Just to be
6   consistent on Exhibit 12 can you write down the number
7   5 again.  "We would not be comfortable putting him in
8   another position until he was able to have some
9   success as a satellite cashier.  I informed him that
10  there were two satellite cashiers positions open right
11  now that he could post for."  And if I go to the
12  proceeding page was that Micki Nardo who was speaking?

13  A.   Stacey.

14  Q.   That was Stacey.

15  A.   Do you want me to give you more?  I can give
16  you more.  They told me you have to be a satellite for
17  strategy, but it's only for me.  On top of that one,
18  the whole thing, I did not even have -- come on, I
19  don't have interview, only after the position is being
20  filled.

21  Q.   And that was the main bank position?

22  A.   Yeah, I'm talking about the main bank.  They
23  told me -- here is what happened.  Roberta called me.
24  I was in one of the booths downstairs.  She called me

Almakhadhi v. Delaware Park, LLC
Sami Almakhadhi

156

1   and she said to come to the office and the satellite

2   -- and even the satellite who was there.  The

3   satellite who was there was Helen Brown.  She called

4   up and send Sami to office.

5            I went to the office and she said, "Sami,

6   I need to tell you we will not have interview with you

7   you for the main bank job."  I said, "Why?"  She said,

8   "The position has been filled."  I felt emotional, you

9   know, not even interview, that's the top of the

10  disrespect.  She sent me to the booth.  I went back to

11  the booth.  Fifteen minutes later she called me back.

12  She said, "Sami, I'm sorry, I told you the position

13  has been filled, but we have to do the interview even

14  without a position."  I said, "Why I have to do

15  interview if there is not a position?"  She said, "We

16  have to go through the procedure."

17  Q.   The requirement to be a satellite and the fact

18  that the main bank position someone else was selected

19  before you were ever interviewed?

20  A.   Before my interview.

21  Q.   Anything else?  I just want to make sure I'm

22  being complete.  And all the other things we talked

23  about.  If there is something new --

24  A.   As I told you, Micki, Stacey and even Kevin,

```
 1              (Almakhadhi Deposition Exhibit No. 16 was
 2    marked for identification.)
 3    BY MS. VOSS:
 4       Q.   Is this the letter you were talking about?
 5       A.   Yes.
 6       Q.   And you received this in early April?
 7       A.   I have the envelope, I received it April 4th.
 8    I can give you the exact date, I still keep the
 9    envelope, April 4th or 5th.
10       Q.   And you called Shannon shortly after receiving
11    this?
12       A.   Yes.  What happened I went to HR, I went to HR
13    in April 3rd to find --
14       Q.   Before you received the letter?
15       A.   The first time I found about my termination
16    here is the story exactly.  In March 9th I went to
17    Happy Harry's to use my -- get medication for my son.
18    The bill she told me because he was a newborn you have
19    to put on the system, Cobra, she told me this card is
20    not good.  That was March 29th.  I said, you know,
21    it's good, can you try again?  She tried again and
22    it's not good.  I called the benefits I think March
23    30th, next day, because 29th I went to Happy Harry's
24    and the next day I called benefits.
```

1    you know, if you want to kill me, you want me out.

2    Even as I told you before she was telling me, Are you

3    going to stay in this country after the injury?  What

4    are you going to do?  Make sense?

5    Q.    No.

6    A.    The point is I was trying to move outside the

7    department, cannot go, outside the department move to

8    a better department, I cannot go, I stopped.

9              MS. VOSS:  I would like to take a brief

10   break for two, three minutes tops, and just clear my

11   thoughts and make sure I really don't have any more

12   questions.  Is that okay?

13             MR. CONLEY:  Yes.

14             (Brief recess.)

15             MS. VOSS:  Please mark this.

16             (Almakhadhi Deposition Exhibit No. 19 was

17   marked for identification.)

18             MS. VOSS:  One bit of housekeeping.  Our

19   court reporter had a question about Beverly Pope and I

20   understand her name to be Beverly Pope spelled P-O-P-E

21   and when you talked about her, it sounds a little

22   different than that, which is fine, but we want to

23   make sure that everybody is okay with having the

24   record use Pope whenever you talk about Beverly

Almakhadhi v. Delaware Park, LLC
Sami Almakhadhi

237

1    Q.    I want to ask you about George Bohatiuk,

2    Exhibit 6 as an example.  Is it your understanding

3    that that doctor is a specialist?

4    A.    I believe he has relation, says here muscle,

5    physical medicine.  He is not a family doctor.  Even

6    when somebody recommended him to me and the person who

7    recommended him to me her name is Tina, she was a

8    cashier worker.  She told me she went to this doctor

9    for, I don't know, muscle, and he is good.

10   Q.    But you went to see him because he is a back

11   specialist?

12   A.    Yes.

13   Q.    Between September 1st when you were sent home

14   and the time of your termination either in February or

15   March, whenever that was, did you receive any

16   correspondence from Delaware Park concerning your

17   absences?

18   A.    No.  Told me, no.

19   Q.    Did you receive any correspondence during that

20   same time frame from Delaware Park concerning your

21   FMLA status?

22   A.    No.

23   Q.    You talked a bit about taking pain medication

24   for your back.  Even with the medication, even when

1    you do take the medication, if you did lifting, would

2    you have any problems after you did the lifting either

3    the same day or the next day?

4                MS. VOSS:  Object to the form.

5    A.    Well, when you take medication you don't feel

6    pain.  Sometimes you feel pain if it's really -- but

7    could be later when there is no affect from the

8    medication you feel the pain.  Maybe when you wake up

9    in the morning, wow, what did I do, did I lift

10   something heavy?

11   Q.    The medication treats the symptoms, but it has

12   not addressed the underlying problems of treatment?

13   A.    Just the symptoms.

14                MR. CONLEY:  Okay, that's it.

15                MS. VOSS:  I have no further questions.

16                (The deposition was concluded at 4:56 p.m.)

17

18

19

20

21

22

23

24

# MID ATLANTIC SPINE

100 Beck's Woods Drive
Suite 102
Bear, DE 19701
(302) 392-6501

126 E. High Street
Elkton, MD 21921
(410) 392-3385

Patient Name _Sami Almakhadhi_    Date: _5·17·05_

Diagnosis: _hern. lumb. disc_

Date of last treatment: _5·17·05_    Date of next appointment: _4 weeks_

☐ Patient is Totally Disabled

    No Work/School    From: _____    To: _____

☐ Patient is Partially Disabled

    From: _5·17·05_    To: _4 wks._

    May Work _8_ Hours Per Day

Restrictions:

☒ No stairs/climbing
☒ No prolonged standing/walking
☒ No prolonged sitting
☒ No lifting over _20_ lbs.
☐ No overhead work
☒ No squatting, crawling, kneeling, stooping
☒ No repetitive bending and twisting
☐ Other: _____

Return to Work:

    Patient may return to work without restrictions on _____

    Comments: _pt. has procedures / diagnostic studies pending_

Physician Signature _____ PA-C


DEPOSITION EXHIBIT
ALMAKHADHI
4-CMV-11/8/07

MAP-028

**B74**

LEXSEE



Positive
As of: Dec 13, 2007

**NUBIA CARDENAS, et al., Plaintiffs, v. DOREL JUVENILE GROUP, INC., et al.,
Defendants.**

**CIVIL ACTION No: 04-2478-KHV-DJW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

**2006 U.S. Dist. LEXIS 37465**

**June 1, 2006, Decided**

**PRIOR HISTORY:** Cardenas v. Dorel Juvenile Group, Inc., 2006 U.S. Dist. LEXIS 2382 (D. Kan., Jan. 23, 2006)

**CORE TERMS:** discovery, redesigned, default judgment, responsive, belated, attorney fees, amend, recess, seat, supplemental, discovery responses, reasonable expenses, interrogatory, failure to produce, failure to comply, substantially justified, bad faith, substantial justification, obey, concealed, order to provide, disclosure, misconduct, harmless, harsh, modification, accounting, paralegal, offending, e-mail

**COUNSEL:** [*1] For Nubia Cardenas, Individually and as natural guardian of Leeyiceth Reyna, a minor, Plaintiff: Ann M. Songer, Shook, Hardy & Bacon L.L.P. -- Kansas City/Grand, Kansas City, MO; Evan A. Douthit, R. Douglas Gentile, Randall L. Rhodes, Douthit, Frets, Rouse, Gentile & Rhodes, LLC, Kansas City, MO; Albert L. Kamas, Larry D. Ehrlich, Render Kamas, L.C., Wichita, KS.

For Southwest National Bank, as Conservator for Leeyiceth Reyna, a minor, Plaintiff: Ann M. Songer, Shook, Hardy & Bacon L.L.P. -- Kansas City/Grand, Kansas City, MO; R. Douglas Gentile, Randall L. Rhodes, Douthit, Frets, Rouse, Gentile & Rhodes, LLC, Kansas City, MO; Albert L. Kamas, Larry D. Ehrlich, Render Kamas, L.C., Wichita, KS.

For Dorel Juvenile Group, Inc., Dorel Industries, Inc., Wal-Mart Stores, Inc., Defendants: Karen M. Fischer, Ann M. Songer, Shook, Hardy & Bacon L.L.P. -- Kansas City/Grand, Kansas City, MO; Walter C. Greenough, Schiff Hardin, LLP, Chicago, IL.

**JUDGES:** David J. Waxse, United States Magistrate Judge.

**OPINION BY:** David J. Waxse

**OPINION**

**MEMORANDUM AND ORDER**

Pending before the Court is Plaintiffs' Motion for Sanctions (doc. 139). Plaintiffs seek sanctions against Dorel Juvenile Group, Inc. [*2] ("DJG") pursuant to Federal Rule of Civil Procedure 37, alleging that DJG attempted to conceal a crucial and damaging document known as "CEA 416," failed to truthfully respond to a request for production of documents, failed to supplement its response to a document request that it knew was false, made a false statement to the Court in an attempt to avoid the entry of an order compelling discovery, and defied the Court's order compelling discovery.

On April 20, 2006, after Plaintiffs' Motion for Sanctions was fully briefed, Plaintiffs filed a

Page 1

**B75**

supplemental brief, asserting that their counsel discovered on eBay two Touriva child safety seats ("Tourivas") that are considerably different than the one they claim injured Leeyiceth Reyna. Plaintiffs allege that DJG concealed the redesigned Touriva from Plaintiffs and served false responses to Plaintiffs' discovery requests and intentionally failed to supplement those responses. [1]

> 1   The Court allowed the parties to file various supplemental briefs relating to these new allegations. *See* doc. 163, 168, 175, and 176.

[*3] Plaintiffs ask the Court to strike DJG's Answer and preclude DJG from pursuing any of its affirmative defenses in this matter, which would effectively result in the entry of default judgment against DJG. [2] In the alternative, Plaintiffs seek the following:

> (1) A finding of fact that the "recess" in the Touriva at issue was a defective and unreasonably dangerous condition that caused or contributed to cause all of Leeyiceth Reyna's injuries.

> (2) A finding of fact, that can be made known to the jury, that DJG defied a Court Order and concealed CEA 416; and

> (3) A finding that CEA 416 and all other documents related to the Touriva's "recess" be deemed admissible at trial.

Plaintiffs also request that they be awarded the attorney fees and expenses they have incurred in connection with the filing of their motion for sanctions.

> 2   In their response to the Motion for Sanctions, DJG construes Plaintiffs' Motion as requesting the entry of default judgment. In addition. Plaintiffs make it clear in their reply brief that they are seeking default judgment against DJG.

[*4] For the reasons set forth below, the Court will deny the motion for sanctions, except to the extent Plaintiffs will be allowed to recover their attorney fees and expenses.

## I. Background Information

### A. Plaintiffs' Causes of Action

This is a product liability lawsuit involving a Touriva child safety seat. According to Plaintiffs, the Touriva was designed, tested, manufactured, labeled, distributed, and sold by DJG and its parent corporation, Defendant Dorel Industries, Inc. ("DI").

The case arises out of an automobile crash that took place on October 12, 2002. Leeyiceth Reyna, who was then eighteen months old, was in a Touriva in the rear seat of one of the automobiles involved in the crash. Plaintiffs claim that as a result of the crash, Leeyiceth hit her head on one or both of the notched, rigid, unpadded and hard plastic "side wings" of the Touriva, causing her to suffer massive and permanent brain damage and other life-altering injuries. Plaintiffs assert that, with a properly designed seat, Leeyiceth would not have sustained such injuries.

Plaintiffs assert strict liability claims against DJG and DI based on alleged design, testing, manufacturing, labeling, [*5] and warning defects in the Touriva. Plaintiffs also assert claims against DJG and DI for negligence in the design, testing, manufacture, labeling, and warning of defects in the Touriva. In addition, Plaintiffs bring claims under the Kansas Consumer Protection Act against all Defendants, alleging that the sale of the Touriva was a deceptive and unconscionable act.

### B. DJG's Belated Production of CEA 416

On March 7, 2005, Plaintiffs served their First Requests for Production on DJG, including First Request No. 13, which asked DJG to produce "[a]ny CEA that applies or applied in any way for the Touriva at any time since it was initially conceived." DJG objected to the request and did not produce any responsive documents. Plaintiffs filed a motion to compel (doc. 39) on May 2, 2005, seeking, *inter alia*, to compel DJG to produce these documents. Plaintiffs explained in their motion to compel that "CEA" is an acronym for a "Capital Expenditure Authorization" and is a DJG form which provides a description and justification for a design modification made during the life of a product. Plaintiffs further explained that a CEA for the Touriva would reveal when design changes were [*6] considered and would identify the DJG employees who approved each major design change to the Touriva.

On May 13, 2005, DJG wrote Plaintiffs' counsel and stated that he was prepared to produce "[t]he Capital

Page 2

Expenditure Authorization you requested." [3] Three days later, DJG responded to Plaintiffs' motion to compel (doc. 58) and, without reasserting its initial objections and without any elaboration, stated: "DJG has produced this document." [4] Plaintiffs filed a reply brief, indicating that DJG had never produced the document, and had only offered to make it available for inspection in Chicago or to ship it to Plaintiffs' counsel's office at Plaintiffs' expense.

> 3  Decl. of Walter Greenough, attached as Ex. 2 to DJG's Resp. to Pls.' Mot. for Sanctions (doc. 144).
> 4  DJG's Resp. to Mot. to Compel (doc. 58) at p. 8.

On August 31, 2005, the Court granted in part the motion to compel (*see* doc. 86). The Court ordered DJG to produce or make available for inspection and copying numerous documents, including [*7] the document that DJG had indicated it had already produced in response to First Request No. 13.

DJG served an amended response to First Request No. 13 on October 20, 2005. It reasserted its initial objections and then stated: "[A]ll responsive documents that DJG has located have been produced as Bates Numbers        COS0002-7;        COS0014-21; CARDENAS18183-190;        23896-23924." These documents were two CEAs pertaining to the initial development of three Touriva molds. CEA 416, which is the document at issue here, was not among the documents produced.

Based on DJG's amended response, Plaintiffs presumed that all documents responsive to First Request No. 13 had been produced. Several weeks later, however. Plaintiffs discovered an unnumbered document contained in a CD of documents DJG had produced in response to other document requests. This document was an internal DJG e-mail from Larry Rumph to Bill Horton dated September 24, 2002 with the subject heading "Touriva Shell Modifications." [5] The e-mail stated: "The CEA was signed today for the modification of the seat shells to remove the barrier recess. The project number is B14-416-201. Total amount $ 50,000." [6] As DJG had never produced a copy [*8] of this CEA, Plaintiffs served on December 21, 2005 a Fourth Request for Production specifically requesting this particular CEA, along with all documents that accompanied or referenced the CEA as it was circulated for approval.

> 5  *See* Ex. 2 attached to Pls.' Mem. in Supp. of Mot. for Sanctions (doc. 140).
> 6  *Id.*

On January 19, 2006, DJG served a written response to Plaintiffs' Fourth Request, stating: "DJG is searching for additional responsive documents." On January 24, 2006, Plaintiffs' counsel sent DJG's counsel a letter asking him to either produce the requested documents or state that none exist. DJG's counsel indicated he would try to produce something soon. On January 30, 2005, Plaintiffs received from DJG five CDs containing numerous videos and more than 1,300 pages of documents. One of those documents was the CEA at issue, i.e., CEA 416.

CEA 416 contained the heading "Description & Justification," under which it stated:

Modification of the Touriva Car Seat Shell Molds

> Request for [*9] capital to modify the three Touriva Convertible Car Seat shell molds to remove the recess for the overhead barrier shields. In use without the barrier, *this recess is a child safety concern* as well as an aesthetic issue.
>
> The estimated cost per mold to remove this recess is $ 15,000 and there will be some incidental mold repair issues corrected during this process.
>
> Total capital required = $ 50,000.00. [7]

> 7  *See* Ex. 1 attached to Pls.' Mem. in Supp. of Mot. for Sanctions (doc. 140) (emphasis added).

CEA 416 was dated September 24, 2002 and signed by its "Originator" Bill Holton, who was a Senior Project Engineer for DJG. The CEA indicated that the expenditure was "approved" by DJG's Vice-President Operations and at least one other DJG employee.

Plaintiffs argue that CEA 416 is "key and crucial evidence" which reveals that less than one month before Leeyiceth Reyna's accident, a DJG engineer requested approval to modify the Touriva to address a "child safety concern." According to Plaintiffs, [*10] this establishes that DJG was on notice that the Touriva used by

Page 3

**B77**

Leeyiceth was defective.

Plaintiffs claim they have been prejudiced by the belated discovery of CEA 416. They argue that because CEA 416 was discovered only two weeks before Plaintiffs' expert witness disclosures were due, their experts were required to re-analyze the evidence and reformulate their opinions, causing Plaintiffs to incur additional expenses. Plaintiffs also contend that DJG's actions leave Plaintiffs unsure as to whether other crucial documents have been concealed and unable to rely on DJG's representations that it has produced all other responsive documents. Furthermore, Plaintiffs contend they can no longer rely on DJG to fairly redact materials that it claims are irrelevant. Finally, Plaintiffs assert they have been prejudiced because the belated discovery of CEA 416 opens up an entire new area of the case that needs to be explored. If Plaintiffs make the decision to seek an extension of time on their expert disclosures and discovery, the trial will need to be moved. Plaintiffs contend that such delay and added expense are clearly prejudicial.

Plaintiffs contend that DJG acted deliberately and that [*11] such deliberate wrongdoing warrants severe sanctions. According to Plaintiffs, the sequence of events reveals that DJG deliberately concealed a crucial piece of highly relevant evidence and that DJG knew CEA 416 was directly responsive to Plaintiffs' First Request No. 13. Plaintiffs explain that CEA 416 was a new and different CEA than the one DJG had expressly represented to the Court on May 16, 2005 had already produced, and they contend that DJG misrepresented to Plaintiffs and the Court that it had already produced all documents responsive to First Request No. 13. Finally, Plaintiffs maintain that DJG flouted the Court's August 31, 2005 Order granting Plaintiffs' motion to compel and directing DJG to produce all documents responsive to First Request No. 13 by failing to produce it with its amended October 20, 2005 response to the First Requests for Production. Plaintiffs assert that but for their fortuitous finding of the September 24, 2002 e-mail which referenced CEA 416, they never would have discovered the document, and DJG would have continued to conceal it, despite an outstanding request requiring its production.

In response to Plaintiffs' Motion for Sanctions, DJG explains [*12] that it did not initially produce CEA 416 in response to Plaintiffs' First Request No. 13 because

DJG's outside counsel and in-house personnel responsible for locating responsive documents were unaware of its existence until DJG received Plaintiffs' Fourth Request for Production. DJG contends that it produced CEA 416 as soon as it was located. DJG maintains that during its investigation into why CEA 416 had not been previously produced, DJG located and promptly produced twenty additional CEAs.

DJG explains that a paralegal employed by DJG coordinated the investigation internally at DJG, including the search for CEAs responsive to Plaintiffs' First Request No. 13. She did not request that DJG's accounting department search for all CEAs pertaining to the Touriva, as she was unaware that DJG's accounting department maintained files of all CEAs. She was able to locate two CEAs relating to the Touriva, which apparently were located in other files, and those were provided to Plaintiffs in DJG's document production. She apparently believed that those were the only two CEAs in existence that were responsive to Request No. 13. This paralegal left DJG's employ in September 2005.

DJG further [*13] explains that on October 31, 2005, another paralegal began working for DJG and took over the duties of locating documents to be produced in this case. Prompted by Plaintiffs' Fourth Requests for Production, this new paralegal investigated why CEA 416 had not been previously produced and whether any additional CEAs responsive to Plaintiffs' discovery requests existed. She learned that the CEAs are maintained in DJG's accounting department. Upon her review of the accounting department files, she discovered twenty additional CEAs, which were then produced to Plaintiffs.

DJG does not dispute that it was obligated to produce the CEAs in response to First Request No. 13, and it concedes that it should have found and produced CEA 416 when it was first requested by Plaintiffs. DJG argues, however, that its failure to initially produce CEA 416 was the result of a mistake and not an attempt to conceal evidence, as Plaintiffs assert.

## C. DJG's Alleged Failure to Provide Discovery Regarding the Redesigned Touriva

With respect to the allegations raised by Plaintiffs in their supplemental brief filed on April 20, 2006, Plaintiffs allege that DJG has not provided truthful responses to Plaintiffs' [*14] discovery requests dealing with the

redesigned Touriva. Plaintiffs claim they discovered the existence of the redesigned Touriva for the very first time on April 18, 2006, when their counsel discovered two of the redesigned car seats for sale on eBay. Plaintiffs also allege that DJG intentionally failed to supplement its discovery responses and has engaged in "a practice of hiding extraordinarily pertinent and material information." [8]

    8  Pls.' Suppl. Mem. (doc. 163) at p. 1.

    DJG responds that it has never concealed the redesigned Touriva from Plaintiffs. It explains that the redesigned Touriva has been available for purchase at retail stores throughout the United States. It also asserts it has never hidden any documents or other evidence regarding the Touriva's redesign from Plaintiffs. To the contrary, DJG asserts it has produced e-mails, meeting minutes, photographs, drawing and sled tests relating to the redesigned, "notchless" version of the Touriva. DJG provides specific details about photographs, blueprints [*15] and drawings of the redesigned Touriva and various documents relating to the implementation of the new design, which it has provided in response to various requests for production and interrogatories served by Plaintiffs. DJG also explains how it has produced documents relating to compliance testing of the redesigned Touriva and documents relating to CEA 416 regarding the redesign process. While DJG admits that it has never provided an actual exemplar of the redesigned Touriva to Plaintiffs, it states that Plaintiffs never requested such an exemplar.

## II. Discussion and Analysis

    Plaintiffs seek sanctions pursuant to subsections (b)(2) and (c)(1) of Federal Rule of Civil Procedure 37.

### A. Rule 37(b)(2) Sanctions

*1. Applicable standard*

    Subsection (b)(2) of Rule 37 authorizes a district court to sanction a party who "fails to obey an order to provide or permit discovery." [9] Included among the available sanctions are (1) an order that facts be deemed established "in accordance with the claim of the party obtaining the order," [10] (2) an order refusing to allow the disobedient party to oppose certain claims or to support defenses, [*16] or prohibiting the disobedient party from introducing certain matters in evidence, [11] and (3) an

order striking certain of the disobedient party's pleadings. [12]

    9  *n.9 Proctor & Gamble Co. v. Haugen, 427 F.3d 727, 737 (10th Cir. 2005)* (quoting Fed. R. Civ. P. 37(b)(2)).
    10  Fed. R. Civ. P. 37(b)(2)(A).
    11  Fed. R. Civ. P. 37(b)(2)(B).
    12  Fed. R. Civ. P. 37(b)(2)(C).

    Rule 37(b)(2) provides that in lieu of, or in addition to, any of these orders, the Court "shall require" the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the non-compliance. An award of fees and expenses is mandatory unless the court finds that the noncompliance was substantially justified or that other circumstances would make an award of expenses unjust. [13] [*17]

    13  Fed. R. Civ. P. 37(b)(2).

    A district court is afforded wide discretion in choosing an appropriate sanction. [14] That discretion, however, is limited in that the chosen sanction "must be in the interests of justice and proportional to the specific violation of the rules." [15] While Federal Rule of Civil Procedure 37(b)(2) authorizes default judgments against a party who fails to comply with a court order to provide or permit discovery, the court's discretion to enter default judgment is not unlimited. [16] The Tenth Circuit has emphasized that "a default judgment is a harsh sanction." [17] Accordingly, due process requires that the "failure" giving rise to the sanction must be the result of willfulness or bad faith, and not the mere inability to comply. [18]

    14  *Proctor & Gamble Co. v. Haugen, 427 F.3d 727, 738 (2005)*.
    15  *Olcott v. Delaware Flood Co., 76 F.3d 1538, 1557 (10th Cir. 1996)*.
[*18]
    16  *M.E.N. Co. v. Control Fluidics, Inc., 834 F.2d 869, 872 (10th Cir. 1987)* (citing Fed. R. Civ. P. 37(b)(2) and (d)).
    17  *FDIC v. Daily, 973 F.2d 1525, 1530 (10th Cir. 1992)*; *see also M.E.N., 834 F.2d at 872*.
    18  *M.E.N., 834 F.2d at 872*.

    In addition to finding the offending party's failure to be willful, the court must also find the entry of default

judgment to be a "just" sanction for the offending party's misconduct. [19] To make this determination, courts typically consider one or more of the following factors: (1) the degree of actual prejudice to the non-offending party; (2) the amount of interference with the judicial process caused by the offending party; (3) whether the court warned the offending party in advance that default judgment would be a likely sanction for noncompliance; and (4) the efficacy of lesser sanctions. [20] These factors do not constitute a rigid test, but rather represent criteria for the district court to consider in selecting a sanction. [21] Only [*19] when "the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits" is default judgment an appropriate sanction. [22]

19  *See* Ehrenhaus v. Reynolds, 965 F.2d 916, 920-21 (10th Cir. 1992) (discussing dismissal of claims as Rule 37(b)(2)) sanction.

20  *See* id. at 921.

21  *Id.*

22  *Id.* (internal quotations omitted).

*2. Application of the Rule 37(b)(2) standard to the facts of this case*

*(a) DJG's belated production of CEA 416*

As noted above, Rule 37(b)(2) sanctions are applicable only when a party fails to obey an order to provide or permit discovery. Plaintiffs base their request for Rule 37(b)(2) sanctions on DJG's failure to comply with the Court's August 31, 2006 Order granting Plaintiffs' motion to compel and directing DJG to produce all documents responsive to First Request No. 13. More specifically, Plaintiffs contend that DJG's failure to produce CEA 416 in response to that Order warrants the [*20] entry of default judgment, or in the alternative, a finding that the "recess" in the Touriva at issue was a defective and unreasonably dangerous condition that caused or contributed to Leeyiceth Reyna's injuries.

The Court does not find the requested sanctions to be warranted. Certainly, the standard for entering default judgment has not been met here. The Court does not find that DJG's failure to produce CEA 416 was the result of willfulness or bad faith on DJG's part. Even if the Court were to find DJG's failure to produce the document willful or in bad faith, the Court would not find that the other factors weigh in favor of such a harsh sanction.

Plaintiffs have not demonstrated that they have suffered, or will suffer, significant prejudice as a result of the belated production of CEA 416. Plaintiffs received a copy of CEA 416 on January 30, 2006, and will have until June 28, 2006 to complete discovery. [23] This is a significant period of time within which to conduct any additional discovery regarding the CEA and the design changes to the Touriva. Although Plaintiffs complain about their experts having to re-analyze the evidence, the Court finds that this does not rise to the level [*21] of significant prejudice that would justify the imposition of such a harsh sanction. Furthermore, the Court cannot find that there has been a serious interference with the judicial process. Finally, DJG has never been warned that its conduct might result in the imposition of default judgment. Consequently, the Court finds no basis to enter the sanction of default judgment against DJG.

23  *See* Dec. 8, 2005 Amended Scheduling Order (doc. 121) at P 2.

In addition, the Court does not believe that Plaintiffs are entitled to a finding that the "recess" in the Touriva at issue was a defective and unreasonably dangerous condition that caused or contributed to Leeyiceth Reyna's injuries. Such a sanction would have virtually the same effect as granting default judgment against DJG. For the reasons sets forth above, such a harsh sanction is out of proportion to DJG's fault in not timely producing the CEA, and must be rejected.

Notwithstanding the above, the Court does not find that DJG's eventual production of CEA [*22] 416 should absolve DJG of liability. Indeed, the fact that a party ultimately produced the requested document is not determinative of whether sanctions should be imposed. [24] Rule 37(b)(2) permits imposition of sanctions when a party "fails to obey an order," a failure that is not absolved upon production. [25] Moreover, attorneys have a duty to insure that their clients discharge in good faith their duties under the discovery provisions of the Federal Rules of Civil Procedure, as implemented by specific orders of this Court. "[P]arties cannot fail to produce highly relevant documents within their possession with impunity. Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents." [26]

24  Ohio v. Arthur Andersen & Co., 570 F.2d 1370, 1374 (10th Cir. 1978) ("Final production is

Page 6

**B80**

not determinative" as to whether Rule 37 sanctions should be imposed for failure to comply with Court order.).

25  *Id.* (quoting Fed. R. Civ. P. 37(b)(2)).

[*23]

26  *Bratka v Anheuser-Busch Co., Inc.,* 164 F.R.D. 448, 461 (S.D. Ohio 1995).

The Court cannot find that DJG was sufficiently diligent in planning and executing an effective search for the CEAs requested by Plaintiffs in their First Request No. 13. Trial counsel have a duty to exercise some degree of oversight over their clients' employees to ensure that they are acting competently, diligently, and ethically in order to fulfill their responsibility to the Court and opposing parties. 27 Accordingly, trial counsel have the obligation to communicate with in-house counsel to identic the persons having responsibility for the matters that are the subject of the document requests and to identify all employees likely to have been authors, recipients or custodians of documents falling within the request. 28 Trial counsel also have an obligation to review all documents received from the client to see whether they indicate the existence of other documents not previously retrieved or produced. 29 The Court does not find that these duties were met here with respect to CEA 416 and the Court's [*24] Order that DJG produce all documents responsive to First Request for Production No. 13.

27  *Id.*
28  *Id.*
29  *Id.*

In light of the above, the Court finds the imposition of some monetary sanctions to be appropriate. As noted above. Rule 37(b)(2) provides that where the Court finds a party has failed to comply with an order to provide or permit discovery, the Court "shall require" the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the non-compliance. 30 The imposition of these sanctions is mandatory unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust. 31

30  Fed. R. Civ. P. 37(b)(2).
31  *Id.*

The parties [*25] have exhaustively briefed DJG's

failure to provide CEA 416, and the Court cannot find that DJG's failure to produce it was substantially justified or that circumstances make an award of expenses to Plaintiffs unjust. The Court will therefore permit Plaintiffs to recover the reasonable expenses and attorney fees they have incurred as a result of (1) DJG's failure to comply with the Court's August 31, 2006 Order and belated production of CEA 416, and (2) Plaintiffs' filing of the instant Motion for Sanctions.

To aid the Court is determining the proper amount of the award, Plaintiffs shall file, within **twenty (20) days** of the date of this Order an affidavit itemizing the reasonable expenses and attorney fees that Plaintiffs have incurred. DJG shall have **twenty (20) days** thereafter to file a response. After reviewing these pleadings, the Court will issue an order specifying the particulars of the award.

*(b) DJG's alleged failure to provide discovery regarding the redesigned Touriva*

The Court will now turn to Plaintiffs' request for Rule 37(b)(2) sanctions due to the misconduct alleged in Plaintiffs' supplemental briefs, i.e., DJG's alleged failure to produce [*26] documents and respond to interrogatories regarding the redesigned Touriva. After carefully reviewing the parties' supplemental briefing and the document requests and interrogatories that Plaintiffs contend are at issue, the Court concludes that Plaintiffs have failed to demonstrate that DJG has violated any Order to provide or permit discovery regarding the redesigned Touriva, except as to CEA 416. Accordingly, the Court will deny Plaintiffs' Motion for Rule 37(b)(2) sanctions as it applies to Plaintiffs' supplemental allegations of misconduct.

**B. Sanctions under Rule 37(c)(1)**

*1. Applicable standard*

As noted above, Plaintiffs also request sanctions under subsection (c)(1) of Rule 37. That subsection provides as follows:

A party that without substantial justification *fails to disclose information required by* Rule 26(a) *or* 26(e)(1), *or to amend a prior response to discovery as required by* Rule 26(e)(2), is not, unless such failure is harmless, permitted to use

as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be [*27] heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure. 32

32 Fed. R. Civ. P. 37(c) (emphasis added).

As noted above, Plaintiffs contend that Rule 37(c)(1) sanctions are warranted on the basis that DJG failed to amend its responses to not only First Request No. 13 but other various requests for production and interrogatories seeking documents and information regarding the redesigned Touriva. In other words, Plaintiffs are contending that DJG failed to meet its duty under Rule 26(e)(2) to amend its prior discovery responses.

Rule 26(e)(2) provides in pertinent part:

A party is under a duty seasonably to amend a prior response to an interrogatory [or] request for production. . . if the party [*28] learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. 33

33 Fed. R. Civ. P. 26(e)(2).

Thus, in order for Rule 37(c)(1) sanctions to be imposed here, the Court must first determine that DJG was under a Rule 26(e)(2) duty to amend its prior discovery responses and failed to meet that duty. If the Court makes such a finding then the Court must determine whether substantial justification for failing to amend the discovery responses existed. 34 If the failure

was not substantially justified then the Court must determine whether the failure to amend the responses was harmless. 35 The burden to establish substantial justification and harmlessness is on DJG. 36

34 *Umbenhower v. Copart, Inc.,* 222 F.R.D. 672, 675 (D. Kan. 2004)(citing *Burton v. R.J. Reynolds Tobacco Co.,* 203 F.R.D. 636, 639 (D. Kan. 2001) (quoting *Mounger v. Goodyear Tire & Rubber Co.,* 2000 U.S. Dist. LEXIS 20505, No. 99-2230-JWL, 2000 WL 1466198, at *2 (D. Kan. Sept. 22, 2000)).

[*29]
35 *Umbenhower,* 222 F.R.D. at 675.
36 *Burton,* 203 F.R.D. at 639 (burden to show substantial justification and harmlessness is on party who is claimed to have failed to serve the required disclosure or amended discovery response).

The determination of whether a Rule 26 violation is "substantially justified" or "harmless" is entrusted to the broad discretion of the district court. 37 A court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. 38 Nevertheless, the Tenth Circuit has held that the following factors should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing the evidence would disrupt the trial; and (4) the party's bad faith or willfulness. 39

37 *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 953 (10th Cir. 2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir. 1999)).

[*30]
38 *Id*. (quoting *Woodworker's Supply,* 170 F.3d at 993).
39 *Id*. (quoting *Woodworker's Supply,* 170 F.3d at 993).

*2. Application of the Rule 37(c)(1) standard to the facts of this case*

*(a) DJG 's belated production of CEA 416*

The Court does not find that Rule 37(c) sanctions are warranted with respect to DJG's belated production of DEA 416, as the Court does not find that DJG violated

any Rule 26(e)(2) duty to amend it response to First Request No. 13. DJG amended its response to Request No. 13 shortly after Plaintiffs brought the apparent existence of the CEA 416 to DJG's attention.

Even if the Court were to hold otherwise and find a Rule 26(e) violation on DJG's part, the Court would still conclude that Rule 37(c)(1) sanctions are not warranted with respect to CEA 416. Applying the four factors cited above, the Court finds DJG's belated production of CEA 416 to be harmless. Plaintiffs have not been substantially prejudiced by its late production--they have had considerable time to conduct discovery since learning of CEA 416's existence [*31] and will have had ample time to prepare for the October 3, 2006 trial. Moreover, there is no reason to believe that the introduction of the CEA as evidence at trial would disrupt the trial. This is not a case where the document was discovered shortly before trial, where Plaintiffs can claim surprise. Finally, the Court does not find that DJG has acted in bad faith or wilfully. Accordingly, the Court will decline to enter Rule 37(c)(1) sanctions with respect to DJG's belated production of CEA 416.

*(b) DJG's alleged failure to provide discovery regarding the redesigned Touriva*

The Court will also decline to impose Rule 37(c)(1) sanctions based on any alleged failure of DJG to produce documents and respond to interrogatories relating to the redesigned Touriva. Plaintiffs have failed to show how DJG has violated any obligation to amend its discovery responses under Rule 26(e) as to any documents or information pertaining to the redesigned Tourivas. Accordingly, the Court will deny Plaintiffs' Motion for Rule 37(c)(1) sanctions as it applies to Plaintiffs' supplemental allegations of misconduct.

*C. Sanctions Imposed Under the Court's General Powers*

The Court recognizes that [*32] sanctions may be awarded independent of Rule 37(b) or (c), in those situations where a party or its counsel engages in abusive litigation practices. [40] It is well settled that a district court has the "inherent power" to levy sanctions in response to such abuse. [41]

40   *See* Jones v. Thompson, 996 F.2d 261, 264 (10th Cir. 1993) (quoting *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980)).

41   *See, e.g.,* *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)* (discussing the inherent powers of courts to impose sanctions for litigation abuses); *Roadway Express,* 447 U.S. at 765 (recognizing court's inherent power to sanction).

The Court does not believe that DJG or its counsel has engaged in abusive litigation tactics. The Court therefore does not believe it appropriate or necessary to levy sanctions against DJG or its counsel under the Court's inherent powers to sanction.

**III. Conclusion**

Having carefully reviewed the parties' briefs [*33] and having examined the totality of the circumstances presented in this case, the Court concludes that the sanctions requested by Plaintiffs, other than an award of fees and expenses incurred, are not warranted and would not serve the interest of justice. The Court is of the opinion that the type of drastic sanctions requested by Plaintiffs should be reserved for those egregious cases where a party has abused the discovery process--either through grossly negligent, reckless or willful conduct or by flouting court orders compelling compliance with discovery obligations. Those circumstances are not present here.

In light of the foregoing, the Court denies Plaintiffs' Motion for Sanctions (doc. 139), except to the extent Plaintiffs seek to recover their attorney fees and expenses. Plaintiffs will be allowed to recover the reasonable attorney fees and expenses they have incurred as a result of (1) DJG's failure to comply with the Court's August 31, 2006 Order and its belated production of CEA 416, and (2) Plaintiffs' filing of the instant Motion for Sanctions. The parties shall follow the schedule set forth herein for the filing of pleadings relating to the amount of the award.

**IT** [*34] **IS THEREFORE ORDERED** that Plaintiffs' Motion for Sanctions (doc. 139) is denied except to the extent Plaintiffs shall recover the reasonable attorney fees and expenses they have incurred as a result of (1) DJG's failure to comply with the Court's August 31, 2006 Order and its belated production of CEA 416, and (2) Plaintiffs' filing of the instant Motion for Sanctions.

**IT IS FURTHER ORDERED** that Plaintiffs shall

2006 U.S. Dist. LEXIS 37465, *34

file, within **twenty (20) days** of the date of this Order, an affidavit itemizing the reasonable expenses and attorney fees Plaintiffs have incurred. DJG shall have **twenty (20) days** thereafter to file a response.

**IT IS SO ORDERED.**

Dated in Kansas City, Kansas on this 1st day of June, 2006.

s/ David J. Waxse

United States Magistrate Judge

LEXSEE



Positive
As of: Dec 13, 2007

**ED COLLINS, Appellant v. PAUL SLOAD, Individually and in his official capacity as Chief of the Commonwealth of Pennsylvania Department of Revenue; ROBERT M. SHARPE, Individually and in his official capacity as Supervisor of the Commonwealth of Pennsylvania Department of Revenue; ROBERT A. JUDGE, SR.**

No. 06-1638

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

212 Fed. Appx. 136; 2007 U.S. App. LEXIS 390

January 2, 2007, Submitted Pursuant to Third Circuit LAR 34.1(a)
January 8, 2007, Filed

**NOTICE:** [**1] NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Middle District of Pennsylvania. D.C. Civil Action No. 99-cv-0829. (Honorable Sylvia H. Rambo).
Collins v. Sload, 2006 U.S. Dist. LEXIS 24766 (M.D. Pa., Feb. 10, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant public employee appealed from the United States District Court for the Middle District of Pennsylvania which dismissed his employment discrimination lawsuit against appellees, public employers, pursuant to 42 U.S.C.S. §§ 2000e, 1981, 1983, 1985, 1986, and the Pennsylvania Human Relations Act (PHRA), and an order denying his motion to expand discovery.

**OVERVIEW:** On appeal, the employee submitted an appointment form to schedule a meeting with an EEOC representative, and a letter from the EEOC outlining the process for filing a charge. However, these documents did not constitute EEOC charges. Even though the district court gave the employee the opportunity to amend his complaint should he have received the right-to-sue notices, the employee apparently never came forward with such notices to demonstrate exhaustion. The employee maintained that the district court erred in granting summary judgment to the public employers on the Title VII and PHRA claims that remained in the suit after the partial dismissal on the public employers' motion to dismiss. As the district court pointed out, however, the employee failed to show that he had suffered an adverse employment action. The employee merely showed that he received a "satisfactory" rating in an employment evaluation. He did not demonstrate that the rating deprived him of employment opportunities or otherwise altered the terms or conditions of his employment. Likewise, the district court did not err in dismissing the employee's claims under 42 U.S.C.S. §§ 1981, 1983, 1985, 1986.

**OUTCOME:** The appellate court affirmed the ruling of the district court in favor of the employers.

**CORE TERMS:** summary judgment, discovery, notice, time-barred, right-to-sue, unexhausted, remaining claims, conspiracy, immunity, deadlines, opportunity to amend, equitable tolling, humiliation, humiliated, rating, employment discrimination, failure to exhaust, discriminatory intent, administrative remedies, official capacities, protected conduct, cause of action, discriminatory, correspondence, satisfactory, unfavorable, deposition, voluminous, retaliated, accusations

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1]An appellate court reviews a district court's determination that certain Title VII, 42 U.S.C.S. §§ 2000e et seq., claims are time-barred and unexhausted under a plenary standard of review.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*
[HN2]Under Title VII, 42 U.S.C.S. § 2000e-5(e)(1), plaintiffs must file a charge with the Equal Employment Opportunity Commission within 300 days of the alleged discriminatory act, if they also file an action with a parallel state agency.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN3]Affirmative defenses may be considered in a motion to dismiss under Fed. R. Civ. P. 12(b)(6) where the defense would present an insuperable barrier to recovery by the plaintiff.

*Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Discharges & Failures to Hire*
[HN4]An adverse employment action may be a discharge or a failure to hire, or any action that alters an employee's compensation, terms, conditions, or privileges of employment.

*Civil Rights Law > Conspiracy > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN5]No action under the provisions of 42 U.S.C.S. § 1986 shall be sustained which is not commenced within one year after the cause of action has accrued.

*Civil Rights Law > Conspiracy > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN6]Pennsylvania's two-year statute of limitations applies to 42 U.S.C.S. § 1985 claims.

*Civil Rights Law > Conspiracy > Elements*
[HN7]To establish a claim under 42 U.S.C.S. § 1985, a plaintiff must show (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Civil Rights Law > Conspiracy > General Overview*
[HN8]Because transgressions of 42 U.S.C.S. § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also.

*Civil Procedure > Discovery > General Overview*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN9]An appellate court applies an abuse of discretion standard when reviewing orders regarding the scope and conduct of discovery.

**COUNSEL:** ED COLLINS, Appellant, Pro se, Harrisburg, PA.

For PAUL SLOAD, Individually and in his official capacity as Chief of the Commonwealth of Pennsylvania Department of Revenue; ROBERT M. SHARPE, Individually and in his official capacity as Supervisor of the Commonwealth of Pennsylvania Department of Revenue; ROBERT A. JUDGE, SR., Appellees: J. Bart DeLone, Office of Attorney General of Pennsylvania, Strawberry Square, Harrisburg, PA.

Page 2

**B86**

**JUDGES:** Before: SCIRICA, Chief Judge, FUENTES and SMITH, Circuit Judges.

**OPINION**

[*138] OPINION OF THE COURT

*PER CURIAM.*

Ed Collins appeals from an order dismissing part of his employment discrimination law suit; a later order granting summary judgment in favor of the defendants on all remaining claims; and an order denying his motion to expand discovery. In 2004, Collins filed an amended complaint alleging numerous civil rights claims [**2] under 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. §§ 1981, 1983, 1985, 1986 and the Pennsylvania Human Relations Act ("PHRA"). [1] The District Court initially dismissed some of Collins' Title VII claims as time-barred and unexhausted, held that the Eleventh Amendment barred Collins' claims under §§ 1981, 1983, 1985, and 1986 against some defendants, and concluded that some of Collins' §§ 1985 and 1986 claims were time-barred. Later, the District Court granted summary judgment to the defendants on what remained of those claims and the §§ 1981 and 1983 claims. Finding no merit to the contentions in Collins' appellate brief and no error with the District Court's actions, we will affirm.

1   Collins originally filed suit in 1999, alleging Title VII and § 1981 claims of employment discrimination based upon race. His Title VII and § 1981 claims were dismissed for failure to exhaust. On appeal, this Court vacated and remanded on that issue, and Collins filed an amended complaint, referred to by the District Court and the parties as Collins' second amended complaint. *See Collins v. Sload, 90 Fed. Appx. 434, slip op. at 1 (3d Cir. 2004)* (non-precedential).

[**3] A. *Title VII claims*

Collins first argues that the District Court erred by dismissing some of his Title VII claims as time-barred and unexhausted. We disagree. Collins alleged in his complaint, (as he had in the complaint that we had considered previously) that he had filed EEOC charge # 170980522 in December 1996. However, the defendants filed a motion to dismiss in which they pointed out that Collins had not in fact filed the EEOC complaint until

January [*139] 12, 1998, and that, therefore, any factual allegations occurring more than 300 days prior to that date were time-barred. The District Court agreed with the defendants and limited the basis of Collins' Title VII claims to events after March 25, 1997. As a practical matter, Collins' claim for failure to promote from August 1994 until November 1996 was dismissed as outside the 300-day period, but his other claims of receiving an unfavorable evaluation on July 14, 1997, and being subjected to humiliation on September 23, 1997, remained in the lawsuit. In that same order, the District Court dismissed without prejudice additional claims which Collins had apparently asserted through later PHRA/EEOC complaints (on July 28, 2000, July 27, 2001, and [**4] February 3, 2004), but for which no right-to-sue notices had issued. The District Court provided Collins with the opportunity to amend his complaint in the future if he could demonstrate that he received right-to-sue notices.

[HN1]We review the District Court's determination that some of Collins' Title VII claims were time-barred and unexhausted under a plenary standard of review. *See*, *e.g.*, *Anderson v. CONRAIL, 297 F.3d 242, 251 (3d Cir. 2002).* [HN2]Under Title VII, plaintiffs must file a charge with the EEOC within 300 days of the alleged discriminatory act, if they also file an action with a parallel state agency. *See* 42 U.S.C. § 2000e-5(e)(1). On appeal, as proof that he filed an EEOC complaint in December 1996, Collins submitted an appointment form to schedule a meeting with an EEOC representative on December 16, 1996, and a letter from the EEOC outlining the process for filing a charge dated January 7, 1996. [2] However, these documents do not constitute EEOC charges under 42 U.S.C. § 2000e-5. [3] Instead, as the EEOC charging document filed by defendants with their motion to dismiss reflects, [**5] the EEOC charge Collins references in his complaint, # 170980522, was filed in January 1998, not in December 1996.

2   The "1996" date appears to be a typographical error because Collins contends he received this letter after December 16, 1996.

3   It is worth noting that neither of these documents details the nature of Collins' allegations, and, considering that part of the function of an EEOC complaint is to provide a respondent with notice of the charge(s) made, they would hardly suffice to do so. Furthermore, Collins does not argue that the limitations period

212 Fed. Appx. 136, *139; 2007 U.S. App. LEXIS 390, **5

should be equitably tolled; rather, he argues that the documents that he submitted comprised his complaint. But even considered under the equitable tolling doctrine, Collins has never explained what caused the delay in meeting and/or corresponding with the EEOC in December 1996 and January 1997, and filing his formal EEOC complaint in January 1998, or otherwise presented any ground for equitable tolling. *See Robinson v. Dalton*, 107 F.3d 1018, 1022 (3d Cir. 1997) (outlining appropriate circumstances for equitable tolling).

[**6] As for the allegations in the latter three complaints, we find no error with their dismissal without prejudice for failure to exhaust. Even though the District Court gave Collins the opportunity to amend his complaint should he have or receive the right-to-sue notices, Collins apparently never came forward with such notices to demonstrate that he exhausted his administrative remedies. Instead, he filed a motion to expand discovery without ever addressing the issue of the absence of right-to-sue notices. *See* Part E, *infra*. We find that it was entirely appropriate for the District Court to dismiss those claims. *See, e.g., Flight Sys., Inc. V. Elec. Data Sys. Corp.*, 112 F.3d 124, 127 (3d Cir. 1997) [HN3](affirmative defenses may be considered in a motion to dismiss under Rule 12(b)(6) where the defense would [*140] "present an insuperable barrier to recovery by the plaintiff").

Collins maintains that the District Court erred in granting summary judgment to the defendants on the Title VII and PHRA claims that remained in the suit after the partial dismissal on the defendants' motion to dismiss. 4 As the District Court pointed out, however, Collins never even established [**7] a prima facie case under the *McDonnell Douglas* standard for his remaining claims of receiving an unfavorable evaluation on July 14, 1997, and being subjected to humiliation on September 23, 1997. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

4 The District Court analyzed Collins' remaining Title VII claims simultaneously under the PHRA, and we will do the same, as the two statutory schemes employ the same criteria

Specifically, Collins failed to show that he had suffered an adverse employment action. [HN4]An adverse employment action may be a discharge or a

failure to hire, or any action that alters an employee's compensation, terms, conditions, or privileges of employment. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997). As to the allegations relating to July 14, 1997, Collins merely showed that he received a "satisfactory" rating in an employment evaluation. He did not demonstrate that the rating deprived him of employment opportunities or otherwise altered the terms or conditions of his employment. The satisfactory rating does not rise to the level of an actionable violation under the circumstances of this case. *See Robinson*, 120 F.3d at 1301. As to the allegations relating to September 23, 1997, Collins simply did not present any evidence that [**8] he was humiliated. In his deposition, he testified that he was not "totally sure" that he was harassed and that he did not recall how he was humiliated. (Supp. app. 90-93.) The District Court was correct in concluding that Collins' clouded recollections of possible humiliation were not enough to withstand the defendants' motion for summary judgment.

B. *§ 1981 claims*

The District Court did not err in dismissing Collins' claims for damages under § 1981 against defendants in their official capacities on the basis of Eleventh Amendment immunity. 5 *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Furthermore, as the District Court concluded, although Collins tried to supplement his remaining allegations of discriminatory intent with voluminous exhibits, he failed to show, through his exhibits or otherwise, the purposeful discrimination necessary to establish a claim under 42 U.S.C. § 1981. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982).

5 We also agree with the District Court that Eleventh Amendment immunity provided the defendants a similar shield against the claims for damages against them in their official capacities under §§ 1983, 1985, & 1986. Furthermore, we note that the Eleventh Amendment barred the suit under §§ 1981, 1983, 1985, & 1986 against defendant Department of Revenue of the Commonwealth of Pennsylvania, who is not participating in this appeal. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984).

[**9] C. *§ 1983 claims*

Page 4

**B88**

212 Fed. Appx. 136, *140; 2007 U.S. App. LEXIS 390, **9

The District Court did not err in granting summary judgment on the remaining § 1983 claims. Collins alleged that the defendants violated his rights under the First and Fourteenth Amendments by intentionally discriminating against him and retaliating against him for opposing [*141] discriminatory practices. However, Collins failed to point to evidence of any discriminatory intent on the part of the defendants to establish his equal protection claim under the Fourteenth Amendment. Even assuming that any opposition that he raised to discrimination was protected conduct, Collins did not show that defendants retaliated against him for any such opposition to meet his burden to show a First Amendment violation, either. Despite his voluminous submission of e-mails, other correspondence, and the like, as well as the opportunity to describe perceived wrongs at his deposition, he did not articulate how the defendants may have humiliated or harassed him or otherwise retaliated against him through (as he had alleged) "manipulation of . . . personnel and disciplinary rules." Even to the extent that Collins may have suggested that he lost opportunities for advancement, he did not [**10] show that any constitutionally protected conduct served as a substantial or motivating factor for those lost opportunities.

D. *§§ 1985 & 1986 claims*

In his appellate brief, Collins lodges several criticisms of the District Court's rejection of his conspiracy claims. [6] We interpret these criticisms as challenges to the District Court's denial of his §§ 1985 and 1986 claims. However, we see no error in the District Court's decision, in response to the defendants' motion, to limit Collins' §§ 1986 and 1985 claims to those that arose within one year or two years, respectively, of the initial filing of Collins' complaint in 1999. *See* [HN5]42 U.S.C. § 1986 ("[N]o action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."); *Bougher v. University of Pittsburgh*, 882 F.2d 74, 80 (3d Cir. 1989) (holding that [HN6]Pennsylvania's two-year statute of limitations applies to § 1985 claims).

6    Collins also accuses the District Court judge of bias and makes claims that justice was offered "to the highest bidder," and that the District Court "operates as a rubber stamp for Executive Power/State Power vs. a safeguard of the people's rights and the prevention of abuse of state power." Collins provides absolutely no substantiation of

his allegations, and we need not address such bald, intemperate accusations here.

[**11] Furthermore, we conclude that the District Court did not err in granting summary judgment in favor of the defendants on the remaining claims under §§ 1985 and 1986. [HN7]To establish a claim under § 1985, a plaintiff must show "'(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983)). In support of his claims, Collins pointed specifically to exhibits C-1 through C-33 that he submitted in support of his motion for summary judgment. The exhibits, relating to grievances Collins had filed and correspondence between Collins and his attorney, do not support Collins' claim. In the hundreds of other pages of exhibits submitted with his motion for summary judgment, there is [**12] no proof of a § 1985 violation, despite Collins' allegations of conspiracy included in attached e-mails and other documents authored by him. Similarly, no evidence of a § 1985 violation is apparent in the two hundred pages of exhibits that Collins submitted with his reply brief. Although he claimed in his [*142] response to the defendants' motion for summary judgment that some of his co-workers have submitted false statements against him, his bald accusations do not suffice to make out a claim. In sum, Collins did not establish the elements of a § 1985 violation.

Collins' claims under § 1986 necessarily failed in the absence of a violation of § 1985. *See* [HN8]*Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir. 1980) ("Because transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also.").

E. *Denial of motions to enlarge discovery deadlines and add Title VII claims*

As stated above, in its April 18, 2005 memorandum, the District Court provided Collins with an opportunity to amend his complaint to demonstrate that he had [**13]

Page 5

**B89**

212 Fed. Appx. 136, *142; 2007 U.S. App. LEXIS 390, **13

properly exhausted his administrative remedies, namely, that he had received right-to-sue notices on his three PHRC/EEOC complaints. He did not. Instead, he filed motions to expand discovery deadlines and to include additional Title VII claims.

We discern no abuse of discretion with respect to the denial of Collins' discovery motion or motion to add claims. *See Petrucelli v. Bohringer and Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995) [HN9](applying abuse of discretion standard "when reviewing orders regarding the scope and conduct of discovery"). The District Court acted within its discretion when it denied Collins' request to enlarge discovery deadlines, on the heels of the numerous, previous extensions of filing deadlines so that Collins could continue to try to secure counsel. Although Collins proceeded *pro se*, the District Court was not obligated to provide him with endless opportunities to conduct discovery and/or add claims. At some point, undue prejudice to the defendants must be considered, especially in a long-pending case. Here, the order denying the motion was entirely reasonable.

Finally, as the District Court made plain, Collins' Title VII claims were [**14] unexhausted, and had previously been dismissed as such. His attempt to add claims while steadfastly failing to demonstrate exhaustion was not well received, nor should it have been. We do not disagree with the District Court's order denying this motion.

In conclusion, some of Collins' claims were time-barred, unexhausted, or barred on immunity grounds. Of his claims that survived the defendants' motion to dismiss, none was supported by evidence sufficient to survive the defendants' motion for summary judgment. Therefore, the District Court properly entered judgment in favor of the defendants and against Collins. Accordingly, we will affirm the judgment of the District Court.

**B90**

LEXSEE



Caution
As of: Dec 13, 2007

**CLAUDIA S. SHERROD, Appellant v. PHILADELPHIA GAS WORKS**

**No. 02-2153**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**57 Fed. Appx. 68; 2003 U.S. App. LEXIS 1428**

**January 14, 2003, Submitted Under Third Circuit L.A.R. 34.1(a)**
**January 29, 2003, Decided**
**January 29, 2003, Filed**

**NOTICE:** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** [**1] On Appeal From the United States District Court For the Eastern District of Pennsylvania. (Civ. A. No. 00-4974). District Judge: Honorable Louis H. Pollak.
Sherrod v. Phila. Gas Works, 209 F. Supp. 2d 443, 2002 U.S. Dist. LEXIS 14233 (E.D. Pa. 2002).

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant former employee, an African-American female, sued defendant employer, alleging that she was subjected to discrimination based on age and race, a hostile work environment, and retaliation, and that she was unlawfully denied family leave. The employee appealed the order of the United States District Court For the Eastern District of Pennsylvania which granted summary judgment to the employer.

**OVERVIEW:** The employee contended that she was paid less than younger Caucasian employees and was constructively terminated based on her race and age. The employee also maintained that she was subjected to a hostile work environment in retaliation for complaining of discrimination and was denied family leave to care for her grandmother. The employee asserted claims under the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C.S. § 1981, the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq., and the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq. The appellate court first held that the employer did not interfere with the employee's FMLA rights, since the employer granted leave upon learning that the grandmother acted as a parent to the employee. Further, the employee was not subjected to conditions so unpleasant or difficult to constitute a hostile work environment or constructive discharge, and any pay disparities were properly based on experience and qualifications.

**OUTCOME:** The order granting summary judgment to the employer was affirmed.

**CORE TERMS:** supervisor's, salary, work environment, hostile, accounting, clerk, desks, pervasive, reasonable person, retaliation, grandmother, severe, summary judgment, disparate treatment, discriminatory, advertised, disparity, pretext, resign, management team, constructive

57 Fed. Appx. 68, *; 2003 U.S. App. LEXIS 1428, **1

discharge, fact-finder, non-moving, successor, proffered, racially, manager, laughing, younger, adverse action

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1]An appellate court exercises plenary review over a district court's order granting summary judgment.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2]Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of fact exists only if a reasonable jury, considering the evidence presented, could find for the non-moving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Evidence*
[HN3]Although a party moving for summary judgment must initially point out the absence of evidence necessary to the non-moving party's case, once he has done so the burden shifts to the non-moving party to provide evidence to support each element of the party's claim. The court must consider all evidence in the light most favorable to the non-moving party.

*Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act*
[HN4]See 29 U.S.C.S. § 2615(a)(1).

*Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act*
*Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act > Coverage & Definitions > General Overview*

[HN5]The Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., does not define interference with FMLA rights, but Department of Labor regulations indicate that interference includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. 29 C.F.R. § 825.220(b).

*Family Law > Parental Duties & Rights > In Loco Parentis*
*Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act*
[HN6]Leave under the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., does not extend to leave to care for grandparents unless the grandparent served as the employee's parent. 29 U.S.C.S. § 2612.

*Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act*
[HN7]See 29 C.F.R. § 825.208(a)(1).

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof*
[HN8]In order to make out a prima facie case of disparate treatment, appellant must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) that action occurred under circumstances giving rise to an inference of discrimination. If plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employee's rejection. Then, if defendant carries this burden, the plaintiff must show these reasons were not the true reasons, but were a pretext for discrimination.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN9]An adverse employment action necessarily encompasses all tangible employment actions such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits. In addition, paying an individual a lower salary for discriminatory reasons can be an adverse employment action.

*Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview*

[HN10]Constructive discharge occurs if the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*

[HN11]In order to show pretext for discrimination, a plaintiff may introduce evidence from which a fact-finder could (1) disbelieve the employer's articulated legitimate reason or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. To disbelieve the employer's proffered reason, the question is not whether the action was prudent, but whether appellant has shown such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties*
*Labor & Employment Law > Discrimination > Actionable Discrimination*

[HN12]To establish a prima facie case of hostile work environment, appellant must show that (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of respondeat superior liability. Factors which may indicate a hostile work environment include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The analysis is the same whether under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C.S. § 1981, or the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §

951 et seq.

*Labor & Employment Law > Discrimination > Actionable Discrimination*

[HN13]The advent of more sophisticated and subtle forms of discrimination requires that a court analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
*Labor & Employment Law > Discrimination > Disparate Treatment > Coverage & Definitions*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN14]Retaliation requires a plaintiff to show that: (1) she engaged in a protected activity; (2) the employer took an adverse action against her; and (3) there is a causal link between the activity and the adverse action. The definition of adverse employment action is the same in the retaliation and the disparate treatment context.

**JUDGES:** Before: SCIRICA, BARRY and SMITH, Circuit Judges.

**OPINION BY:** D. Brooks Smith

**OPINION**

[*69] OPINION OF THE COURT

SMITH, Circuit Judge:

Claudia Sherrod appeals the District Court's grant of summary judgment in favor of Philadelphia Gas Works on her [*70] claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et. seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et. seq. and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 et. seq. For the reasons discussed herein, we will affirm the decision of the District Court.

I. FACTS

57 Fed. Appx. 68, *70; 2003 U.S. App. LEXIS 1428, **1

Appellant, Claudia Sherrod, is an African-American woman who was born on September 9, 1940. Sherrod [**2] began working for the appellee, Pennsylvania Gas Works ("PGW"), in March of 1989, as a Junior Clerk in the Treasury Department. Sherrod was promoted several times, culminating in her promotion to Supervisor of the Bill Passing Department on September 27, 1997. When Sherrod was offered the promotion to Supervisor, she was told she would receive a salary of $ 38,500, below the minimum $ 40,705 advertised. Larry Hoffman, Vice President and Chief Accounting Officer and Sherrod's new supervisor, explained that this lower salary was based on the fact that she did not have experience with the material accounting system. However, when Sherrod actually assumed the position, she was given a salary of $ 40,000. She was later given an increase to $ 41,000, which was made retroactive to October 4, 1997. Appellant claims that Hoffman promised to raise her salary to $ 45,000 within six months, but that this did not occur.

When Sherrod assumed the position of Supervisor of Bill Passing, she inherited a huge backlog of unpaid bills. This problem was exacerbated by the fact that PGW was implementing a new accounting system known as ORACLE, and it was causing mass confusion. After ORACLE was installed, [**3] plaintiff took a stress-related leave of absence which lasted from December 2, 1998 to January 19, 1999. While she was on leave, Hoffman left PGW. In February, Tom Smyth took over as Chief Accounting Officer.

Sherrod took another leave of absence from March 1999 until July 1999. While out on leave, Sherrod told Ann Stewart, the manager of Staffing and Diversity, that she did not want to return to the Accounting Department because of Smyth's racism. Upon her return to work, Sherrod was transferred to the Public Affairs Department, to serve as "Community Relations Specialist." According to Sherrod, this new job had no duties because all of her assigned duties were already undertaken by James Emmanuel - another employee. Sherrod received the same pay and benefits in this position as she had in the Accounting Department. Nonetheless, she felt that her new position was humiliating and that people were laughing at her. [1] She resigned after seven months in this position.

　　1　Appellant was unable to specify exactly who she thought was laughing at her, stating "I can't be

specific right now."

[**4] *A. Disparate Treatment*

Appellant claims she was paid a lower salary than similarly situated younger Caucasian employees and was eventually constructively terminated because of her race and age. Sherrod points out that both her temporary replacement in the position of Supervisor - Ann Breyer - and her permanent replacement - Daniel Andrews - were younger [2], Caucasian and [*71] were paid more than she. Breyer assumed Sherrod's responsibilities while the latter was on FMLA leave from March to May of 1999, and was paid an annual salary of $ 64,000. Daniel Andrews replaced Sherrod in May of 1999 and was paid an annual salary of $ 53,000. Andrews did not have a four-year degree, and was unfamiliar with accounting. In addition, Kim Brennan, the Supervisor of Property Records, was younger and Caucasian, and she was paid $ 53,000 in 1999. [3]

　　2　Breyer was born on April 1, 1952 and Andrews born on July 22, 1956.
　　3　In her factual summary, appellant describes facts that might be the basis for a disparate treatment failure to promote claim. Because appellant does not mention failure to promote in her legal analysis of disparate treatment, we will assume that dismissal of this claim is not being appealed.

[**5] *B. Hostile Work Environment*

Appellant claims she was subject to a hostile work environment based on her race. Shortly after he arrived in February of 1999, Smyth said that "he didn't like the way they [Jim Smith and Darcel Young - two African-American clerks that Sherrod supervised] were eating at their desks, it must be their culture." Then, in July of 1999, Joe Bogdonavage, the Senior Vice President of Finance, [4] told Sherrod "if they [Smith and Young] don't do their work, I'm going to sit at their desks with a whip." In addition, the minority clerks' desks were placed directly in front of their white supervisor's office windows. Sherrod admitted that this was related to seniority, and that she did not really have any opinion as to whether it was racially motivated. Sherrod also claims that one of the reports she prepared for the CEO was thrown away by his secretary, that Smyth told a clerk in the department "don't do nothing she [Sherrod] tells you to do," and that other members of the management team

57 Fed. Appx. 68, *71; 2003 U.S. App. LEXIS 1428, **5

would scream at her and treat her badly. Sherrod claims that as a result of this hostile work environment, she had to go on leave and seek mental health treatment.

> 4    Bogdonavage served as acting Chief Accounting Officer from the time that Hoffman was terminated until Smyth was hired.

[**6] *C. Retaliation*

Sherrod complained many times to Ann Stewart, prior to 1997, that she was being discriminated against based on her race and age. In March of 1999, Sherrod once again filed a written complaint with Stewart alleging racial and age-based discrimination. She claims that her constructive termination was in retaliation for these complaints.

*D. FMLA*

On March 2, 1999, Sherrod requested thirty days of FMLA leave to begin on March 22, in order to care for her grandmother. Initially, the Director of Employee Services denied the request on the basis that one could not use FMLA leave to care for a grandparent. After appellant explained via e-mail on March 5, 1999 that her grandmother had raised her, the leave of absence was approved. 5 Instead of caring for her grandmother, however, appellant took sick leave in order to deal with stress and to address her own mental health issues. Appellant was out on leave from March 16, 1999 until July 1999.

> 5    Appellant suggested during her deposition that PGW should have been aware of this close relationship because she had taken FMLA leave to care for her grandmother back in 1994.

[**7] II. PROCEDURAL POSTURE

Appellant filed a five count complaint alleging violation of Title VII, the ADEA, Section 1981, the FMLA and the PHRA. [*72] PGW moved for summary judgment on all counts, and the motion was granted by the District Court on March 29, 2002.

III. JURISDICTION

The District Court had subject matter jurisdiction via 28 U.S.C.§ 1331. This Court has jurisdiction over the appeal based on 28 U.S.C. § 1291.

IV. STANDARD OF REVIEW

[HN1]This court exercises plenary review over a district court's order granting summary judgment. See Reitz v. County of Bucks, 125 F.3d 139, 143 (3d Cir. 1997). [HN2]Summary judgment must be granted if "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of fact exists "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." Childers v. Joseph, 842 F.2d 689, 694 (3d Cir. 1988) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). [HN3]Although the moving party [**8] must initially point out the absence of evidence necessary to the non-moving party's case, once he has done so the burden shifts to the non-moving party to provide evidence to support each element of the party's claim. See Celotex Corp. v. Catrett 477 U.S. 317, 323-25, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The court must consider all evidence in the light most favorable to the non-moving party. See Marzano v. Computer Sci., 91 F.3d 497, 502 (3d Cir. 1996); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).

V. LEGAL ANALYSIS

*A. Interference with rights under the FMLA*

The District Court dismissed appellant's FMLA claim, concluding that she was not retaliated against for taking FMLA leave because she did not suffer an adverse employment action. Appellant asserts that she did not have a retaliation claim, but that she was bringing a claim for the interference with her right to FMLA leave in March of 1999, because her claim was initially denied. Although PGW reversed its initial denial of leave once appellant clarified that her grandmother had raised her, appellant appears to believe that she is entitled [**9] to payment for her leave as a result of the initial denial. She therefore requests the $ 6,000 difference between her salary in 1998 and her salary in 1999.

The FMLA states that: [HN4]"it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). [HN5]The FMLA does not define interference, but the Department of Labor regulations indicate that interference includes "not only refusing to authorize

57 Fed. Appx. 68, *72; 2003 U.S. App. LEXIS 1428, **9

FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

[HN6]FMLA leave does not extend to leave to care for grandparents unless the grandparent served as the employee's parent. See 29 U.S.C. § 2612 (granting leave to care for parent), § 2611(7) (defining parent as "the biological parent of an employee or an individual who stood in loco parentis to an employee when the employee was a son or daughter"). In addition, "[HN7]an employee giving notice of the need for unpaid FMLA leave must explain the reasons [*73] for the needed leave so as to allow the employer to determine that the [**10] leave qualifies under the Act." 29 C.F.R. § 825.208(a)(1). Since appellant did not initially tell her employer that her grandmother had raised her, she failed to sufficiently explain her reasons for the needed leave so as to allow the employer to determine that her request was covered by the FMLA. Therefore, the initial denial of leave was not improper, nor was it so discouraging that it interfered with appellant's right to leave under the FMLA. [6]

> [6] Some district courts in this Circuit have suggested that an employee may bring an interference claim for actions which could "chill" desire to take FMLA leave, even when the employee takes the leave. Compare Williams v. Shenango, Inc., 986 F. Supp. 309, 320-321 (W.D. Pa. 1997) (where employer denied request for FMLA leave and suggested that employee take leave on a different week, but retroactively approved the leave after it was taken, reasonable person could conclude that employer interfered with FMLA rights); Shtab v. Greate Bay Hotel and Casino, Inc., 173 F. Supp. 2d 255, 267-68 (D.N.J. 2001) (where authorization for FMLA leave was denied after leave occurred, noting that a jury could conclude that employer's suggestion that employee take different date of leave chilled plaintiffs assertion of rights under FMLA), with Alifano v. Merck & Co., Inc., 175 F. Supp. 2d 792 (E.D. Pa. 2001) (plaintiff could not bring claim for interference in the absence of any adverse employment action where employer allegedly discouraged but did not deny leave). Nonetheless, appellant does not have a cause of action for interference in this case because she failed to give her employer sufficient notice that her FMLA requested leave qualified under the statute.

[**11] *B. Disparate treatment under Title VII, Section 1981, ADEA and PHRA*

Appellant's claims of disparate treatment under Title VII, ADEA, PHRA and Section 1981 must be analyzed under the test articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See Jones v. School District of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (Title VII, PHRA and Section 1981 claims governed by McDonnell Douglas); Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000) (ADEA and Title VII claims governed by McDonnell Douglas).

[HN8]In order to make out a prima facie case, appellant must show that: 1) she is a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) that action occurred under circumstances giving rise to an inference of discrimination. See Jones 198 F.3d at 410-11. If plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." Id. (quoting McDonnell Douglas, 411 U.S. at 802). [**12] Then, if defendant carries this burden, the plaintiff must show these reasons were not the true reasons, but were the pretext for discrimination. See id.; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).

First, PGW asserts that plaintiff did not suffer any adverse employment action. [HN9]An adverse employment action necessarily encompasses all tangible employment actions such as "hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998). In addition, paying an individual a lower salary for discriminatory reasons can be an adverse employment action. See Stanziale v. Jaraowsky, 200 F.3d at 105. Thus, appellant argues that there are three adverse employment actions in this case: 1) a pay disparity between the amount advertised for Supervisor and the amount paid to appellant, 2) a pay disparity between appellant as Supervisor and her successors, and 3) a constructive discharge.

[HN10]Constructive discharge occurs if the "conduct complained [**13] of would have the [*74] foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes

Page 6

**B96**

57 Fed. Appx. 68, *74; 2003 U.S. App. LEXIS 1428, **13

would resign." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992). In the case in which we first adopted the constructive discharge doctrine, Goss v. Exxon Office Systems Co., 747 F.2d 885 (3d Cir. 1984), we held that the work conditions were so intolerable as to constitute constructive discharge. There, the plaintiff was a sales representative for Exxon with a lucrative territory. Goss's supervisor began interrogating her about her plans to have a family. Goss then became pregnant twice, and each time her supervisor became verbally - abusive and expressed doubts about the plaintiffs ability to combine motherhood and a career. Goss miscarried both times and, upon her return to work after the second miscarriage, her supervisor informed her she would either have to accept a new territory or resign. The Supervisor also described Goss as a "'wackko' pregnant and likely to leave." 747 F.2d at 888. We concluded that under these conditions a reasonable person in the employee's shoes would [**14] resign.

Here, even viewing all the evidence in the light most favorable to the appellant, the work conditions were not so severe that a reasonable person in the employee's shoes would resign. Appellant suggests that she had to resign because, although she requested her transfer, her new job duties were duplicative of those of another employee and people were laughing at her. Appellant does not allege that her new supervisor threatened her with demotion, in any way harassed her, or suggested she should leave. Accordingly, the mere fact that appellant felt her job was unnecessary and that unspecified people were laughing at her would not be "so unpleasant or difficult" to constitute constructive discharge.

As to the pay disparities between appellant and her successors, and between the advertised salary and the actual salary she received, PGW does not explain why these pay disparities did not constitute adverse employment actions. PGW does argue that appellant has not carried her burden to show that the reasons given by PGW for the pay disparities were pretextual. [HN11]In order to show pretext, a plaintiff may introduce evidence from which a fact-finder could "(1) disbelieve the employer's [**15] articulated legitimate reason or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 283 (3d Cir. 2001) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)) To disbelieve the employer's proffered reason, the

question is not whether the action was prudent, but whether appellant has shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence'[.]" Fuentes, 32 F.3d at 765 (internal quotation omitted).

PGW points to the fact that appellant received, for only one week, a lower salary than that advertised because she did not have all of the necessary job skills. This is a legitimate reason. Appellant suggests that this reason was pretext for age and/or race discrimination because Andrews, her successor, did not have experience in accounting and he was not given a lower salary. The fact that Andrews was paid [**16] a higher salary approximately one-and-a-half years later does not cast doubt on PGW's proffered reason for Sherrod's salary inasmuch as his lack of experience in accounting was countered by his, greater supervisory experience; he had received a [*75] higher salary in his previous position; and PGW had difficulty finding anyone willing to take the position after the chaos caused by implementation of ORACLE. Since the fact that Andrews was paid more than the advertised salary is insufficient for a reasonable fact-finder to conclude that PGW's proffered reason for paying Sherrod less was "unworthy of credence," appellant has not carried her burden to show pretext on this count.

With respect to the greater salaries paid to her successors, PGW explains that they had more experience and better qualifications. Daniel Andrews had been a supervisor in the Meter Reading Department for four years before becoming Supervisor of Bill Passing, and was already earning nearly $ 49,000 in that position. Ann Breyer had 20 years of management experience with POW in departments such as Internal Auditing, Accounting and Budgets and Information Systems. Moreover, while Breyer temporarily assumed appellant's duties, [**17] she retained her primary responsibility to implement ORACLE. Accordingly, her position was hardly equivalent to the position held by Sherrod. [7]

7   Sherrod also points to Kim Brennan as someone in an equivalent position: Supervisor of Property Records rather than Bill Passing, who was Caucasian, younger than her (born on 4/19/67), and was earning more than her. PGW explains that Brennan had more management

57 Fed. Appx. 68, *75; 2003 U.S. App. LEXIS 1428, **17

experience, including two years as an Internal Auditor before transferring to Property Records. In addition, Brennan's starting salary was less than Sherrod's. Brennan was earning $ 36,000 when she became a supervisor in July of 1996, while Sherrod earned $ 40,000 when she became a supervisor in September 1997.

Appellant notes, however, that she had a four-year degree and Andrews did not. Andrews was also unfamiliar with accounting. This evidence suggests that Andrews was not better qualified than appellant in every category. Yet, the fact that appellant's qualifications were superior in some other areas [**18] is not enough for a reasonable fact-finder to disbelieve PGW's explanation that Andrews was paid more because he had more years of supervisory experience. Appellant also introduced no evidence suggesting that the reasons that Breyer was paid more were pretext. Therefore, the District Court's grant of summary judgment will be affirmed on this count.

*C. Hostile Work Environment under Title VII, Section 1981 and the PHRA*

[HN12]To establish a prima facie case of hostile work environment, appellant must show that (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of respondeat superior liability. See West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995). Factors which may indicate a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [**19] an employee's work performance." Harris v. Forklift Systems, Inc. 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). The analysis is the same whether under Title VII, Section 1981 or the PHRA. See Harley v. McCoach, 928 F. Supp. 533, 538 (E.D. Pa. 1996).

Appellant points to several incidents that allegedly show a racially discriminatory work environment. First, shortly after he arrived in February of 1999, Smyth said that "he didn't like the way they [Jim Smith and Darcel Young - two African- [*76] American clerks that Sherrod supervised] were eating at their desks, it must be their culture." Second, in July of 1999, Joe Bogdonavage,

another manager in the Bill Passing Department, told Sherrod "if they [Smith and Young] don't do their work, I'm going to sit at their desks with a whip." Third, the minority clerk's desks were placed directly in front of their white supervisor's office windows. Sherrod also claims that: one of the reports she prepared for the CEO was thrown away by his secretary; Smyth told a clerk in the department "don't do nothing she [Sherrod] tells you to do;" she was told not to attend a meeting despite the fact that [**20] her presentation was on the agenda; Ann Breyer turned her back on Sherrod to snub her; Smyth told Sherrod that if he was fired he would fire her as well; and other members of the management team would scream at her and treat her badly.

PGW argues that none of these incidents can reasonably be interpreted as acts of intentional discrimination against the plaintiff based on her race. PGW points out that Smyth testified that his "culture" comment was about corporate culture not racial culture, and after making this comment he established a work rule prohibiting all employees from eating at their desks. PGW also suggests that the "whipping" comment was unrelated to race and notes that Sherrod admitted that the clerk's desks were repositioned based on seniority. Finally, PGW argues that if any other members of the management team screamed at Sherrod or treated her badly, it was for reasons unrelated to race. For example, plaintiff admits that at one point Bogdonavage yelled at her because he believed that an employee had paid a PGW bill out of his own pocket. She also admits that some of the conflict with other managers was over her opinions about how to implement the ORACLE transition.

[**21] This Court has recognized that [HN13]"the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." Cardenas v. Massey, 269 F.3d 251, 262 (3d Cir. 2001). Assuming that Smyth's culture comment and Bogdonavage's whipping comment were racially motivated, these two incidents were not sufficiently severe and pervasive to establish a hostile work environment. See Drinkwater v. Union Carbide Corp., 904 F.2d 853, 863 (3d Cir. 1990) (two sexually stereotyped discriminatory comments do not constitute continuous, pervasive discrimination). However, in light

of these two comments, a reasonable fact-finder could find that all the facially neutral mistreatment of Sherrod by other members of the management team was related to race. See Cardenas, 269 F.3d at 262. Therefore, we must determine whether all of the alleged conduct was severe and pervasive enough to create a hostile work environment.

In Cardenas, the defendants [**22] subjected the plaintiff to ethnic slurs, dealt with disagreements by asking if the plaintiff intended to pull out a switchblade, wrote derogatory messages on the marker board in the plaintiffs cubicle, rounded the numbers on all other employees evaluations upward while rounding the plaintiffs evaluation numbers downward, disproportionately assigned minorities and trainees to the plaintiffs unit, gave plaintiff contradictory instructions and assignments incompatible with his staff resources, and spread the word that the plaintiff was an affirmative action hire. 269 F.3d at 258-59. This Court held that, looking at the totality of the circumstances, these activities were sufficiently severe and pervasive so as to [*77] constitute a hostile work environment. Cardenas, 269 F.3d at 263. In Aman v. Cort Furniture Rental Corp, 85 F.3d 1074, 1082-84 (3d Cir. 1996), this Court once again found the alleged conduct sufficiently severe and pervasive to constitute a hostile work environment where African-American employees were referred to as "one of them" or "another one," told not to touch anything or steal anything, made to do menial jobs, screamed [**23] at, threatened with termination, had their time cards stolen, were falsely accused of wrongdoing, had information necessary to their jobs withheld, were given conflicting orders, and the general manager stated at a district meeting that "the blacks were against the whites" and that if they did not like it at Cort Furniture they could leave.

Appellant's showing falls short of the severe and pervasive conduct in Cardenas and Aman. Unlike the plaintiff in Cardenas, there is no evidence that anyone ever referred to appellant using racial slurs. The statements which Sherrod considered offensive were subject to a non-racial interpretation and were not physically threatening or humiliating. In addition, although appellant was excluded from one meeting, a report was thrown away, and a colleague told one clerk not to listen to Sherrod, there is no evidence suggesting that this unreasonably interfered with her work performance, as was the case in Cardenas and Aman. Finally, even if the conduct described had a detrimental effect on appellant's mental health, these incidents would not have detrimentally affected a reasonable person in appellant's position. Accordingly, these [**24] incidents are insufficient to create a racially hostile work environment as a matter of law.

*D. Retaliation for asserting claims*

[HN14]Retaliation requires a plaintiff to show that (1) she engaged in a protected activity; (2) the employer took an adverse action against her; and (3) there is a causal link between the activity and the adverse action. See Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 201 (3d Cir. 1994). The definition of adverse employment action is the same in the retaliation and the disparate treatment context. See Cardenas, 269 F.3d at 263.

Appellant suggests that she was constructively terminated because she complained about age and race discrimination to Human Resources. Because, as discussed *supra,* appellant was not constructively discharged, she has not introduced any evidence from which a reasonable factfinder could conclude that PGW took adverse action against her because of her complaints.

VI. CONCLUSION

The District Court's grant of summary judgment will be affirmed.

/s/ D. Brooks Smith

Circuit Judge

DATED: January 29, 2003

LEXSEE



Positive
As of: Dec 13, 2007

**JEFFREY VERDIN, Appellant v. WEEKS MARINE INC; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 25, Marine DIVISION; JOHN DOES 1-10, (said names being fictitious) ABC CORPORATIONS 1-100, (said corporations being fictitious)**

No. 03-4571

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**124 Fed. Appx. 92; 2005 U.S. App. LEXIS 2649**

**January 25, 2005, Submitted Under Third Circuit LAR 34.1(a)**
**February 16, 2005, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 01-cv-04598). District Judge: Honorable William H. Walls.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant employee sought review of an order of the United States District Court for the District of New Jersey, which granted appellee employer summary judgment on the employee's Title VII of the Civil Rights Act of 1964 and 42 U.S.C.S. § 1981 claims of race discrimination and retaliation.

**OVERVIEW:** The employee, a Native American, alleged that a master of the tug on which he worked encouraged him to drink alcohol as a result of his stereotypical beliefs and called him a derogatory name. The court affirmed the summary judgment granted the employer on the employee's Title VII and 42 U.S.C.S. § 1981 claims. The court agreed that incidents before May 16, 2000, were barred by the 300-day limitations period because the Equal Employment Opportunity Commission charge on March 12, 2001, did not reflect a continuing violation and he exhausted administrative remedies only as to his May 2000 termination. The court held that the Title VII discrimination and retaliation claims failed because he did not show that non-Native American employees received more favorable treatment and a causal connection existed between his termination and engagement in protected activities. The 42 U.S.C.S. § 1981 claims that alleged incidents that occurred more than four years before the September 28, 2001, filing were time-barred. The court found no hostile work environment claim under § 1981 because many of the incidents were mere offensive utterances that he overheard and were not pervasive or regular.

**OUTCOME:** The court affirmed the order.

**CORE TERMS:** tug's, termination, summary judgment, prima facie case, hostile work environment, statute of limitations, continuing violation, retaliation, time-barred, pervasive, regular, prima facie claim, limitations period, protected class, overheard, terminated, discriminatory act, genuine issues, protected activity, adduced evidence,

Page 1

124 Fed. Appx. 92, *; 2005 U.S. App. LEXIS 2649, **1

causal connection, cause of action, discriminatory, detrimentally, favorably, offensive, harassed, racially, marine, arbitration award

**LexisNexis(R) Headnotes**

***Civil Procedure > Summary Judgment > Appellate Review > Standards of Review***
***Civil Procedure > Appeals > Standards of Review > De Novo Review***
[HN1]An appellate court's standard of review of a district court's entry of summary judgment is plenary.

***Civil Procedure > Discovery > Methods > General Overview***
***Civil Procedure > Summary Judgment > Standards > General Overview***
***Civil Procedure > Summary Judgment > Supporting Materials > General Overview***
[HN2]See Fed. R. Civ. P. 56(c).

***Civil Procedure > Summary Judgment > Appellate Review > Standards of Review***
[HN3]In reviewing the grant of summary judgment, a court must affirm if the record evidence submitted by the non-movant is merely colorable or is not significantly probative.

***Civil Rights Law > Practice & Procedure > Continuing Violations***
***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations > Continuing Violations***
***Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > Continuing Violations***
[HN4]To pursue a Title VII of the Civil Rights Act of 1964 claim, an individual has 300 days from the date of the discriminatory act to file a charge with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C.S. § 2000e-5(e). Absent a continuing violation, all discriminatory acts that are alleged to have occurred more than 300 days prior to the EEOC filing are time-barred.

***Labor & Employment Law > Discrimination > Title VII***

***of the Civil Rights Act of 1964 > General Overview***
[HN5]To establish a prima facie claim for discriminatory termination, an employee must offer sufficient evidence that (1) he was a member of the protected class, (2) he qualified for the position he sought, (3) he was fired, and (4) nonmembers of the protected class were treated more favorably.

***Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities***
***Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities***
***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview***
[HN6]To establish a prima facie claim for retaliation, an employee must show he engaged in a statutorily protected activity, that the employer took adverse action against him, and that there is a causal connection between the two events.

***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview***
***Torts > Strict Liability > Harm Caused by Animals > Defenses***
[HN7]To establish a prima facie case of hostile work environment, an employee must show that (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position; and (5) the existence of respondeat superior liability.

***Civil Rights Law > Practice & Procedure > Continuing Violations***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations > Continuing Violations***
[HN8]Regarding 42 U.S.C.S. § 1981 claims, courts use the same analysis in assessing the substantive merit of the claims and the applicability of a continuing violation theory that courts apply for Title VII of the Civil Rights Act of 1964 claims, except, at least with respect to a hostile work environment claim, there is a four-year

Page 2

statute of limitations.

**COUNSEL:** For JEFFREY VERDIN, Appellant: Fred Shahrooz-Scampato, Westfield, NJ.

For WEEKS MARINE INC, Appellee: Patricia A. Smith, Ballard, Spahr, Andrews & Ingersoll, Voorhees, NJ.

**JUDGES:** Before: SCIRICA, Chief Judge, RENDELL and FISHER, Circuit Judges.

**OPINION BY:** RENDELL

**OPINION**

[*93] OPINION OF THE COURT

RENDELL, Circuit Judge.

Jeffery Verdin appeals the order of the District Court's grant of summary judgment to Weeks Marine, Inc. ("Weeks"), foreclosing him from proceeding his Title VII and Section 1981 claims. Verdin contends that the District Court erred by failing to apply the continuing violation theory to his Title VII and Section 1981 claims. Furthermore, Verdin contends that he has set forth a prima facie claim for discrimination and has raised genuine issues of fact for both his hostile work environment and retaliation claims sufficient to defeat summary judgment. [**2] We will affirm the grant of summary judgment in favor of Weeks.

[*94] **I. Background**

As the parties are familiar with the facts, we will recite only those necessary to our determination. Verdin, a Native American, was formerly employed by Weeks from June 1997 to May 2000. Weeks is a large marine construction and dredging organization in the United States that operates over thirty tugboats ("tugs") in the waters off the coasts of North and South America, as well as in the Caribbean Sea. Employed as a First Captain of the Tug Matthew, Verdin alleges that Tug Master Mike Scheibe had an adversarial and harassing attitude which created a hostile working environment. Over the course of his employment with Weeks, Verdin alleges that a variety of discriminatory conduct occurred. While employed on the Tug Robert in 1998, Verdin asserts that Tug Master Ronald Bearb ("Bearb") encouraged him to drink alcohol as a result of Bearb's stereotypical belief that alcohol would subdue and placate Native Americans.

Later that year, Verdin overheard Bearb recite a story about a Native American bar lounge where people acted like savages and were willing to cut each others throats over a 25-cent pool game. [**3] [1]

1 Verdin does not claim that the word "savages" was used in the incident.

Weeks terminated Verdin's employment from the Tug Robert in 1998 due to escalating hostilities in his interaction with other personnel. Following this termination, Verdin successfully won an arbitration award granting reinstatement and full back pay with benefits.

In August of 1999, several months after the arbitration award, Verdin was reinstated on the Tug Robert. However, due to continuing problems with crew members, Verdin was transferred to the Tug Shelby. On April 25, 2000, the night prior to his transfer, Verdin overheard Bearb state, "I finally got rid of that nigger" to his son in a private conversation.

On May 6, 2000, Verdin threatened and harassed Scowman Phillip Clarke, a black South American, stating, "we don't like foreigners-we beat them with baseball bats in the head." The next day, May 7, 2000, he repeated the same comment over the tug's loudspeaker. Scowman Clarke's complaints led to an investigation with several [**4] employees confirming the incident. As a result of the investigation, Verdin's employment with Weeks was terminated on or about May 23, 2000. Verdin denies that the incident ever occurred, arguing that the accusation was pretext for his racially motivated termination.

On March 12, 2001, Verdin filed a charge with the EEOC against Weeks alleging: (1) plaintiff was "constantly" referred to as a "nigger," creating a hostile work environment; (2) Weeks failed to promote him to Tug Master; (3) Weeks failed to redress his discrimination complaints; and (4) Weeks terminated him on May 23, 2000 because of his race and in retaliation for reporting Weeks to his union. Weeks moved for summary judgment on all claims. The District Court, finding that the majority of Verdin's claims were time-barred and the remainder failed to satisfy the requirements for a prima facie case, granted summary judgment on all claims.

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331. We have appellate

jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Standard of Review

[HN1]Our standard of review of the District Court's entry of summary [**5] judgment in favor of Weeks is plenary. *See Pacitti v. Macy's*, 193 F.3d 766, 772 (3d Cir. 1999); [*95] *Hines v. Conrail*, 926 F.2d 262, 267 (3d Cir. 1991). A grant of summary judgment is appropriate [HN2]"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). [HN3]In reviewing the grant of summary judgment, we must affirm if the record evidence submitted by the non-movant "is merely colorable or is not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (citations omitted).

## III. Analysis

### A. *Title VII Claims*

As the District Court noted, [HN4]to pursue a Title VII claim, an individual has 300 days from the date of the discriminatory act to file a charge with the Equal Employment Opportunity Commission ("EEOC"). *See* 42 U.S.C. § 2000e-5(e). Absent a continuing violation, all discriminatory acts that are alleged [**6] to have occurred more than 300 days prior to the EEOC filing are time-barred. *See AMTRAK v. Morgan*, 536 U.S. 101, 113, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002). Verdin filed his EEOC charge on March 12, 2001; therefore, absent a continuing violation, all alleged incidents which occurred before May 16, 2000 are barred by the 300-day limitations period. We agree with the District Court that Verdin's charge does not reflect a continuing violation and that he exhausted his administrative remedies only as to his termination in May 2000.

[HN5]To establish a prima facie claim for discriminatory termination, an employee must offer sufficient evidence that: (1) he was a member of the protected class, (2) he qualified for the position he sought, (3) he was fired, and (4) nonmembers of the protected class were treated more favorably. *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000). We agree with the District Court's conclusion that because Verdin has not adduced evidence

demonstrating that non-Native American employees were treated more favorably, he cannot establish the fourth prong of a prima facie case for discrimination, and, consequently, this claim [**7] fails. Furthermore, even if he established a prima facie case, Verdin has not raised a genuine issue of material fact with regard to Weeks' stated reasons for his termination, *i.e.*, that he harassed a subordinate employee.

Verdin next asserts that he successfully established a prima facie case for retaliatory termination under Title VII. [HN6]To establish a prima facie claim for retaliation, an employee must show he engaged in a statutorily protected activity, that the employer took adverse action against him, and that there is a causal connection between the two events. *See Goosby*, 228 F.3d at 323. We agree with the District Court's conclusion that this claim fails because Verdin has not adduced evidence that there was a causal connection between his termination and engagement in any protected activities.

Regarding Verdin's hostile work environment, [HN7]to establish a prima facie case, he must show that: (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected Verdin; (4) the discrimination would detrimentally affect a reasonable person of [**8] the same protected class in that position; and (5) the existence of respondeat superior liability. *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 [*96] (3d Cir. 1999). As Verdin relies on Bearb's 1998 comments and other incidents which occurred outside the May 16, 2000 filing period, these incidents are time-barred and Verdin's hostile work environment claim fails.

### B. *Section 1981 Claims*

[HN8]Regarding Verdin's Section 1981 claims, we use the same analysis in assessing the substantive merit of the claims and the applicability of a continuing violation theory that we apply for Title VII claims, except, at least with respect to the hostile work environment claim, there is a four-year statute of limitations. *See generally Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). [2] As noted in the District Court's opinion, Verdin filed his Section 1981 claims on September 28, 2001. Upon application of a four-year limitations period and absent the application of a continuing violation

Page 4

124 Fed. Appx. 92, *96; 2005 U.S. App. LEXIS 2649, **8

theory, all events which occurred before September 28, 1997 are time-barred for the purposes of Verdin's Section 1981 claims. ³ As this [**9] limitations period corresponds with nearly all of Verdin's employment with Weeks, and Verdin cites no incidents prior to September 28, 1997, none of the incidents Verdin alleges are barred from consideration.

2  The District Court applied a two-year statute of limitations to Verdin's Section 1981 claims. During the pendency of this appeal, however, the United States Supreme Court ruled that Section 1981 claims alleging a cause of action arising under an Act of Congress enacted after December 1, 1990 is governed by the federal "catch-all" four-year statute of limitations under 28 U.S.C. § 1658(a). Jones, 124 S. Ct. at 1845. Because hostile work environment, wrongful termination, and failure to transfer claims "arise under" the Civil Rights Act of 1991 in the sense that that Act defined the key "make and enforce contracts" language in Section 1981 to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b) (1991), these causes of action are governed by the four-year statute of limitations in 28 U.S.C. § 1658. Id. The Jones decision does not impact the substantive analysis of Verdin's claims because courts utilize the same analysis for the merits of Title VII and Section 1981 claims. See McKenna v. Pac. Rail Serv., 32 F.3d 820, 826 n.3 (3d Cir. 1994); Watkins v. Nabisco Biscuit Co., 224 F. Supp. 2d 852, 873-74 (D.N.J. 2002).

[**10]

3  For the reasons discussed infra, Verdin's Section 1981 claims lack substantive merit when applying either a four-year statute of limitations or a two-year statute of limitations, as the District Court applied. Consequently, we will assume, without deciding, that the four-year statute of limitations applies to all of Verdin's Section 1981 claims.

Regarding Verdin's hostile work environment claim, the same standard used under Title VII applies under Section 1981. See McKenna v. Pac. Rail Serv., 32 F.3d 820, 826 n.3 (3d Cir. 1994). Verdin contends that when all the incidents he alleges are assessed as a whole, the sum constitutes "pervasive and regular" discrimination. See West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995). However, even when considering all the incidents Verdin alleges, see supra Part I, our conclusion is the same as that of the District Court-the comments and events that Verdin relies on to meet the pervasive and regular requirement do not demonstrate the ongoing pattern of racially offensive conduct that is required [**11] to show a prima facie case. The majority of the events which Verdin relies upon occurred in 1998, followed by a two-year gap and a final comment by Bearb on April 28, 2000. Many of these incidents were "mere offensive utterances" that Verdin overheard, see Faragher v. City of Boca Raton, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998), and a time line of these incidents [*97] alone demonstrates that they were clearly neither pervasive nor regular. Without this element of a prima facie case, this claim fails.

Because Verdin's Section 1981 discrimination and retaliation claims are based on the same incidents and analyzed under the same standards as those of his coordinate Title VII claims, these claims fail for the same reasons the Title VII claims failed. See supra Part III.A.

### IV. Conclusion

For the foregoing reasons, we will AFFIRM the District Court's order.