## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | |
| | ) | |
| Defendant, | ) | |

---

## APPENDIX TO
## REPLY BRIEF IN FURTHER SUPPORT OF
## DEFENDANT DELAWARE PARK, L.L.C.'S
## MOTION FOR SUMMARY JUDGMENT

---

POTTER ANDERSON & CORROON LLP
Wendy K. Voss (#3142)
Jennifer Wasson (#4933)
Hercules Plaza - 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000

*Attorneys for Defendant Delaware Park, LLC*

Dated: December 20, 2007
838263v1 / 14672-132

# **TABLE OF CONTENTS**

Excerpts from the Deposition of Sami Almakhadhi
Taken November 8, 2007.................................................................................................C1

Excerpts from Defendant's Responses to Plaintiff's First Set of Interrogatories
Dated October 4, 2007..................................................................................................C23

Excerpts from Defendant's Responses to Plaintiff's First Requests For Admission
Dated October 4, 2007..................................................................................................C28

Plaintiff's Certificate of Bachelor's Degree and Transcript, Sana's University
Awarded October 1994
Bates Nos. DP0482, DP0480.........................................................................................C31

Employee Counseling Notice
Dated December 12, 2003
Bates No. DP0793.........................................................................................................C33

Follow-Up Report Prepared by Dr. Bohutiak
Dated June 1, 2005
Bates No. DP0701.........................................................................................................C34

Follow-Up Report Prepared by Dr. Bohutiak
Dated June 13, 2005
Bates No. DP0702.........................................................................................................C35

Plaintiff's Pay Stub
Period Ending February 4, 2006
Numbered DDOL FOIA 000057 ....................................................................................C36

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,                        )
                                        )
            Plaintiff,                  )
                                        )   Civil Action
v.                                      )   No. 07-78 (JJF)
                                        )
DELAWARE PARK, LLC,                     )
                                        )
            Defendant.                  )

            Deposition of SAMI ALMAKHADHI taken
pursuant to notice at the law offices of Potter,
Anderson & Corroon, LLP, Hercules Plaza, Sixth Floor,
1313 North Market Street, Wilmington, Delaware,
beginning at 9:30 a.m. on Thursday, November 8, 2007,
before Christina M. Vitale, Certified Shorthand
Reporter and Notary Public.

APPEARANCES:


        FRANK J. CONLEY, ESQUIRE
        THE CONLEY FIRM
          7715 Crittendon Street, Suite 133
          Philadelphia, Pennsylvania   19118
          For the Plaintiff


        WENDY K. VOSS, ESQUIRE
        JENNIFER C. WASSON, ESQUIRE
        POTTER ANDERSON & CORROON, LLP
          Hercules Plaza, 6th Floor
          1313 N. Market Street
          Wilmington, Delaware  19899
          For the Defendant


                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com                    C1



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Sami Almakhadhi

23

1    Q.    Is that one of those trucks that goes through

2    neighborhoods?

3    A.    Yes.

4    Q.    In that job did you supervise anyone?

5    A.    Just for myself.

6    Q.    Okay, what else have you done?

7    A.    I had my own store.

8    Q.    When did you purchase that?

9    A.    2000.

10   Q.    How long did you work in your own store?

11   A.    From -- I purchased it in 2000.  I sold the

12   business in 2001.

13   Q.    Do you recall when you opened?

14   A.    I purchased it in -- I think I open it in 2000

15   -- beginning of 2001.

16   Q.    Did you have employees who worked for you?

17   A.    Just part-time.

18   Q.    How many part-time employees did you have?

19   A.    One.

20   Q.    In your complaint it also says you were a car

21   salesman?

22   A.    I was a car salesman.

23   Q.    How long did you do that?

24   A.    I think it was -- I'm not sure, but less than a

Sami Almakhadhi

31

1    that.

2       Q.    Were you disciplined?

3       A.    No.

4       Q.    Do I understand you correctly that your

5    managers thought you had provoked her?

6       A.    Well, I want for investigation, I took the case

7    to the investigator, to HR investigator.

8       Q.    Did they do that because you complained?

9       A.    Yes, I complained. I complained or they sent

10   us what happened.

11              MR. CONLEY:   There is not a question.  Wait

12   until she asks that question.

13   BY MS. VOSS:

14      Q.    On the review that you are talking about how do

15   you know that those comments related to Keisha?

16      A.    I didn't have any problem with anybody else.

17      Q.    So, based on you just assumed -- did anyone say

18   we wrote this because of what happened with Keisha?

19      A.    It's all about Keisha.

20      Q.    No, did anyone say that to you or explain why

21   they wrote that down?

22      A.    Did anybody?  I don't remember anybody, but at

23   the time I only have problem with Keisha.

24      Q.    But it's your opinion that it must have been

Sami Almakhadhi

32

1    Keisha not because someone told you, just because you

2    figured that out?

3       A.    It's not I figure.  If you read the evaluation,

4    you know, it's about Keisha.

5       Q.    Well, we can look at the evaluation in a little

6    bit.

7       A.    Yeah, you can look at it.

8       Q.    But I don't believe it mentioned her

9    personally, so I want to know if someone told you

10   specifically that's what their concern was.

11                MR. CONLEY:  It's a yes or no answer.

12      A.    I'm not sure.  I don't remember.

13      Q.    In 2004 you were promoted to satellite cashier?

14      A.    That's right.

15      Q.    Before I talk about the satellite cashier I do

16   have a question.  On your tax return your occupation

17   is listed as gate operator, what is a gate operator?

18      A.    Cage operator or booth cashier, same thing.

19   Call us cage operator, booth cashier, cage cashier.

20      Q.    What department did you work in?

21      A.    The cage department.

22      Q.    Is that G-A-G-E, gage department?

23      A.    Cage, yes, C-A-G-E.

24      Q.    Oh, cage department.  Again, I just want to

Sami Almakhadhi

61

1    Q.    Yes.

2    A.    No.

3    Q.    Why not?

4    A.    I was under FMLA.

5    Q.    So, you didn't think it was necessary?

6    A.    I was home, I was under FMLA.  It's only for

7    four weeks.

8    Q.    So, from 5/17/05 were you out of work

9    continually until the end of your FMLA period?

10   A.    5/17, yes, I was out.

11            MS. VOSS:  Please mark this.

12            (Almakhadhi Deposition Exhibit No. 5 was

13   marked for identification.)

14   BY MS. VOSS:

15   Q.    Exhibit 5 is, again, a one-page document, this

16   time from Dr. George -- I'm not sure how to pronounce

17   his last name.  Is it Bohatiuk, is that correct?

18   A.    Okay.

19   Q.    Did you see him on June 1, 2005?

20   A.    June 1, 2005, okay.

21   Q.    Again, he is discussing your back injury in

22   this document, is that correct?

23   A.    Yes.

24   Q.    And at the end of of the letter do you see

Sami Almakhadhi

62

1  where it says "Discussion"?  It says, "He remains

2  disabled from work."

3    A.    Okay.

4    Q.    Correct?

5          MS. VOSS:  Would you mark this.

6          (Almakhadhi Deposition Exhibit No. 6 was

7  marked for identification.)

8  BY MS. VOSS:

9    Q.    Exhibit 6 is also a one-page document from Dr.

10  Bohatiuk, this one is dated June 13, 2005?

11    A.    Um-hum.

12    Q.    Why did you see Dr. Bohatiuk on June 13, 2005?

13    A.    Because I finished my FMLA and I needed to go

14  back to work.

15    Q.    And what did you need from Dr. Bohatiuk?

16    A.    I went to Delaware Park because I took FMLA and

17  by law you have to give a full release, you know.  It

18  wasn't worker's comp.  It was only they want a release

19  from my doctor to get back to work.  They will not

20  allow me to go back to work unless if I bring the

21  documents for full release.

22          MS. VOSS:  I probably should have marked

23  these together, I apologize.

24          (Almakhadhi Deposition Exhibit No. 7 was

Sami Almakhadhi

63

1 | marked for identification.)

2 | BY MS. VOSS:

3 |    Q.   Did Dr. Bohatiuk give you a full release?

4 |    A.   Yes.

5 |    Q.   On Exhibit 6 under "Discussion" it says, "He

6 | will return to work full-time full duty tomorrow and

7 | see how he can handle it.  He will keep me informed of

8 | his progress."

9 |    A.   Yes.

10 |    Q.   What had changed between June 1 when you saw

11 | Dr. Bohatiuk and you were disabled and June 13 when

12 | you were able to return to full duty?

13 |    A.   This one, when I went to this doctor, 5/17,

14 | this one, June 1st --

15 |    Q.   For the court reporter I want to be clear.

16 | When you said I went to this doctor 5/17 you are

17 | referring to what is the exhibit number on that one?

18 |    A.   For four weeks.  Exhibit 6.

19 |           MS. WASSON:  I think that's 4.

20 | BY MS. VOSS:

21 |    Q.   When you went to the doctor on 5/17 and that's

22 | reflected in Exhibit 4, correct, we are agreed?

23 |    A.   That's Exhibit 4.

24 |    Q.   Now, go ahead.

C7

Sami Almakhadhi

64

1    A.    This one from 5/17, four weeks, like a month,

2    okay?  When I went to this doctor -- I went to this

3    doctor to see what is his opinion, I was going on my

4    cash and paying cash to seek -- it wasn't worker's

5    comp. -- to seek different opinion of this doctor.  I

6    went to this doctor and he gave me four weeks.  I went

7    back to see him and I told him I'm still in FMLA, I'm

8    out of work, that was June 1st, Exhibit 5.

9    Q.    Is Dr. Bohatiuk affiliated with Mid Atlantic

10    Spine?

11    A.    No, that's a different --

12    Q.    Different doctor?

13    A.    Different doctor.

14    Q.    Then, you also went to see Dr. Bohatiuk in

15    June?

16    A.    Yeah, I went to see.  That doctor I was

17    treating with, this one I went to see him I think one

18    or twice, take his opinion.

19    Q.    The doctor at Mid Atlantic Spine?

20    A.    Yeah, I think I saw him or his assistant

21    several times talking to me while drinking coffee or

22    something.

23    Q.    So, my question is between June 1 when you saw

24    Dr. Bohatiuk and he said you were disabled and June 13

Sami Almakhadhi

65

1  when he says you were returning to full-time full duty

2  what changed?

3     A.   This one he didn't disable from work.  I told

4  him I'm disabled, I'm still home.

5     Q.   That's because you told him?

6     A.   Yeah, I told him.

7  BY MS. VOSS:

8     Q.   Exhibit 7 is a note from Dr. Bohatiuk, dated --

9  it's a little hard to read, but -- I can read the

10 text.  The text says, "Released to full-time full duty

11 work on 6/14/05."

12    A.   That's right.

13    Q.   That was the day after your FMLA leave expired?

14    A.   That's right.

15    Q.   Why did Dr. Bohatiuk agree to release you

16 full-time full duty?

17    A.   You have back injury and sometimes you feel

18 good and you can carry and sometimes -- this doctor, I

19 was, you know, as I said, in two months I told him

20 full duty.

21    Q.   Did you tell Dr. Bohatiuk that you felt you

22 could do your job?

23    A.   Yes, I told him and he released me.

24    Q.   Had anything else changed in your medical

Sami Almakhadhi

72

1   Q.    Did these two incidents happen around the same

2   time?

3   A.    No, I'm saying -- what is this, number 14?

4   Q.    Number 13.

5   A.    This one it happened -- it's not like in the

6   same time, but during 2001 she was working there.

7   Q.    During 2001?

8   A.    Yes, she called me --

9   Q.    What did you understand that comment to mean?

10  Wait a minute, you didn't start working until 2002 so

11  I don't think it happened in 2001.

12  A.    I didn't say 2001, I said 2004.

13  Q.    I didn't hear that, but Janet made her comment

14  in 2004?

15  A.    Yeah, 2004, 2003, I'm not sure when she was

16  working there.

17  Q.    Did she still work there?

18  A.    No, she left.

19  Q.    And her job was cashier supervisor?

20  A.    She was cashier supervisor.

21  Q.    Do you know if she left voluntarily?

22  A.    I have no idea.  I don't know.

23  Q.    What did you understand her comment to mean?

24  A.    She was calling me a terrorist of Delaware Park

Sami Almakhadhi

73

1  or Delaware Park terrorist.

2  Q.   Who did she say that to?

3  A.   To me.

4  Q.   And what was happening when she said that?

5  A.   She was, "Hey, Delaware Park terrorist."

6  Q.   Did you report that?

7  A.   To who?

8  Q.   To anyone, to your supervisors?

9  A.   I didn't report it to anyone.

10  Q.   Did you report that to HR?

11  A.   No.

12  Q.   Why not?

13  A.   Well, I don't want to talk anything like about

14  terrorists.  This one should not be talking, but she

15  said it and, as I told you, I'm a family with kids and

16  I came here to find good living.  I did not come here

17  to argument and, you know.

18  Q.   Well, you complained about Keisha?

19  A.   Keisha, they told me I have to go to the HR.

20  They told me to go to the HR.

21  Q.   Who told you to go to HR?

22  A.   Stacey, she send me.  She called me in the

23  booth, she told me, "Go see a guy named Mark," I

24  believe, Mark in HR.

Sami Almakhadhi

74

1    Q.    Do you know why she wanted you to go to HR?

2    A.    Even I told her, I forgive her, it's okay.  She

3    said, "No, you have to go."

4    Q.    So, that was the investigation you were talking

5    about earlier?

6    A.    Yeah, there is another one, Frank Penta --

7    Q.    Right now Mark did the investigation?

8    A.    I believe his name is Mark, I believe, but

9    Stacey she called me to the booth while I'm working

10   and she told me to go to the HR.

11   Q.    So, you didn't complain about Keisha?

12   A.    I did not go to the office, but when she came,

13   the supervisor, I told her, you know, that -- do you

14   not understand what happened with this Keisha and

15   stuff?

16   Q.    Not completely, no.

17   A.    I went to complain to Janet.  I get out of the

18   booth after she called me.  I went -- not out.  Before

19   after she told me my bank close and I closed my bank

20   because -- and I went to Janet, supervisor, Jane or

21   Janet, you know, you know her.

22   Q.    It's the same Janet you are talking about here?

23   A.    Janet she yelled at me with no respect, she

24   told me go back to the booth.  I went to complain to

Sami Almakhadhi

75

1    her, but she sent me without respect, go back to the

2    booth.  So, I went back to the booth.  I complain to

3    Janet, you understand, and told her what happened

4    because later she came into the booth and she said,

5    "What happened?"  When I went to her she told me go

6    back to the booth and open your window, don't close

7    your window.  I went back and she came back and I

8    talked to her about what happened.

9    Q.    And then later on you were asked to go to HR

10   for the investigation?

11   A.    Yeah, I think -- I don't know the same day or

12   second day Stacey called me.  She said go to I believe

13   it's Mark, I don't remember exactly his name.  She

14   told me go to HR, he is waiting for you, and I went to

15   him and we report it and I did not get any --

16   Q.    No discipline for you?

17   A.    No.

18   Q.    And then sometime later Janet made this comment

19   about the terrorist?

20   A.    Not later.

21   Q.    When was that?

22   A.    As I told you, I don't remember exactly the

23   year.  While she was working there.  It's not like one

24   time she called me, you know -- I did not even make

Sami Almakhadhi

76

1    the tape because I didn't know we were going to be

2    here.  She told me while she was working there more

3    than once, "Hey, terrorist, what are you doing?"  You

4    know.  I tried to --

5      Q.  Were you offended by that comment?

6      A.  Well, I kidded.  As I told you, I'm trying to

7    make living in Delaware Park so I'm not trying to

8    start fight or make argument, talk about terrorism.  I

9    mean, you feel it, of course, somebody is telling you,

10   but what are you going to do?

11     Q.  How many times do you think she made comments

12   like that?

13     A.  She told me more than once.  Maybe two, three

14   times when she seen me.

15     Q.  Did anybody else make any comments to you about

16   your race or your national orgin?

17     A.  Karlyn Dixon.

18     Q.  What did she do?

19     A.  Karlyn she told me I should not be applying for

20   supervisor because Americans don't like to be

21   supervised by Arabs one time and one time she told me

22   all Americans hate Arabs after 9/11.

23     Q.  Do you recall when that was?

24     A.  No.  I remember it was in the break room.

Sami Almakhadhi

196

1   September 2nd --

2     A.    I came back because I need --

3            MR. CONLEY:  Wait until she finishes her

4   question.

5   BY MS. VOSS:

6     Q.    -- you brought that back to risk management to

7   Sherry Cartwright?

8     A.    Yes.

9     Q.    In your conversation with Sherry Cartwright did

10  you suggest that you should just keep working your

11  full job?

12    A.    I didn't suggest anything.  I told her, "What

13  happened?"  She told me, "It's a different time now."

14  I told her, "You denied my injury."  She said, "It's

15  okay, it's a different time."  That's what she told

16  me, you know, because I talked to them many times, but

17  my injury nobody listen.  Only she told me it's a

18  different time.  And she was willing to give me light

19  duty.

20    Q.    When did you first speak with Shannon DeLucia?

21    A.    After I received the letter, the termination

22  letter, that was in April.

23    Q.    You never talked with Shannon DeLucia before

24  you received that letter?

**W&F**

Sami Almakhadhi

197

1    A.    Never.

2    Q.    Was there an incident in February 2006 where

3    you went to fill a prescription for your son and they

4    wouldn't cover it with the insurance?

5    A.    In February '06?

6    Q.    Um-hum.

7    A.    It was not in February '06, it was in March,

8    March 29th, I remember that date.  March 29th, '06.  I

9    have a slip.  I can give you the slip.

10    Q.    No, I think you produced it in your document

11    production.

12    A.    Yeah, it was in March 29th.

13    Q.    I think it was February 29th.  Couldn't have

14    been February 29th, that's Leap Year.

15    A.    No, I have that document, I have all that, I

16    can produce it to you.  I have the original documents

17    from Happy Harry's in Suburban Plaza.

18    Q.    Was that the first time you contacted anyone at

19    Delaware Park about your employment status after you

20    talked with Alfred Sheats?

21    A.    Here is exactly what happened, you know.  I

22    went --

23          MR. CONLEY:  No, but she -- and you are

24    referring to the February conversation about the

Sami Almakhadhi

203

1   Q.   Then, what happened next?  Had you talked with

2   Shannon by that time?

3   A.   No.

4   Q.   When did you talk to Shannon?

5   A.   I talked to Shannon after I received this

6   letter.

7   Q.   Which you received it on the 4th, did you call

8   her the same day?

9   A.   Fourth or 5th.  As I told you, I have the

10  envelope.  Fourth, 5th, I don't recall exactly, but

11  it's after April 3rd.  So, I was suprised.  I have

12  this letter that tells me that I was terminated March

13  10th.  I knew they were playing a game.

14  Q.   When you talked with Shannon, what was that

15  conversation about?

16  A.   I talked to Shannon and the first thing I ask

17  her why is she -- I called Dave.

18  Q.   Dave?

19  A.   Dave in risk management.

20  Q.   Was that Dave Foraker do you know?

21  A.   I believe so.  He is the only one David in the

22  risk management.  And he knows me before.  I was

23  asking him about this letter and why she sent it

24  August.  I told him August is my day off, August 30th,

Sami Almakhadhi

204

1  31st both is my day off and should be in September and

2  I told him why did they not send me a letter.  I

3  should have received a letter.  He is telling me that

4  I didn't have your file in front of me, I have to talk

5  to Shannon every time I ask him, but I believe that, I

6  told him, okay, if --

7  Q.    When you asked him about not receiving a

8  letter, you meant why didn't I receive a letter before

9  I received this one we have marked as Exhibit 16?

10  A.    Yeah, I told him when was I terminated, March

11  10th or in February 12th.  He told me I believe it was

12  in March 10th, but he changed, he said February 12th.

13  He said I didn't know what date exactly.  You have to

14  talk to Shannon, but I believe it's February 12th.  I

15  told him why didn't I receive the letter?  He said

16  because they have wrong date, wrong address for me.

17           I told him, well, wait -- I told him that

18  I -- something has wrong address -- I received from

19  risk management my paychecks, which means like my

20  vacation, the checks from them, you know, it has on

21  the top risk management.  I received my W2's to my

22  right address.  He told me that the computer is

23  different than the payroll thing and he told me -- I

24  think you can pull a copy and then you should go to HR

Sami Almakhadhi

205

1   and pull a copy.  They can do it for it.  Copy from

2   the termination.  He told me a letter was sent.

3       Q.   Did he transfer you to speak with Shannon?

4       A.   No.  He asked me to call her in the HR office.

5   He gave me her extension number.  He was trying to

6   reach out and call me.  I did speak at that moment and

7   he find out what happened and he give me her extension

8   number.  He said she is at the HR office, you can call

9   her now.

10      Q.   And you called her?

11      A.   I called her right after him.

12      Q.   What did you talk about with Shannon?

13      A.   I told her, "Do you have a minute?  Can you

14  talk?"  She said, "Yes, what can I do for you?"  I

15  said, "I need to discuss about the letter you sent it

16  to me."  She was saying, "Did you talk to your

17  worker's comp. attorney?"  I said, "Yes, but you are

18  risk management and I'm talking to you to get some

19  information.  Why you did not send me a letter in time

20  that I was terminated and stuff?"

21              She was telling me that the girl she was

22  working there we didn't know what she did and didn't

23  do she was telling me.

24      Q.   Do you know who she meant by "the girl"?

Sami Almakhadhi

206

1    A.    No, I don't know, but I think you told me it

2    was Micki, you told me.

3    Q.    What else did you and Shannon talk about?

4    A.    She was -- I told her about the termination,

5    you know, the letter was in March 10th or in February

6    12th.  She said it was in February 12th.  And that's

7    as a courtesy for me, she told me as a courtesy for

8    me.  That's why when you wrote in the discovery it was

9    a courtesy for me, it was not my words, it was her

10   words.

11   Q.    I want to try to re-state what you just said so

12   I get it correct.  If I get it wrong, tell me it's

13   wrong.  You asked Shannon because you now have a

14   statement from Rose Benson that says you were

15   terminated on February 12th and you have a letter from

16   Shannon DeLucia that says you were terminated on March

17   10th and you asked her which is it or something like

18   that?

19   A.    Exactly, I was asking her -- I did not mention

20   that I have from Rose.

21   Q.    Okay, you didn't mention that.

22   A.    I was talking about this one.

23   Q.    Did you say anything to her about February

24   12th?



Sami Almakhadhi

207

1    A.    Yeah, I told her did I get terminated February

2    12th.  She doesn't know, maybe I get this document or

3    not, she has no idea.

4    Q.    You asked her if you were terminated on

5    February 12th?

6    A.    Yes, same question I asked Dave.

7    Q.    What did she say?

8    A.    I think, I'm not sure, you know, she was in

9    conversation with Dave when I was talking to Dave.  I

10   think she was listening, I'm not sure.  Like she knows

11   what I talked to Dave she sounds.  She was -- because

12   Dave told me February 12th.  You can ask Dave what

13   happened.

14   Q.    Did she agree you were terminated on February

15   12?

16   A.    She was telling me that I was terminated on

17   February 12 and as a courtesy for me she extended the

18   benefits.

19   Q.    So, those were her words, "as a courtesy"?

20   A.    That was her words.

21   Q.    Did she explain why she thought that was a

22   courtesy?

23   A.    As I said, because the girl she left and we

24   didn't know, she said, we didn't know what she did or

Sami Almakhadhi

208

1    didn't do.  She was telling me I don't have your file

2    in front of me she was telling me.

3      Q.    Was there anything else that you and Shannon

4    talked about?

5      A.    We talked about discrimination.

6      Q.    How did that come up?

7      A.    She was telling me that we give you all light

8    duty available.  We all work, you have exhausted all

9    your light duty, you know, you --

10      Q.    Excuse me, did you mean light duty?

11      A.    Light duty, yes.

12      Q.    You exhausted your light duty?

13      A.    She told me, yes.  She have no idea what

14    happened.

15      Q.    So, she said you exhausted your light duty?

16      A.    Yes, she told me we give you all light duty.

17    We can not extend it more than 90 days.

18      Q.    What else did she tell you?

19      A.    I told her that's discrimination treating me,

20    you know, you should have sent me at least a letter.

21    I'm a human being and, you know, something like that I

22    told her she should at least give me a warning my

23    termination was happening.

24      Q.    If you had a warning, could you have changed

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,           )
                                   )
         Plaintiff,        )    Civ. A. No. 07-78-JJF
                                   )
        v.                )
                                   )
DELAWARE PARK,           )
                                   )
         Defendant,    )

## DEFENDANT DELAWARE PARK LLC'S RESPONSES
## AND OBJECTIONS TO PLAINTIFF SAMI ALMAKHADHI'S
## FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Delaware Park, L.L.C. ("Delaware Park" or "Defendant"), by and through its undersigned counsel, hereby submits its responses and objections to Plaintiff Sami Almakhadhi's First Set of Interrogatories.

## GENERAL LIMITATIONS AND OBJECTIONS

1.    Delaware Park's specific objections set forth below are in addition to the general limitations and objections set forth in this section. These limitations and objections form a part of the response to each and every interrogatory. Thus, the absence of a reference to a general limitation or objection should not be construed as a waiver of the general limitation or objection as to a specific interrogatory.

2.    Delaware Park submits these responses and objections without conceding the relevancy or materiality of the subject matter of any interrogatory and without prejudice to Delaware Park. Delaware Park expressly reserves the right to object to further discovery into the

C23

9.    Delaware Park objects to the requests to the extent that they are vague, ambiguous, overly broad, and do not identify the subject of inquiry with any reasonable particularity.

10.    Delaware Park objects to the use of "every," "all," "each," "ever," "any," or other similar words of expansion as overly broad, unduly burdensome, and harassing, particularly because, in some cases, the information sought covers an undefined period of time and/or location.

## INTERROGATORIES

1.  Explain the true story about my termination and identify the following:

    a.    Exact date, reason and the name who made the decision.
    b.    Whether or not was a letter sent to me.
    c.    Whether or not this information had been discussed during the investigation by the department of labor.

**RESPONSE:**

a.    Plaintiff's employment with Delaware Park was terminated effective February 12, 2006 because he had not been able to fully perform the essential duties of his position for a period in excess of five months. In addition, Plaintiff had informed Delaware Park that he continued to be unable to perform such duties, and had provided no information that might establish when, if ever, he would be able to do so. The decision to terminate Plaintiff's employment was made by Shannon DeLucia, Director of Risk Management. As a courtesy to Plaintiff and to extend his health insurance coverage through the end of March 2006, Ms. DeLucia later modified Plaintiff's date of termination to March 10, 2006, the date on which Plaintiff reasonably was on notice of his termination.

b.    Ms. DeLucia sent a letter to Plaintiff, dated March 30, 2006, advising him that his employment was terminated effective March 10, 2006.

c.    Delaware Park advised the Delaware Department of Labor that Plaintiff's employment was terminated effective March 10, 2006, identified Ms. DeLucia as the decision-maker, discussed the reasons for Plaintiff's termination, and stated that the decision was made in February 2006.

C24

POTTER ANDERSON & CORROON LLP

By: _____

Wendy K. Voss (#3142)
Jennifer C. Wasson (#4933)
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
wvoss@potteranderson.com - Email
jwasson@potteranderson.com - Email

*Attorneys for Defendant Delaware Park, L.L.C.*

Dated: October 4, 2007
816708v2 / 14672-132

**C25**

11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMI ALMAKHADHI, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. A. No. 07-78-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE PARK, | ) | |
| | ) | |
| Defendant, | ) | |

### VERIFICATION

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) SS. |
| COUNTY OF NEW CASTLE | ) |

I, Nancy Myshko, being duly sworn, depose and state that I am Senior Vice President of Delaware Park Management Company LLC (successor in interest to Delaware Park, LLC), and that I previously served as Vice President and Senior Vice President of Delaware Park LLC. I verify Defendant Delaware Park LLC's Response and Objections to Plaintiff Sami Almakhadhi's First Set of Interrogatories for and on behalf of Delaware Park LLC. I further state that I am duly authorized to do so; that some or all of the facts and matters set forth therein are not within my personal knowledge; that the facts and matters set forth therein have been assembled by authorized employees and counsel of Delaware Park LLC and/or Delaware Park Management Company LLC, and that I am informed that the facts and matters set forth therein are true.

Nancy Myshko

**C26**

SWORN TO AND SUBSCRIBED before a Notary Public for the County of

New Castle on this _3rd_ day of October, 2007.

Notary Public
My Commission Expires    11/25/09

KATHLEEN A. VANLUVANEE
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Nov. 25, 2009

822508v1

C27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SAMI ALMAKHADHI,                    )
                                    )
                   Plaintiff,       )        Civ. A. No. 07-78-JJF
                                    )
          v.                        )
                                    )
DELAWARE PARK,                      )
                                    )
                   Defendant,       )

## DEFENDANT DELAWARE PARK LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFF SAMI ALMAKHADHI'S FIRST REQUESTS FOR ADMISSION

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant Delaware Park, L.L.C. ("Delaware Park" or "Defendant"), by and through its undersigned counsel, hereby submits its responses and objections to Plaintiff Sami Almakhadhi's First Requests for Admission, as follows:

### GENERAL OBJECTIONS

Delaware Park submits these responses and objections without conceding the relevancy or materiality of the subject matter of any request and without prejudice to Delaware Park. Delaware Park expressly reserves the right to object to further discovery into the subject matters of the requests or to object to the introduction into evidence of any information provided.

### REQUESTS FOR ADMISSION

1.    Admit that I was terminated on February 12, 2006.

**RESPONSE:**

Admitted that plaintiff's employment with Delaware Park was terminated effective February 12, 2006; denied that all administrative steps in the termination process were completed by February 12, 2006. With the apparent exception of a letter to Plaintiff advising him in writing

**C28**

13.    Admit that I was told by my management that I should have some success as a Satellite Cashier before I apply for Main Bank job and in the same time the Candidate who was chosen none of them was a Satellite Cashier.

**RESPONSE:**

Delaware Park objects to this request on the grounds that it fails to identify the time period to which is directed. Subject to and without waiving the foregoing objection, Delaware Park agrees to respond to this request in regard to the time period January/February 2005 when a Main Bank Cashier position was posted at Delaware Park for which Plaintiff applied, and states as follows: Denied that Plaintiff was told prior to applying for a Main Bank Cashier position in January 2005 that he needed to have some success as a Satellite Cashier before making such application. Admitted that Plaintiff was told by one of his supervisors in February 2005, i.e., after another candidate was selected for the Main Bank Cashier Position, that the Cage Department wanted Plaintiff to have some success as a Satellite Cashier before he moved to a higher-level position. Admitted that the candidates who were selected for the Main Bank Cashier position(s) in February 2005 did not have experience as Satellite Cashiers. By way of clarification, Plaintiff was advised of the reasons that he was not selected for the position. See document Bates number DP0027. Subsequently, Plaintiff was informed of the various factors that were considered in selecting the successful candidates. Plaintiff was further was advised that, although being a Satellite Cashier was not a prerequisite for a higher-level position, it would be a good strategic move for him if he wished to move up. See Bates number DP0034. In February 2005, Plaintiff's supervisor invited Plaintiff to apply for Satellite positions that were open at that time.

14.    Admit that you told the department of labor that I had grievance rights referring me as a union member and that's not true.

**RESPONSE:**

Admitted that Delaware Park told the Delaware Department of Labor that plaintiff had grievance rights. Denied that Delaware Park told the Delaware Department of Labor that plaintiff was a "union member" or made any statement that was not true. In response to a request for information from the Delaware Department of Labor, Delaware Park stated as follows: "Mr. Almakhadhi was a member of the bargaining unit represented by the UFCW. Pursuant to the UFCW's Collective Bargaining Agreement with Delaware Park, Mr. Almakhadhi had grievance rights, which he did not exercise." Delaware Park did not state that plaintiff was a "union member," which Delaware Park understands to require a voluntary election on the part of the employee concerned and agreement to pay dues to the union. The bargaining unit concerned includes video lottery operations and/or slot machine employees in defined positions. Plaintiff's position with Delaware Park, Booth Cashier, is explicitly identified in the pertinent collective bargaining agreement (at Section 1.2) as a bargaining unit position. Pursuant to that same agreement (as provided in Article 24) all employees in the collective bargaining unit have grievance rights.

C29

agreement with UFCW Local 27, Delaware Park is required to consider light duty assignments "within the employee's own department." Bathroom duties are a function of the housekeeping department, and therefore such duty is not assigned to Cage Department employees, whether in the form of light duty or otherwise.

27.    Admit that at least Two Booth Cashiers were given light duty in the Delaware Park Bathrooms.

**RESPONSE:**

Delaware Park objects to this request as irrelevant, vague, and ambiguous, overly broad and unduly burdensome. The request is without time limitation, and fails to identify any Booth Cashiers with sufficient particularity to allow Delaware Park to respond. By way of further response, Delaware Park refers Plaintiff to its response to Request number 26.

POTTER ANDERSON & CORROON LLP

By: _____
Wendy K. Voss (#3142)
Jennifer C. Wasson (#4933)
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
wvoss@potteranderson.com - Email
jwasson@potteranderson.com - Email

*Attorneys for Defendant Delaware Park, L.L.C.*

Dated:  October 4, 2007
816700v1 / 14672-132

**C30**

11

23/12/96
245

**REPUBLIC OF YEMEN**

**SANA,A UNIVERSITY**

**COMMERC FACULTY OF &**

**ECONOMIC**

الجمهورية اليمنية

جامعة صنعاء

كلية التجارة والاقتصاد



# CERTIFICATE

The   Faculty  of  Commerce  and  Economics  certifies  that
Mr.sami  Mohammed  Abdullah  Yahya  Al-Makhathi of
Yemeni  Nationality,  has been awarded  a Bachelor Degree
in  Commerce  With a    major    in  Political Science in the
month of  October 1994  with a final grade of // Good.//

This  certificate  has  been  issued  upon  his  request to be
presented to whom it may concern

STUDENTS   REGISTRAR   CONTROLLER   DEAN
AFFAIRS



**ATTESTED BY**
**VICE-RECTOR**

C31

DP0482

REPUBLIC OF YEMEN

SANA,A UNIVERSIT ı

COMMERC FACULTY O &

ECONOMIC

الجمهورية اليمنية

جامعة صنعاء

كلية التجارة والاقتصاد

DP0480

# TRANSCRIPT CERTIFICATE

The Faculty of Commerce and Economics certifies that Mr.sami Mohammed Abdullah Yahya Al-Makhathi of Yemeni nationality, was enrolled in the Faculty of Commerce and Economics during the academic years 90/1991 – 93/1994 and was awarded a Bachelor degree in Commerce with a major in Political Science in the month of October 1994 with a final grade of //Good.// This transcript been given upon his request to be presented to wnom it may concern .



| Academic Year 1990/1991 | | | Academic Year 1991/1992 | | |
|---|---|---|---|---|---|
| No. | Courses | Grades | No. | Courses | Grades |
| 1 | Principles of Accounting (I)        *(1993) | Pass | 1 | English Language (I) | Good |
| 2 | Principles of Micro Economics      *(1994) | Pass | 2 | Introduction to Computer Science | Good |
| 3 | Arabic Languge (I)                 *(1992) | Pass | 3 | Islamic Political Thought | Pass |
| 4 | Principles of Pure Mathematics (I) | Pass | 4 | Money and Banking | Pass |
| 5 | Principles of Political Sciences | Good | 5 | International Organization | Good |
| 6 | Principles of Business Administration | Pass | 6 | English Language (II) | Good |
| 7 | Principles of Accounting (II) | Pass | 7 | Islamic Culture | V.Good |
| 8 | Principles of Macro Economics      *(1994) | Pass | 8 | Principles of statistic (I) | Pass |
| 9 | Arabic Language (II)               *(1992) | Pass | 9 | Public Administration | Good |
| 10 | Principles of Law                 *(1992) | Pass | 10 | Development of Western Political Thought *(1993) | Pass |
| 11 | Principles of Behavioral Sciences | Pass | 11 | ////////////////////////////////////////// | ////// |
| 12 | Yemen Government System | Good | 12 | ////////////////////////////////////////// | ////// |
| | Final Grade | Pass | | Final Grade | Pass |
| Academic Year 1992/1993 | | | Academic Year 1993/1994 | | |
| No. | Courses | Grades | No. | Courses | Grades |
| 1 | Introduction to Mass Media & Public Opinion | Pass | 1 | Political Theory | V.Good |
| 2 | Diplomacy | Good | 2 | Development of Political Systems | V.Good |
| 3 | Yemen's Foreign Policy | Pass | 3 | International Issues & Problems | Pass |
| 4 | Introduction to International Relations | V.Good | 4 | Arabic European Relation | Pass |
| 5 | International to Political Systems | V.Good | 5 | Governments & Politics in the Arab World | Good |
| 6 | International Law | Good | 6 | Foreign Policy of the Major Powers | Excellent |
| 7 | International Trade               *(1994) | Pass | 7 | Issues of Mass Communication in the Developing Societies | V.Good |
| 8 | Methods of Political Analysis | Good | 8 | Issues & Problems in the Arab World | Good |
| 9 | Political System in Europe & America | Good | 9 | Regional Organization | Excellent |
| 10 | International Relations after 45 | Pass | 10 | Palestinian Issue                *OC(1994) | Pass |
| 11 | Public Finance | Pass | 11 | Organization & Administrative Reform | Pass |
| 12 | Arab National Security | Pass | 12 | ////////////////////////////////////////// | ////// |
| | Final Grade | Pass | | Final Grade | Good |

*Rebeted Courses

STUDENT AFFAIRS

REGISTRAR

CONTROLLER

DEAN

ATTESTED BY : VICE-REGISTRAR

C32



BADGE # C - 1 4 9 0 3
DEPT # 112
JOB CODE 1131

DEC 1 5 2003 **EMPLOYEE COUNSELING NOTICE**

Employee Hire Date 7-28-98                DATE 12-12-03

| LAST NAME | FIRST | M. INIT. | DEPARTMENT |
|---|---|---|---|
| May | Keisha | | Cage 112 |

This is an advisory notice. Future violations or failure to improve may result in disciplinary action up to and including discharge.

Type of infraction:    (X) Violation of Company Policies or Procedures
( ) Violation of Departmental Polices or Procedures
( ) Poor Job Performance
( ) Other (describe briefly)

**COMPLETE DETAILS OF THIS INFRACTION (including time and date):** On Monday, December 8, 2003 Keisha displayed inprofessional behavior and made inappropriate comments to a co-worker. This is a violation of Delaware Parks Standards of Conduct #16.

**ACTION TO BE TAKEN:** Final written warning

PREVIOUS WARNINGS:        YES (X)        NO ( )        If "YES" complete the following:

| VERBAL | WRITTEN | MO | DAY | YR | TYPE OF INFRACTION |
|---|---|---|---|---|---|
| (X) | ( ) | 1 | 13 | 03 | Pattern absenteeism |
| ( ) | ( ) | | | | |
| ( ) | ( ) | | | | |

**EMPLOYEE'S COMMENTS:**

**EMPLOYEE'S SIGNATURE ACKNOWLEDGES ONLY THAT THIS NOTICE HAS BEEN READ AND DISCUSSED. IT DOES NOT CONSTITUTE AGREEMENT WITH THE CONTENTS OF THIS NOTICE.**

Keisha May          14944
Employee's Signature/Date          Supervisor's Signature/Date

M Nardo 12-16-03          14311
Director, Human Resources/Date          Department Head/Date          12-12-03

ENTERED

White – H.R.        Yellow – Dept.        Pink – Employee        Copy to Employee (Y) N        DP#120

DP0793        **CONFIDENTIAL**

C33

# GEORGE M. BOHATIUK, M.D.

### PHYSICAL MEDICINE & REHABILITATION
### MUSCULOSKELETAL INJURIES
### EMG's & NERVE CONDUCTION STUDIES

*Board Certified Physical Medicine & Rehabilitation*
*Board Certified Internal Medicine*

June 1, 2005

## PHYSIATRIC FOLLOW-UP VISIT

### RE: Sami Almakhadhi

Sami continues complaining of a left lower back pain which persistently radiates down the left lower extremity with associated numbness and tingling.

**PHYSICAL EXAMINATION:** There is tenderness and guarding over the left lumbosacral paraspinal muscles. He can forward flex his lumbar spine 75 degrees and extend 10 degrees. Side-bending 10 bilatreally. Positive left-sided seated straight leg raising test. Positive Kemp's test on left. There is weakness in the left ankle and toe dorsiflexors/left ankle plantar flexors (4+/5). He ambulates with a slow antalgic gait favoring his right leg.

**IMPRESSION:**

1. L4-L5 disc protrusion/herniation secondary to 4/04 work injury.
2. L5-S1 disc bulge/protrusion secondary to 4/04 work injury.
3. Left-sided L5-S1 radiculopathies secondary to 4/04 work injury.

**DISCUSSION:** He was prescribed Lortab 10 tab for his pain. He remains disabled from work.

Sincerely,

George M. Bohatiuk, M.D.

C34

**DP0701**

# GEORGE M. BOHATIUK, M.D.

### PHYSICAL MEDICINE & REHABILITATION
### MUSCULOSKELETAL INJURIES
### EMG's & NERVE CONDUCTION STUDIES

*Board Certified Physical Medicine & Rehabilitation*
*Board Certified Internal Medicine*

---

June 13, 2005

## PHYSIATRIC FOLLOW-UP VISIT

### RE: Sami Almakhadhi

Sami's left-sided lower back pain still radiates into his left leg with paresthesias.

**PHYSICAL EXAMINATION:** Tenderness and guarding in the left lumbosacral paraspinal muscles. He can forward flex his lumbar spine 75 degrees and extend 15 degrees. Side-bending 10 bilaterally. Positive left-sided Kemp's and seated straight leg raising test. Weakness noted in the left ankle and toe dorsiflexors as well as the left ankle plantar flexors (4+/5). Diminished left Achilles reflex. Otherwise equal and symmetrical reflexes. He ambulates with an antalgic gait favoring his right leg.

**IMPRESSION:**

1. L4-L5 disc protrusion/herniation secondary to 4/04 work injury.
2. L5-S1 disc bulge/protrusion secondary to 4/04 work injury.
3. Left-sided L5-S1 radiculopathies secondary to 4/04 work injury.

**DISCUSSION:** He will return to work full-time full duty tomorrow and see how he can handle it. He will keep me informed of his progress.

Sincerely,

George M. Bohatiuk, M.D.

**C35**

**DP0702**

*500 CHRISTIANA MEDICAL CENTER   NEWARK, DE 19702   Phone: 302.455.1007   Fax: 302.455.1008*



| EMPLOYEE NAME: | ID: | PERIOD END: | 12/04/20 |
| SAMI M. ALMAKHADHI | 10-6300 | CK # | 406921 |

| HOURS AND EARNINGS | | | | YTD EARN: | 626.97 | | | TAXES AND DEDUCTIONS | | | |
| Benefits: | 10-6300 | ID: | 102178 | CK DATE | 12/09/2006 | | | | | | |
| DESCRIPTION | HOURS | CURRENT | HOURS | YEAR TO DATE | DESCRIPTION | | THIS PERIOD | YEAR TO DATE |
| SICK | | 216.57 | 40.00 | 410.40 | SOCIAL SECURITY | 02 | 13.43 | 13.43 |
| GIFT | | | | 216.57 | MEDICARE | 02 | 3.14 | 3.14 |
| | | | | | MEDICAL | | | 410.40 |

| | FED. EX.: | M |
| | STATE EX.: | M |

| LEAVE ACCRUAL: | |
| Current Vacation Accrual | 30.24 |
| Vacation Bal | 30.24 |
| Sick Bal | 0.00 |
| Personal Bal | 24.00 |
| Incentive B | 0.00 |

| TOTALS: | | 16.57 | 426.97 |
| DEPOSITED | ACCT.# | TRANSIT# | AMOUNT |
| GROSS PAY: | 216.57 | NET PAY: | 200.00 |

C36

DDOL FOIA
000057

## CERTIFICATE OF SERVICE

I hereby certify this 20th day of December, 2007, that true and correct copies of

the foregoing **APPENDIX TO REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT**

**DELAWARE PARK, L.L.C.'S MOTION FOR SUMMARY JUDGMENT** was

electronically filed with U.S. District Court District of Delaware via CM/ECF (Official Court

Electronic Document Filing System) which will send notification of such filing that the

document is available for viewing and downloading via CM/ECF to the following counsel of

record:

> Glenn A. Brown, Esquire
> Real World Law, PC
> 916 North Union Street, Suite #2
> Wilmington, DE 19805

I further certify this 20th day of December, 2007, that one (1) true and correct

copy of the above-mentioned document was sent First Class U.S. Mail, postage prepaid, to the

following:

> Frank Conley, Esquire
> The Conley Firm
> 7715 Crittendon Street, Suite 133
> Philadelphia, PA 19118

> Wendy K. Voss (#3142)
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza, Sixth Floor
> 1313 North Market Street
> P.O. Box 951
> Wilmington, DE 19899
> (302) 984-6000 - Telephone
> (302) 658-1192 - Facsimile
> wvoss@potteranderson.com